Kimberly Clisbee
3531 Springridge Way
Palmdale, CA, 93551
Phone: 661-471-0015

FEE PAID

FILED
CLERK, U.S. DISTRICT COURT

OCT - 8 2024

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
For the
Central District of California

s/I

2:24-cv-08733 - WLH (JPRx)

Kimberly Clisbee and Christopher Co

vs

State of California and Los Angeles County

)
)
)
)
)
)
)
)
)
)
)
)

**Cause of action: 13th and 14th
Amendment violations, Negligence,
Conspiracy against Rights, the color of
the law crimes, and personal injury
Under the California Government
Claims Act**

**Jury Demand**

Case filed on: 10/2/2024

## Introduction

On October 1, 2024, the State of California sent a letter forfeiting its immunity and
granting us the ability to pursue actions against the state in Federal Court. This document is in
EXHIBIT A for confirmation. The county also forfeited its rights to immunity by failing to
respond to our claim in a timely manner and committing fraud during the claims process, which
is explained with supporting documents in EXHIBIT B. Granting us the ability to pursue this
action without immunity in accordance with Government Code section 912.4.C. Because of the
retaliation we are suffering, we request that the state and county settle immediately before the
damage gets worse and life is lost.

Rob Bonta and Gavin Newsom are deliberately obstructing justice for their political
party, and it has caused my family to lose our 13th and 14th Amendment rights for over a decade.
We cannot survive without the protection of the government or our fundamental rights any
longer. Chris and Leilani were injured by a byproduct of the Affordable Care Act, and that is all
they care about.

When we elect an official, yes, they have a party they represent. Still, their first job is to
act as protectors of the law and Constitution, and to act like a human being and protect the
people of California using the law and ethics and not ignoring a little girl who has been
medically and sexually battered since infancy for scientific study, trafficked from doctor to
doctor so they can all take a piece, and removed of all rights so you can protect a group of
criminals because they are in your party.

Two people instrumental in establishing the California Medical waiver and CCS
Redesign model's approval to use the SSA Section 1115 waiver are Kamila Harris and Xavier

Beccera. It is why they were chosen to go to Washington. Now the policy that started in
California is being used in seventeen other states. People wonder why California offers so many
entitlements to the illegal immigrant population, like healthcare and housing. It's not out of love;
it's like the witch in Hansel and Gretel laying out treats to fool the masses.

I want to believe Gavin Newsom and Rob Bonta are not participants in this Californian
Genocide, but it is hard not to because they are permitting this to happen. What's more,
protecting the people who did it by refusing to investigate or do their due diligence when they
know we are suffering color of the law crimes making them both guilty of committing color of
the law crimes against us.

Gavin Newsom has made it impossible for the disabled community to escape this abuse
with organizations like the Office of Civil Rights and the Office of Fair Hearings. They are both
geared towards the disabled community specifically, and I can tell you from experience that
they only obstruct justice and further the injuries. They are primarily USC attorneys, which is
half the problem same as all the state courts. UCS is the greatest criminal element in California,
and its Nazi tree has long, plentiful branches that reach out to every corner of the system,
including the Governor's office and the Attorney General. Otherwise, they would have helped us
by now.

Kathryn Barger, who is our county supervisor, is as guilty as the doctors and rest; she
allows her district to be used as Guinea pigs for California's human experiments and has attacked
my child on behalf of Dr. Bloch, her cohort whose attorneys participated in fraud that occurred
during the county claim investigation. As you can see, this is an impossible and dangerous
situation for us, and we require immediate relief.

3

### Cause for Action

The State and County are both negligent for allowing Dr. Edward Bloch and Kathryn Barger to stalk, harass, conspire against our rights, withhold our 13th and 14th amendment rights, and retaliate against us on behalf of themselves and USC (proof in the exhibits) because we took them to court for the crimes, they committed against us and are pursuing justice.

Both the State and County were in civil trials from 2022-2023 and knew the allegation was correct because the offenders admitted to it. But they still refused to intervene because of prejudice and conflict of interest by HHS Secretary Mark Ghaly, Gavin Newsom, Los Angeles County board of Supervisors, and Rob Bonta, and we are suffering retaliation and color-of-the-law crimes that could have been prevented if they had done their due diligence.

To eliminate any language that is inappropriate to this matter, the Medical Board of California confirmed what we already knew and will testify to it in **court. There was no malpractice** because, after a thorough evaluation, it was determined that treatment was never needed in either case. Being an immigrant and a kidnapped human sample for the CCS Redesign Model and California Healthcare Market is not a medical condition; it is a crime and violates the precedence set forth in the Belmont papers.

#### 9/30/2024

According to the Medical Board's enforcement division, there must be a medical need for surgery unless it's voluntary to say the doctor was working within the scope of his job and call it malpractice. Still, nothing in either Chris's or Leilani's medical records suggests surgery of any kind was ever needed, including her hip, and that this was a matter for the OIG.

#### 8/30/2024

4

Leilani is finally able to see a new neurologist and like her new neurosurgeon we saw the week before, she confirmed what a dozen specialists had told us within the past few months, including the medical board, that Leilani never needed surgery, TSC medication would have shrunk her SEGA, she was never critical or in need of vital or oxygen support, she was just in the NICCU waiting for CCS authorization. Surgery was not necessary. To give her brain surgery was like giving someone having an asthma attack a lung transplant. All they need is an inhaler.

Chris never even knew he had surgery; the county took his temporal lobe in 2008, and he never knew until 2013. So, the crimes to him were never confused as malpractice by the Medical Board, which is why the State and county are ignoring it.

The State does not acknowledge Chris's 13th and 14th amendment rights and never has; Rob Bonta refused to speak to him or investigate the crimes that happened to him or Leilani. His brain was removed without his knowledge and then his daughter's by way of fraud, force, and coercion; then they were medically tortured for profit for 14 years and denied access to fundamental rights because he is a non-white immigrant, but Rob Bonta won't help them because it makes his party look bad and because of all the policies that surround the healthcare industry like the Social Security Act Section 1115 waiver used to create the healthcare market but also used to conduct human experimentation in the prisons and schools.

However, the Attorney General will help a doctor who was denied access to an abortion in a Catholic hospital. Because our injuries vilify his party's policies, and Her's supports them. But he is supposed to be impartial and working for the State, not his party, and his prejudice and failure to provide access to law enforcement protection and fundamental rights to protect his

party has made it impossible for us to escape the retaliation, and we cannot live without our rights or access to resources.

What's more, the people who injured us should be incarcerated and not allowed to continue to pray on humans as if they are superior and above the law just because they are key members of the Democratic party working on behalf of the Affordable Care Act. There has to be fairness and policing of the parties, not the AG and governor obstructing justice and allowing a child to be injured and deprived of their rights.

Neither Rob Bonta nor Gavin Newsom has a moral compass, and the State is becoming communist for the marginalized as a result. Dr. Bloch and the CHLA/UCLA doctors who pray for society in the most vicious and unthinkable way live above the law because of corrupt and irresponsible leadership by Gavin Newsom and Rob Bonta.

**7/01/2024**

After a thorough investigation, Kathryn Johnson, the Director of the Los Angeles County Department of Social Services, has determined that this is a matter for law enforcement and that the DPSS cannot move forward. The letter is in the exhibits.

**7/2024**

After a thorough investigation, the Department of Civil Rights has determined that this is a matter for the FBI, OIG, and DDS. The letter is included in the exhibits.

**9/4/2024**

Sedwick claims group confirmed Kathryn Barger's attorneys (also Dr. Bloch) were trying
to use them to conduct a false assessment, but Sedgwick did not authorize it—proof in the
exhibits.

The negligence of the State and county has caused substantial personal injury, including
psychological trauma, and keeps us under the control and servitude of Dr. Edward Bloch and Los
Angeles County Supervisor Kathryn Barger, violating our 13th and 14th Amendment rights.

**Brief Background**

The California Healthcare system has grown exponentially over the past decade. USC has
created dozens of programs and facilities to support the disabled community, such as the
Regional Centers, SELPA, and California Child Services. Leilani was part of all these programs
and had them stripped away one by one as a form of retaliation, so I know the type of fraud and
discrimination each of these programs commits. They are all part of CCS and are run by Dr.
Bloch and his associates.

The Affordable Care Act allowed for the expansion of the health market, and California is
the pioneer in that. In 2009, Dr. Edward Bloch, Director of CCS and Los Angeles County's chief
Pediatric physician, requested the use of the Social Security Act Section 1115 waiver so that
California could build its healthcare system. The waiver allowed federal funding for human
studies based on request without having to provide data or follow typical standards. This
provision violates the Constitution as it impacts society, but they were not the ones to vote it into
use; it was a constitutional act.

The use of the SSA waiver created the California Medical waiver, which allows
researchers to access State funds without explaining their studies. This saves time so that the

benefits of science can become available to the public, as it is all supposed to be for the "greater good."

But it was not; it was so that USC investors could cut corners and hurry up and get their healthcare system going, bleed the federal government, and not care who they hurt. This is not an accusation. USC doctors mutilated my child and took turns using her for studies to gain recognition but abused her like WWII Nazi Doctors. See the previous complaints in EXHIBIT D.

**Note**: We only discovered that this was a crime when we were told by a doctor in 2019. Everything else took time to unfold because Leilani was denied access to healthcare, so we could not gain confirmation. However, since then, all the doctors agreed none of the surgery was necessary but are also restricting care for their colleagues and putting Leilani's life in danger. If Proposition 35 is passed, Leilani will be forced back to Dr. Bloch because that act is to force all disabled people off of straight Medi-Cal and onto a managed care plan run by the county, and he will kill her. I have pulled her out of anything having to do with the county (i.e., school, the Regional Centers, CCS) because Dr. Bloch uses it to injure us. He now comes after me in my adult healthcare, and Chris is his DDS, so he will hurt her once she is forced back into county care, and I need to have her out of California before that happens.

**No one** (State, County, FBI, HHS, OIG, DOJ) will allow Chris access to his 13th Amendment rights and dues process. There is no reason not to interview him; his temporal lobe was removed without his knowledge, and it is easy to prove. But the reason for Leilani's decade of medical trafficking and battery, sexual assault, and deprivation of fundamental rights is that they were able to enslave Chris without his knowledge successfully. Rob Bonta, Gavin Newsom, and Mark Ghaley denied Chris access to his 13th and 14th Amendment rights multiple times and owe him.

8

The state judges (all USC alumni) refused to allow us a trial by jury even though we requested it twice and did not want to hear Chris's testimony in court. He is not acknowledged when he files a claim because the crimes that happened to him make the crimes that happened to Leilani likely, and they want to keep everyone thinking it is just me fighting with them and not me fighting for Chris and Leilani's rights. Chris is denied all rights because he is the cause of her injuries; they abuse generationally, like the prison system.

The county continued to retaliate, resulting in a SLAPP Action in 2022 to deter me from seeking justice and the truth.

The state and county are well-versed in how this all started, and they know that this is an ongoing crime and has allowed it to go on. We deserve justice and compensation for our injuries and forced servitude to the county of Los Angeles and the State of California.

### Trail Demand

We demand a trial by jury if a settlement cannot be made and all actors in the case are summonsed to testify. A list of these actors and their contact information are in EXHIBIT C.

### Marsy's LAW

As victims of a crime, we are protected under Marsy's law and are exempt from discovery. We are promised a speedy trial to reduce further victimization.

## California Constitution, Article I, Section 28(b)

(b) In order to preserve and protect a victim's rights to justice and due process, a victim shall be entitled to the following rights:

(1) To be treated with fairness and respect for his or her privacy and dignity and to be free from intimidation, harassment, and abuse throughout the criminal or juvenile justice process.

(2) To be reasonably protected from the defendant and persons acting on behalf of the defendant.

(3) To have the safety of the victim and the victim's family considered in fixing the amount of bail and release conditions for the defendant.

(4) To prevent the disclosure of confidential information or records to the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass the victim or the victim's family or which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law.

(5) To refuse an interview, deposition, or discovery request by the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, and to set reasonable conditions on the conduct of any such interview to which the victim consents.

(6) To reasonable notice of and to reasonably confer with the prosecuting agency, upon request, regarding, the arrest of the defendant if known by the prosecutor, the charges filed, the determination whether to extradite the defendant, and, upon request, to be notified of and informed before any pretrial disposition of the case.

(7) To reasonable notice of all public proceedings, including delinquency proceedings, upon request, at which the defendant and the prosecutor are entitled to be present and of all parole or other post-conviction release proceedings, and to be present at all such proceedings.

(8) To be heard, upon request, at any proceeding, including any delinquency proceeding, involving a post-arrest release decision, plea, sentencing, post-conviction release decision, or any proceeding in which a right of the victim is at issue.

(9) To a speedy trial and a prompt and final conclusion of the case and any related post-judgment proceedings.

(10) To provide information to a probation department official conducting a presentence investigation concerning the impact of the offense on the victim and the victim's family and any sentencing recommendations before the sentencing of the defendant.

(11) To receive, upon request, the pre-sentence report when available to the defendant, except for those portions made confidential by law.

(12) To be informed, upon request, of the conviction, sentence, place and time of incarceration, or other disposition of the defendant, the scheduled release date of the defendant, and the release of or the escape by the defendant from custody.

(13) To restitution.

(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing the losses they suffer.

(B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss.

(C) All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.

(14) To the prompt return of property when no longer needed as evidence.

(15) To be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified, upon request, of the parole or other release of the offender.

(16) To ensure the safety of the victim, the victim's family and the general public is considered before any parole or other post-judgment release decision is made.

(17) To be informed of the rights enumerated in paragraphs (1) through (16).

### Demand for damages

Monetary Demand of 100,000,000 plus triple damages for fraud if the jury sees fit, explained in

the cause of action section. If this matter is settled outside of a jury, the triple damages will not

apply because fraud will not be confirmed by testimony, documents, and facts surrounding this

matter. However, fraud by the Board Supervisor Kathryn Barger, County Assessor Jackie

Stewart, County Assessor for Intercare insurance, Carl Saltsman of Sedwick Corp, and Dr.

Edward Bloch was confirmed by Sedwick Corporation on September 13th, 2024. See EXHIBIT

B for documentation and details.

### Continuance of damages and further retaliation

The defendants have been in state court with us several times in the past for negligence

and are aware of the original damages and supporting documentation. However, this ongoing

matter has continued because the State of California and the County of Los Angeles failed in

11

their due diligence and have kept us in forced indentured servitude, which is a 13th Amendment right violation. The state, county, and federal governments refused to allow Chris's injuries to be heard, nor was he or Leilani included in the county claim investigation or Federal claims process that is now in appeals and as explained below. The state is the only one that has turned this over to the courts properly.

**Indentured servant Justification**

1.) Chris was injured because of his immigration status and because he is not white. There is no other reason. Rob Bonta is aware this is likely, seeing he and the Oakland Mayor also accused Mark Ghaley of the same crimes towards Latino migrants during COVID. This letter can be found in EXHIBIT F. Rob Bonta knows this is likely but still refuses ever to investigate.

No matter what happens, it is prejudice towards me that causes the FBI, HHS, and DOJ to investigate, and it has cost Chris and Leilani a lot in physical suffering. They depend on me for help. Chris would tell law enforcement all about this, but they refused and never spoke to him about what happened to him that led to all of this. What happened to Chris is being ignored because it makes the rest likely. Still, the evidence makes it beyond a shadow of a doubt, and now that the medical board is saying it's a crime, not malpractice, they cannot use that excuse for their failure to protect and preserve our 13th and 14th Amendment rights as required by Federal law.

2.) Chris has been denied access to all Constitutional rights by the State, County, and Federal Governments ever since he was stolen out of his life and made a slave for the county and state in 2008. The county (9/18/2024) and federal government (10/2/2024)

12

refused to include him and Leilani in any of the claims even though they were plaintiff(s) and had signed violating ***Dred Scott v. Sandford***, 60 U.S. (19 How.) 393 (1857) because it keeps them in slavery. Other case laws relating to the actions of the county, state, and federal governments are the Slaughterhouse Case (1873), Plessy v. Ferguson (1896), and Brown v. Board of Education (1954).  Proof they were omitted from the Federal claims is in EXHIBIT E.

**Desert Haven**

3.) In 2010, the Regional Center helped Chris get a job at Desert Haven, which is a facility for disabled adults run by the Department of Rehab and the same people who run the Reginal Centers (i.e., Dr. Bloch, Dr. Gahley, Kathryn Barger). They are supposed to be teaching life skills to disabled adults. However, they also had a workforce, and Chris wanted to try work. He was not able to do what he did before the Regional Center took his brain, but he was determined and, at that time, had no idea he had part of his brain missing.

4.) The Regional Center arranged all this for him, like his brain surgery. His Desert Haven worker was Martha Night. She got Chris a job at Walmart after I started asking questions and complaining about civil rights. The bus would pick him up at 6 a.m. and drop him off at 6 p.m. Monday through Friday. Even though Chris has a seizure disorder and is not supposed to be in the heat or sun, they had him clean city parks and work in Rite Aid and Michaels's warehouses in the summer with no air conditioning for $3.11 an hour.

Being the Regional Center, you would think they would care about his medical condition, but they don't; these individuals are used to working for the investors for

10% of the minimum wage so they can save on taxes, insurance, and wages they have to pay legal employees. I can also tell you the disgraceful story of how Dr. Bloch, Mark Ghaley, and Kathryn Barger came up with the wage to pay their indentured slaves.

Gary Cothran was Leilan's homeschool teacher in 2017. He is retired and works for the Chamber of Commerce in my city. Gary has worked for the City of Palmdale and Lancaster for forty years and was even Rex Parris College dorm mate. He told me that he was told to take twenty-five Mason jars, remove the caps, put them back on, and time how long that took. He then took one client with severe Cerebral palsy, so they could not even handle the jars, and had them repeat the task. It took her 90% longer, and that is how Kathryn Barger decided to pay the disabled community that worked at Desert Haven for twenty-five years.

This year, after taking her to court, the clients at Desert Haven now get minimum wage. But 10% before that, and we have old pay stubs and a dozen clients and former work coaches to concur. Gary will also testify that this is true.

5.) On August 30th, 2024, we were told Leilani never needed surgery by Dr. Sharply, her new neurologist, and that medication was all she needed. This was told to us the month before by her new neurosurgeon, Dr. Bonta, as well as by her former Neurologist at Stanford, Dr. Porter, in 2022. When Dr. Porter told us it was at the time, she confirmed there was no cancer and removed that from her record. She never said she was sure; she said she did not think so, and then we never saw her again. We were not 100% sure until just recently but have been assured by multiple doctors and

TSC professionals. It is straightforward to understand that Leilani had a typical
SEGA and was not asymptomatic, meaning it did not impact her or threaten her life.
It was just like she was doing baby crunches, but it would not hurt her even if left
untreated. The worst that could happen was ADHD or autism, but with her, it was
improbable. She only required TSC medication to shrink the SEGA, and eventually,
it would vanish. She was never in distress or even sick, just having seizures that made
her body flex but did not hurt her brain. We know all this now.

6.) Her condition was very TSC typical, and with medication, she would have been just
fine. To put it in perspective, to give Leilani surgery for her condition was like giving
a lung transplant to someone having an asthma attack. As you can see in the attached
complaints in EXHIBIT D that show all the damage, she had over a half dozen
unneeded surgeries.

7.) On 9/30/2024, the enforcement department for the Medical Board of California called
me to explain why they have closed my current complaint and all those who came
before it and will testify to it. They confirmed that neither Chris nor Leilani needed
surgery or any of the procedures and treatment they received, so they will not
investigate further. It needs to be handled by law enforcement. What's more, Chris
did not consent to his or even know, and Leilani never needed surgery to begin with
but had many.

Dwayne, the officer whose last name I don't remember, but it was a recorded call. He
said that no matter who I spoke to at the medical board, they would tell me the same
thing because it is on our file. Their job is to monitor the work of doctors when they

are conducting treatment within the scope of their profession, and what we report and
what they found in the medical records is not malpractice. It is something that needs
to be investigated by law enforcement or some other agency; he never said the word
crime; he just said it should be investigated because it needs to be needed for
treatment, and surgery is life or death last resort, and Leilani's record shows a normal
birth and stable healthy baby by her medical records all the way to her surgery. He
said there is no justification for surgery, so we can't call it malpractice.

8.) Chris and Leilani are for the profit of their owners, USC, the County of Los Angeles,
Dr. Edward Bloch, Kathryn Barger, and Mark Ghaley, as well as their investors and
colleagues. I am oppressed, and my professional name is ruined. Unable to work
because Leilani cannot go to school. I am constantly intimidated or oppressed to keep
me in California, to keep me broken, and to keep me in check. Which is not possible;
I will die fighting for their and my rights; it is who I am.

**slave**

/slāv/

**noun**

1. One who is owned as the property of someone else, especially in involuntary servitude.
2. One who is subservient to or controlled by another.
3. One who is subject to or controlled by a specified influence.

9.) Dr Edward Bloch owned us, and his assistant Jeany Umana said that to me multiple
times and in front of witnesses other than Chris and me. I often took our home nurse,

16

Ophelia, with us, and she bore witness to a lot of the abuse we suffered at the CCS
Therapy Unit.

10.)    Leilani was never allowed to go anywhere. Dr. Bloch disapproved because he was
using her for his study, so he chose her school, teachers, doctors we could see,
therapy, and so on. When I took her out of CCS after Dr. Fallah confessed the truth
(see complaints in exhibits) is when we started losing everything else: school,
disability services, my freedom almost a few times, Leilani's ability to succeed in
care, medical equipment, etc. Then, when I still did not take her back to CCS and
CHLA, he harassed me at my doctor's appointments and restricted Chris and Leilani's
DDS rights, which they lost. See Exhibits for documentation.

11.)    When Chris was working for Desert Haven, they only paid the disabled workers
$3.11 per hour to work in the Rite Aid warehouse, stalking shelves and cleaning the
parks, when they would typically pay employees minimum wage and insurance for
those jobs.


## Cause of Action


### Negligence

The negligence proves itself; it was not malpractice; it was everything I said it was, and if
they had investigated, they would have known that, but they refused out of prejudice, validating
our claim. I begged and begged for four years, and all I got was a hard time, hung up on, denied,
yelled at, made fun of, and, eventually, lost my privileges to call the FBI altogether. Rob Bonta
refused to assist and said he did not help the public. However, he has no problem helping a white

17

doctor who wanted to abort her twins in a catholic hospital when there were other options on behalf of his party and their me2 campaign.

Still, Rob Bonta, like Xavier Beccera before him, refuses to help two minorities in forced county medical slavery for fourteen years who were not in need of surgery or treatment but were medically altered, abused, sexually assaulted, and denied fundamental human rights like school all for the CCS Redesign model and California Medical Waiver which is a broken policy in this state that allows marginalized individuals to be prated on like we were. He has no excuse for not helping, and we are owed for the slavery he supported, as did Gavin Newsom.

Dr. James Peters was the director of the Special Needs Division of the California Department of Education during COVID-19 but also owned a law firm that Gavin Newsom allowed him to Sue the State to compensate children who lost their IEP services during COVID-19. Now, if this was legitimate and for the entire population, a class action suit would have been filed. However, that was not the case; Dr Peters collected names like Leilani's, and then when the seven million dollars was granted, he was gone, and so was Leilani's IEP.

The school removed Leilani's IEP out of retaliation. Mr. Peters presented himself as my attorney but then dropped out, leaving me vulnerable to attack, so I contacted the Office of Civil Rights for the OCR investigation. I threatened an attorney who was retained but never showed up. Gavin Newsom knows Leilani lost her IEP in 2020 because he was in court with us, but he has never offered help, and Leilani is still being prevented from going to school. Gavin Newsom is also president of UC Regents, which is the doctors and hospitals that are injuring Leilani and denying her access to care. He refused to help and, therefore, is negligent and responsible for the personal injury caused in 2020.

18

When I brought Leilani to a new school in 2023, Gorman Elementary, and tried to establish her IEP, I was again met with retaliation. Except this time, I was told Leilani was being assigned to eighth-grade general education, and she had to go; if she could not do the work, I would have to go and do it for her or go to prison. I asked, so you're saying I must go to eighth grade for Leilani and be a student. The teacher said yes.

I immediately signed up to become a private school where you lose all access to school, therapy, and equipment, you pay for everything, and the school district gets the State and Federal funds for your child. I have a BA in Criminal Justice with a specialization in emergency management, a master's in criminal justice and global-related issues, and a master's in criminal justice philosophy, and I am just finishing my PhD, so I don't need to sit in the eighth grade like Billy Madison. But it was to humiliate and withhold rights.

The county was also aware of this because they were in court with us for three years and had committed fraud via the claims process. See EXHIBIT, but several officials, including Supervisor Kathryn Barger, are part of the bigger crime and have committed most of the retaliation we have suffered in the past year.

I am sick of this and deserve justice for being kidnapped by the county and imprisoned in this hell where I have to watch my baby be tortured, have no rights, be constantly restricted by the government, and suffer color of the law crime and conspiracy against rights.

**Personal Injury**

Leilani was denied care in Ronald Regan Medical 10/23-5/34 when she became hypothermic from the damage to her brain and was borderline in shock. Her heart rate was 38, and her body temperature was 80. This is while admitted and coming out of sedation from an

19

MRI. She was denied care from the neurology and neurosurgical care out of retaliation and could have died, but she was left with a neurological disorder called lingual dystonia, where her tongue becomes paralyzed out of nowhere, and she is in danger of choking to death on it for 3-24 hours. She cannot access therapy, healthcare, or DMEs; it is so sad to watch.

Dr. Bloch bullied both Chris and Leilani out of the Regional Center last month. See EXHIBIT G for documentation.

I was denied access to healthcare by a USC/CCS pediatric oncologist named Dr. Randel Chan, who took the place of my doctor to harass me for his colleagues and deny me care. See EXHIBIT G for documentation.

**Conspiracy against Rights and Color of the Law Crimes**

Dr. Bloch and Kathryn Barger are working together to restrict our rights by abusing their power. See EXHIBIT D for details.

Indirectly, The State of California, the United States of America, the County of Los Angeles, Rob Bonta, Gavin Newsom, District Attorney, and Mark Ghaley (not so indirectly) are all contributing to Conspiracy against Rights and Color of the Law Crimes by ignoring slavery and human rights violations the State and Federal government is responsible for investigating.

**Conclusion**

In closing, we prefer to settle without all of this going to court, but I will not just let a judge handle it after what I have been through with State courts. We demand a jury; we demand all offenders in all cases be subpoenaed to testify, and a list will be provided in EXHIBIT B. We will also not wait years for a trial because our lives are in danger, and we cannot access essential

resources thanks to our offenders. We are victims of a crime that will become clear in a hearing, and our trial must be within the time required by the California victim's rights.

This situation has taken everything from us: our physical well-being, our Constitutional rights, family, friends, and our belief in the system or humanity. I moved here to start a business, and even with a disabled child in tow, I would still have been able to continue that with the help of appropriately provided resources and fair treatment. St. Joseph denied me access to have my child there and forced me to Glendale Memorial, where the county could pray on us. But Rob Bonta will not afford me the same rights he is affording the chiropractor who could not get an abortion in a catholic hospital.

However, that woman was not also stripped of her rights and forced into systematic service where she had to watch her child be discriminated against, sexually assaulted, medically battered, and denied access to healthcare, disability services, school, police protection, and basic human empathy for fourteen years and counting. She is not more valuable to society than me; she is a chiropractor. I am everything else. What's more, I am the only one in society who would take this fight on because I am not afraid to put someone else first and fight for those who cannot fight for themselves. What type of world are we living in when that does not matter? My moral compass won't allow it. However, Rob Bonta and Gavin Newsom have proven their moral compass in this situation, which needs adjusting.

They are not helping them to protect their party, and it is immoral; it is horrific that the use of the Social Security Act Section 1115 Waiver permitted doctors to conduct research and get funding without having to report where their findings came from, so they used marginalized citizens in California like WWII Nazi doctors since 2008. You can't just ignore it and let these monsters carry on. Also, this waiver is being used in seventeen other states; there needs to be

21

changes made so this cannot keep happening; we are the United States of America. We are better
than that. Everything that happened is in the State complaints included in the exhibits.

Attorney General Bonta, like Gavin Newsom, moves to what is best for his party, not
right and wrong, and a me-too case is better than one that shows that provisions in the Affordable
Care Act cause slavery for immigrants by medical battery and trafficking of infants and the
criminalization in his party. It's political, and he allowed his biases, association, and conflict of
interest to infringe on our rights, and for that, we are owed compensation, freedom, and
protection. My entire life was stolen, and my ability to have more children due to fear of
retaliation by the monsters that were abusing us. I feel I deserve the same representation as the
chiropractor who was denied an abortion.

Leilani was born into slavery; they planned to hurt her before she was even born. I cannot
explain the pain it killed part of me, not just that it was my child, but that this was acceptable at
all. I am glad I don't have any more children for California to injure because that is all they do,
and I see no hope for the future if the courts and officials are going to ignore government abuse
of this degree.

Christopher and Leilani Co. are not even human beings to the Federal Government, as
proven by Judge Eric G. Bruggink, who did not even give them the right to participate in their
claim and even omitted them as plaintiffs, as did the County of Los Angeles with their claim
process 9/18/2024-3/2022.

However, after much research, it seems Judge Bruggink is one of the top judges who
obstruct cases associated with the Affordable Care Act, which makes me wonder if random
selection is real. He has no experience with a white-collar crime case like this. He did not even

acknowledge the claims, just the defense claim that I was claiming "malpractice," which, as you

can see by the document in the exhibits, it was not. However, because of the nature of the case

and his prejudice, he was never going to consider it anyway. This claim is now in appeal and is

for a group different than the one in this case, and seeing the obvious violation of statute and

procedure, it should be granted.

Rob Bonta, the FBI, HHS, OIG, DOJ, and Gavin Newsom, the CDE, and UC Regents

refuse to interview Chris, examine his medical records, speak to the witnesses, or investigate his

and Leilani's crimes no matter how much worse it gets. These are not isolated incidents that

happened a decade ago; they are continual and happening to multiple people, however, because

of prejudice toward them because of their race, disability, what the country is doing, which the

State allows, which is enslaving a chosen population, and their discrimination towards me

because of how traumatized I am and my delivery of this crime they have never investigated to

affirm medical malpractice and because it was never that failed their due diligence and

contributed to the withholding of 13th and 14th amendment rights.

The State cannot just take the lives of immigrants because they do not have constitutional

freedoms and they sure don't have the right to take them away from me. I never committed a

crime, have never been part of the "system." I was imprisoned here by Dr. Bloch and Kathryn

Barger, and I demand my freedom, I demand my rights be restored and I demand justice.

Chris and Leilani Co were medically barred by the County of Los Angeles and the State

of California, who both refuse to acknowledge their rights not only as an American citizen but as

human beings. California has gotten so good at faking humanity that it lost it all. In addition to

the State and county, we also had an Office of Civil Rights hearing for school last year that

permitted us to pursue action in court for abuse, discrimination, taking away Leilani's IEP, bullying me, and denying FAPE.

I am confident a jury will rule in our favor because this is an obvious crime and what is happening to us is easy to prove, a heinous act by thirty-three people that required investigation by the county, state, and federal government and we are owed, compensation, protection and the freedoms we are being denied.

Leilani deserves to be able to go to school and not worry about safety or discrimination from Districts and the California Department of Education that prevents her from accessing her IEP services. I deserve to be able to work so I can provide my family with healthcare, and we don't have to deal with the broken and dysfunctional California medical system or Los Angeles County corruption. We deserve to be treated with respect as equal citizens. I do not deserve to be bullied by a bunch of pink-collar criminals over my child's school and resources because of their prejudice toward my family. I don't deserve to be threatened and laughed at by law enforcement for my enslavement.

Chris deserves justice for all that has happened to him and to be acknowledged as a human being. His life was stolen by the Regional Center, the same as mine was stolen the day they imprisoned me in Glendale Memorial and took my child to CHLA to begin the process of stealing her life for greedy USC monsters. The State of California and the county of Los Angeles not only took a chunk of his brain without telling him but created degenerative nerve damage so he would become ill as he got older and needed more care, meaning more profit. Then, they do the same to his only child repeatedly and tell us it is because of who we are that we are in the system and less than everyone else because we are lesser people. I did not come here in the system; I came here to open a business and was forced into it by Dr. Bloch and his colleagues. I

24

# EXHIBIT LIST

EXHIBIT A----------------------------------STATE'S PERMISSION TO PROCEED TO CIVIL COURT

EXHIBIT B--------------------------------------PROOF OF COUNTY FRAUD IN CLAIMS PROCESS

EXHIBIT C------------------------------------------------------------WITNESS AND OFFENDER LIST

EXHIBIT D--------------------------------------------------------------------ORIGNIAL COMPLAINT

EXHIBIT E------------- PROOF CHIRIS AND LEILANI WERE OMITTED FROM FEDERAL CLAIM

EXHIBIT F-------------------LETTER FROM DPSS STATING CRIME LETTER FROM COUNTY OCR
AGREEING IT IS A FEDERAL CRIME, ROB BONTA'S LETTER TO ME, ROB BONTA'S LETTER TO
MARK GHALEY, PROOF LEILANI WAS BULLIED OUT OF REGINAL CENTER BY DR BLOCH

EXHIBIT G------DDS PROOF OF CHRI'S RECENT LOSS OF SERVICES DUE TO RETALIATION

## EXHIBIT A

This is the correspondence from the State allowing me to pursue
this action in Federal court without the obstacle of immunity

## GCP-22062960 – RE: Claim for property damage

From: **GC Info@DGS (gcinfo@dgs.ca.gov)**

To: **kimberlyclisbee@yahoo.com**

Date: **Tuesday, October 1, 2024 at 10:29 AM PDT**

Good morning,

The Government Claims Program was unable to act on the claim within the timeframe prescribed
by law. Therefore, the claim was deemed rejected pursuant to Government Code section 912.4.
The rejection of the claim will allow you to file a court action, should you choose to pursue the
matter further.

Please consult Government Code section 945.6 for information on the filing deadline and
Government Code section 955.4 regarding proper service of the summons. If you require legal
advice, please contact an attorney.

Sincerely,

**California Department of General Services**
Office of Risk and Insurance Management | Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052
**Website: https://www.dgs.ca.gov/ORIM**
**Phone: 1 (800) 955-0045**
**Email: gcinfo@dgs.ca.gov**



**GENERAL SERVICES**

*Excellence in the Business of Government*

**From:** Kimberly Clisbee <kimberlyclisbee@yahoo.com>
**Sent:** Friday, September 27, 2024 2:35 PM
**To:** GC Info@DGS <gcinfo@dgs.ca.gov>
**Subject:** Claim for property damage

**CAUTION:** This email originated from a NON-State email address. Do not click links or open attachments unless
you are certain of the sender's authenticity.

Good afternoon.

I was told to email you after talking with your office. I filed a claim a couple of months ago, and the check was cashed on 8/12, which is exactly 45 days ago. Our claim is not visible in the system and we are suffering additional retaliation and was instructed to file again with an ex-parte and new forms.

I omitted an additional payment because I was told to just attach the canceled check to the documents, which I did. However, if I need to pay again, please let me know. My case has not been decided or even logged according to the call center.

Please let me know if I need to do anything more.

Thank you,

Kimberly Clisbee

**CHASE ○**

Printed from Chase Personal Online

## Check Details

Total: **-$25.00**

Post date: Aug 12, 2024

Check #: 106

Front    **Back**



JPMorgan Chase Bank, N.A. Member FDIC    ©2024 JPMorgan Chase & Co    Equal Opportunity Lender

Christopher Co
3531 Springridge Way
Palmdale, CA, 93551
Phone: 818-679-1584

## The State of California

Christopher Co, Leilani Co,

Kimberly Clisbee

vs

The State of California

**Claim for Civil Rights Violation of the
Thirteenth Amendment Under the
California Tort Claim Act Request for Ex-
Parte due to retaliation**

Introduction

Exactly forty-five days ago, the State of California cashed our check for the original

claim that was not in the system or trackable. Please see Exhibit A for the canceled check. The

retaliation we are suffering is getting worse, and our involuntary servitude and the abuse that

comes with it are becoming too much. We deserve to have the same rights as everyone else and

not be oppressed by our government for crimes they are committing as a result of our slavery to

the county of Los Angeles and the State of California.

If this situation is not expedited and resolved, we will file a federal suit for 13th

Amendment violations on 10/7/2024. The state has had plenty of time; it is not like Gavin

Newsom and Rob Bonta do not have personal knowledge of this situation.  They have known for

years and even gone to court and know all of this is true but refuse to assist, which has kept us in

servitude and without 13th Amendment privileges.

Below are the recent events and the ones that preceded them. Please note: We now

understand neither Chris nor Leilani ever needed surgery or medical treatment. This crime has

only been known to us since 2019, and the State has refused to investigate because of the

involvement of the officials, so it has been mislabeled as Medical Malpractice without

investigation, just prejudice.

However, seeing it is an ongoing crime and new information is constant, we know Leilani

only received surgery because of the crime Mark Ghaley committed against Chris, her father,

who also received brain surgery and had his temporal lobe removed without knowledge. Not

because he needed it removed but because he was an immigrant.

Leilani also never needed surgery. One year of TSC medication would have cured her for life, and the county and doctors knew that, but her father was an involuntary slave of the California Medical waiver, and so she would also be, and so did I, and I demand our freedom.

I was kidnapped and enslaved into the system, as you can see in the background information. I cannot work because they will not allow Leilani to go to school. I am bullied by the school and was told last year when Leilani's IEP was removed out of retaliation, "You need to attend the eighth grade or become a private school, giving up access to ADA funds or go to prison." I obviously became a private school. I have been threatened and abused to the point of wanting to commit suicide because it is the only way to get away from the systematic abuse.

These people are relentless bullies, and there is no way to get out from under them because the county owns us, and the state nurtures that by blocking access to freedoms via the office of civil rights and fair hearing, which are only attorneys of USC and the other criminal organizations that enslave citizens for investor profit. We are not free people and demand our freedom and access to Federal, State, Civil, and human rights that the State of California is restricting!

**Recent claim against the County of Los Angeles.**

On or around July 25th, 2024, we filed a claim against the Board and District Attorney for negligence and personal injury, county claim#24-4424817, along with my daughter Leilani Co and her mother Kimberly Clisbee.

Mr. Carl Saltzman, the claim adjuster for Sedgwick who is handling this claim, is refusing to acknowledge my (Christopher Co) and my daughter Leilani's

claim for damage because of his prejudice towards us and this case and is violating

our fourteen amendments rights to equality and due process by doing so. We

demand the Board Settle this claim based on the guidelines of California Victims'

Rights, which you have violated for a very long time, as explained below.

# Marsy's Law

On November 4, 2008, the People of the State of California approved Proposition 9, the
Victims' Bill of Rights Act of 2008: Marsy's Law. This measure amended the California
Constitution to provide additional rights to victims. This card contains specific sections
of the Victims' Bill of Rights and resources. Crime victims may obtain additional
information regarding Marsy's Law and local Victim Witness Assistance Center
information by contacting the Attorney General's Victim Services Unit at 1-877-433-
9069.

Mr. Saltzman has also decided that even though we are filing a civil rights

claim against the Board of Supervisors and DA for failing to do your due diligence

in 2020, this resulted in this extreme retaliation. He is insisting on changing my

claim to a medical malpractice case where he is scrutinizing all the crimes the

court already knows the defendants are guilty of because it was learned by

admittance and discovery. This is obviously obstruction, a Federal Offense, an

administrative crime, and unethical in all ways. Kathryn Barger's name is all over

it because of the type of questions being asked and the willingness of Mr. Saltzman

to commit these crimes against us.

**Conspiracy against rights by Sedwick and the County**

No one filed a medical malpractice claim. We are being denied our rights, and Kathryn Barger is being allowed to investigate her crimes and allow individuals who have committed crimes since the case was filed in 2020 with Jackie Stewart also to obtain information that is not necessary for this type of claim and can be considered collecting discovery by the defendants because.

Suppose this all goes to the Federal Court, which it likely will. In that case, Ms. Stewart will be included, not by me but by the Federal Government, because she committed the same felony as Mr. Saltzman and relabeled a Federal Civil rights claim to "malpractice" so she could unlawfully decide on my federal rights which requires a federal court. That is not my doing, and for Mr. Saltzman to threaten me because Ms. Stewart is a criminal is a CRIME.

Again, no man can decide on another's federal rights outside of a federal court. Jackie Stewart and Mr. Saltzman decided they could, and it's a felony and violation of our Thirteenth and Fourteenth Amendment rights and has gone on for over four years! It is too late for Anything, but settlement is at this point.

I believe Kathryn sees this claims investigation as a way to fight these charges, but she was two years too late; everyone confessed in the first year. Also, the overwhelming proof and doctors who will testify, neither of them needed

surgery, and there is no reason for any of this aside from the crimes I am charging the doctors with.

Kathryn Barger must have skin in the game, or she would have come to the aid of the victims, not attacked them.

There is no question that all that I have claimed happened; the problem is that the Board of Supervisors does not want to do what is right, and you are all women who see me as the angry mother from Boston who is yelling at everyone instead of hearing what I am yelling about or why. Your prejudice towards me is getting in the way of doing what is right by the law and by Chris and Leilani.

It is a competition for Kathryn and most of the Karens who run the county, and they all want to fight me instead of focusing on right and wrong. I did not start off yelling; I was traumatized by Dr. Bloch and La County for fourteen long years, and it developed out of fear and abuse. You start to speak to people the way you're spoken to. So, if it's offensive, know what was said and done to me was so much worse!

I am strong; I will die for my child and yours; I am the one percent. I am not afraid of anyone or anything, I have never had a boss, I am the ALPHA in all ways, and people like me are usually respected, not abused, by county social workers, doctors, and educators, but this is a crime I am part of not ordinary county care.

You need to break me down for some reason and not care about Chris and Leilani. Kathryn Barger wants to make this about me, but I was forcefully and criminally enslaved here by the county and the crimes the BOS allows county employees to commit.

Chirs was injured because he is an immigrant, no other reason. He did not need surgery. Tuber Sclerosis medication would have cured his seizures, was not life-threatening, and did not require surgery. They stole his life and knew he had TSC, and 50% of his children would as well, and saw dollar signs instead of a human being. You made him a county slave, his child, and his partner and violated all of our 13th Amendment right in the process.

And the county thought they could get away with it; he was **enslaved** into the system, and so you stole his child and me, and now we are also the Board of Supervisors **slave population**. Below is the definition of a slave. We are the county's slaves. You medically altered Chris and Leilani to enslave into the system because they are immigrants; this is a hate crime. You took them and enslaved me as well. And that is a violation of the Constitution.

Instead of acknowledging this and seeing what happened to us as empathetic humans, Mrs. Barger and the rest of the board treat this as if we did something wrong and that we deserve this all for some reason. Because we are part of the

slave population. Property of the Board of Supervisors, and they are harsh and cruel masters!

All of you are a bunch of felons. I am a member of the Criminal Justice community who lives a life of servitude to my fellow man and always does the right thing, no matter the consequence. She is a fraud and a monster and will serve her community best behind bars.

(Chris)

The retaliation I am suffering from the Regional Center is from Dr. Bloch due to the county's negligence, which has caused me to lose my DDS services and rights, and my daughter is suffering retaliation from UCLA doctors whose May 28th, 2024, refusal to provide care that resulted in Leilani developing lingual dystonia.

The three of us (Kim, Leilani, and Myself) all suffered separate retaliations for the same crime, but the county is not treating it that way. You are fighting us like this is a continuation of the lawsuit against the county, and you're the defendants instead of the body of government responsible for providing unbiased service and protection in accordance with the law.

This is new retaliation, and it is not fair my daughter and I are not being treated as equal citizens or being protected as required by the ADA Statute. We are

being forced into county slavery, something we would not be if the county did not batter us. We are not free people, and God or illness did not cripple us. You did! We are reaching out to the BOS because we are slaves of Los Angeles County. Kathryn Barger and Edward Bloch removed our Thirteenth and Fourteenth Amendments when they removed my temporal lobe and butchered my child's brain repeatedly because we are immigrants and this is a hate crime, not because we needed brain surgery or even emergency treatment of any kind.

Yet you continue to give our claim to a county assessor instead of the FBI to investigate, violating our federal rights once again. Only a Federal Judge can preserve these rights, and you have enslaved us by removing our 13th and 14th Amendment rights, including Kim's, so the FBI must be involved, or the Board must settle. Still, Sedgwick is violating our rights by making decisions on our civil rights, and we are filing this new claim as a result. However, the Board of Supervisors gave Sedgwick the claim instead of settling or turning it over to the Federal Government when we were threatened with imprisonment, had our 14th amendment rights withheld, and suffered additional retaliation on behalf of the defendants that we were already suffering retaliation for.

There is no more opportunity for investigation. These are our federal rights, and you have violated them since 2020 in this case and imprisoned us as county slaves where Chris and Leilani had to give up parts of their bodies repeatedly for

your investors to profit from her pain like an organ mule since 2010. You need to settle with us so we can escape this abuse and be allowed the same freedoms as every other citizen afforded by the amendments you are depriving us of, 13 and 14.

The County of Los Angeles Department of Healthcare Services is the one who removed my temporal lobe without telling me when I never needed surgery. This is a provable fact, as I never needed surgery and was misdiagnosed.

These monsters, after injuring me, attacked my child, who also never needed surgery and kept us medical slaves for fourteen years, and no one from the county has even spoken to me or come to see us. I am a victim of a crime and deserve equal protection under the law. You all don't even acknowledge me because I am disabled and born in another country, so I am not a person to you, and neither is my child.

LEILANI, KIM, AND I ARE LEGAL CITIZENS, AND WE ARE PROTECTED UNDER THE UNITED STATES CONSTITUTION AND HAVE THE RIGHT TO DUE PROCESS AND ACCESS TO THE FOURTEENTH AMENDMENT. THE BOARD OF SUPERVISORS AND COUNTY OF LOS ANGELES ARE DEPRIVING US OF THAT RIGHT.

YOU CAN MEDICALLY ALTER ME AND MY CHILD TO MAKE US SLAVES FOR COUNTY PROFIT JUST BECAUSE WE ARE NOT WHITE OR BECAUSE I WAS BORN IN ANOTHER COUNTRY! YOU STOLE MY LIFE AND INJURED MY ONLY CHILD TO STEAL HERS AS WELL, AND ALL YOU WANT TO DO IS FIGHT WITH KIM, WHO IS

ALSO A VICTIM OF THIS CRIME. I DEMAND YOU PAY ATTENTION TO LEILANI AND
ME EQUALLY!

Neither I nor my child ever needed surgery. We only needed medication, and
the doctors knew that.

This has been an ongoing crime since 2008, and it will continue thanks to
the board, and I am owed damages. As disabled Americans, my child and I have
rights under the ADA that the board is violating, not to mention my 14th
Amendment right to equal due process and treatment.

The Board of Supervisors, County of Los Angeles, has also violated our 13th
Amendment because you made us disabled and enslaved us because we are not
white, and slavery is against the Constitution. I never committed a crime; I did not
need lifelong medical care until the Regional Center came along and TOOK MY
BRAIN!

SLAVERY OF NON-WHITE CITIZENS HAS BEEN AGAINST THE LAW SINCE
EARLY 1800, YET THAT IS WHAT THE COUNTY OF LOS ANGELES HAS DONE TO US.
THE COUNTY MADE MY FAMILY AND ME SLAVES. YOU MADE US YOUR PROPERTY
FOR PROFIT, AND THAT IS A FELONY, AND WE DEMAND OUR FREEDOM.

What you did to my family and me is a form of slavery. We are forced to serve as
medical slaves you altered for profit. We did not need surgery; you stole our lives

and enslaved us and are refusing to protect us or provide equal rights, and we are owed damages and demand justice!

**Update on this Claim**

On September 4th, the Sedgwick claims group sent me a letter stating they never assigned this case to an assessor because it was not a medical malpractice case based on the information provided and needed to go to the Attorney General. The letter is in exhibit B.

On September 13th, Jackie Stewart sent me a letter from "Sedgwick" not knowing I had already communicated with them, and told me Sedgwick was going to deny my claim because it was for the old incidents and omitted the new damage, then sent another letter denying the claim on the 18th proving the corruption and manipulation of the law by Supervisor Kathryn Barger and Dr Bloch's attorneys, who are overseeing the claim.

I will bring these federal crimes to the Federal Court. The Director of DPSS, Kathryn Johnson, sees the crimes and calls our situation the responsibility of the FBI, as you can see in the previously admitted exhibits.

I need not attach any more details. The court cashed our check on August 12, so you have the over 600 documents I sent previously.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on September 7, 2024, in Palmdale, California.

Kimberly Clisbee, on behalf of Leilani Co.

Christopher Co
Pro See

Kimberly Clisbee
Pro See

ATE OF CALIFORNIA    DEPARTMENT OF GENERAL SERVICES
**OVERNMENT CLAIM**    OFFICE OF RISK AND INSURANCE MANAGEMENT

3S ORIM 006 (Rev. 08/19)

| LAIMANT INFORMATION | | | |
|---|---|---|---|
| ST NAME<br>O | FIRST NAME<br>**Christopher** | | MIDDLE INITIAL |
| ΛATE OR PATIENT IDENTIFICATION NUMBER (if applicable) | BUSINESS NAME(if applicable) | | |
| LEPHONE NUMBER<br>18-679-1584 | EMAIL ADDRESS<br>kimberlyclisbee@yahoo.com | | |
| ILING ADDRESS<br>531 Springridge Way | CITY<br>**Palmdale** | STATE<br>**Ca** | ZIP<br>**93551** |
| THE CLAIMANT UNDER 18 YEARS OF AGE?<br>☐ Yes ☒ No | INSURED NAME(Insurance Company Subrogation) | | |
| THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?<br>☒ Yes ☐ No | EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME(if applicable) | |

| TTORNEY OR REPRESENTATIVE INFORMATION | | | |
|---|---|---|---|
| ST NAME<br>ro See | FIRST NAME | | MIDDLE INITIAL |
| LEPHONE NUMBER | EMAIL ADDRESS | | |
| ILING ADDRESS | CITY | STATE | ZIP |

| CLAIM INFORMATION | |
|---|---|
| ATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED<br>tate of Califorina et al (see attached complaint) | DATE OF INCIDENT<br>**9/18/2024** |

TE CLAIM EXPLANATION (Required, if incident was more than six months ago)

his is a multifacited ongoing crime, it began in 2009 but has never stopped we are endentured servents

| OLLAR AMOUNT OF CLAIM<br>00,000,000 | CIVIL CASE TYPE(Required, if amount is more than $10,000)<br>☐ Limited ($25,000 or less) ☒ Non-Limited (over $25,000) |
|---|---|

OLLAR AMOUNT EXPLANATION
ne Hundred Million Dollars

CIDENT LOCATION

l8 was the board of Supervisor Kathryn Baerger via County claims. but also and not limited to: State, Federal Buildings, County, medical facilies, courts, CDE,

PECIFIC DAMAGE OR INJURY DESCRIPTION

Ve are enslaved people explained in the complaint. The State of Califorina removed 13th and 14th rights

RCUMSTANCES THAT LED TO DAMAGE OR INJURY

ly daughter and her father are endentured servants for the Califorina Medcial Waiver.

KPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

ie State refused to investigate or protect us from this crime which has not stopped, and indoing so removed our 13th ammendment rights.

ATE OF CALIFORNIA

DEPARTMENT OF GENERAL SERVICES

**OVERNMENT CLAIM**

OFFICE OF RISK AND INSURANCE MANAGEMENT

S ORIM 006 (Rev. 08/19)

---

**AUTOMOBILE CLAIM INFORMATION**

| | | VEHICLE LICENSE NUMBER(if known) | STATE DRIVER NAME (if known) |
|---|---|---|---|
| OES THE CLAIM INVOLVE A STATE VEHICLE? ☐ Yes ☑ No | | | |
| AS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? ☐ Yes ☑ No | | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| VE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? ☐ Yes ☑ No | | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE(if any) |

**NOTICE AND SIGNATURE**

leclare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to e best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or isleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code ection 72).

| GNATURE | PRINTED NAME | DATE |
|---|---|---|
| *Chilgilm Co* | ~~Kimberly Glisbee~~ Christopher | 9/27/2024 |

**INSTRUCTIONS**

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

lail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

---

**Department of General Services Privacy Notice on Information Collection**

his notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal 'rivacy Act (Public Law 93-579).

he Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this orm pursuant to Government Code Section 905.2(c).

he principal purpose for requesting this data is to process claims against the state. The information provided will/may be disclosed to a person, or > another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is ompatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code ection 1798.25.

ndividuals should not provide personal information that is not requested.

he submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the nformation provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Jepartment Privacy Policy**

he information collected by DGS is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**

DRIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal nformation maintained by the state entity. To request access, contact:

DGSORIM
Public Records Officer
'07 3rd St., West Sacramento, CA 95605
'916) 376-5300

STATE OF CALIFORNIA
GOVERNMENT CLAIM
GS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

## CLAIMANT INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Co | Leilani | |

| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) | BUSINESS NAME(if applicable) | | |
|---|---|---|---|

| TELEPHONE NUMBER | EMAIL ADDRESS | | |
|---|---|---|---|
| 661-471-0015 | kimberlyclisbee@yahoo.com | | |

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 3531 Springridge Way | Palmdale | Ca | 93551 |

IS THE CLAIMANT UNDER 18 YEARS OF AGE?
☐ Yes   ☑ No

INSURED NAME(Insurance Company Subrogation)

IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM?
☑ Yes   ☐ No

| EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME(if applicable) |
|---|---|

## ATTORNEY OR REPRESENTATIVE INFORMATION

| LAST NAME | FIRST NAME | MIDDLE INITIAL |
|---|---|---|
| Pro See | | |

| TELEPHONE NUMBER | EMAIL ADDRESS | | |
|---|---|---|---|

| MAILING ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|

## CLAIM INFORMATION

| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED | DATE OF INCIDENT |
|---|---|
| State of Califorina et al (see attached complaint) | 9/18/2024 |

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

This is a multifacited ongoing crime, it began in 2009 but has never stopped we are endentured servents

| DOLLAR AMOUNT OF CLAIM | CIVIL CASE TYPE(Required, if amount is more than $10,000) |
|---|---|
| 100,000,000 | ☐ Limited ($25,000 or less)   ☑ Non-Limited (over $25,000) |

DOLLAR AMOUNT EXPLANATION
One Hundred Million Dollars

INCIDENT LOCATION
9/18 was the board of Supervisor Kathryn Baerger via County claims. but also and not limited to: State, Federal Buildings, County, medical faciliies, courts, CDE,

SPECIFIC DAMAGE OR INJURY DESCRIPTION

We are enslaved people explained in the complaint. The State of Califorina removed 13th and 14th rights

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

My daughter and her father are endentured servants for the Califorina Medcial Waiver.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

The State refused to investigate or protect us from this crime which has not stopped, and indoing so removed our 13th ammendment rights.

# GOVERNMENT CLAIM

DGS ORIM 006 (Rev. 08/19)

---

## AUTOMOBILE CLAIM INFORMATION

| DOES THE CLAIM INVOLVE A STATE VEHICLE? | VEHICLE LICENSE NUMBER (if known) | STATE DRIVER NAME (if known) |
|---|---|---|
| ☐ Yes   ☒ No | | |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER? | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| ☐ Yes   ☒ No | | |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY? | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE (if any) |
| ☐ Yes   ☒ No | | |

## NOTICE AND SIGNATURE

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE | PRINTED NAME | DATE |
|---|---|---|
| (Sign For user) | Kimberly Clisbee | 9/27/2024 |

## INSTRUCTIONS

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS 414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

---

**Department of General Services Privacy Notice on Information Collection**

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**

The information collected by DGS is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**

ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
707 3rd St., West Sacramento, CA 95605
(916) 376-5300

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

## CLAIMANT INFORMATION

| | | |
|---|---|---|
| LAST NAME **Clisbee** | FIRST NAME **Kimberly** | MIDDLE INITIAL |
| INMATE OR PATIENT IDENTIFICATION NUMBER (if applicable) | BUSINESS NAME (if applicable) | |
| TELEPHONE NUMBER **661-471-0015** | EMAIL ADDRESS **kimberlyclisbee@yahoo.com** | |

| | | | |
|---|---|---|---|
| MAILING ADDRESS **3531 Springridge Way** | CITY **Palmdale** | STATE **Ca** | ZIP **93551** |

| | |
|---|---|
| IS THE CLAIMANT UNDER 18 YEARS OF AGE? ☐ Yes ☑ No | INSURED NAME (Insurance Company Subrogation) |

| | | |
|---|---|---|
| IS THIS AN AMENDMENT TO A PREVIOUSLY EXISTING CLAIM? ☑ Yes ☐ No | EXISTING CLAIM NUMBER (if applicable) | EXISTING CLAIMANT NAME (if applicable) |

## ATTORNEY OR REPRESENTATIVE INFORMATION

| | | |
|---|---|---|
| LAST NAME **Pro See** | FIRST NAME | MIDDLE INITIAL |
| TELEPHONE NUMBER | EMAIL ADDRESS | |

| | | | |
|---|---|---|---|
| MAILING ADDRESS | CITY | STATE | ZIP |

## CLAIM INFORMATION

| | |
|---|---|
| STATE AGENCIES OR EMPLOYEES AGAINST WHOM THE CLAIM IS FILED **State of Califorina et al (see attached complaint)** | DATE OF INCIDENT **9/18/2024** |

LATE CLAIM EXPLANATION (Required, if incident was more than six months ago)

This is a multifaceted ongoing crime, it began in 2009 but has never stopped we are endentured servents

| | |
|---|---|
| DOLLAR AMOUNT OF CLAIM **100,000,000** | CIVIL CASE TYPE (Required, if amount is more than $10,000) ☐ Limited ($25,000 or less) ☑ Non-Limited (over $25,000) |

DOLLAR AMOUNT EXPLANATION
**One Hundred Million Dollars**

INCIDENT LOCATION
9/18 was the board of Supervisor Kathryn Baerger via County claims. but also and not limited to: State, Federal Buildings, County, medical facilies, courts, CDE,

SPECIFIC DAMAGE OR INJURY DESCRIPTION

We are enslaved people explained in the complaint. The State of Califorina removed 13th and 14th rights

CIRCUMSTANCES THAT LED TO DAMAGE OR INJURY

My daughter and her father are endentured servants for the Califorina Medcial Waiver.

EXPLAIN WHY YOU BELIEVE THE STATE IS RESPONSIBLE FOR THE DAMAGE OR INJURY

The State refused to investigate or protect us from this crime which has not stopped, and indoing so removed our 13th ammendment rights.

STATE OF CALIFORNIA
**GOVERNMENT CLAIM**
DGS ORIM 006 (Rev. 08/19)

DEPARTMENT OF GENERAL SERVICES
OFFICE OF RISK AND INSURANCE MANAGEMENT

| **AUTOMOBILE CLAIM INFORMATION** | | |
|---|---|---|
| DOES THE CLAIM INVOLVE A STATE VEHICLE?  ☐ Yes  ☒ No | VEHICLE LICENSE NUMBER(if known) | STATE DRIVER NAME (if known) |
| HAS A CLAIM BEEN FILED WITH YOUR INSURANCE CARRIER?  ☐ Yes  ☒ No | INSURANCE CARRIER NAME | INSURANCE CLAIM NUMBER |
| HAVE YOU RECEIVED AN INSURANCE PAYMENT FOR THIS DAMAGE OR INJURY?  ☐ Yes  ☒ No | AMOUNT RECEIVED (if any) | AMOUNT OF DEDUCTIBLE(if any) |

**NOTICE AND SIGNATURE**

I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true and correct to the best of my information and belief. I further understand that if I have provided information that is false, intentionally incomplete, or misleading I may be charged with a felony punishable by up to four years in state prison and/or a fine of up to $10,000 (Penal Code section 72).

| SIGNATURE | PRINTED NAME  **Kimberly Clisbee** | DATE  **9/27/2024** |
|---|---|---|

**INSTRUCTIONS**

- Include a check or money order for $25, payable to the State of California.
  - $25 filing fee is not required for amendments to existing claims.
- Confirm all sections relating to this claim are complete and the form is signed.
- Attach copies of any documentation that supports your claim. Do not submit originals.

Mail the claim form and all attachments to:
Office of Risk and Insurance Management
Government Claims Program
P.O. Box 989052, MS414
West Sacramento, CA 95798-9052

Claim forms can also be delivered to:
Office of Risk and Insurance Management
Government Claims Program
707 3rd Street, 1st Floor
West Sacramento, CA 95605
1-800-955-0045

**Department of General Services Privacy Notice on Information Collection**

This notice is provided pursuant to the Information Practices Act of 1977, California Civil Code Sections 1798.17 & 1798.24 and the Federal Privacy Act (Public Law 93-579).

The Department of General Services (DGS), Office of Risk and Insurance Management (ORIM), is requesting the information specified on this form pursuant to Government Code Section 905.2(c).

The principal purpose for requesting this data is to process claims against the state The information provided will/may be disclosed to a person, or to another agency where the transfer is necessary for the transferee-agency to perform its constitutional or statutory duties, and the use is compatible with a purpose for which the information was collected and the use or transfer is accounted for in accordance with California Civil Code Section 1798.25.

Individuals should not provide personal information that is not requested.

The submission of all information requested is mandatory unless otherwise noted. If you fail to provide the information requested to DGS, or if the information provided is deemed incomplete or unreadable, this may result in a delay in processing.

**Department Privacy Policy**
The information collected by DGS is subject to the limitations in the Information Practices Act of 1977 and state policy (see State Administrative Manual 5310-5310.7). For more information on how we care for your personal information, please read the DGS Privacy Policy.

**Access to Your Information**
ORIM is responsible for maintaining collected records and retaining them for 5 years. You have a right to access records containing personal information maintained by the state entity. To request access, contact:

**DGS ORIM**
**Public Records Officer**
**707 3rd St., West Sacramento, CA 95605**
(916) 376-5300

# CHASE ◑

Printed from Chase Personal Online

## Check Details

Total: **-$25.00**

Post date: Aug 12, 2024

Check #: 106

**Front**   **Back**



JPMorgan Chase Bank, N.A. Member FDIC          ©2024 JPMorgan Chase & Co          Equal Opportunity Lender

# CHASE ◐

Printed from Chase Personal Online

## Check Details

Total: **-$25.00**

Post date: Aug 12, 2024

Check #: 106

**Front**   **Back**



JPMorgan Chase Bank, N.A. Member FDIC          ©2024 JPMorgan Chase & Co          Equal Opportunity Lender

## EXHIBIT B

The first document is from Sedgwick Corp, dated 9/4/2024. It
explains that they were not taking my case and did not assign it to an
assessor because it was not a matter of medical malpractice and
needed to be sent to the proper authority.

Next is the letter I sent to Sedgwick about the trouble I was having
with Dr. Bloch/Kathryn Barger's attorneys, the assessor Carl
Saltzman, and County administrator Jackie Stewart for harassing me
through the claims process, committing fraud and obstructing
justice that prompted their letter informing me they were not
handling my claim, which was not sent to me when they determined
this. Likely because of the fraud Jackie Stewart and the county
attorneys were committing on behalf of their clients, Dr. Bloch and
Kathryn Barger.

Lastly, several documents regarding the fraudulent claim are
included. You can see Carl Salzman and Jackie Stewart pretend to
be claim assessors assigned to this case and request personal
information to give the defendants.

Chris and Leilani Co were also omitted from this claim, violating
their 13th and 14th Amendment rights and making the claim response
invalid as does the fraud, allowing us to file without the obstacle of
their immunity.



sedgwick.

September 9, 2024

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

RE          : Kimberly Clisbee
              Sedgwick File No.:    6810
              County File No.:      24-4424817

Dear Ms. Clisbee:

Enclosed please find the documents received at this office on 9/4/2024.

Sedgwick is not an agent for service of process on the County of Los Angeles. Service on the County of Los Angeles must be made on the Clerk of the Board of Supervisors located at 500 W. Temple St., Los Angeles, CA 90012. Therefore, we are returning your documents to you herewith. This office will take no further action with your letter until it has been properly served.

Sedgwick

Kimberly Clisbee                                                      9/7/2024

3531 Springridge Way

Palmdale, California, 93551

661-471-0015

kimberlyclisbee@yahoo.com


Dear Mr. Saltzman,

Christopher Co. and Leilani Co. are filing a Federal Law Suite against Mr. Saltzman

for violating their 14th Amendment rights to due process. They filed a claim along with me,

and Mr. Saltzman is ignoring their claims. It is likely because of Mr. Saltzman's extreme

prejudice towards the disabled or immigrants, or that if he includes them, he will have to do

his analysis ethically and legally since there is nothing about Mr. Saltzman that suggests he

is an ethical person and everything he has done thus far proves otherwise.

As for Jackie Stewart, she is a lying disgrace to humanity and is dealing with the case

to commit a crime because that is what she does: she hurts American citizens so

government officials can pray on society and create a communist state where a Nazi

supporter like herself can have power. Someone with her education would not normally

have power in the professional world, but in California, it is not about education. It is about

how much crime you will commit for your organization. That is why California is thought of

as a crime state. It is not society. It is people like Mr. Saltzman and Jackie Stewart who

created communism in California by simply not following the law. It is the government, thanks to criminals like Mr. Saltsman and Jackie Stewart, who are the reason babies are being mutilated and no one is doing anything. Ms. Stewart is personally responsible for hundreds of babies dying because he failed her due diligence.

The original complaint involved corruption from the LAPD, the government, the Department of Education, and everything in between, and because she is a criminal, she did not do her due diligence. No one is going to look at this case and not call her a criminal. Just because the LAPD is filled with morons does not mean the rest of the Criminal Justice system is not educated. The LAPD is supported by white-collar crime; they are not doing the same work as police in other states; because of people like Jackie Stewart and Mr. Saltzman, society is not safe because they lie to protect crimes for government officials.

In response to your letter threatening me with retaliation for seeking justice against Jackie Stewart, a known felon (explained below) who works for Intercare, not Sedgwick, who committed a federal crime against me and my family that resulted in the past four years of abuse, retaliation, a SLAPP violation, my professional name ruined and almost killed Leilani. She participated in the trial as a witness for Kathryn Barger, and Dr. Bloch failed her due diligence purposefully and criminally in 2020 and is now interfering with this claim. I will not be bullied on behalf of that criminal!

Jackie Stewart violated our Fourteenth and Thirteenth Amendments by denying us due process and keeping us in forced servitude for the county, where we were further abused for an additional four years. She is responsible for that.

There was no need to threaten my freedoms for exercising my rights; it's a crime to do that, and in doing so, you also violated my victim's rights. It's also a felony to use your position to intimidate and make threats to scare me with retaliation if I did report you and your colleague's crimes is a crime. If you did nothing, you will be cleared, but to threaten me is a crime and a violation of my victim's rights. Just because you phrased it as "for your protection," it was a threat.

You may not think Ms. Stewart is a criminal, but she is. You have done some of the same things as her, which are crimes, like deciding on a federal civil rights claim and relabeling it to "malpractice" so you can decide on it, not being a federal judge. That is a **federal offense and a violation of my Fourteenth Amendment rights.**

Do you even understand that it is wrong to withhold another man's rights and enslave them, or have you been doing it so long that it is natural to do that? I know most of the slaves are immigrants like Chris, so they don't have Constitutional rights, which is why you seem to forget the Constitution exists with the degree you have violated it.

**Fourteenth Amendment Violation**

I filed a civil rights claim that required federal law enforcement based on its nature and because I stated it was a civil rights violation claim and crime. Ms. Stewart relabeled my claim to malpractice so she could rule on it and, in doing so, committed a felony because it is a federal offense for one man to withhold another Federal rights, and she was required to get the DA, civil rights team, and law enforcement involved, especially seeing there was a component of sexual battery, but chose to change my claim as Mr. Saltzman

did, and violated my Fourteenth Amendment rights in the process. None of this retaliation would have occurred if she had done her job ethically the first time, but she did not, and all the retaliation we suffered was her fault.

I did not even state that I was taking legal action against Ms. Stewart; I objected to her being involved in my claim because of the crimes she committed against us. She is a criminal to me and belongs to me in prison. I don't respect her, and I don't want her near me, my claim, or my person. She has proven to be corrupt.

Mr. Saltzman threatened me on her behalf (letter included in exhibits), and I blame the BOS for her actions. If this is not settled, I am taking the Board of Supervisors to the Federal Court for violating our 13th and 14th Amendment rights, and I will win because I can prove we are forced slaves of the county of Los Angeles for profit. I am not trying to sound threatening. You are leaving me with no other option. I will not be oppressed anymore, and I won't let you kill my child.

This must stop; we deserve our freedom; we did not commit a crime, and Chris and Leilani are guilty of being brown; that is the entire reason Leilani is in a wheelchair, and why you took Chris's temporal lobe out of hate, and I have begged for my Federal Rights that you all are withholding for four years, I can't do this anymore, it has to stop, and I will win because this is all true.

Seeing that Ms. Stewart is an employee of Los Angeles County and Intercare and does not work for Sedgwick Claims Department but is interfering, it is obvious she is still an

**Mr. Saltzman was given a claim of federal rights violation of the 13th and 14th Amendments by the BOS and DA's lack of due diligence in my 2020 complaint. No one told him to investigate the doctors or defend the criminals involved. He has taken that role upon himself and is not an attorney or a judge. He is doing this to assist his colleagues and to create a narrative by someone who is not calling them all a criminal. Every other department in government that has investigated this crime has called this a Federal Crime and extreme government corruption and is in need of the FBI; what Mr. Saltzman is doing is a crime and a violation of my victim's rights. He is not a Federal Judge or officer and is breaking the law by making decisions on a Federal Rights claim.**

Jackie Stewart also turned a civil rights case that I filed into a medical malpractice case so law enforcement could not arrest her colleagues; that is a felony, and it makes her and anyone else who decides on a federal rights claim who is not a Federal judge a felony. No man has a right to take another's federal rights away, and Ms. Stewart's did, and now Mr. Saltzman is. What's worse, he is threatening me with legal action if I defend myself against this crime.

Jackie Stewart, along with Nicol Iron, are two of the most disgraceful criminals in the county, and if the world opened up and swallowed them, we would all be better off. That criminal caused all of this so Intercare would not have to pay out the claim, and that is insurance fraud. To threaten me for her is a violation of my victims' rights and a crime on your part. You didn't need to put yourself in jeopardy for these people. But crime is a choice, and you choose.

active member of this crime. I don't care what anyone has to say about her innocence; a judge did and would differ, as would a jury based on her actions.

Also, state that you know for a fact that Ms. Stewart has not communicated with Mrs. Barger; it is observed for you to say, Do you live together and are with her 24/7? No, so to say that is subjective because it is impossible to prove, and she is not someone whose word holds value without evidence, so you don't know that for sure.

It is clear Sedgwick is not working on my claim as filed and is harassing me for the county degenerates who are part of the bigger crime. This is retaliation for and or by the defense once again. Sedgwick assists the county and medical facilities; you cannot police them, too, as it is a conflict of interest. However, the fact this ended up as a medical malpractice claim when I filed a civil rights claim is all the proof of corruption that is needed and proves the claim of harassment and stalking.

I see Jackie Stewart as a criminal participant in this crime. Everyone else does, too, and she has proven to be a colleague of Dr. Bloch and Mrs. Barger, so it is appropriate to call this claim process harassment and retaliation for the defendants, seeing she is involved and you're treating me for her.

This claim is being used to try and clear the names of the known county offenders, but nothing will erase their crimes, and it violates our rights. Everything, including the fact that Ms. Stewart violated my rights and is the cause of this continued abuse, has already been established; the Federal Government will see her participation as her committing more crime, as she is a criminal! But that is not the claim Mr. Saltzman was given.

Still, seeing the threat to my freedoms made on her behalf by an individual who is not a member of the criminal justice system, Mr. Saltzman, it would appear Sedgwick is the legal representative for the defense and is not capable of ethics or following the law of Good Business practices, state, or Federal government due to their conflict of interests which is providing support for the medical industry no matter what they did.

In your first letter to us, Mr. Saltzman defended Dr. Bloch aggressively, as you can see from all the questions you had about him and only him. You did not mention one other component of any of the three claims just about Dr. Bloch as if you were defending him.

You then stated you disagreed that I was claiming civil rights violations against the board of supervisors and DA and insisted I was filing a medical malpractice complaint. Who are you to tell me what crimes against me I am filing? And what gives you the right to decide on a Federal Claim? Your license could be revoked for this Federal offense.

When I told you I was not filing a claim against Dr. Bloch, it was against Kathryn Barger, the BOS, and the DA for prejudice, refusal of due process, and withholding of the 13th and 14th Amendments, you told me no that you disagree, which is insane. Who are you to tell me what I am filing my claim about? This is a Federal crime and requires a federal judge, not a claims assessor, and you are committing a Federal Crime by insisting you have the authority to decide on my Federal rights, the same as Jackie Stewart did.

Mr. Saltzman then states that what happened to the three of us was no retaliation, even though he has no criminal justice background. He took less than one day to respond,

so there was no investigation, and he disregarded the two county investigations that

established otherwise. There is no adherence to the law, Federal or otherwise.

The retaliation happened in UCLA Medical, DDS, Los Angeles County Regional

Center, the DHCS, DPSS, superior court, the Board of Supervisors, and countless

USC/UCS doctors, and you did not have one question about any of it.

Then you want to argue whether it was a crime versus medical malpractice when no

surgery was ever needed, and they were both trapped and tricked into the surgery. Several

judges and countless others, including the defendants, had already agreed to it as a crime.

So why do you think that is your place to decide? Only law enforcement can determine a

crime; you are not that.

In the letter I am responding to, you defend Ms. Jackie Stewart and threaten me

with imprisonment should I dare pursue justice against her. Not that I ever said I was; I

merely showed how she obstructed justice in the last hearing, aligning with criminals and

is likely one, and how she also obstructed justice in 2020 and would likely do so if involved

in this claim because she is a criminal and that is what they do and her involvement is a

violation of my victim's rights because she is a big reason on why we are still victims and

everything that has happened since filing the claim in 2020.

However, I never threatened to sue her, so I am curious why you threatened me if I

mentioned her in litigation. She assisted in removing my federal rights for the past four

years and counting. She is part of the crime, whether she likes it or not. But that is for the

Federal Government to prosecute, not me. I am only here to file a claim against the

**Board of Supervisors and DA for failing to do the due diligence that led to all this**. You're bringing the rest out by treating this like a malpractice claim when it is a Federal rights claim you're not qualified to decide and are just harassing me for your colleagues.

I have never made a false statement in this case and don't need to because all of this is true and super easy to prove. Ms. Stewart, however, is a liar. She filed a false report and even handed it to a judge because she also broke the law when I filed my claim for damages due to civil rights violations in 2020. She did not turn it over to the DA, and she turned my complaint regarding federal rights into malpractice, as Mr. Saltzman did, and decided to commit a federal offense because no man has the right to withhold another Federal right according to the 14th Amendment, which you both violated and You, Mr. Saltzman, are still violating that right.

**Ms. Stewart broke Federal Law by determining the merit of my Federal rights claim, denying me access to my rights, and not being a Federal Judge while doing so.**

If we want to get technical. I can prove I filed my claim as a civil tort and only had to file in civil court because the doctor's attorneys filed a SLAPP violation due to retaliation that occurred for filing the claim Ms. Stewart denied.

Because Ms. Stewart did not do her due diligence and violated our Federal Rights, all of the sufferings we have endured since 2020 is her fault. So please do not threaten me for Ms. Stewart; it proves your inability to be impartial and that you are only here to violate my rights further for these county animals.

To threaten me for Ms. Stewart and remove my 14th Amendment rights, which you
have done, Mr. Saltzman is a violation of my Federal Constitutional rights and the

## California Constitution, Article I, Section 28(b)

(b) In order to preserve and protect a victim's rights to justice and due process, a victim
shall be entitled to the following rights:

(1) To be treated with fairness and respect for his or her privacy and dignity and to be free
from intimidation, harassment, and abuse throughout the criminal or juvenile justice
process.

(2) To be reasonably protected from the defendant and persons acting on behalf of the
defendant.

(5) To refuse an interview, deposition, or discovery request by the defendant, the
defendant's attorney, or any other person acting on behalf of the defendant and to set
reasonable conditions on the conduct of any such interview to which the victim consents.

(13) To restitution.

(A) It is the unequivocal intention of the People of the State of California that all persons
who suffer losses as a result of criminal activity shall have the right to seek and secure
restitution from the persons convicted of the crimes causing the losses they suffer.

(B) Restitution shall be ordered from the convicted wrongdoer in every case, regardless of
the sentence or disposition imposed, in which a crime victim suffers a loss.

(C) All monetary payments, monies, and property collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.

You are going to great lengths to defend the defendants, which is a violation of my due process rights. This case is supposed to be with the DA or another body of law, not with a medical claims department that is not legally able to judge anything in this case, as it is a Federal offense to preserve Federal rights outside of a Federal Court.

We are forcefully enslaved into the system and victims of constant county abuse because of illegal trafficking and medical battery against two healthy immigrants not in need of surgery. That is a violation of the thirteenth and fourteenth Amendments, and only a federal judge can decide.

Although the realization was made through our medical providers, it was all three of us in separate locations at separate times, in separate types of care, but all the same people: Dr. Bloch and USC/UCLA doctors.

Our claim against the board and DA was a violation of our Federal Rights, and not doing their due diligence in 2020 has caused us to suffer retaliation. So, bringing in the assessor who failed to do her due diligence in 2020 proved to be unethical based on her declaration, and the fact that neither Chris nor Leilani ever needed surgery is unethical.

If she had turned this over to the DA back then, this information would have been more accessible sooner, the defendants would have been in prison, and the damage we

have suffered since then, especially the damage to my professional name, would not have
been.

This is all Ms. Stewarts' fault because she decided on a federal offense, which is a
Federal Offense. She is not even an attorney. The law required her to get the FBI involved,
not play Federal Court Judge.

Ms. Stewarts' incompetence or corruption, pick one, is why we are still suffering this
crime and why, for four years, dozens of more infants were brutalized through surgery, and
their lives were stolen. It is why Lelani now has lingual dystonia, why I can't access
healthcare, why Leilani cannot go to school, and why Chris was bullied out of his DDS
services, all because she failed to do her job. So, of course, I don't want her anywhere near
this claim.

Ms. Stewart has been proven wrong multiple times. Even the judge threw her
declaration out of court, so know there is nothing false but the claims Ms. Stewart made.

It is not up to a medical claim assessor to determine whether our Federal Civil
rights, including the13th and 14th Amendments, were violated by the Board of Supervisors
and DA for failing to stop the abuse and medical slavery of Chirs and Leilani Co. This must
go to Federal Court or be settled monetarily so we can escape the county and defendants
who want us dead and in prison to shut us up, pick one but those are the only legal
choices.

Only a Federal Judge can determine the withholding and violation of our Federal
Rights, and your job is to get the Federal Law enforcement involved or settle. Pick one, but

you don't get to decide if these rights were violated. Clearly, they were, and omitting Chris
and Leilani from this claim process is also a violation of those rights.

I take your threat not to complain about anyone violating the law or my rights at
Sedgwick's seriously. I do believe you would use unethical tactics to injure us, as this claim
process has been less than by the book from the start and has already violated Chris and
Leilani's rights to due process and access to the 13th and 14th Amendments.

Also, you don't know if Jackie Stewart has been in touch with Mrs. Barger, Dr. Bloch,
or anyone else associated with this crime. Are you with her 24/7, taking notes? Of course
not. She has proven to be unethical and corrupt in the past, and I don't believe her, and that
is sufficient. a

**I said nothing that was not proven by documentation**.

•Jackie Stewart worked on this first claim, and the documents were provided.

• Jackie is an administrator who works in the same department as the Board of
Supervisors. This is a fact.

• Jackie Stewart provided a decoration for Kathryn Barger and Dr. Bloch in the lawsuit I
withdrew in civil court.

•This is a fact and makes it reasonable for me to believe Jackie is working to help Dr. Bloch
and Kathryn Barger commit fraud because her actions, whether Mr. Saltzman agrees or not,
were unethical, in my opinion.

• Based on how long she has been involved, it is likely, based on the history of this case, that she would continue her corruption in this claim.

• Again, I have the right to express what I believe is true based on my experience, and just because you disagree does not mean I am providing "false information." This is an opinion I developed from her involvement in this case over the past five years.

To suggest I am in any way "knowingly providing false information to get approval on a claim" is **slanderous and unfounded**. I am the victim of a crime following the guidelines of the law, and you all are claim assessors whose job it is to be deceitful to a degree. This is proven by your asking me for information you told me you already had.

Based on the facts of this case, you will not get a body of law to believe that I am filing a false report because I have documents and witnesses to prove every word of it. Threatening me with prison for stating what I believe is true is the actual crime here, not me saying what is evident based on documented proof.

There is no other reason for sending me that letter besides intimidating me and threatening me with legal retaliation for stating the facts of Ms. Stewart's involvement in the previous case, which was filled with county corruption.

I would never pass on false information; I have proof I don't need to lie.

• Ms. Stewart broke the law in her initial assessment by converting my Federal Rights into a claim she could rule on, which is the same as deciding on the Federal Claim I submitted; it's still a violation of the Fourteenth Amendment. She also

neglected to get the attorney general involved as required by law. This was deemed a crime by multiple judges and, just recently, the director of DPSS, the DDS Ombudsman, and a County Civil Rights investigator. So she was wrong, and there is no doubt, that she does not get a redo or get to tamper with this case and obstruct justice twice.

• I stated Ms. Stewart acted as a witness to Dr. Bloch and Kathryn Barger because she did; the proof was attached,

• I stated that Jackie Stewart (the only name on the document) asked for my personal information. As you can see in the documents. Another administrative personnel member can work on this case. Her involvement is inappropriate and suspicious, seeing she did all that I stated because there is proof.

• I never claimed that I was suing Ms. Stewart of Sedgwick to encourage that response.

• My wording of "demand" was more out of exhaustion from dealing with corrupt and unfair claims people when the crimes are evident and fear more than anything else. I need to move my family away from this abuse before one of us dies because of it. This is a real fear for us and is supported by the overwhelming proof that I provided.

• I don't need to commit fraud to win my claim; it is accurate and proves itself, and it is unethical not to grant it. I don't need a loophole or to pull a fast one. I need an ethical human being working in this department.

What part of that is false or fraudulent? None. There was no need aside from trying

to put me in my place or intimidate me because you did not like my wording, but too bad I

have the right to protect my child and self and the right to preserve our rights.

In closing,

Mr. Saltzman, you're supposed to act as a neutral party, and based on that letter,

you clearly are not. A neutral assessor would have sent a letter saying, "I see your concern

and will make sure Ms. Stewart is not included in any part of this assessment to ensure it is

conducted fairly." But you did not do that. You politely threatened me with imprisonment by

reminding me about the laws of filing a false claim, as if I would need that reminder. I would

never file a false claim or tell a lie to a court, police officer, or anyone else. I have the proof;

there is no need to add or embellish; the truth in this case is horrific enough, and in front of

a jury, it would land everyone in prison. I am confident of that.

Secondly, you dared to change my claim from a Federal Complaint requiring Federal

Law enforcement to a medical malpractice claim, like Ms. Stewart's, violating our

Fourteenth Amendment rights and California victims' rights. This action shows the crimes

being committed against us and the cause of our enslavement and constant systematic

abuse.

At this point, I am requesting a settlement, or I will take the board to the Federal

Court for these civil rights violations because you are literally killing us, as in murder

charges if it happens. They did not need surgery, and Dr. Bloch lied to make it happen and

proceeded to butcher her repeatedly. Leilani is having a hard time with all the injuries the

county caused, and If she dies, it's murder because she never needed surgery; the county

lied and stole her life and mine with it and forced us into the system where the oppressed

us for profit, which is no different than human trafficking and slavery by definition.

A Federal case will force all the defendants and individuals who work for the county

that injured us on its behalf to testify, which was thirty-three before all of this. It may be

more now, but each incident will be added, and there are plenty of witnesses and

documents to prove everything. You all know it, so stop tormenting us!

All of you will be able to explain to a jury in Federal Court why two people who did

not need surgery were butchered by the county and enslaved only to be tortured with more

surgeries, sexually assaulted, deprived access to Constitutional rights, threatened and

abused for fourteen years. You forced them to serve the county with their actual flesh that

you stole from them for money and stole my life along with them, and I can't wait to get this

in front of a jury.

However, the law requires the county to settle with these evident and continual

violations of our rights, and failing to do so is an additional violation.

Attached is the new claim Chris and Leilani have filed because of the prejudice

shown to them in this claim.


Best Regards,

Kimberly Clisbee

 **sedgwick.**

Sedgwick Claims Management
PL-COLA Program
Post Office Box 8397
Long Beach, California 90808

September 18, 2024

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

> Claimant:  Kimberly A. Clisbee
> Sedgwick File No:  6823
> County File No.: 24-4425496 BOS No: 24-3746

Dear Ms. Clisbee:

The claim you presented to the County Board of Supervisors on August 29, 2024, is being returned because it was not presented within six (6) months after the event or occurrence as required by law. See sections 901 and 911.2 of the Government Code. Because the claim was not presented within the time allowed by law, no action was taken on the claim.

**WARNING**

Government Code section 911.3 provides that when a claim is denied because it was not presented within the time allowed by law, notice to the claimant shall so state and further give notice in substantially the following form:

"Your only recourse at this time is to apply without delay to the Los Angeles County Board of Supervisors for leave to present a late claim. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the Government Code. Under some circumstances, leave to present a late claim will be granted. See section 911.6 of the Government Code."

"You make seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately." If you dispute the County's conclusion that your claim was untimely, the following warning may be applicable under Government Code section 913.

**WARNING**

"Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited into the mail to file a court action on this claim. See Government Code Section 945.6. You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately."

CS/js

Hybrid

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is P. O. Box 8397; Long Beach, CA 90808.

On 9/18/2024, I served the foregoing document described as:

- Denial Of Claim

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

XX   **(BY MAIL)**   I placed such envelope with postage thereon fully prepaid in the United
States                mail at Long Beach, California.

____ **(BY PERSONAL SERVICE)**
                      I caused such envelope to be delivered by hand to the offices of the
                      addressee.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on 9/18/2024 at Long Beach, California.

Jackie Stewart

 **sedgwick.**

Sedgwick Claims Management
PL-COLA Program
Post Office Box 8397
Long Beach, California 90808

September 16, 2024

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

> Claimant:  Kimberly A. Clisbee
> Sedgwick File No:  6810
> County File No.: 24-4424817 BOS No: 24-3208

Dear Ms. Clisbee:

The claim you presented to the County Board of Supervisors on July 26, 2024 (as amended August 29,
2024) is being returned because it was not presented within six (6) months after the event or occurrence
as required by law. See sections 901 and 911.2 of the Government Code. Because the claim was not
presented within the time allowed by law, no action was taken on the claim.

**WARNING**
Government Code section 911.3 provides that when a claim is denied because it was not presented
within the time allowed by law, notice to the claimant shall so state and further give notice in
substantially the following form:

"Your only recourse at this time is to apply without delay to the Los Angeles County Board of Supervisors
for leave to present a late claim. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the
Government Code. Under some circumstances, leave to present a late claim will be granted. See section
911.6 of the Government Code. "You make seek the advice of an attorney of your choice in connection
with this matter. If you desire to consult an attorney, you should do so immediately."

If you dispute the County's conclusion that your claim was untimely, the following warning may be
applicable under Government Code section 913.

**WARNING**
Subject to certain exceptions, you have only six (6) months from the date this notice was personally
delivered or deposited into the mail to file a court action on this claim. See Government Code Section
945.6. You may seek the advice of an attorney of your choice in connection with this matter. If you desire
to consult an attorney, you should do so immediately."

CS/js

Hybrid

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is P. O. Box 8397; Long Beach, CA 90808.

On 9/16/2024, I served the foregoing document described as:

• Denial Of Claim

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

XX  **(BY MAIL)**    I placed such envelope with postage thereon fully prepaid in the United
States                 mail at Long Beach, California.

____  **(BY PERSONAL SERVICE)**

I caused such envelope to be delivered by hand to the offices of the
addressee.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on 9/16/2024 at Long Beach, California.

Jackie Stewart

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is P. O. Box 8397; Long Beach, CA 90808.

On 9/16/2024, I served the foregoing document described as:

- Denial Of Claim

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

XX   **(BY MAIL)**   I placed such envelope with postage thereon fully prepaid in the United States   mail at Long Beach, California.

_____ **(BY PERSONAL SERVICE)**
           I caused such envelope to be delivered by hand to the offices of the addressee.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on 9/16/2024 at Long Beach, California.

Jackie Stewart

Ca-+l_____
914-742-6732

 sedgwick.

**Sedgwick**
**PL-COLA Program**
**Post Office Box 8397**
**Long Beach, California 90808**

August 21, 2024

Kimberly A. Clisbee
3531 Springridge Way
Palmdale, CA 93551

> Claimant(s)        : Kimberly A. Clisbee
> Claim Filed         : 07/26/2024
> Sedgwick File No.    : 6810  County File No.: 24-4424817 BOS No: 24-3208
> PL Claims Specialist : Carl Saltzman

Dear Ms. Clisbee:

We are liability claims administrators for the County of Los Angeles. The above-referenced claim that you filed with the Los Angeles County Board of Supervisors has been referred to us for handling.

This letter is notice of the insufficiency of the claim presented by you to the Board of Supervisors and is sent pursuant to Government Code Section 910.8. The claim as presented fails to comply substantially with the requirements of Sections 910 and 910.2 of the Government Code.

The claim for damages filed with the Board of Supervisors is defective in the following respect:

**Part 8 of the CLAIMS FOR DAMAGES TO PERSON OR PROPERTY states, in part:**

**"Stalking and retaliation by county official for taking him to court and reporting him to the DA for selling State property on a private site for personal profit."**
**Please identify the details of the "(s)talking" you referred to in your claim. Who did the stalking, against whom, when each event occurred? Please identify the details of the "retaliation" you referred to in your claim. Who retaliated, against whom, when each event occurred? Please identify the "county official" by name.**
**Please identify "him" by name.**
**Please identify the case name, case number and location of "court" that the person "him" was taken to as referred to in your claim.**
**Please identify the "State property" referred to in your claim.**
**Please identify the location of the "private site" referred to in your claim.**
**Please direct us to the PDF page number(s) of your attachments that provides an explanation of the "(s)talking and retaliation" you referred to in your claim.**

## Please provide any additional information regarding the "(s)talking and retaliation" you referred to in your claim.

Pursuant to Government Code Section 910.8, no action will be taken on this claim for a period of 15 days after the date of this notice.

Please file an amended claim with the Clerk of the Board of Supervisors.

Questions with respect to this claim should be directed to the assigned PL Claims Specialist, noted above, at Sedgwick PL-COLA Program, Post Office Box 8397, Long Beach, California 90808.

CS/js-43

## PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is P. O. Box 8397; Long Beach, CA 90808.

On 08/21/2024, I served the foregoing document described as:

- Notice of Insufficiency

on interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows

Kimberly A. Clisbee
3531 Springridge Way
Palmdale, CA 93551

__XX__   **(BY MAIL)**      I placed such envelope with postage thereon fully prepaid in the United States mail at Long Beach, California.

_____   **(BY PERSONAL SERVICE)**
                          I caused such envelope to be delivered by hand to the offices of the addressee.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on 08/21/2024 at Long Beach, California.

Jackie Stewart

**Sedgwick**
**PL- COLA Program**
**P. O. Box 8397**
**Long Beach, CA 90808**
**1-855-850-2252**

**Patient Name:  Kimberly Clisbee**
**Sedgwick File No.:   6810**
**County File No.: 24-4424817**

Note: please make copy of this page if you have more than one
provider to list.

Complete Name of Non-County Healthcare Provider, Hospital, Clinic
or Physician: _____
Complete Address:_____
City, State and Zip code: _____
Phone Number, including area code: _____

B. When relevant to my claim, Sedgwick may re-disclose (without my
further authorization) any and all of my individually identifiable medical or
health information (whether obtained pursuant to this authorization or
otherwise from any person or entity) to any of the following, (a) Any
person or facility that attends, treats or examines me; (b) Any person or
facility that impacts determination of my claim or that coordinates my
benefits; (c) My employer and its affiliates and their representatives,
independent contractors and service providers that may receive any such
information from my employer to the extent permitted by state or federal
law; or (d) The Social Security Administration or a social security or
vocational rehabilitation vendor. Sedgwick may use my information
obtained pursuant to this authorization in any other claim matter that
Sedgwick may administer or handle related to me.

3. **How Long this Authorization is Valid?**  This authorization is valid from one
year from date of signature.

4. **Revocation of this Authorization.**  Unless otherwise provided by federal or
state law, I understand that I may revoke this authorization at any time by
notifying, in writing, to Sedgwick, PL COLA Program, P. O. Box 8397, Long

3                                      _____ Initials

**Sedgwick**
**PL- COLA Program**
**P. O. Box 8397**
**Long Beach, CA 90808**
**1-855-850-2252**

## Patient Name: Kimberly Clisbee
## Sedgwick File No.: 6810
## County File No.: 24-4424817

Beach, CA 90808 of my revocation and that my revocation shall be effective upon Sedgwick's receipt of my notice of revocation.

5. I also understand that my revocation of this Authorization will not have any effect on any actions taken by Sedgwick before it receives my revocation.

6. **Refusal To Sign.** I further understand my health care providers will not condition my treatment, payment, enrollment, or eligibility on my refusal to sign this Authorization.

I understand that I have the right to request and receive a copy of this authorization. I understand that I have the right to inspect the disclosed information at any time. A photocopy of this authorization shall be valid and is to be accepted with the same effect as the original.

| | |
|---|---|
| Signature of Patient or Patient's Representative | Patient or Patient's Representative Address |
| Printed Name of Patient or Patient's Representative | Patient's Social Security Number |
| Representative's Relationship to Patient, if applicable | Patient's Date of Birth |
| If inmate records, Inmate's CDC Number | Date Signed |

Sedgwick 01-03-2023

4

_____ **Initials**



Sedgwick
PL-COLA Program
Post Office Box 8397
Long Beach, California 90808

August 20, 2024

Kimberly Clisbee
3531 Springridge Way
Palmdale, CA 93551

| | | |
|---|---|---|
| Patient Name | : | Kimberly Clisbee |
| Claimant(s) | : | Kimberly Clisbee |
| Sedgwick File No. | : | 6810    County File No.: 24-4424817 |

Dear Ms. Clisbee:

Sedgwick is the administrator for the Hospital and Professional Liability Program of the County of Los Angeles. The correspondence you filed has been referred to us for evaluation. In order to assist us in our evaluation of this case, we are asking your cooperation in identifying the following:

(1)    The names of individuals or facilities which provided prior or subsequent treatment.
(2)    Names and addresses of your current or prior employers, if it is your contention that lost income is involved.
(3)    The date of birth and social security number for the patient.

In accordance with California Civil Code Section 56.105, we ask that you sign the enclosed authorizations, in order that we may retrieve the appropriate records for our evaluation.

We would like to remind you that all applicable statutes of limitations and provisions of California law must be met. Nothing in this letter shall be construed as operating as a waiver of any existing provisions of law, nor can this letter be construed as estopping our clients from asserting all defenses applicable in this case.

We look forward to working with you. All questions, comments and correspondence should be directed to the undersigned.

Very truly yours,

Carl Saltzman
PL Claims Specialist          by Jackie Stewart
                              Administrative Services

CS/js

Enclosures

Professional Liability – County of Los Angeles
P. O. Box 8397; Long Beach, CA 90808
Telephone 855-850-2252

**Patient Name:   Kimberly Clisbee**
**Sedgwick File No.:   6810**
**County File No.:   24-4424817**

## Authorization
## Employer and Social Security Information

I authorize any firm or employer by whom I am or by whom I have been employed to give any

representative of Sedgwick all information and evidence in their possession regarding wages, hours,

time lost from work and nature of my employment.   It is agreed a photocopy of this authorization is

considered to be as valid as the original.

**Signature:** _____

**Date:**            _____

_____
**Social Security Number**

_____
**Date of Birth**

INITIALS _____

**Sedgwick**
**PL- COLA Program**
**P. O. Box 8397**
**Long Beach, CA 90808**
**1-855-850-2252**

**Patient Name:  Kimberly Clisbee**
**Sedgwick File No.:    6810**
**County File No.: 24-4424817**

Please Note:  This form requires the signature and initials, where appropriate, of patient.  If patient unable to sign, please have authorized person sign and initial and attach proof such as power of attorney, durable power of attorney for heath care, or other proof.

## AUTHORIZATION FOR RELEASE AND USE OF MEDICAL INFORMATION

I authorize each of the parties identified below to use and disclose any and all of my individually identifiable medical billing or health information, as described below, for purposes of administering my claim or request for reasonable accommodation.  I understand that the information about me that I authorize to be used or disclosed may be redisclosed in accordance with the terms of this Authorization by the recipient thereof and may no longer be protected by federal or state privacy laws or regulations.

I specifically authorize physicians, nurses and hospitals to communicate my individually identifiable medical or health information by any means, including written or telephonic communications or by direct interview, whether or not I am present during, or notified of, such communications, and I hereby authorize Sedgwick to initiate and conduct such communications whether or not I am present or have received notice thereof.

1. **What Information is covered by this Authorization?**  This authorization applies to all medical, health, psychological, and/or psychiatric information, billing, records and reports, including information regarding pre-existing health or medical conditions or illnesses (a) that are in existence while this authorization is valid (see Item 3) and (b) that are related to claim for bodily injury for:

| | |
|---|---|
| **Name of Patient:** | - |
| **DOB of Patient:** | |
| **SSN of Patient:** | |

1

_____ Initials

**Sedgwick**
**PL- COLA Program**
**P. O. Box 8397**
**Long Beach, CA 90808**
**1-855-850-2252**

## Patient Name:  Kimberly Clisbee
## Sedgwick File No.:    6810
## County File No.:  24-4424817

| | |
|---|---|
| Date range of records to be released: | 1/1/2008 to Present |

My information to be disclosed may include, but is not limited to, medical or health history, chart notes, prescriptions, patient billing, diagnostic test results, radiology studies and reports, photos (color, if available) and records received from other health care providers.  If directly related to my claimed condition or illness, this information may include the following, **Please check yes or no and initial**:

| | | | |
|---|---|---|---|
| HIV test results, HIV or AIDS information. | YES ☐ | NO ☐ | Initial here ____ |
| Psychiatric information. | YES ☐ | NO ☐ | Initial here ____ |
| Information related to drug or alcohol abuse. | YES ☐ | NO ☐ | Initial here ____ |

### 2. Who may disclose and receive Information under this Authorization?

A. Any person or facility that attends, treats or examines me, including but not limited to, the healthcare provider(s) indicated below, is to make this information available to Sedgwick or any of its agents (Ronsin Photocopy Service), representatives or independent contractors.

RONSIN PHOTOCOPY, INC.
215 S. LEMON CREEK DR.
WALNUT, CA 91789

2                                                    _____ Initials

The Centers for Medicare & Medicaid Services (CMS) is the federal agency that oversees the Medicare program. Many Medicare beneficiaries have other insurance in addition to their Medicare benefits. Sometimes, Medicare is supposed to pay after the other insurance. However, if certain other insurance delays payment, Medicare may make a "conditional payment" so as not to inconvenience the beneficiary, and recover after the other insurance pays.

Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007 (MMSEA), a new federal law that became effective January 1, 2009, requires that liability insurers (including self-insurers), no-fault insurers, and workers' compensation plans report specific information about Medicare beneficiaries who have other insurance coverage. This reporting is to assist CMS and other insurance plans to properly coordinate payment of benefits among plans so that your claims are paid promptly and correctly.

We are asking you to the answer the questions below so that we may comply with this law.

Please review this picture of the Medicare card to determine if you have, or have ever had, a similar Medicare card.



## Section I

| Are you presently, or have you ever been, enrolled in Medicare Part A or Part B? | ☐Yes | ☐No |
|---|---|---|
| *If yes, please complete the following. If no, proceed to Section II.* | | |

**Full Name:** *(Please print the name exactly as it appears on your SSN or Medicare card if available.)*

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Medicare Claim Number:** | | | | | **Date of Birth (Mo/Day/Year)** | | - | | - | |

**Social Security Number:** *(If Medicare Claim Number is Unavailable)* | | | - | | - | | | **Sex** ☐Female ☐Male

## Section II

I understand that the information requested is to assist the requesting insurance arrangement to accurately coordinate benefits with Medicare and to meet its mandatory reporting obligations under Medicare law.

_____        _____
**Claimant Name (Please Print)**                **Claim Number**

_____
**Name of Person Completing This Form If Claimant is Unable (Please Print)**

_____        _____
**Signature of Person Completing This Form**        **Date**

*If you have completed Sections I and II above, stop here. If you are refusing to provide the information requested in Sections I and II, proceed to Section III.*

**Section III**

_____          _____
**Claimant Name (Please Print)**            **Claim Number**

For the reason(s) listed below, I have not provided the information requested. I understand that if I am a
Medicare beneficiary and I do not provide the requested information, I may be violating obligations as a
beneficiary to assist Medicare in coordinating benefits to pay my claims correctly and promptly.

**Reason(s) for Refusal to Provide Requested Information:**

_____

_____

_____

_____

_____          _____
**Signature of Person Completing This Form**   **Date**

# EXHIBIT C

Witness and offender list

# Witness List

Doctors from the doctors listed in Exhibit B

Witnesses of the incidents at Glendale Memorial and CHLA after Leilani's birth.

**Witnesses who were there waiting for Leilani's birth**

**Puja and Arvy Guihama Phone 323-518-8058**

Both will testify the delivery went fine, and they were able to be with Leilani immediately. They even took a video that we still have from an hour after Leilani's birth.

Witnesses present the first couple days after Leilani was born will testify that, according to all the doctors, she was fine, and I had to force NICU to observe her.

These witnesses will also testify I was forced to stay at Glendale Memorial against my will and that Leilani was forced to go to CHLA and not allowed to use my medical insurance.

This witness will also testify the doctors insisted Leilani had cancer, that she was not a priority for surgery and had to wait a month, and that we were forced to sign up for CCS even to get surgery at CHLA.

Kathryn Giordano **Phone 781-820-0002**

Leilani Holmberg phone **818-203-8467**

Henry Co Phone 818 441 3335

**Abraham Quibbin 747-305-9801**

**Anthoney Quibinn 818-862-1973**

**Mariana Kim 818-523-2151**

**Micheal Ewasko 818-523-2151**

**Dr. Parks, Glendale Memorial,** will testify Leilani had an uneventful birth, that she was instructed to transfer Leilani to CHLA, and that I was not allowed to leave the hospital under county order.

### Dr Samantha Hann, St Joseph's Regional Medical Center

Obstetrician

Witness the day of Leilani's surgery when Dr. Krieger changed Leilani's surgery from a hemispherectomy to a lobectomy and gave us no option aside from taking her home to die.

**Mariana Kim 818-523-2151**

Witnesses who participated in the organization of the first surgery

**Dr. Gordan McCombe, CHLA**

**Registered Nurse Nichol Vanloon CHLA NICCU**

**Nurse Practitioner Karen Rapaport**

**Witnesses to Dr. Block's abuse through the school system, CCS, and Regional Center**

**Nurse Case Manager Jeany Umana 626-569-3987** Dr. Bloch's assistant and witnessed most of the abuse in the hospital and out and participated willingly.

**Jenny Pohl CCS MTU Palmdale 661-456-1255**

**RN Sylvia Rubal CCS MTU Palmdale**

**Erica Barios Regional Center Palmdale 661-951-1224**

**Carol Armstrong Regional Center Palmdale 661-951-1248**

**Super Intendant of Palmdale Aerospace Academy Julie Eliott Braswell**

**Behavioral Learning Center Supervisor Glory Delorio 818-389-6212**

**Behavioral Learning Center Therapist Jennifer Frost 661-202-8886**

**Behavioral Learning Center Alysa Davies 661-208-7062**

**Speech Pathologist Cheryl Goodman 661-400-9234**

Witness to Dr. Fallah's confession aside from Chris and I

**Kim Arrendando 661-365-8814 ASAP home health**

She takes monthly reports and remembers Leilani before her hip surgery and remembers me reporting to her what Dr. Fallah said. She has also seen and recorded the downward spiral for all three of us immediately after.

**Shahara Perera 661-645-5863 ASAP home health supervisor**

Witness to Leilani's growth, all abuse, and who has documented her regression is her PT, Leticia, whom we have had in some capacity since Leilani was 3 months old.

Leticia remembers the medical issues Leilani suffered and the systematic abuse. Leticia has worked for CCS, the Regional Center, and the school district and is now a private PT.

She will testify that Leilani could almost walk before her leg-altering surgery and all the physical problems that come with it. She will tell you that the Regional Center and schools denied us services.

Leticia remembers when we had to inject ACTH when Leilani had her hemispherectomy and has been there through it all.


**Leticia Pena 661-212-1360**

**Witnesses from UCLA**

**Pediatrician DR. James Lee** told me, "The abuse will stop if you sign back up to CCS," and I witnessed Dr. Wu's discrimination firsthand.  He also went behind her back for us to get an appointment at neurosurgery after Dr. Wu said we could not be right in front of him. So, he seems to know a lot.

**Dr. Elizabeth Marcus, the gastroenterologist,** has taken all of our reports since this started and has known us since Leilani was 5. She sees us four times a year and has heard everything.

**Dr. Stacy Pinellas,** Leilani's ophthalmologist, has known us since Leilani was one and has seen my mental distress develop over the years and will testify to it. Stacy did two strabismus eye surgeries on Leilani and knows about her botched brain surgeries by looking at the MRIs and medical records.

**Dr. Nana Zadah,** who is on the doctor list will testify she had to send the blood to Boston because both CHLA and CHOC were denying the ability to test for Tuber Sclerosis when they could.

**Defendants from previous cases and offenders that caused the injury must be subpoenaed.**

**Huntington Memorial Hospital**

**Pasadena**

**Chris's surgery**

Dr. William Sutherling, Neurologist

Dr. Ian Ross, Neurosurgeon

**Regional Center Employee who arranges Chris's surgery**

Marie McGinley

Dr. Sun

**Children's Hospital Los Angeles**

**4650 Sunset Blvd.**

**Los Angeles, CA 90027**

**323-660-2450**

Dr. Gordon McCombe Children's Hospital Los Angeles, Pediatric Neurosurgery

Dr. Mark Krieger Children's Hospital Los Angeles, Pediatric Neurosurgery

Dr Mona Shah, Dr. Krieger's assistant and Leilani's pediatrician up to 2019.

Dr. Fredlick, CHLA director of pediatrics NICCU

Social Worker for CHAL Glenda gdanek@chla.usc.ed

Dr. Leigh Ramos-Platt Children's Hospital Los Angeles, Neurology

Dr. Anat Eldriech-Epstein Children's Hospital Los Angeles, Oncology

Dr. Randall Chan Children's Hospital Los Angeles, Oncology

Dr. Tara Rosser Children's Hospital Los Angeles, Neurology TSC Clinic

Dr. Robert McKay Children's Hospital Los Angeles, Orthopedics

Dr. Borchett Children's Hospital Los Angeles, Ophthalmology

Dr. Devin Binder, Children's Hospital Orange County

Dr. Mary Zupank Children's Hospital Orange County

**UCLA**

**200 Medical Plaza, Suite 265, Los Angeles, CA 90095**

**310-825-0867**

Dr. Joyce Wu, UCLA Mattel Children's Hospital, Neurology

Dr. Arie Fallah, UCLA Mattel Children's Hospital, Neurosurgery,

Dr. Racheal Thompson, UCLA Mattel Children's Hospital, Orthopedics

Rajsekar R. Rajaraman, UCLA Mattel Children's Hospital, Neurology

Dr. Scott Gahley, UCLA Mattel Children's Hospital (Colorado), Orthopedics

Dr. Carolos Learner UCLA Mattel Children's Hospital, pediatrics

Dr. James Peters, UCLA Mattel Children's Hospital, pediatrics

Dr. Mathew Sun, UCLA Mattel Children's Hospital, Neurosurgery


**Los Angeles County officials and officers**

Chief Pediatric Medical Physician Dr. Edward Bloch

Jeany Umana, Dr. Bloch's assistant

District Six Supervisor Kathryn Barger

Jackie Stewart, Administrative officer

Nichole Iron, Administrative officer

Former District Attorney Tom Lackey

Los Angeles Police Department Threat Unit Detective Tracy Grundland

Los Angeles Police Department Threat Unit Detective Sunny Cruze


**State Judges Guilty of Misconduct**

Honorable Steven Morgan Antelope Valley Courthouse Department 14

Honorable Cherol Nelon Stanley Mosk Courthouse Department 14

Honorable John Takasugi Stanley Mosk Courthouse Department 17

Honorable William Fahey Stanley Mosk Courthouse Department 69

Honorable Terry Green Stanley Mosk Courthouse Department 14 (retired because of this case)

## Department of Education

Ana Marsh, Special Needs investigator CDE

James Peters, former director of Special Needs California Department of Education.

## Palmdale School District

Super intendant Raul Maldonado

Assistant Super Intendant Donna Campbell

Special needs liaison Aaron Yaskovitz

Special Needs Director Ronald Cooper

Special needs coordinator Irene Orloff

Special Needs Instructor Julie Author

Former Special Needs Director and Aerospace Academy SI Julie Braswell-Elliot

Special Needs Advocate Brian Allen

## Antelope Valley Learning Academy

Special Needs Director Heather Struve

Special Needs Coordinator Casey McWhorter

## Gorman Learning Academy

Dr. Steven Allen, Special Needs Director

**Regional Center**

Ruth Jenka

Carol Armstrong

Gabriel Sanches

# EXHIBIT D

# 2022 ORIGINAL COMPLAINT, THE COURT REFUSED TO ALLOW ME TO PURSUE

### Plead for compensation for damages caused by Los Angeles County

These claims were presented to the Los Angeles Board of Superiors and denied because they exceeded the statute of limitations. However, as damages were evident, we were granted the right to a civil trial per (Cal. Gov. Code 946.6(e)). We are an exception to the rule for filing a late claim under Gov. Code 911.6 for the following reasons.

*The failure to present the claim was through mistake, inadvertence, surprise, or excusable neglect.*

*The person who sustained the alleged injury, damage, or loss was a minor during the specified time.*

*The person(s) who sustained the alleged injury, damage, or loss was physically or mentally incapacitated during the specified time.*

*The board fails or refuses to act on an application within the time prescribed by this section. In that case, the application shall be deemed denied on the 45th day or if the period within which the board is required to act is extended by the agreement under this section, the last day of the period specified in the agreement.* (**The State did not respond to tort after accepting the filing on May 26th, 2022, according to the cashed check**) **giving us the right to include State agencies in this complaint.**

1.) The abuse is consistent; from 2010 to date, it never stopped long enough to breathe or think. I was focused on my baby's health, not law suites. Leilani had multiple surgeries to correct the mistake from the previous surgery. She had two surgeries a year for most of her life. Her recovery was constant. All I could do all day was work with her, bring her to appointments, and nurse her to health, along with being a mommy, friend, teacher, therapist, provider, and protector. The job I failed the most at. All while earning a BA, 2 MA's, one being a double, a dual Ph.D., and multiple certifications from prestigious universities so I could provide for my family while being able to stay home and care for them. My mind was not on lawsuits, nor could I grasp what was happening. It took being told by Dr. Fallah in 2019. I would have never conceptualized this without his confession. But he painted a clear enough picture for me to gather the information needed to see the truth. There was so much going on at once and so many people involved. I was in psychological shock for a decade and still am. I call it PTSD, but it's not; there is nothing "post" about it. I was a forty-year-old professional with an impressive resume when I moved here; I was not a member of the marginalized population aside from being female, but I see that as a strength, not a weakness. I have lived on my own since eighteen, taught martial arts for fifteen years, was raised in a military family, and have more real-world experiences than most. I am not easily shaken or offended, but when you are constantly bullied and abused by the people assigned by the county to help you (whose help you did not even ask for but was ordered to take), your Constitutional freedoms are withheld. At the same time, you are continuously threatened with prison or some other punishment, and law enforcement refuses to help but joins in on the attack.

Even the strongest will break down. You keep going in the same circle expecting
different results.

2.) I tried to get help, but no one will. As soon as Dr. Fallah told me the truth in 2019 and
threatened me, I called the police, FBI, dozens of attorneys, Bar association, disability
rights advocacy, Cal Victim, the Medical Board, the Regional Center, my mayor's office,
the district attorney, the attorney general, DHCS, DDS, DOJ, congressman Garcia, Tom
Lackey, Kathryn Barger, and the Governor; no one would help.

3.) I didn't know where to start, whom to sue, or what to do. This is not a straightforward
situation or just one person. Medical malpractice is taking the wrong organ or leaving a
sponge. This was a group of doctors, nurses, vendors, therapists, etc., working together
like organized criminals helping one another commit insurance fraud. I see it as
insurance fraud because Dr. James Lee at UCLA said if I don't want the abuse to stop, I
need to sign back up to CCS for protection. CCS offers an extra 30% over the regular
rate, making his comments suggest a conspiracy to commit medical Insurance fraud and
racketeering because, according to Dr. Lee, the abuse was to coerce me into rejoining
CCS to make a profit. In my professional opinion.

4.) It was not easy to see without Dr. Fallah's confession. As soon as this happened, I
reported it to the police, medical board, etc. Kathryn Barger's office instructed me on
how to start in April, and I did the very day I was given instruction, and the court has
been helping me through the process, which I appreciate.

5.) The mental distress is too much. I can barely function. I have panic attacks most of the
time and will burst into tears out no were, no matter where I am which is embarrassing. I
am learning to control it, but I need to move from California to heal. My psychological
distress from this decade of abuse is why this document is so long. I am broken from all
of the abuse and need it all to stop, and it won't; even Stanford hurt Leilani in April of
Last year. She is not safe here. Kathryn Barger's office guided me to reach out in April
and instructed me on how to start my complaint, and the clerks and judges have pushed
me through the rest of the way, for which I am grateful.

### Allegations

Medical Malpractice, insurance fraud, falsifying reports, administrative and medical negligence,
Discrimination, Abuse by a county official, Abuse by county employees, Abuse by a State
Program, withholding of constitutional rights of a disabled person afforded in the American
Disability Act, Withholding of constitutional freedoms of a disabled person afforded in the
Lanterman Act, Sexual humiliation and assault of a disabled minor, Harassment, Law
Enforcement misconduct, and administrative crime.

**Plaintiffs**

**Responsible agencies**

· **Los Angeles County**

· **Los Angeles Police Department**

100 W 1st St, 90012, Los Angeles

· **California Child Services**

9320 Telstar Ave Ste 226 El Monte, CA 91731

**North Los Angeles County Regional Center**

38345 30th St East, Suite A-2 Palmdale, CA 93550 Contact Us Phone: 661.274.4136

· **Children's Hospital Los Angeles**

Address: 4650 Sunset Blvd, Los Angeles, CA 90027

· **UCLA Mattel Children's Medical Center**

200 Medical Plaza Driveway Suite 265, Los Angeles, CA 90095 Phone: (310) 825-0867

· **Santa Monica Hospital**

Address: 1225 15th St Suite 2100, Santa Monica, CA 90404 Phone: (310) 319-1234

**Individuals who have abused Leilani**

· **Dr. Edward Bloch**

9320 Telstar Ave Ste 226 El Monte, CA 91731

· **Dr. Mark Kreiger (Neurosurgery)**

Organization: Children's Hospital Los Angeles Address: 4650 Sunset Blvd, Los Angeles, CA 90027

· **Dr. Leigh Ramos Platt (Neurologist)**

Organization: Children's Hospital Los Angeles Address: 4650 Sunset Blvd, Los Angeles, CA 90027

· **Dr. Anit Epstein, MD (Oncology)**

Organization: Children's Hospital Los Angeles Address: 4650 Sunset Blvd, Los Angeles, CA 90027

· **Dr. Thompson (Orthopedic Surgery UCLA) Address: Renee Meyer Luskin Children's Clinic**

1225 15th Street Suite 2100 Santa Monica, California 90404

· **Dr. Joyce Wu (Former director of the TCS clinic and neurologist)**

Organization: UCLA and the TSC Alliance Address: 200 Medical Plaza Driveway Suite 265, Los Angeles, CA

**· Dr. Arie Fallah (pediatric Neurosurgery)**

Organization UCLA: 300 Stein Plaza Suite 420 Los Angeles, California 90095

**· Detective Tracy Grundland**

Organization: LAPD

Address LAPD 100 W 1st St, 90012, Los Angeles

### The county of Los Angeles is responsible for the following reasons.

La County executive officer Chief Pediatric Medical Physician Dr. Edward Bloch was our primary abuser and authorized and instructed others to abuse us. I can prove he led others to harm us because many of the parties involved and witnesses that can be subpoenaed have confessed to this. Jeanie Umana told me Dr. Bloch would complicate things if I didn't stop fighting. Dr. Krieger told us Dr. Bloch ordered the surgery modification and all neurological decisions that followed; Julie Braswell from the Palmdale School District told us Dr. Bloch told her it was okay to take Leilani's aid away. So, I am not assuming he ordered abuse; I know he did.

All of our abusers, even today, are county employees or connected to the county via the Department of Public Services, Department of Developmental Service, County Regional Centers, law enforcement, Palmdale School district, USC, and California Child Services.

Dr. Edward Bloch, Los Angeles chief pediatric physician, led a study to prove the value of CCS to state and county investors that began a month after Leilani was born, according to the wealth of online documentation that was already provided to the county and can be provided to the court should this make it to a public trial. Note, Dr. Fallah gave me the names (of Dr. Krieger, USC, UCLA, CHLA, DHCS, the County, and Quest Diagnostics, which I haven't found the connection for (Quest), but he named them specifically.) and directed me to the path that discovered all of this I did not get here on my own, doctors told me most of what I know. Also, I don't believe they did this just for a study. I think this always happens based on the casual way everyone handles this. No one is the least bit phased, and I am shocked! If I was in New Hampshire and someone told me this, I would be knocking on the Governs door and demanding action. I am appalled at how unempathetic most people are here. But NH does not have investors, which is the government I came from. California does not feel like America to people who come from Constitutional States; it is like a machine where everyone either works for the investors or is profit for the investors, like a feudal system. From my observation, anyway, no disrespect was meant. The police can do whatever they want to you, and so can a teacher, doctor, or county employee; it does not matter, you are always wrong, no one will help, and internal investigations cause more harm than good. This is almost a third-world Government because there is no access to help without going to these measures and things going this far, not because the people are less or the courts don't try; the court has helped me more than anyone. It's the county supervisor's fault. Internal investigations are laughable; they don't collect evidence or speak to witnesses. It's not real. It's meant to keep you running in circles until the statute of limitations is exhausted or you give up. But it is a nightmare when you need help from abuse that will not stop without

intervention. The LAPD and LA County Sherriff's Department refused to take our report, including sexual abuse, a State and Federal requirement. Since Leilani is disabled, reporting sexual abuse of a disabled minor at the hands of an employee of a covered entity is required under the Americans with Disabilities Act. When I had proof from a UCLA investigator, they didn't care. Over a dozen LAPD and LA County officers refused to take my report. Some were so cruel about it too. She is a disabled little girl. If the police are not supposed to protect disabled children from predators, they are a waste of funding because the vulnerable populations need law enforcement the most and require them to be kind and empathetic, not abusive. I was sexually assaulted as a child and as an adult, so in 13 years, Leilani has never had a babysitter. I don't trust anyone else to change her, and she can't tell me if someone hurts her, so I am always with her. I had to watch a nurse catheter rape her (not just insert the device and leave it to do its job, but poke the tube in and out, stabbing her bladder with it to get her to urinate with an empty bladder for over a period of 5 minutes with my baby screaming and I was threatened with jail if I interfered). I broke after that. I feel raped. Still, for the police to not care killed me; I can't trust anyone now; I questioned my career path for a long time after the LAPD came to my house to defend those who hurt my child.

Dr. Bloch was Leilani's boogieman. He was not just a presence in her medical care but in every aspect of Leilani's' life, from medical to school to community resources, as if he was studying her and needed her close; he is responsible for millions of other children being county officials. It is unusual for someone of his status to have a one-on-one relationship with patients unless you are a scientist running a study which Dr. Bloch was. He was also present before she was born, explained later in this document.

Leilani could not go to her home school. She had to go to Buena Vista Elementary, where Dr. Bloch's nurse case manager Jeanie Umana worked, and the CCS therapy unit was located. She could not use the therapy unit for therapy but was forced to go to school there because Jeanie was there and could observe her and control who interacted with her. According to Julie Braswell-Eliot, then (2013-2017), Buena Vista elementary school special needs director Dr. Bloch coached the school staff on how to work with Leilani and treat me. When they took away her aid, Julie said, "Dr. Bloch says Leilani's condition does not come with physical disabilities, so we don't have to give her any services we don't want to provide; what's more, if you don't bring her to school, I will send the police to get her. I did not bring her to school, and the police did come but did not take her. They were mortified to be called to collect a fragile child. Under State and Federal law, disabled children can miss school due to illness and appointments. Julie said she was the only authority that mattered, and only she says who gets to be home hospital schooled. Leilani almost died in school on the first day. I called the DA and complained about their order to bring her to school, which nearly killed her (I still have the letter). The only way out of this was to move Leilani to a charter school. However, it did not help much; county employees are incredibly abusive to parents of disabled children, from my experience. I didn't have county experience as a client before moving to CA at 40. But I counseled many families and individuals in crisis, taught for the Nashua School System for three years, and volunteered at the Boys and Girls Club for 2. I saw a lot, but never what I am experiencing in the disabled community. But with Leilani home with me, I could keep her safe, so it was better that way. I

have the letter and a dozen school employees and aids that will testify to all of this. The aids reported abuse by multiple teachers in the school, which is why the school wanted the aids removed. Dr. Bloch gave them the okay.

Dr. Bloch was also in charge at the Regional Center and DDS in Palmdale, where we live. Leilani is supposed to get help for the Regional Center when a covered entity abuses her, but they refuse to help because it is their supervisor. If you look at Leilani's client files on the Regional Center database, there are no records before 2019 because they were all erased according to our current service provider that we are forced to keep to get DMEs. Same with the DHCS database, all gone, all 12 years of medical service. The county approved a dozen surgeries, medications, and procedures, but where are they? Not in the database, according to all the investigators. Again, I have all the correspondence—every denial from medical because of CCS eligibility. Dr. Bloch controls what gets approved via Medical and what doesn't, and he can refuse care to force you onto CCS. It's a conflict of interest. My work was also investigated by the county department of public services last year. This could be a coincidence, but the timing suggests otherwise. I am a licensed home health aide, and Leilani is a client at my job. After looking at all of Leilani's records, they told my supervisor they wanted to come and inspect my house, then never showed up, rescheduled, and never showed. My supervisor was confused because she said I was a specific person of interest. This happened a month after the incident with the LAPD in 2021. My employer will confirm all of this.

I did not seek community services; they were forced on me. According to Dr. Krieger, "Dr. Bloch refused to allow the planned surgery and ordered it be modified," and as a result, caused all the disabilities, otherwise unnecessary surgeries, and abuse that followed. However, oddly, the county's involvement began before Leilani's birth which is why I believe this was planned before my delivery. I was only on medical because my employer could not afford to insure me. I moved to California pregnant in 2010 and was here to open a martial arts school. Dozens of people both in California and New Hampshire can confirm that in court, I was a famous (within my industry) martial artist at the time and had a sizable following. I would have had a very successful school if the county didn't target me.

Over the decade of systematic abuse, there was abuse from other county entities and dozens of county employees, but that would take another 20 pages. I don't want to drag this out unless it is in a courtroom with a jury. The complaint for the Department of Education is incident after incident like this one. However, there was always an aide around. I hired a behaviorist service to attend school with Leilani. Before that, her nurse went with her, and after, the behavioral staff was fired. She had four aids in total, and they all have stories of systematic abuse, not just with Leilani, and will divulge this in open court. We typically had a nurse with us at doctors' appointments at UCLA who would testify to much of what I am reporting. We had many people in our lives at one point because I wanted to give Leilani every opportunity to recover and thrive. Many of those people are still in contact with us and are on to other jobs, so there is no conflict of interest, and they are great character witnesses. Before moving here, my job was to create leaders, teach people to be better humans, and live every aspect of their life with integrity, character, and a moral compass. I made many leaders in my lifetime; one of my students (Patrick

Thomas) even helped engineer Moderna. That did not stop in NH. I encouraged my IHSS worker Erica Sims to pursue a career as a county coroner because that was her dream. She said if I can go to school with all that is happening to me, then so can she. For a year, I kept nudging her until one day. She finally signed up for school. Two years later, she called me to thank me, giving me some intel on what I was denied at IHSS on her way out the door. She told me she got her dream job and would not have if it weren't for me. Jen Frost, Leilani's behavioralist in 2016, dreamed of working as a special needs teacher. I had her go to school with Leilani so she could learn; she was the first to go to school with Leilani and has a wealth of information about the discrimination the disabled community suffers. She quit after a year to return to school because I inspired her to become a special needs teacher. I make leaders even when I am at my lowest. These women can also testify to the gross systematic abuse of disabled children by the county and county employees beyond Leilani in all agencies; they have a lot of horrific stories.

### Why I believe I was targeted

I believe it was partly through my obstetrician Dr. Samantha Hann at St. Josephs's and because Leilani's father was given brain surgery the year before that left him impaired and in the care of the Regional Center, which shares the same investors as CCS and USC. His surgery was also malpractice, explained later in this document.

Although St. Josephs conducted ultrasounds twice a month, I was not allowed a 3D sonogram. I was told, "it would not be fair to privately insured patients," so I took that answer but later found out that was not the policy. When I asked the technician what he was looking at, he said, "fluid on the brain" when I asked if it was a problem, he said nope, everything is fine. However, a week later, Leilani was born with a tumor the size of a golf ball, so how did he miss for 12 visits last a week before birth? If I had known that, I would have flown to Boston and had her there, but I was constantly told everything was all right so I wouldn't fly home.

Three weeks before the birth, I received a phone call from Dr. Samantha Hann telling me that the county wanted me to have Leilani in the USC hospital in Palmdale and not St. Joseph's in Burbank, where it was planned for months. She said St. Joseph's did not want Leilani to be born there because "it wasn't fair to privately insured patients," the same thing the ultrasound tech said when I asked for a 3D sonogram, which was odd. Still, that phrase was used dozens of times by CCS and doctors over the years, so it was how they felt about their low-income clients; it was just prejudice. When I refused, they allowed us to go to Glendale Memorial.1 However, I did not understand why the county decided where I gave birth because the same doctor delivered her. We still owned property in Burbank, so we should have been able to give birth at St. Joseph's. Thousands of babies are born here daily in Los Angeles. Does the county pediatric particular case medical team get involved in all of them pre-birth? Also, does everyone get personal attention from the chief medical officers? Of course not.

Leilani was born on a Thursday at 8 pm, a week ahead of schedule. A doctor from the county was in my delivery room, they were not introduced by name, but I am sure Dr. Parks and Dr. Hann will remember if called to testify.

Leilani did not show signs of distress until Saturday. She was transported to CHLA on Sunday. When we were asked what hospital I wanted to go to, CHLA or UCLA, I was told by Dr. Parks, "never mind, the county said you can only go to CHLA." But why? She was covered under my insurance, and I can go to UCLA, so why could Leilani not go? According to Dr. Fallah at UCLA, patients with brain tumors like Leilani's (SEGA) typically go to UCLA because CHLA does not do hemispherectomy surgery, something they lied to us about. He said a trained neurosurgeon could tell at first glance what type of tumor it is without question if he was adequate in his profession. This was repeated by every doctor who saw the MRIs after him. No one will willingly testify, given the hospital's "no fire" clause in all the doctor's contracts, but they will under subpoena.

What also confuses me is, out of the thousands of babies born that weekend, why was Dr. Bloch working so closely with mine on a Sunday when nothing was reported beyond one unknown seizure that was so small it barely made it onto the chart, never mind in the county database? They did not have the proper MRI equipment at Glendale Memorial to see the SEGA, so we were sent there, so they would have to be sent to CHLA. If Leilani were born at St. Joseph's, they would have MRI, and they would have to do what was right and give her the correct surgery, and that was not what was planned, so they sent her somewhere she could be forced to go to CHLA and be under Dr. Bloch's control. She had a normal birth with a healthy 8-9 Apgar. According to St. Josephs, she had no problems in the womb and was not in critical condition at Glendale Memorial or CHLA based on all of her records; no one was alarmed about her health, but Dr. Bloch and CCS were already involved with her care on a Sunday. Why?

Leilani did not have a CCS-eligible condition, was not signed up for CCS, and CCS was not even part of Medi-Cal at the time. They were a volunteer state program making medical decisions for my newborn. Why? Dr. Bloch was running the CCS redesign study and needed samples. Leilani lived in Palmdale, where he controlled the pediatric disabled community in all ways. She might have been spared if I had never moved her, but the house with the yard was here, and the family home we were occupying in Burbank was a townhouse. We thought it would be okay to move out here.

### 8/25/2010

#### How Leilani ended up in the NICU

Leilani had a normal birth; her vitals were normal, and the doctor said she was healthy. When Leilani refused to breastfeed, the nurse insisted I cup-fed my infant and refused to give me a bottle (4 witnesses were in the room). Because Leilani was having silent seizures (none desaturating) due to the obstruction, she inhaled some of the formulae when trying to swallow and developed a little fluid in her lungs. They had a team of people check her and said she was fine, but I insisted she was admitted to the NICU overnight for observation. They refused at first, but I pleaded to assure her that she would not aspirate in her sleep because of the nurses' nonprocedural actions. That evening in the NICU, they recorded Leilani having a seizure. They conducted an MRI that could not detect tumors. GM is a level 3 hospital, not equipped for advanced imaging, but revealed the shadowy mass and sent her to CHLA as instructed by the county for further testing. I was not allowed to go with her on the first day. I was forced to stay in the hospital an extra day, which was odd because I was already there for three days,

and my catheter was out. The night before, I could run down the hall and across two buildings to see my child in the MRI. After that day, I didn't feel pain and was walking fine and climbing stairs. There was no reason to keep me. My vitals were good, and my IV was out. I didn't have a problem moving or with pain. I was so full of adrenaline I could not feel it. Typically, once the catheter is out and your vitals are stable, you can leave, but they would not let me release myself, which I thought was unlawful, but no one will enforce it. Legally you can remove yourself from the hospital at any time. I gave birth, and women did that and got up for work the next day in some countries; I did not have bypass surgery. I went home the same day after gallbladder surgery, foot surgery, dental surgery, and a tummy tuck. Still, I was not allowed to leave this hospital three days after giving birth until my child was in the hands of Dr. Bloch and CHLA for over twenty-four hours.

### 9/11/2010

Leilani is admitted to the NICU. After a biopsy, we were told Leilani had a 7cm cancerous brain tumor called a congenital Gemistocytic astrocytoma (anaplastic)and needed surgery. We were told this was a rare form of cancer that had only been seen in four other children in medical history, and they needed us to sign off on a study so they could explore it. We permitted them to study, but they were playing out their lies. Who knows what the study was? None, I am guessing, since neither doctor wrote about it. As a fellow research scientist, the phenomenal study is my career goal. One aims to discover or understand something your colleagues do not. However, with Leilani's case being "once in a lifetime," according to Dr. Epstein, neither she nor Dr. Krieger, who are well-published and can be seen in Medpub on the USC facility database, wrote about it. Dr. Fallah wrote a paper on arrested hydrocephalus and the permanent damage from ignoring it, so he did, so why not the ones who discovered this medical phenomenon? Before Leilani's first surgery, Chris and I were brought to a room filled with doctors and nurses whose names were on the hospital's docs I could provide. Neurosurgeon Dr. McComb told Leilani's father and me that Leilani has a rare form of brain cancer that developed in the womb. This confused me because St. Josephs did not see it a week before at my routine ultrasound. We were told she had congenital gynostemia astrocytoma. She would go on to live everyday life with a hemispherectomy and a shunt. This is true; according to the data Dr. Epstein gave us, 100% of the kids who have had Leilani's same condition and treatment made a 98% recovery. All Leilani ever needed was one surgery, and she could have lived an everyday life. Dr. McComb said Leilani would also need a lot of care and support to recover because she would only have half a brain but should fully recover, given her age and current medical status. He then began to say that Leilani may not do as well as other kids because of your demographic and my assumed ability to care for a disabled child. We were better off taking her home and letting her die instead of wasting surgery on her. Plus, our insurance may not cover all the costs. I felt drunk; I did not understand what was being said. You can fix my baby, and she could have an everyday life, but you are conflicted because of what you see in me and will not lower yourself to do our surgery, but also, the hospital will not unless we are CCS clients. I have not recovered from that conversation. How can people treat other people that way?  But it was only the beginning.

I said no; if God wanted her to die, she would have been born dead. You could see in her eyes that she was there and would be okay; she just needed a chance. The hospital dragged out her stay, forcing us to wait 30 days for CCS to approve the surgery. Still not sure why we have to be on CCS; my Medi-Cal would pay for the surgery, and we would need to wait. The surgery would have been done on the first day of admittance, according to Dr. Falllah at UCLA. Dr. McComb refused to do the surgery; he said we were a "waste of surgery" in front of witnesses and picked up a phone on the wall and called someone.

Next thing you know, Dr. Krieger, now the director of neurosurgery at CHLA, was to conduct the surgery. The nurses hurt my baby so many times and almost killed her twice, and I was discriminated against, but I did not have time to get into it. This is already too long of a complaint.

If you Google images of a TCS SEGA and compare it to a gynostemia astrocytoma, even someone without knowledge can see the extreme differences. Leilani's MRIs mirror the ones online that are TSC patients and share no characteristics with those of a GA. So, either Dr. Krieger is the worst neurosurgeon on the planet because he cannot tell an apple from an orange, or he is not being honest. Given his position at CHLA and USC, I doubt he could not tell the difference, and Dr. Fallah agreed.

### 9/23/2010

Leilani went in for her surgery. Dr. Kreiger said he would do a hemispherectomy and insert a shunt as it was procedural to avoid hydrocephalus in an infant having this type of surgery. It is also written in the medical records (no mention of the shunt, just hemispherectomy) as the surgery we agreed on and would happen. Right before the surgery began, Dr. Kreiger came up to the waiting room and brought us into a conference room to tell us he could not do the brain surgery as planned because Dr. Bloch from CCS called into the operating room and said Medi-Cal was refusing to pay for the surgery as planned, and alternative measures needed to be made. Dr. Kreiger said Dr. Bloch told him he could only remove the tumor, not the damaged tissue around it, and she could not have a shunt to drain the excess brain fluid. At the time, I did not realize hospitals could not do this; I did not know a shunt was a mandatory piece of equipment for infant brain surgery (according to Dr. Fallah and other medical experts who will testify if subpoenaed) )and that not having it would cause her brain damage, but I trusted them. When I asked if leaving the damaged tissue would cause her mental retardation, Dr. Kreiger said, "probably, but I am not God, and you have State insurance that won't pay for a proper procedure, so it is either the surgery as CCS requests, or I will close her up and send her home to die, it's up to you." He said shunts are more problematic than helpful, and her chances of getting an infection and dying are more significant with the shunt than without, so I told him to go ahead with the surgery; I had no choice. CHLA filed a grievance with the medical board in February 2018, but the medical board refused to investigate. Dr. Platt told me in 2011 that Dr. Krieger has never done a hemispherectomy which is why he couldn't. According to Dr. Fallah, he was required to send Leilani to UCLA because he could not do the surgery even as of 2019. So to do brain surgery, knowing she needed a surgery he was not qualified to do, is medically unethical and legally questionable.

### 9/24/2010

Leilani develops diabetes insipidus and adrenal disorder immediately following Dr. Krieger's frontal lobe restationing. According to the doctor at UCLA and Stanford, this is a well-known sign of hydrocephalus in infants, especially if it clears up in a couple of months. Dr. Mona Shah and I were the ones to discover Leilani no longer had DI through medical experimentation. I slowly reduced her DDAVP based on the sodium levels I had taken daily at the local hospital and output to see if she had DI. Sure enough, after a month of daily tests, it was found that she was cured. This was important to me because DDAVP causes blindness, and I had to stick her with a needle every day and did not if it was not medically necessary. When I told Dr. Fisher what Dr. Shah and I discovered, she said in a snarky manner: "it's a miracle; In 40 years, I have never released a patient from this department. She is the first-ever cured. Then refused to see Leilani moving forward. Dr. Krieger told us Leilani's pituitary gland went into shock, another sign of hydrocephalus and brain trauma caused by the botched surgery. A shunt was essential to avoid

permanent disabilities at this stage. At that point, I started asking questions about cancer if all the other disorders were not real and she was not getting cancer treatment or post-cancer removal therapy. Why didn't she receive chemo or radiation if it was cancer? According to Dr. Epstein's documents, Leilani was supposed to get 26 rounds of Chemo and radiation. But they knew she didn't have cancer which is why she was not treated. I also thought it was odd that oncology was leading Leilani's case but did not see her in the clinic. Dr. Krieger told me that tiny babies don't get chemo because it will kill them. Dr. Fallah said if she had cancer, they would have treated her, no matter how small. He said they give chemo to babies smaller than Leilani all the time. Dr. Epstein, the head of CHLA oncology, collected service fees for Leilani from 2010- 2019 but never treated her. When I realized she never had cancer, it was Tuber Sclerosis the whole time, Dr. Epstein said, "we can just change her diagnosis; it's easy to confuse the two," and never saw us again. UCLA disclosed in 2019 that the tumor was not cancer and CHLA was aware, but when they requested a sample to test it, CHLA refused to say they disposed of it right after the surgery, per Dr. Joyce Wu.

What else is odd is that Dr. Epstein is a professor at USC and has written dozens of papers since 2010. Leilani supposedly had a form of cancer seen for the first time since 1980 in Boston and only four other known cases, and she never wrote a paper about it. As a research scientist myself, that makes no sense; scientists live for the unprecedented situation that makes them a leader in their field. She kept saying how rare and exciting it was to the medical world and how she was going to conferences to discuss Leilani's tumor with other oncologists. But not one article about it. Dr. Krieger. He wrote a paper in 2011 about properties in brain cancer patients that identify cancer. But not one word about the only child to have a congenital Gemistocytic astrocytoma and how he managed it. He also did not use any tests or language in the study when discussing Leilani, whereas Dr. Bloch used the exact wording in his CCS Redesign model in his threatening letter. Dr. Platt also teaches at USC, as does Dr. Phillip Fredlick the NICCU director who was part of this team as well, and Dr. Epstein, and none of them wrote about the once-on-lifetime cancer patient that spent a month in their NICCU and was one of the most significant medical phenomena ever to be admitted. I have the documents to prove they sold me this. Dr. Epstein gave me a printout to tell me all about Leilani's tumor, and I still have it. It was all a well orchastrated lie. USC is the connection, by the way; everyone who hurt us is connected or works of USC.

### 11/30/2010

Because Leilani was not given the full hemispherectomy and shunt, her seizures started again. This time we were told we had to be out of the hospital the day after brain surgery, and she would not receive a post-surgical drain because Medical and CCS refused to let us stay more than a day since we had been in the hospital for 41 days the month before. When we got to the PICU, the nurse was ready to inject my child with insulin. I stopped her and asked why she was giving her that, and she said, "because she has diabetes" I said, no, she has diabetes insipidus, salt diabetes, not sugar diabetes; you will kill her with that. She said, oops. I did not leave Leilani's side after that. Her surgery was completed in the evening, and we were told we had to be out of the hospital first. They removed her temporal lobe, which was major surgery, but they treated it as an outpatient. My baby's head began to swell, she was screaming in agony, and the nurses refused to help. They said she could not have pain medication, and even if she was sick, she had to leave the hospital in the morning and forced me to sign an agreement, or we would get forced out right then and there. Dr. Krieger never came to see her, nor any residents. Leilani had a catheter and was developing hydrocephalus because they did not drain her; she threw up and had diarrhea all over me. The nurses refused to clean her up and would not give me scrubs. I had to walk to

the Ronald McDonald house with vomit and fesses. I was forced to sign a release form and left at 8 am the next day without seeing a neurosurgeon or resident. Leilani's head was swollen, and she was screaming, but no one cared; they forced us to leave. I had never felt so alienated and scared.

At that point, the seizures happened 100 times a day from the moment Leilani came out of surgery. It was because of the hydrocephalus, according to Dr. Fallah. She was so sick, you could see something change in her eyes, and I have a PT from back then who is still with us that will attest to the same thing. She said she saw Leilani slowly fade away and was heartbroken by it. She is happy to testify. She also worked for CCS for a month but quit because of the accusive, neglect, discrimination, and abuse she witnessed. She is a business owner and services most AV school therapies. Her name is Leticia, and she is well respected in her field. She knows how hard we work with Leilani and has been with us most of Leilani's life. I told Dr. Platt I would take Leilani back to Boston for care, and she said I could not do that; Leilani was California's problem, and she lived here now, so they would fix her. She did not want anyone else to see the MRLs or medical records; if they did, they would see the crimes, which eventually happened at UCLA in 2019.

### 9/21/2011

I wanted to bring my baby home to Boston to have the doctors there check Leilani out and give her whatever surgeries she needed, and I will never forgive myself for not doing that. Dr. Platt insisted and said, "you live in California now, and she will be under the care of doctors here; you don't want to go to another state to have surgery; who will care for her post-surgery"? I asked if Dr. Krieger would see her when we got back if I took her to Boston for surgery since he couldn't do a hemispherectomy. She said he wouldn't see her again; she must visit the doctor who operates on her; no one will care for her here if she gets surgery in Boston. At the time, not knowing any better, I believed.

Dr. Devon Binder is an adult neurosurgeon that Dr. Ramos-Platt and CHLA hired to do Leilani's hemispherectomy at Children's Hospital Orange County. I thought it was interesting that he could not do the surgery at CHLA, but my baby was dying, and I was desperate to save her life, so I didn't ask. Dr. Ramos-Platt then told me that Leilani was not given a hemispherectomy initially because Dr. Kreiger didn't know how and did not disclose that to us. We would have gone to UCLA, and Leilani might have had a chance at life, but we were deceived.

This surgery was the 5th and should have required a shunt and drain. Dr. Krieger told me to make sure they didn't give her a shunt, that it would get infected, dislodge, and may end up killing Leilani, which is why he never fought CCS to implant one. So, I was okay with no shunt; I still trusted he gave me honest advice. I was in disbelief that they were hurting her. Who would do that? Nazi doctors, not CHLA pediatrics. I didn't believe regular people could do that; I am still not okay with knowing this. I don't want to. It hurts my sole. I was so naïve! However, that was not the biggest problem in this surgery. Dr. Binder removed healthy brain tissue from the central and right portions of Leilani's optical lobe, which is needed to walk, talk, and coordinate. According to Dr. Fallah, this part of the brain is never removed, even if the result is death because it causes too much damage and unknown future damage.

According to the MRI imaging, medical reports, and doctors who reviewed my daughter's case, there was no medical reason to take this part of the brain. It was healthy and needed to keep Leilani's spinal cord straight and the flow of CF from being restricted. In a statement from Dr. Fallah that will be included, the removal of this section of the brain was "aggressive" and the cause of many complications.

Leilani was denied a bedside drain during this surgery, like last time to ensure she would be released ASAP. However, this time it was too much pressure due to the aggressiveness of the surgery, and my baby's head swelled like a balloon, causing her third cranial ventricle to collapse and the right side of her face to droop, requiring two eye surgeries and taking away her ability to eat.

Now they had her where they wanted her, under the care of all departments with no chance to recover. No matter how hard I tried to save my baby's brain and future, I couldn't. I was constantly reminded of my demographic and treated like a degenerate by the doctors in this hospital, just like all the others.

However, this time she almost died twice, the only two times I left her side. The first time I went to the Ronald McDonald house to shower and came back, my baby was drowning in her vomit. It was cold, so I knew no one was monitoring her. The second time I left was a month in; the nurses told me to go out and relax. Reluctantly I went to a movie. Instead of returning to the Ronald McDonald house like I said the nurse staff would, I stopped to check on Lani. Her cranial drain was open, and all of her Cerebral Fluid was draining out onto the bed. I never left his side again.

After one visit, we were told we could not see Dr. Binder anymore and had to return to CHLA. CCS means you, as does CHLA, kids on Medical have no freedom to choose healthcare facilities and are lucky to get any care. Knowing this, I just followed orders. However, before I left CHOC after Leilani's surgery, I asked the genealogist Dr. Zadeh to have Leilani's bloodwork sent to Boston and check her for TSC. Dr. Zedeh was our ally; I have her contact info if needed. She and her mother would come in when no one else was around and test Chris and Leilani for TSC, tuber sclerosis complex with lights, and other gadgets. They kept telling the TSC doctor that Leilani needed to be tested, but Dr. Parks refused and said they couldn't test for TSC in CHOC because they did not have the capability; Dr. Platt also said the same thing about CHLA, which is a lie, they have a TSC clinic in both hospitals and have been treating TSC for decades. It's a simple blood test; they wanted the cancer lie to continue. Dr. Sadeh told me that if I come and see her after Leilani is released, she will have the bloodwork sent to Boston so that I can have the results but not to tell anyone until after the results are back and I have the diagnosis in my hand. She knew what was going on and helped us; she will testify to what she knows and thinks after receiving Leilani's complete medical history. Even though CHLA and CHOC are leaders in TSC research in all of California, they told us they could not test her blood and did not make a diagnosis in TSC clinics. I know this is all a lie now, being a pro of the TSC clinic after 8-years of receiving care there and knowing they have been diagnosing it for decades. The TSC diagnosis would have explained the tumor and rejected the cancer theory, proving Leilani only needed the one SEGA surgery, typically a hemispherectomy but also that she does not have a condition that justifies her condition because it does cause physical disabilities and Leilani was born with a normal APGAR. However, the lack of cancer treatment makes me question whether they knew it was TSC and not cancer from the beginning and just wanted to profit as much as possible before she died, which I was told over and over she would without reason, and almost did in 2019, but was saved by Dr. Fallah explained later in this document. The test results for TSC came back positive. When I brought this to CHLA, they said the results were subjective and rejected the diagnosis. However, TSC is also mentioned in Leilani's early records at CHLA. I found it while reading all 1100 pages. The TSC clinic is there, so there is no way they did not know. When I told Dr. Platt, she said it could be a false positive. She is barely affected by it. She then said it was both cancer and a SEGA. Leilani was now a super phenom because she would be the only patient with this condition, and still, no studies or papers. When we transferred to UCLA, they refused to give us an oncology team because they said it was a false diagnosis and it was not justified. Leilani only needed a TSC team. After Dr. Platt told

me the TSC diagnosis was unlikely, I had my daughter's father's blood tested which was quite an undertaking, explained later in this document. His results returned positive, and we were referred to UCLA TSC clinic, not CHLA's, for unknown reasons.

Leilani was supposed to get therapy after her hemispherectomy; it is essential to get the body moving. Dr. Parker told me at CHOC that my daughter could not have post- surgical therapy because it was a waste of resources. After all, her movements were only reflexive, and she was grossly mentally disabled. This is not the case; Leilani can read, do math, and problem-solve at her grade level. Dr. Parks was aware of what was happening.

### 2015-16

I began to question why my daughter was not getting any better physically. There was a 98% prognosis of her only having a slight limp; everything else should have been fine. When I pushed about therapy, Dr. Bloch sent me a threatening note that I still have, stating I should be arrested and that it was my fault my child was not thriving. However, before writing that note, he knew that the refusal of a shunt and botched surgeries were the cause of Leilani's disabilities, yet he went out of his way to threaten and victim blames me; what type of monster does that? After complaining to Dr. Krieger, suddenly, Leilani could have all the therapy she wanted at CHLA; it was such a relief. Leilani was five now and had yet to see a real orthopedic.

Upon seeing Dr. Kay, I was told my daughter was labeled as CP for insurance purposes, so doing corrective surgery would be wasteful since kids diagnosed with CP typically don't walk, which I knew was not true; lots of people with cerebral palsy can walk. But also, she was never diagnosed with Cerebral palsy. It was the first I heard of it. He then used the term "CP-like" disabilities but CP for billing. I was told he would only authorize the surgery if both hips fell out of place. But there was no medical reason for that to happen. The one was out 30 percent because of an unusual growth spurt, and she was standing well and trying to walk. I was later told that what Dr. Kay said was not true; you are supposed to do them one at a time, and it was unusual for both legs to come out of joint simultaneously. Jeanie Umana, Nurse Case manager, told me that Leilani had to prove she could make five purposeful steps before they would allow corrective surgery or a device to help her walk. They forced her to do PT with a dislocated hip. They tortured my baby. I remember asking to have a private room to change Leilani as she was eight at the time and in diapers; they had an open examination room with a table but refused us and made me change her in the middle of the PT gym with students and therapists both male and female watching. They held up a blanket, but you could still see. I called and complained that they needed to have proper changing facilities for larger children and that it was immoral to force her to either sit in filth or expose herself to a room full of people. We were kicked out of the therapy unit the following day. We then sought a second opinion for Leilani's hip problem at UCLA. We could not go to UCLA for some reason; we had to go to the USC campus. Dr. Thompson works for both UCLA and USC; if I had understood, we would not have trusted her. She was affiliated with CCS and hurt Leilani to get her "CCS eligible" as a life-long patient instead of a girl who needed one surgery. According to countless PTs that have worked with her, Leilani was doing well with her walking and only needed her hipped popped back into place. Dr. Thompson cut 3 inches off of my child's healthy left leg without medical justification to make a prosthetic that could be made from cadaver bone or manufactured prosthetics. Dr. Thompson said insurance would not pay for the prosthetic, which I investigated. It is false. She also said she did not use cadaver bone, the normal go-to, because of Leilani's fragile immune system which there is no

medical proof. Leilani has two colds, no COVID, and not even a diaper rash. At a fair hearing, she justified her actions by passing false records. I can prove it because I have the correct ones. She said she was justified because Leilani would never walk based on her 3-4 APGAR, but her birth records report an 8-9, and many people saw Leilani at the hospital, even right after her birth, and will tell you there was no distress. Guests could see her 30 minutes after she was born; I have video and photos to prove it. She was also never in an incubator or with breathing support but swaddled in a blanket in a crib like any other baby. Dr. Thompson said Leilani might be able to walk when she is 18 if she gets injections in her healthy legs once a month for the next eight years to stunt growth. One botched leg surgery turned Dr. Thompson's one-time fee into a life-long patient. She is now the director of her department. Leilani can no longer walk at all or stand. I tried hard to get her back on her feet, but Dr. Thompson refused to help with DMEs. Leilani was also sexually assaulted in the surgery that shortened her leg explained below.

**2018**

Leilani began to develop odd sicknesses in late 2017. She first developed precocious puberty, caused by the pituitary gland being injured during the first surgery, where the shunt was denied, and hydrocephalus set in. According to Dr. Fallah at UCLA, it is a sign of arrested hydrocephalus.

Leilani's temperature dropped down to 94. It was a hot summer, and she was not sick. I knew it was serious and asked Dr. Rosser, the TSC neurologist at CHLA, who could not diagnose Leilani but was now in charge of her care. I wondered if we could do Leilani's annual MRI to see if everything was all right. It was already overdue, so I assumed it would not be a problem. Dr. Rosser refused and said she checked with Dr.Kreiger, and he was okay with waiting up to 3 years for another MRI. I said she was sick; one year was always how it had been done. Dr. Rosen replied, "it's up to me, and I say no."

I then requested to transfer care to UCLA and get a second opinion from Dr. Joyce Wu. We saw her briefly in 2015, and she was nice back then, so I in-boxed her for help. Dr. Bloch at CCS and Dr. Rosser already told me I could only get a second opinion at CHLA because of my medical insurance. I said straight medical could be taken anywhere, but they said not if they said no. When I tried to get help from the Ombudsman, I was told I needed to move to San Francisco if I wanted healthcare without CCS. It is on a recorded line.

I then made an appointment with Dr.Krieger to ask why he did not see the need for an MRI. I asked him point blank whether she had cancer, and he said yes when there was no medical proof. I wondered if she had hydrocephalus now or ever, and he said no, which according to all the MRLs since birth, says she did. He said she was fine; I was overreacting. But I did not believe him this time; something was different in his attitude toward us; he knew I would find out. I wrote a nasty email to Dr. Rosser, ensuring she would never want to see me again, and was granted my referral. However, getting away from CCS was not as easy.

**UCLA 2019**

Upon request to see Dr. Wu, I was informed that CCS would not allow the move, even though I was told that we could only see doctors Dr. Bloch approved of, and if we tried to get a second opinion at UCLA, Leilani would lose all her insurance, not just CCS. This was a huge red flag because I knew he did not have the authority to do that. I then reached out to Dr. Rossen, who told me CCS, and Dr. Bloch told her she did not have to give me a referral if she thought she was doing her due diligence and that I had no

choice but to see her. When I tried to make appointments at UCLA alone, Dr. Bloch would have them canceled. I finally called Dr. Young for CCS and told her what was happening, and she withdrew Leilani's CCS. But Dr. Bloch was also in charge of Medi-Cal and abused his power to deny Leilani care to force her back onto CCS.

### 2/2019 Santa Monica Hospital

Pediatric orthopedic surgical resident Scott Gayley purposefully injured my child during his residency at Santa Monica Hospital in February 2019. Immediately after the surgery, Dr. Thompson cut 3 inches off Leilani's leg. I noticed my daughter's incision leaking outside the surgical wrapping, so I asked to have it reinforced, so she didn't get an infection. Dr. Gayley enters the room with a nurse; the nurse comes in with bandages in her hand but is instructed by Dr. Gayley not to use them because "Medi-Cal does not pay for post-surgical bandages, and since she doesn't have CCS, she can't have an actual bandage to cover the surgery site" (a nurse was there, she filed a report) then placed a giant piece of purple rubber industrial foam down the length of her incision, which was about a little under a foot long. When my daughter's home nurse Jill from ASAP home health care, removed it, the skin and hair came with it. The nurse took pictures and filed a report with the agency. Although the nurses at Santa Monica hospital filed a complaint, no disciplinary action was taken. But that is not the worst thing he did to my child; he told a nurse (according to her) to sexually assault Leilani, I am assuming to hurt both of us because it was a prison-style rapping.

After surgery, Leilani was more irritable than usual, I could see her belly was swollen, and she was in pain. After surgery, you did not feel pain for some time, so I knew something was wrong. She was trying to move her bowels; a mother knows when her baby has a constipated belly, and you could see the agony when she crunched. She just had hip surgery and was too weak and numb to push. I requested an enema to help relieve her pain. She was hysterical right after surgery, and the nurses acted like she was a burden. It was so sad. When the nurse (Carol Alvos, according to UCLA investigator Eric Gamm) returned, she said doctor Gayley refused to give her laxatives and insisted they do a bladder scan. I was confused; what for? I was told that children with CP have problems urinating and often develop a UTI causing similar symptoms. Leilani does not have CP and has never had a urinary tract infection, her temperature was average, and nothing indicated UTI. I could not understand why they insisted, but I assumed they would see it was not that once they checked her bladder and gave her the enema so Leilani could go to sleep. Leilani had eight surgeries before this where they could see constipation as her problem. The nurse scanned Leilani's kidneys and found 13 ml of fluid in her bladder, not even enough to constitute a need to urinate. The human bladder holds between 400-600ml of liquid. 13 is empty.

The nurse (Carol Avalos, according to the UCLA investigation report from investigator Evan Gamm) had then entered the room with a catheter tube and said Dr. Gayley insisted she had a catheter to force urine out of her. I said, "she only has 13 ml," the nurse said, "I know, but we can't refuse the doctor's order". I said I would not allow it, especially since Leilani has an underlining kidney disorder due to TSC. They told me they would use force if I did not allow them. When I told them they could not do that, the nurse told me, "I have no legal right to stop a doctor from conducting a test he or she deems necessary." It was agonizing to watch; they did not do it the conventional way, where they insert the catheter and let the bladder drain slowly; they took this little tube and poked her bladder by going in and out of her vagina with it repeatedly for a few minutes to force her to pee which of course she didn't because her bladder was empty. It felt like an eternity; I get sick thinking about it.

Leilani was so freaked out and in pain because she still had to move her bowels that she flailed in agony, ripping at tubes all night. I had to hold her down all night, one hand on her right arm and one on her right leg. She was in so much pain. I asked for help restraining or relaxing her because I feared she would hurt herself. I was told by her nurse, "what is the matter? You can't handle your child." But she was in pain and scared; she kept trying to rip out her tubes and tear up her incision. It was the longest night of my life. I had to pin her down for four hours while she screamed, and the nurses ignored us. Chris Leilani's father could not stay overnight with us because he had to work and is devastated, unable to forgive himself for leaving us. It probably still would have happened, but he is broken that he could not protect her from a sexual assault. We didn't let her out of sight after that, which we never did. Leilani has never had a babysitter and won't so long as I am alive. When the shift finally changed, the charge nurse found us. I was crying, my arms numb from holding my poor baby down all night. She gave Leilani her enema and stopped her pain; she was so lovely; her name is on the report she filed. She cried. She was so distraught by what happened and had someone from family services come and talk to us. The proof of the catheter incident is included in this notice.

### Dr. Wu

At Leilani's November 2018 appointment, I asked Dr. Wu to see the previous MRI screens to review them to understand if Leilani was having a problem that could be seen through the imagery. We knew she had issues with her temperature that could cause cardiac arrest and were concerned. Dr. Wu said she did not bother loading them because there was no point. I would not know what I am looking at as I am not smart enough. She said this in front of Dr. James Lee and another witness. I was mortified. I have looked at dozens of MRLs with Dr. Kreiger and other doctors and completely understand how the brain works and what I am looking at. It is not that difficult if you have training. She then began to quiz me and said to Dr. Lee, see, she has no idea.

The truth is, she did not want me to see what I already knew. She was not abusive when we saw her in 2015; this was a different side of her. I asked for a referral to child psychology to have Leilani's well-being assessed after everything she has been through. Dr. Wu said kids with Leilani's insurance are not allowed psychological services and would not refer them. This is sad; who needs a psychologist more than a disabled child? No one. But it's true; Medi-Cal will not pay for it. We tried to see a behaviorist after her sexual assault as she became depressed and was sleeping all day and would not let anyone but me change her diaper, but they won't take her without CCS. The condition or need does not matter. I then asked for an appointment with neurosurgery so they could explain the MRLs to me. She said no, I would decide on Leilani's care. If you do not like that, go to another hospital.

Knowing something was wrong, I called the neurosurgery department and asked for an appointment but was shot down because I needed a referral. I then begged Dr. Lee in pediatrics to help me, and he did. Even though Dr. Lee also told us to go back to CCS if we wanted to stop the abuse and never stood up for us, he referred her to the neurosurgery department without telling Dr. Wu, and in doing so saved Leilani's life, so there is a good man in there; he is also stuck in a corrupt system. Doctors can't be fired from UCLA per their contract, so most nurses and doctors turn a blind eye to corruption as it will only lead to them being harassed by their peers. However, Dr. James Lee saved Leilani's life with that referral, so no matter what he said to me, I am forever grateful for what he did and forgive him. He is the only one I forgive in this situation. Not everyone who ignores the evil deeds of others will participate.

When we saw Dr. Fallah for the first time, he told us Leilani was dying because her third cranial ventricle was too inflamed due to arrested hydrocephalus and pressing against Leilani's basal ganglia and hypothalamus, causing her temperature to drop and all of the other neurological problems she was having. He also told me that the "scar tissue" on her left hemisphere was a tumor that needed to be removed ASAP because it was growing and may quickly become the size of a softball if left too long. He told us about this fancy ultrasound laser they would use, and Leilani would live a long life.

He then told us about the arrested hydrocephalus and that it was apparent to anyone who looked at Leilani's MRLs since her first surgery. He said that without a shunt, an infant's brain could not recover from the amount and type of surgery Leilani underwent. The ventricles could not drain the excess fluid, causing it to stay in the skull, slowly eating away at the brain and causing her disabilities with no other apparent cause, like eating, walking, and talking. He said that her advanced cognitive abilities also indicate injury vs. condition.

Dr. Fallah seemed sincere and said he was sorry this happened but would do the best for Leilani moving forward. He said some of her functions should return, but it was not likely. He told me he could also tell by Leilani's older images, medical records, and general health. He said the precocious puberty was a sign the hydrocephalus was causing new damage and should have been caught when she was diagnosed at CHLA in 2016. He also said dozens of incidents throughout Leilani's medical life show apparent signs of arrested hydrocephalus. He wanted me to know the truth, so I could heal and move forward. He was not pre-framed yet, so he didn't know what he had just done, proven by his actions after the shunt surgery.

Dr, Fallah also confirmed that Leilani never had cancer. He said no matter how fragile, if they removed a 7 cm cancerous tumor from an infant's brain, they would have done a round of chemo and radiation. It is standard procedure. Dr. Kreiger told me she was too fragile, but Dr. Fallah said no; they would have to ensure it would grow back. They knew it was not cancer. Dr. Wu did not know Dr. Fallah performed Leilani's brain surgery on 7/26/2019, which saved her life until a week after the surgery when I told her. He said she would have died within a few months, evident by the MRI scans and lab work.

**7/26/2019**

After Dr. Fallah conducted Leilani's shunt surgery, Dr. Mathew Sun took over Leilani's care in the ICU and ordered her discharge. The day Leilani was to be released, he entered Leilani's room, looked at Leilani's chart, and asked me to go out into the hallway with him. He told me I could take Leilani home and "remove her surgical staples with a staple puller because he refused to do it." When I said that is illegal, you couldn't do that or even say this to me. He informed me that nothing was" medically unlawful." He made this statement around the corner from the nurse's station. He took me into the hall to avoid Chris's hearing but forgot about the nine nurses sitting in ears distance around the corner. They all came running into her room as soon as he left, telling me not to do that! I said I had no intentions. They said it was protocol for the nurses to remove the staples; they could not understand why he said that to me and told me they were filing a report.

**9/3/ 2019**

Leilani goes to see Dr. Fallah, and the tone is much different this time. I explained what happened with Dr. Sun; he said it was in retaliation to the yelp review I posted about Dr. Krieger. I told him it was anonymous. How did he know it was me? He said, by the content and now, thanks to his confession to

me, there is tension between UCLA and CHLA. He then told me everything, who was involved, what they did, and that if he knew what he had about Leilani, he would not have done the surgery because it only caused problems for the hospital relationship. He said that the entire medical industry would band against me to save the numerous people involved in this project and that UCLA would deny Leilani's service moving forward. He said it was sad but that nothing could turn back time, and he was not going to be the one to take a fellow doctor down for a "state-insured child that no one cares if she lives or dies because she will never contribute to the world because of her injuries. He said she had already served her purpose, and no one would believe someone like me. He said that to be treated like this, I must have come from the "system" and would be there for other reasons even if Leilani was not born, so I don't count as a human in the real world. He also said there was a big meeting after Leilani's surgery and decided to withdraw care and not get involved further. These are not the words of ethical people. They should have taken her in and helped her, not added to the abuse knowingly and willingly!

Leilani cannot get the care she needs now and has to move and reestablish respect in a State where she is considered a living human with constitutional and human rights because, based on this, California is not that.

After this happened, we reported everything to the medical board. They came back and told us they were not going to investigate, that one doctor reviewed all of the allegations and sides with the doctor's right to conduct medicine as they see fit. When I told them I would appeal, the claims manager told me she would deny it without allowing a second investigation.

I called the LAPD, Santa Monica PD, and FBI for the umpteenth time. Law enforcement is rude and abusive when you call, so it takes a lot of me, mentally and physically, to call them. I never once called or had an interaction (aside from social or work) with the police before the county abuse, so I am just assuming this is how they always are with victims, which is sad; the people calling them need help; they don't need to be yelled at and insulted by a 25-year-old with no real-world experience but all the power. I think they get mad at me because I am trying to force them to understand something they cant. Most police officers are not college educated, so they can't understand intellectual and white-collar crimes unless they grew up in it. These are neurosurgeons and high-level white-collar medical crimes. I am supposed to understand these types of crime; it is what my degree is in.

## 2020

Leilani needed to have the pin in her hip removed; we filed complaints with the medical board about Dr. Thompson and knew she was being investigated and would not hurt Leilani in the removal surgery with eyes on her, so we scheduled an appointment with her. When we got to the preop appointment, Dr. Thompson came into the room with three nurses and someone from administration to confront me about my medical board reports. I just wanted her to take the pin out of Leilani's hip, it was starting to eat through her skin, so I said whatever she wanted. I knew we were never going back once the pin was out, so I said what she wanted to hear. Although she could not hurt Leilani, it was a piggyback surgery with dentistry, so Dr. Chang did her dirty work. After the pin removal, the dentist was to go in and clean Leilani's teeth and remove a problem tooth. He opened the gum but left the tooth. A week after

surgery, Leilani's face blew up (have pictures), and she developed a fever. It was the height of COVID, so to keep her going back and forth was dangerous, but she managed to avoid COVID, as did her father and me. Leilani had to have a second surgery that does not show up in her medical records, nor does the abscess visit to pediatrics.

Dr. Marcus Leilani's GI told me her F-tube needed to be resisted because she was growing out of the one she has. Dr. Marcus set us up with Dr. Chin whom we had a telehealth appointment in April 2020.  He said if we had the surgery with him, Dr. Fallah would be at the surgery and ensure Leilani left with a colostomy bag. When I told Dr. Marcus, she filed a report and recommended I go to Stanford, as I told her I was going to after the telehealth appointment. She said there was no reason for Dr. Fallah to be there or an apparent reason as to why she needed a colostomy bag. The g-tube resets on kids with shunts all the time, and there is never an issue like that. Dr. Bronzini, the GI surgeon who did the surgery at Stanford last April, agreed that this was an unusual comment and rare outcome. However, Leilani was also injured during that surgery. Proving she will never be safe from abuse by the California medical industry.

### LAPD 2021-2022

After Dr. Fallah threatened me, my yelp reviews disappeared online, the LAPD refused to help me, and the Medical Board told me they wouldn't help. I reached out to DR. Krieger out of desperation. I was terrified my baby would die, so I emailed him to beg for mercy. It was not wholly vulnerable, there was animosity from all I had just learned, and I said some things that were not nice and could be interpreted as threatening but no direct threat aside from putting him in prison. On May 5th, 2021, two detectives from the threat unit, a member of the department of health, and someone from La county sheriff (all plane clothed, the psychologist and LAPD officers did leave a card, the officer from the sheriff's department did not. I have accused this man of being both Mike Moor and the former LA County Sheriff because that is what the fourth man looked like but had a mask, and those individuals share many physical characteristics. But I can't be sure if it was either. I would guess the LA county Sheriff, but only the officers who came to my home can confirm. They refused to take my report as they "were here for Dr. Kreiger not to understand what happened." They said they did not want to confuse what I did wrong with anything he did, so to report his crime would be inappropriate. This is highly biased, police officers are supposed to take both sides into account, but this was not an ethical police visit; last I checked, you can't accuse someone of threatening another without an actual threat. The officers that came here said that even though another doctor threatened me on his behalf that led us here, this was the first angry email I sent Dr. Krieger. I never called his office, went to see him, or was anything but polite face-to-face, and there was no actual threat. I had no criminal record. There was a decade of mitigating circumstances, and I lived 150 miles away from Dr. Krieger. Still, that email was enough to get a restraining order that would take away my constitutional rights to own a gun and follow me for three years. I don't care about gun rights; I hate guns and have severe arthritis. I can't shoot it anyway. But I do care about what it implies.

Before Leaving, Detective Musgrove from the DHCS, where Dr. Bloch is an official, told me to send him my statement to the court before submitting it so he could coach me on what to say. I told him I had too much PTSD to go to court and would get sick in Dr. Krieger's presence. He told me the judge would understand if I didn't go to court. I would have gone if I knew he would automatically rule against me. I have saved emails to prove he was coaching me. I did what he said and blamed myself for this. Even

though I knew I was under duress and protecting my child from injury, they made me feel like I had to show I was sorry for Dr. Krieger; they were so psychologically manipulating. Not because they are smart but because they are bad cops. Musgrove said that even though I did not make a threat, Dr. Krieger took it as one, so I have to be remorseful if I want to judge to be lenient.

Detective Grunland was the one who filed for a restraining order for Dr. Kreiger using a false description. She said I was 5'10, had dark eyes, a dark complexion, was 59, and was living in the projects but had the correct weight from my DMV records, suggesting she looked at my DMV records but chose to use what she saw as a criminal, which is grossly discriminatory. I am 5'3, have green eyes, blonde hair, and light-complected, and I own a home in the suburbs, which is what you see online and in the DMV. She is supposed to be a crime expert, but she did not, at the very least, google me or search the DMV for my records; she used an old address and false description. Dr. Krieger did not give her that description; he had known me for a decade.

In her declaration Detective Grundland States, I have been sending angry emails to Dr. Kreiger since 2018; where are they? No evidence was listed, including the supposed threatening email, only cherrypicked phrases to make it look so.

Detective Grundland said, "due to the length of time I have blamed Dr. Kreger for my child's disability, it is unlikely I will cease to contact him and require extreme restraint." I never once blamed him before Dr. Fallah told me what he did in 2019. I never contacted him before Dr. Fallah's confession. One other time when we were trying to get out of CHLA when Leilani was dying because they were trying to let her, I did email, Dr. Krieger, not say anything bad, to tell him we were going to UCLA for care and that I knew he was lying about cancer and I would find out. I never called him, never approached him while at appointments at CHLA; it is not in my nature; I taught Tia Chi for over a decade, I am an expert in self-control and have all the proof I need to put this monster away; I don't need vengeance, I have evidence.

The most damaging aspect of this declaration is that it questions my sanity, which is imperative to do my job and is well intact, I assure you. I spoke to several LAPD mental wellness specialists throughout this process. None of them thought I was dangerous or lying or that Detective Grundland was right in her deformation of me. Detective Grunland said, in her expert opinion, I am the type to keep stalking Dr. Krieger. I never started stalking him, nor will I, and there is no evidence I am that type of personality. I don't have a history of such behavior and repeatedly said I would never contact him again, which I won't. All he had to do was spam me; these are the actions of a guilty man with lots of power. Detective Grunland did not have my psycho analyzed, and she is not a Ph.D., so she is not qualified to judge my mental state. Especially given the circumstances. Also, she is not an expert in medical crimes of systematic abuse; she is a threats specialist, so when she says: her professional opinion: she is speaking out of bias. She says she knows my "type." My type makes up 0.25% of the population, and we rarely have a rub with the police. I learned to play three instruments, but I am unsure if I can still play. I was in the school band and even had solo performances, but I could not read music. I can hear sound on a different level and separate it. I was told it was my Darwin notch, but who knows, I am not Mozart, nor can I solve a rubrics cube. My first word was cracker. At nine months, I was walking and potty trained at one. When I was eight, Children in Boston told my mother I had the learning capability of a senior in high school. I was asked to study for a play; I remembered the whole thing after reading it once, so my mother had me tested. She will confirm this. I have mastered every primary profession, including athletics and academia. As you can see on my resume, Detective Grundland would not know someone

like me unless she took my class. Otherwise, our paths would not likely intersect. I filed a complaint against Detective Grunland. I initially thought she was one of the men who came here because detective Gonzales who was doing the IA investigation, told me so. But she was employed there for a long time, and everyone seemed to know who she was when I started asking around, so he chose to lie to me. I didn't realize she was a female and had never met me until a few months ago.

In May 2022, Detective Cruz from the LAPD contacted me because I emailed Dr. Platt to get her to help. He said if I spoke to another doctor about Dr. Krieger, it would be considered me trying to get a message to him, and I would get arrested. I told him the restraining order was only for him, and I could even go into his office for care if I chose. He said he didn't care. He would consider it a threat to Dr. Krieger, and I would go to jail; I explained that I needed to discuss my child's care with the doctors. He said I am taking a chance. If it gets back to Dr. Krieger that I said anything about him to his colleagues, I will get arrested, so I am better off not going to CHLA.

### Damages begin sought

From The county of Los Angeles, we request 100 million dollars for each victim. We were all hurt individually for over a decade in various ways by the county and are still being denied the right to public school, medical care, public safety, or disability services, forcing us to move. The county put us on the road, and if it weren't for their actions, Leilani would have only ever had the one brain surgery and be living a whole life. The police harassment, county abuse, abuse of a county official, discrimination, and Dr. Bloch's terrorism for a decade comprise hundreds of acts of abuse, discrimination, and torture. The request is modest in comparison to the damage.

From CHLA and UCLA, we request 100 million dollars each for Leilani for multiple surgical malpractices, misdiagnosis, medical negligence, medical torture, medical fraud, conspiracy to commit medical fraud, attempted murder, and conspiracy to murder a patient by allowing a child to die by denying treatment knowing she was dying based on the previous tests (I.e., MRI and vital reports), and 50 million for Kimberly Clisbee and Christopher Co each for mental anguish, discrimination, violation of human rights, and torture. We include all doctors, aside from Dr. Krieger and Dr. Thompson, who brutalized Leilani purposefully through botched surgeries and should pay their fines. Doctors are supposed to help people, not injure them; many outstanding healthcare professionals will lead these departments with ethics and integrity. These individuals are doing the community a disservice by victimizing them at will.

From the Regional Center and DDS, we request 10 million dollars for Leilani. They withheld her rights and refused to report acts of abuse like sexual assault and threats. NLCRC allowed Dr. Bloch to control us using threats and denials for service, and when we reached out for help, they threatened me with legal action. And 50 million for Christopher (explained below).

From Dr. Kreiger, we are requesting 50 million dollars in damages. His crimes should put him in prison for what he did, you, my child. This compensation is solely Leilani's.

From Dr. Thompson, we are requesting 50 million dollars in damages. Leilani may never walk again, lives in pain, and her body is deforming because of this doctor's choice to engage in corruption with her peers. The malic of the false documents boldly presented to a judge shows her respect for the justice system and my child. But also, she did wrong; otherwise, why not submit the proper documents? This will also only go to Leilani.

LAPD refused for five years to take our report, then conducted an unlawful act to protect Dr. Krieger and defame me. My child's injuries, including sexual assault, may have never happened if they had only done their due diligence. To Kimberly, I request 5 million dollars from the LAPD for refusing to protect a 12-year-old disabled child from systematic abuse and their employees who caused further injury.

**Christopher Co**

Chris was a licensed dental assistant and pharmaceutical tech who needed help controlling his seizures and turned to the Regional Center at the recommendation of a friend. Chris was on his mother's private insurance until he was 27 but was now forced onto Medi-Cal because his employer did not offer health insurance. When he first walked into the Regional Center, they had him fill out a request for Social Security and Medi-Cal. He said he didn't need SSI, that he worked, and was told he would need it down the road. Confused, he filled out the papers. He was then told he needed a life coach. Chris works full time, was a college man, and had lots of good jobs like debt collector and security for NBC. He manages the townhouse complex his mother owned on Hollywood Way and could take care of himself fine, He grew up in an upper-middle-class home in Burbank, and he knew how to food shop and clean the house, but Regional Center said he had to. They told him the only hospital he could go to was Huntington memorial, and the only doctor in that hospital he could see was Dr. Sutherland. Before he knew it, he had a craniotomy and brain surgery that would not help his seizures but leave him impaired. I did not know Chris, but I had a million questions when he had his surgery. They diagnosed him with Sturge Weber disorder when he had no symptoms of that and all the symptoms of TSC. After discovering Leilani's TSC, I asked his doctors to run a test. They refused to say the same thing I was told at CHLA: California does not have the technology for TSC testing. I contacted Dr. Zadah and said she would get the blood to Boston if Chris's doctor could do the blood draw. They let the blood sample die three times before the carrier could collect it. I had to go there and meet the courier, watch them take his blood, and then put it in the transport bag to ensure it made it out of the facility. As soon as the results came back, Chris's doctor retired, and suddenly he was free to go to UCLA for care. There Chris was informed that they had removed his temporal lobe. He didn't even know his temporal lobe was gone until he was told by UCLA doctors in 2013, 4 years after his surgery. He is unable to work, left with severe constant headaches, mentally deteriorating over time, and suffers from PTSD due to his trauma, his child's abuse, and having to watch his partner be destroyed by the people who preyed upon him. He is mentally, physically, and psychologically broken and will need professional lifelong care due to his injuries. He will never get to live the life he would have should he never have sought help through the Regional Center of Los Angeles.

**Currently,**

**Leilani cannot attend physical school thanks to Superintendent Maldonado and is denied access to services in her homeschool. I applied to become a private school to fulfill my Federal obligation of sending my child to school and not being attacked by a pack of Karens every day and to get the funding and benefits myself.** No one hates the disabled community more than public school special needs coordinators, in my extensive experience. I was told by County employee Nancy Collins that communication services for the disabled population are a waste because when you die, Leilani is going to be a ward of the county and will be left in a room all day with no one paying attention to her, to give the ability to communicate when no one is ever going to talk to her will set her up for depression as an

adult. I told her, first of all, Leilani has two military uncles. One she is willing to go with when I die, the other a backup and not in this Godforsaken State; second, how could you say that to me? She left, and I requested that she is removed from Leilani's case. It is hard enough to have a fragile child that you know will need lifelong care. But when it is not because of nature or God, and people in the county assure you your child will be abused when you die, you become numb. I have not stopped crying over that, and I was already scared for her because she had horrific behaviors due to her intellectual capabilities and broken body. She understands what these doctors are saying about her, and they have said everything you have read right in front of her, so she has social and maladaptive behaviors.

**The medical abuse extended to Stanford Pediatric Hospital in 2022, proving it impossible to get care without injury in all of California.**

On April 7, 2022, Leilani went in for her annual Tuber Sclerosis MRI and to have her mickey-button (external feeding portal) resisted. For an unexplained reason, the anesthesiologist used ACTH during the second sedation, and her temperature dropped to 93. ACTH is a steroid used for infant spasms; it is not understood why he would use it according to all of Leilani's doctors; it is not used in the type of procedure. However, what it also does is cause steroid hypothermia and causes symptoms that mimic cardiovascular issues. A known side effect of ACTH is that it causes the body temperature to drop to 93-92 within the first four hours and can last for 30. This can cause cardiac arrest and even death, so to give this drug for no reason is dangerous. I am familiar with this drug because Leilani was prescribed it once before at nine months old, and it almost killed her. It is also 25k a unit. A man in white gloves carried it to my refrigerator. Then without training, I had to administer this drug intramuscularly to an infant. Which requires an RN license, but they would not send a nurse. The doctors at Stanford then told me a lie. They said that Leilani had tubers growing in her heart and that she would need to have a cardiology team for the rest of her life, and that with (TSC) tuber sclerosis complex, tubers grow in the heart during adolescence and need to be monitored for the rest of the patient's life. He said the reason for Leilani's temperatures dropping in 2019 was likely because of growing heart tubers. None of that is true. Everyone familiar with TSC knows that heart growths are at birth and usually clear up on their own in 2 weeks and rarely return. Leilani saw a cardiologist (Dr. Pines UCLA) before going to Stanford for an EKG before sedation, as she does every year. Like always, there are no growths or abnormalities her heart is healthy. Plus, the UCLA doctor confirmed it was steroid hypothermia and not a heart abnormality that caused the temperature drop at an appointment following this incident because ACTH is known to do that. Also, the issue with Leilani's vitals in 2019 was when the cardiologist referred to was when her brain was suffocating from arrested hydrocephalus (old brain swelling), and she needed a shunt  (brain, not heart) or would eventually die. Leilani's third cranial ventricle was swollen and pressing against her hypothalamus and basil ganglia, causing the drop in temp, so he just assumed I didn't understand that or did not know his job. Still, I doubt that is the case if he is in that position, so I deduct he lied to get Leilani in that department as a life-long patient for ongoing revenue purposes or insurance fraud; either way, you say it's the same thing. Leilani's life is forever at risk because of what Dr. Bloch of La County and Dr. Mark Krieger of CHLA did to her. Making it essential to move Leilani where we know this will not happen. I have family in the medical industry in Massachusetts and New Hampshire. She will be safe there.


a.  Leilani cannot access the medical care needed to sustain her life in all of Los Angeles in part due to threats of imprisonment by Detective Cruz of the LAPD on behalf of Dr. Krieger's attorney

(according to detective Cruz). Access to the department of neurosurgery, neurology, and orthopedics is required for Leilani's survival. She cannot access doctors in the appropriate hospitals because the department heads are the individuals who injured her. Like law enforcement or any other tight-knit group, they have each other's back above all and will do the unspeakable so long as they know their colleagues will lie for them. According to the UCLA patient experience department, doctors have "no fire" contracts, and the only punishment was temporary, contributing to fellow practitioners' reluctance to fight against the criminal element. If you report your coworker, you could be bullied out of your job, leaving only the corrupt medical professionals. Everyone fears coming forward but will not lie under oath if subpoenaed. Leilani had a VP shunt (drain) installed in her brain at UCLA in 2019 that requires monitoring. If it gets clogged, malfunctions or becomes dislodged, I have to drive her 700 miles to Stanford and hope she makes it there alive because of the malpractice she suffered all these years, which is unfair to her.

b.  Leilani cannot get Durable Medical Equipment afforded to her by the American Disability Act, Lanterman Act, and State policy. California vendors refuse to provide Leilani with DMEs because we are not CCS. To service straight medical clients without secondary CCS insurance, they lose out on the 30% extra CCS pays,  so you get bullied a lot, especially National seating and Mobility; they flat out refused to order an electric wheelchair for us without CCS because of the revenues loss (kickback) even though Medical was willing to pay the fair price all other states and insurances would pay without the pediatric medical prison system known as California Child Services.  The extra 30% from CCS is common knowledge and a theme throughout this document and our lives. Dr. James Lee of ULCA pediatrics told me that if I wanted the abuse and bullying to stop, I needed to return to CCS for protection. I told him that if I needed a state program to protect me from medical abuse, there was a bigger problem here than CCS giving 30% over the standard rate to encourage doctors to produce more CCS clientele via botched brain surgeries. What they are doing is more than just systematically abusing my family. It is medical fraud but also racketeering if they offer relief from the abuse by signing on to CCS for the extra 30%. The pediatric medical industry mirrors the prison system. However, inmates commit crimes to get imprisoned in the system; babies are helpless victims preyed upon by prejudiced doctors.

c.  Leilani does not have the protection of Health and Human Services, the Department of Education, Child protective services, DA, OIG, AG, the American Disability association, the medical board, the association of children's hospitals and pediatrics, the Regional Center, the police, the Ombudsman, the DHCS, CDSS, DPSS, assemblyman, congressman, or governor. This is a disabled child, and none of the entities designed to protect her rights are doing so and are refusing to help her get healthcare, schooling, and the fundamental rights everyone else has. The California government has abandoned my baby and left her to be mauled by a merciless system. Leilani needs to be made whole, so she can move to a State that will protect her rights and person from harm.

d.  This poor child is not allowed to go to school does not have a supportive medical team, the county does not provide her support, and she lives to be operated on for profit.

## EXHIBIT E

# PROOF BOTH CHIRS AND LEILANI WERE DENIED THE RIGHT TO PARTICIPATE IN THE FEDERAL CLAIM THAT IS IN APPEAL

## ORIGINAL CLAIM THAT SHOWS IT WAS NOT ADDRESSED

# In the United States Court of Federal Claims

No. 24-1135
(Filed: October 2, 2024)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KIMBERLY CLISBEE *et al.*,

     *Plaintiff,*

v.

THE UNITED STATES,

     *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## ORDER

Plaintiff, proceeding *pro se*, filed this action on July 25, 2024. In her complaint (ECF No. 1), plaintiff reiterates many of the claims she brought to this court previously. ECF No. 1 at 4; *see also Clisbee v. United States*, 172 Fed. Cl. 143, 145–46 (2024). There, plaintiff claimed that the defendant is liable for injuries to her children caused by the State of California and various California officials. *Id.* at 146. After we dismissed plaintiff's earlier case for lack of jurisdiction, *id.* at 149, she filed this complaint, *see* ECF No. 1.

Here, plaintiff reasserts her tort and constitutional theories of liability, but also claims that the Federal Bureau of Investigation ("FBI"), Department of Justice ("DOJ"), and the Department of Health and Human Services ("HHS") violated various federal criminal statutes and the Americans with Disabilities Act ("ADA"). ECF No. 1 at 2–17. The defendant moved to dismiss (ECF No. 5) on September 13, 2024, arguing that this court lacks subject matter jurisdiction. ECF No. 5 at 1. Plaintiff responded (ECF No. 6) on September 23, 2024, and argued that her claims accrue primarily under the Thirteenth Amendment. ECF No. 6 at 6. Because we do not have jurisdiction to hear any of plaintiff's claims, we grant the defendant's motion to dismiss.

In brief, plaintiff's claims center on an alleged "RICO crime across multiple agencies who are all using the disabled population to commit Federal insurance fraud . . . [and] create disabled people to gain funding . . . ." ECF No. 1 at 20. Plaintiff alleges that the State of California and California officials physically injured her children. *See Clisbee*, 172 Fed. Cl. at 146. She further asserts that the federal government is "vicariously responsible" for her children's injuries because California officials acted pursuant to a "waiver" under § 1115 of the Social Security Act. ECF No. 1 at 20, 24.

New to this case are plaintiff's allegations against the FBI, DOJ, and HHS. She alleges "negligence and misconduct" on the part of the FBI for not investigating her claims and that the HHS acted "unethical[ly] and illegal[ly]" by "refus[ing] to investigate" her claims that "three victims" were "purposefully made disabled for a project that is now a federal policy . . . ." ECF No. 1 at 9–10. Plaintiff contends that the HHS (and presumably the DOJ and FBI, although it is unclear) are "abusing their office to shield their colleagues who committed horrific crimes and violat[ed] our civil rights." ECF No. 1 at 10 (citing 18 U.S.C. §§ 241–42). Plaintiff also alleges that the FBI defamed her and damaged unspecified property she owns. ECF No. 1 at 11–12, 14. Plaintiff likewise asserts that the FBI, DOJ, and HHS violated the ADA and the Fourteenth Amendment. ECF No. 1 at 16, 95.

Finally, in her response to the defendant's motion to dismiss, plaintiff raises a new claim—that the FBI, DOJ, and HHS violated the Thirteenth Amendment. ECF No. 6 at 2. While demurring that "[t]he United States is not [g]uilty of the crimes committed" by state officials, she claims that the federal agencies "neglected to do their due diligence and preserve our 13th [A]mendment rights . . . ." *Id.* Contrary to her complaint, plaintiff insists that her criminal law and constitutional claims "are the only ones I am holding the Federal Government responsible for not preserving along with our 13th Amendment rights." ECF No. 6 at 11–14 (citing 18 §§ U.S.C. 241– 42, 245, 249). She also argues that she does not seek to hold the United States "vicarious[ly] responsib[le]" but liable "for [its] negligence." ECF No. 6 at 30.

Although plaintiff's complaint contains serious allegations, we cannot consider the merits of her case unless she satisfies the "threshold

2

requirement" of subject matter jurisdiction. *JG Tech., LLC v. United States*, 156 Fed. Cl. 691, 699 (2021). Plaintiff bears the burden of proving that we possess jurisdiction by a preponderance of the evidence. *Fletcher v. United States*, 26 F.4th 1314, 1321 (Fed. Cir. 2022). Although *pro se* litigants are held "to less stringent standards," they "must nonetheless meet basic jurisdictional requirements." *Michelotti v. United States*, 112 Fed. Cl. 187, 191 (2013) (first quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972), then citing *Kelley v. Sec'y, U.S. Dep't of Labor*, 812 F.2d 1378, 1380 (Fed. Cir. 1987)).

This court's jurisdiction is anchored in the Tucker Act. The Tucker Act grants this court jurisdiction over certain claims for money damages against the United States founded upon the United States Constitution, federal statutes, executive regulations, or government contracts. 28 U.S.C. § 1491(a)(1) (2018); *United States v. Mitchell*, 463 U.S. 206, 215–18 (1983). The Tucker Act does not itself create a cause of action; rather, "to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1306 (2008) (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc)). Plaintiff's claims, therefore, "must be . . . for money damages against the United States," and she "must demonstrate that [a] source of substantive law" requires compensation by the United States. *Mitchell* 463 U.S, at 216–17. The absence of a money-mandating law is "fatal" to this court's Tucker Act jurisdiction. *Fisher*, 402 F.3d at 1173.

As we previously held, we do not have jurisdiction over any of plaintiff's claims against parties other than the United States. Put simply, plaintiff's claims against the State of California and California officials are not claims "for money damages against the United States." *Id.* at 216; *see also* § 1491(a)(1) (stating that this court "shall have jurisdiction to render judgment upon any claim against the United States . . . ."); *Curry v. United States*, 787 F. App'x 720, 722–23 (Fed. Cir. 2019) (noting that this court lacks jurisdiction "against parties other than the United States"). Although plaintiff vacillates on whether the United States is vicariously liable for the alleged harms caused by state officials, *compare* ECF No. 1 at 24, *with* ECF No. 6 at 30, either way, we do not have jurisdiction over vicarious liability claims against the United States, *see Jordan v. United States*, 128 Fed. Cl. 46, 52 (2016). We must, once again, find that we lack jurisdiction over plaintiff's claims against all parties other than the United States. *See Clisbee*,

3

172 Fed. Cl. at 147.

Further, plaintiff cannot manufacture jurisdiction in this court by alleging that federal agencies—the FBI, DOJ, and HHS—injured her by not investigating her allegations. Our jurisdiction over cases against the United States depend on whether there is a money-mandating source of substantive law that requires the United States to pay compensation. *Mitchell* 463 U.S. at 216–17. The Tucker Act limits money-mandating sources to those "founded on an express or implied contract with the United States," "seeking a refund from a prior payment made" to the United States, or "based on federal constitutional, statutory, or regulatory law mandating compensation" by the United States. *Payne v. United States*, 139 Fed. Cl. 499, 507 (2018).

Plaintiff identifies no money-mandating sources of law. First, this court has no jurisdiction over plaintiff's assorted tort claims against the defendant. *See* ECF No. 1 at 2–16 (alleging tortious conduct including personal injury, negligence, property damage, and defamation). The Tucker Act excludes tort claims from our jurisdiction. § 1491(a)(1) (stating that this court does not have jurisdiction over "cases sounding in tort"); *Liu v. United States*, 171 Fed. Cl. 495, 504 (2024) ("[C]ase[s] [have] . . . uniformly found that this court does not have jurisdiction to adjudicate claims sounding in tort."). Thus, we cannot entertain plaintiff's tort claims.

Next, we have no jurisdiction over plaintiff's criminal law claims. Plaintiff alleges that the FBI, DOJ, and HHS are involved in a criminal conspiracy to perpetuate civil rights violations and hate crimes by "purposefully" "disabl[ing]" plaintiff's children "for a project that is now a federal policy." ECF No. 1 at 10; ECF No. 6 at 11–15 (citing 18 U.S.C. §§ 241–42, 245, 249). Yet the Tucker Act grants this court no "jurisdiction over claims alleging" "criminal conduct." *Hornback v. United States*, 91 F. App'x 679, 682 (Fed. Cir. 2004); *see also Liu*, 171 Fed. Cl. at 505; *Okoro v. United States*, 169 Fed. Cl. 462, 465 (2024). As we informed plaintiff before, we have no authority to hear her claims that are based on federal criminal law. *Clisbee*, 172 Fed. Cl. at 148.

This court similarly has no jurisdiction to adjudicate plaintiff's ADA claims. For one thing, the ADA "does not create a substantive right to money damages against the United States," so it is not money-mandating. *Gable v. United States*, 106 Fed. Cl. 294, 298 (2012); *see also Searles v. United States*, 88 Fed. Cl. 801, 805 (2009). In addition, the ADA vests district courts with "exclusive jurisdiction over ADA claims." *Dziekonski v.*

4

*United States*, 120 Fed. Cl. 806, 810 (2015). Plainly, we lack jurisdiction over plaintiff's ADA claims.

Finally, plaintiff's constitutional claims are beyond our jurisdiction. Plaintiff appears to argue that her children were denied services in violation of the Fourteenth Amendment (whether the Due Process Clause or Equal Protection Clause is unclear). ECF No. 1 at 97–99. Either way, we lack jurisdiction because the Fourteenth Amendment's Due Process Clause is not money-mandating. *See, e.g.*, *Ash v. United States*, 170 Fed. Cl. 761, 772 (2024) (collecting cases that the Due Process Clause is not money-mandating). The Equal Protection Clause is also not money-mandating. *Cummins v. United States*, 171 Fed. Cl. 527, 533 (2024). Likewise, plaintiff's claim in her responsive brief that federal agencies violated the Thirteenth Amendment cannot satisfy our jurisdiction. When evaluating a motion to dismiss under Rule 12(b)(1), we may only look at the claims contained in plaintiff's complaint; we cannot consider claims first raised in responsive briefing. *Perry v. United States*, 149 Fed. Cl. 1, 17 n.11 (2020). Even if we could, the Thirteenth Amendment is not money-mandating. *Johnson v. United States*, 79 Fed. Cl. 769, 774 (2007). In effect, we lack jurisdiction to decide plaintiff's constitutional claims.

Accordingly, we cannot grant plaintiff any of the relief she seeks. This court possesses jurisdiction only over suits against the federal government for money damages based on substantive rights to that money granted either by law or contract. *See* § 1491(a)(1). We have no jurisdiction to award relief for any of plaintiff's claims—as we held when we last dismissed her claims for lack of subject matter jurisdiction. *See Clisbee*, 172 Fed. Cl. at 147–49.

In sum, we must dismiss because there is no jurisdiction over plaintiff's claims. We therefore order the following: plaintiff's claims are dismissed per RCFC 12(b)(1). Accordingly, the Clerk of Court is directed to enter judgment for defendant. No costs.

> s/Eric G. Bruggink
> ERIC G. BRUGGINK
> Senior Judge

5

1  Kimberly Clisbee

2  3531 Springridge Way

3  Palmdale, CA, 93551

   Phone: 661-471-0015

4

                    In the United States Court of Federal Claims

5

6

7
                                              )
8                                             )  **Cause of Action: Negligence, Personal Injury**
              Kimberly Clisbee,               )
9                                             )  **Under the Federal Tort Claim Act**
          Christopher Co, Leilani, Co         )
10                                            )
11                    vs                      )
                                              )
12        The United States of America        )
                                              )
13   Federal Bureau of Investigation, Department

14
     of Justice, Department of Health and Human      Complaint filed 7/22/2024
15
                   Services                          Related Complaint Filed: 6/14/2024
16

17

18

19

20

21

22

23

24

25

26

27

28
                                        -  1  -

## INTRODUCTION

This is the second and hopefully the last claim I will file regarding this matter, and I apologize to the court. If it were not for the recent events, the danger my family is in, and the Federal government's refusal to help or investigate, I would not have to. I am not sure if the original judge overseeing this matter will be assigned to the claim, so the previous details are included below, which is why the document is so long. The new information is only a few pages long.

**On June 11**, my regular primary care doctor did not show up to my appointment, but Dr. Randall Chan did. He came in 90 minutes late, and when he came in, he did not examine me at all and told me he only had twenty minutes to hear my problems and was only going to address one issue in that appointment: taking my blood.

**Sidebar**

I started taking Wangovy for weight loss, and my dietitian needs blood work. I do not have recent lab results because Dr. Bloch and the County of Los Angeles's healthcare system also restrict my healthcare. In 2019, after reporting what Dr. Fallah told me to the police and anyone else who would listen, the county stopped letting me see specialists for my pre-existing conditions. It reduced my access to care and services usually provided. Dr. Bloch often manipulates Leilani's healthcare from his executive position at the DHCS and changes or cancels appointments, denies treatment, equipment, and services, creates fake documents, and erases data, so it is not unreasonable to believe he does the same to me.

My healthcare plan, La Care Pac-SEIU2015, is controlled by the department he works in, which is the community for health and integrated programs where he and Mark Ghaley, the current HHS secretary for the state of California along with the current Federal Secretary for the Department of Health and Human Services and former Attorney General and longtime congressman of Los Angeles Xavier Beccera created the CCS

- 2 -

redesign model, Regional Centers, California Healthcare Market, and child welfare program. Xaviar Beccera is using this model as the framework for the nation and has seventeen other states getting ready to apply the Social Security Act Section 1115 waiver to their healthcare system. This waiver is used to create a state waiver and then is used across all entities, including schools and prisons. Both individuals oversee state and federal investigations but are blocking me due to prejudice and association, which is against the law. However, they are the law, so who is to stop them?

**Continue**

I told Dr. Chan I also needed referrals for my pre-existing osteoarthritis that was diagnosed in 2022 and that I am suffering and need to see an orthopedic for surgery and treatment; he said no. I told him I could barely walk and, my baker's cysts were flaring up, my knees were bone on bone according to my 2022 x-ray and were getting worse, my synaptic nerve was preventing me from sleeping and moving. I told him I needed to see about surgery or therapy. He ignored me. I have had two-foot surgeries in the past and have seen the orthopedist multiple times prior to 2019. They also do a monthly clinic, according to the emergency room doctor who diagnosed my condition in 2022 at the hospital where I was denied.

I told Dr. Chan I needed to see a dermatologist for my psoriasis and other skin issues. I had a suspicious tag removed in 2017 and have a family history of skin cancer. Dr. Chan said he would not refer me to a specialist, that he would take pictures and send them to the dermatologist, and that he would prescribe a treatment, but I was not going to be allowed to see the dermatologist anymore. I was in tears at this point because there were other skin issues. I have a preexisting condition that I had surgery for, and it is deprivation and conspiracy against my rights to prevent me from seeing a specialist I would usually be approved to see.

I also told him I was denied access to an ear, nose, and throat by the specialist in 2020 when I came in with sinusitis and a note from my dentist about my x-rays and that she was concerned by the shadowing and is required to report it as it may be severe. I told him it had impacted my hearing, balance, breathing, and

- 3 -

eyesight and was causing fatigue and headaches. He refuses to refer me. All of this is in the report in the exhibits.

At this point, I was crying and shaking; I began to tell him about my stress and that this was all too much. I asked why my doctor, Jeffari, was not there, and Dr. Chan just said, "You scheduled with me today."

When I got home, I looked Dr Chan up so I could file a medical board report. I came to find out that Dr. Chan is a renowned USC/Children's Hospital Los Angeles pediatric hematologist-oncologist, the very people I have in court. He also works for **California Child Services**, where Dr. Bloch is his supervisor and director.

Dr. Chan had no business at my appointment and was not there by accident. In the attached emails, I confronted Dr. Chan and told him I knew who he was and was going to file a medical board report for HIPPA violations and refusal of care. Dr. Bloch having his colleague take my blood is beyond disturbing to me.

Dr. Chan called me on the phone the day I sent the emails to tell me he has no control over my referrals or what the hospital will allow me for care; he said, "They will not let him refer me to a dermatologist." I asked who they were and since when does a doctor needed permission to refer a patient? He said again that he could not and even put it in a document that is attached. Dr. Chan also prescribed heart medication on the 11th and did not fill the prescriptions. I know Dr. Chan can write prescriptions because he wrote me a cortisone prescription but said he could not fill these for some reason. So I sent an email to my primary on the 14th asking about Dr. Chan and why he did not take my appointment and has refused to respond to my requests for assistance. However, he has yet to respond.

I then began to send my information to other doctors in the network and begged for a referral. A nurse practitioner calling herself my primary submitted only for dermatology. I contacted her and asked who she was, but I received no response. On the 20th, after waiting a week for my primary to respond, I sent him an email telling him that if my prescriptions were not filled and I had a stroke, it would be on him and that if he filed a medical board report, DPSS, and HHS.

Later that day, my primary care physician's nurse, Maria, called me and told me she had spoken to Dr. Chan, and he said he would get to it when he could. I asked why my primary doctor was not working on my case and why Dr. Chan was still involved after I requested that he not be. I was told my primary had no control over this, and I was under Dr. Chan's care until they were "done with me." I again asked who they were, and she told me the county but said she did not know anything, just what she was told, and that Dr. Chan was circumventing my primary, and I had no control. I told her this was harassment. A few days later, some random doctor from infectious diseases ordered my medications. I told them I was never going there again and would fly to Boston and walk into their emergency room the next time I needed medical attention, which I would do.

He knew who I was when he came to see me and knew what his colleagues did to my child because he was working alongside them. It is improbable that Dr. Chan does not know who I am if he knows who my child is and works under Dr. Bloch, who has sent many people to intimidate and harass me.

Dr. Bloch is denying me referrals because he was causing me physical injury without touching me. I would get a restraining order, except I cannot prove that Dr. Bloch did anything; he is smart and has made too many people rich. I cannot get away from the impact of the crime he committed against my child, and the HHS Secretary, both State and Federal, helped build this healthcare program and is blocking us from having it investigated. I am at their mercy, and they are not showing any.

**On Wednesday, June 26, 2024,** Thomas Scott, Special Investigator in the Civil, Human Rights, and Equity Department of the Los Angeles County Department of Public Social Services, called me to discuss the complaint he received regarding my June 11th incident with Dr. Randall Chan, He recommended I contact the FBI, HHS, OIG, and Attorney General and stated, "This is a federal crime you are reporting, and you need the DOJ to handle it." I explained that I never get help when I call the FBI or DOJ and was afraid it would be a dead end. He said to try because this is the

- 5 -

right place for this situation and is visibly a crime based on the current harassment, the information I provided, history, and accompanying documents, and it should not be a problem to get an investigation into this type of crime. The number of victims, one being a child who was sexually assaulted and medially battered over a decade by multiple doctors, requires FBI and HHS investigation. The email associated with this is in the exhibits.

On Sunday, June 28, 2024, I called the FBI as instructed; I could not reach them from my phone, so I tried Chris's. When I got through, before I could get anything out of my mouth, I was told I was never to call the FBI again, that I was a repeat tipper, and that my reports were false. I was devastated; I couldn't even call the FBI anymore. They had never taken my full report and only spoke to me for one to three minutes max before they started yelling at me for wasting the FBI's time or insulting me because of the prejudice they felt towards me and my situation.

Chris has never been interviewed; no one has ever come to see them, review documents, or speak to the witnesses. He feels helpless because he depends on me for help, and the FBI will not even listen long enough to hear the whole story. This is a complex medical crime that the average person would not understand even a little. The agents answering the phones do not have the education to determine anything in this case without expert review and a thorough investigation.

**On Tuesday, July 9th, 2024**, at 1:21 PM, the Department of Social Services Department of Disability Civil Rights called regarding the Consumer and Civil Rights complaints I filed for Chris and Leilani. Mrs. Johnson told me that the investigation unit went over all the information thoroughly and recommended I contact the FBI, as it is beyond their ability to assist. They said that because it is an official of the DPSS, it requires Federal intervention. She also stated that the injuries to Leilani, especially the sexual battery and the county official medical allowing multiple doctors to injure a

- 6 -

child medically, is a crime, not just a civil rights violation, and the Attorney General and District Attorney are required by State and Federal law to investigate. I explained what happened when I called on the 29th, and she said she wished she could help, but the Federal Government is required to respond to your requests; this is an official, and the crimes you are describing are felonies and color of the law violations, so her hands were tied, which is why I had no choice but to file this claim.

Before I filed this claim, I requested help from the FBI (both Washington and California), OIG (both Washington and California), HHS (both Washington and California), California Medical Board, Department of Social Services, and Department of Healthcare Services. Complaints and their responses, if any, are in the exhibits. All Federal Agencies failed to respond.

**FBI negligence and misconduct**

The Federal Bureau of Investigation has been delaying my report since 2019. I must have called a dozen times, and every time, I was insulted, yelled at by some youngster, and scolded like a child for calling to report a crime that has been proven, has many witnesses, the offenders admit to, and there is a mountain of proof. However, because the FBI refuses to even listen to the report, never mind investigating the color of law crimes, intimidation, and so forth continues. It has cost my family so much. There are three victims in this case, including an adult male who, unbeknownst to him, had his temporal lobe removed in 2008 by the county doctors who ran the integrated programs (Dr. Ghley, Dr. Bloch, USC, Los Angeles County, etc.) which we discovered in 2013 and was the reason for Leilani's injuries, according to Dr. Arie Fallah, the director of pediatric neurosurgery at UCLA, who divulged this in front of three witnesses in 2019, the reason I started calling the FBI. Seeing Dr. Ghaley was the director of the program that injured both Chris and Leilani, you would think he would investigate as the secretary of the HHS, but he seems to be helping the defendants instead. Again, this is my resource for Federal reporting, so how can I get justice? Chris and Leilani are both covered by Federal Health Insurance through Social Security, and he oversees that as well. I have reported this

- 7 -

to Social Security, seeing that the federal government is where their insurance comes from, but no one ever helps. In the height of the civil trial, when it looked as if this would all go to a jury trial this past January, the state tried to take Leilani's Social Security and state healthcare away. The proof is in the exhibits. Leilani is also being denied access to ADA and Developmental Disabilities services, which Dr. Ghaley controls.

Seeing how much Dr. Ghaly is involved with the CCS redesign model, Dr. Bloch, Los Angeles County, the Regional Centers, the medical waiver, and all things healthcare, and helped to get the integrated programs in Los Angeles County going with Dr. Bloch by his side, if he had not been involved, Dr. Ghaley would have investigated this immediately.

Also, it is unethical and illegal for both HHS Secretaries to refuse to investigate a case involving three victims with this level of injury and proof who were purposefully made disabled for a project that is now a federal policy they are the leaders and supports of. They are abusing their office to shield their colleagues who committed horrific crimes and violating our civil rights in the process.

**Title 18, U.S.C., Section 241 - Conspiracy Against Rights**

**Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law**

**There is no justifiable reason not to take this situation seriously and investigate as the law requires**

• The defendants have admitted their guilt in regard to Leilani's surgeries since 2020

• There are many witnesses, and the documentation I have and Leilani's medical history and current condition prove my case almost by itself.

• A UCLA investigation proved Sexual abuse.

- 8 -

• Leilani is not allowed in several hospitals because of her injuries. All it takes is a phone call to authenticate

• Every judge stated at the beginning of this trial that these are federal crimes,

• Chris has never been asked to give his report or interviewed about the crimes I am trying to report for him, but I am unable to because of FBI misconduct.

**No one denied their actions**, and AG Rob Bonta, who oversees the DOJ and FBI investigations in California, had people there, so he knew. He still refused to have the FBI investigate; I sent a request for help in this situation, but he ignored it.

I cannot call the FBI at all from my phone, so if there is a public event I am witnessing, I cannot call it in; if I need help—not that they will give it, but at least the resource was there—I now cannot because I am considered a repeat tipper, which is the same as calling me a false reporter. This injures my reputation in law enforcement and reduces my credibility. I worked very hard my entire life to build my name, reputation, and credentials in the criminal justice world, but now I cannot even get a job as a social worker.

If no investigation is done, it does not make me the abuser to keep calling when a new incident occurs. This is an ongoing crime with multiple participants because committing Federal Insurance Fraud from disabled children is a huge money maker for school executives, hospitals, the county, and so forth. All the defendants admit to their crimes but argue they cannot fight it in civil court; the injuries they caused happened to Chris and Leilani, and they are incapacitated and cannot represent themselves, and the statute of limitation is exhausted all which the judges disagree except one component which is why they have not dismissed this case, they all agree it is a Federal crime in need of the FBI. However, the FBI is too busy yelling at me and telling me I "need someone to blame for my child's disability." What type of a moronic statement is that?

**Property Damage**

**Deformation of my character and psychological well-being in the Criminal Justice Industry by labeling me.**

• My call record aligns with my situation. I did not start calling until Dr. Fallah confessed to me what was going on.

• I never called the FBI or police to report anything prior to the 2019 incident. If I knew what the doctors did or wanted to blame them for my child's disabilities, I would not have waited nine years to start calling them.

• I am 50; if I were the type to have a psychological breakdown so easily, there would be other records of me calling the FBI or police for nonsense (Okada, 2018). I would have disputes with my neighbors, domestic calls, and so on. It does not make sense. People do not become psychologically impaired from having a disabled child. It is a natural phenomenon; you start a non-profit in their name and adapt to that life, which isn't bad. I would rather spend my life hugging my child at Disney than worrying about what the world is doing to them. We must make the best of what we have.

• I have been working on my reputation as a criminal justice academic and professional for the past thirteen years. Why would I ruin all that by making false FBI reports?

• I have one of the highest educations and most eclectic work history in criminal justice today, according to national statistics gathered by Marquis Who is Who, and I cannot get a job in law enforcement or any other position I am qualified for because the LAPD and FBI have destroyed my name.

• Someone who has worked as hard as I to accomplish this level of success would not jeopardize it for anything! Especially not to make false reports to the FBI or any government entity. My reputation for reliability and dependability are everything to my career that is now never going to be. I must go and get my JD now if I ever want to work in the legal field and change my name.

-  10  -

• The only reason I brought this to civil court was because the retaliation was getting so bad, and the FBI was being abusive and not even listening, so I had to do something. The defendants got the LPAD to defame and file an SLAPP violation; I had no choice. However, it was there that all the crimes were proven because of the degree of evidence and witnesses, and of course, the physical condition of Chris and Lani and the doctors who will come forward for them. However, the FBI only wants to yell at me, so the situation is stalled, and the retaliation continues.

• Between 2019 and 2024, I must have spent thirty thousand dollars trying to build my reputation through Marquis Who is Who, the New Your Times, and Forbs's magazine, and none of it mattered because of my reputation of having to take all these people to court to save my child's life because the FBI refused to help. What is more, I am labeled as filing false reports. My professional name is ruined because of your prejudice and refusal to do your job.

• There is no reason to consider me anything but credible. I am a fifty-year-old member of the criminal justice system who has worked as a professional all her life. I am a serious person. I even closed all my social media so my friends and family would not see what we were going through. I have put myself out there a few times out of fear because something was happening at the time, and I was afraid and needed help. However, I immediately took it down because I did not want the public to know what happened to me. I want law enforcement to do their jobs so I can move my child to safety and we can salvage what is left of our lives.

• If I was so upset my child was disabled, why would I wait until she was nine to report it and not when she was one, or two, or five? Why would I wait nine years and four college degrees later after I have already risen from the poverty I was shoved into, bought a house, and made a name for myself in a new industry? I did not know until I was told, and then it all came falling into place. Mainly because Dr. Edward Bloch kept interfering with Leilan's ability to access healthcare, canceling her Medi-Cal, and tormenting me through IHSS.

- The defendants all admitted their guilt in court; three State judges and one Federal judge all agree it is a situation that requires the FBI, but the FBI will not even treat me with enough respect to hear my case, never mind investigate.

- All the new doctors we were finally able to see concurred with the medical facts of this case and some of the criminal elements.

**My character, the FBI, continuously attack**

I am not the type of person to cry when life gets hard. I grew up a latch-key kid without a key in a segregated Massachusetts community run by the Mafia. The streets raised me, and I learned a lot, which is why I got into the criminal justice system. When you grow up around something, it becomes part of you, and your instincts will help you identify it as an adult. I learned more about actual organized crime in my childhood than an agent could in his entire career. This is why I am exceptional as a CJ scholar; I have more perspectives from which to pull and fifty years of real-world life experience. People like me do not get scared easily; we are not shaken by nonsense, and we do not call the FBI unless we have something tangible to report.

I am also a successful professional who has worked with disabled families as a martial arts instructor for over a decade. I am the type of person who would embrace that phenomenal life event that could happen to anyone. There is no need to be that sad. Why not me? Why you or the next guy? It is no Biggy to have a disabled child; they add so much joy and innocence. I have been to Disney 156 times, which I would not have otherwise. Sure, it is sad to see your child suffer, but it is life; no one is promised anything.

Family members help a loved one through cancer go through the same thing and do not become mentally disabled. Unless you are psychologically impaired, you will not fall apart just because your child is disabled—especially someone like me (Meyers, 2021). PTSD from something unnatural is different, but it still only impacts those who are already susceptible to mental dysfunction. It is scientific, and that is not who I am, or I would not have accomplished all I have while this was all happening. See my resume attached to the document.

- 12 -

I lived an incredible and full life before I had Leilani, the life most people dream of. It was filled with adventure and success. I got to work as a professional martial artist for fifteen years, a dream job that earned me a spot in the Hall of Fame. Before that, I was a microchip engineer apprentice, and before that, I worked multiple jobs starting at the age of 13 because it was the 80's and life was different.

I was ready to slow it down and had already started college to begin my new chapter in life as a Federal Agent, if you can believe that. I aged out and continued my education so I could be a policymaker and instructor instead. I pivot when life sends me a curve ball; I do not panic.

The one thing missing was a child. I was 40, accomplished more than most, and needed to slow down anyway. I was ready to give my life up to start the next chapter. There is nothing I missed; I accomplished it all.

When I moved here, I was getting ready to open a martial arts school. I would have started a foundation and non-profit and used my school to help the disabled community.

I only call when new injuries occur, and now I cannot. Not that you are going to help, but it is what I am supposed to do, and I do not believe that it is my fault you, according to the State and Federal court, are not doing your due diligence in this case. It has proven its merit in court for the past three years.

This situation cannot be tolerated any longer because the offenders are now harassing me in my healthcare, and I am terrified, not that I have not been for the past five years, but the FBI are cruel bullies; there is no other way to describe them. They yell at you because they do not believe the crime that is happening. However, they are 25-35-year-old former military members from the middle class; they have nothing to pull from to judge anything. Yes, if someone calls about aliens at the end of the day, I see, but never yell, hang up on, or criticize when you do not have the evidence or education to comprehend what is going on. You take the report and pass it on. However, the person who reads it had the same handicap as the previous, 25–35-year-old former military, typically from the Midwest, based on their accent, so there is no

1  way they could understand the sophisticated types of white-collar crimes that happen in places like Los

2  Angeles.

3  The FBI's refusal is based on a prejudice they hold towards me, my situation, and my delivery. There

4  is no valid reason to question my reliability, especially when the crime is a fact proven by mountains of

5  evidence, doctors' reviews, and a confession in front of three witnesses. Multiple victims, including one

6  defeated admittance, three State judges, and two Federalists, are all left wondering where law enforcement is.

7

8  **Personal Injury**

9  The personal injury that the FBI, DOJ, and HHS refused to investigate and help us has impacted my

10  entire family and has caused us to lose family support, but Leilani has suffered the most. Not only is she

11  denied care at most hospitals and almost died three times and may at any moment, if she is not able to access

12  medical care, she needs to survive her brain injuries caused by the doctors, according to her new Ceders

13  Doctor who told her this last month. She has also been retaliated against in-school and DDS services. She has

14  been unable to go to school or access these services since Dr. Fallah's 2019 confession in front of three

15  witnesses the FBI refuses to interview. Dr. Bloch runs both of those programs as well. Hence, his reach is long,

16  and he is allowing the school officials to commit Federal Insurance Fraud because he approves everything that

17  is billed to the State and Federal Government. Dr. Fallah's confession proved these individuals were also

18  involved, or they would not have retaliated.

19

20  **Leilani's Complaint**

21  The complaint I filed for Leilani on 6/14/2024 with the DPSS, OIG, HHS, and DOJ was the

22  inability to access neurosurgical treatment in October 2023 and May 2024 while admitted post-op at

23  UCLA due to retaliation for pediatric neurosurgery director Dr. Fallah and the malpractice CHLA

24  doctors caused before that. Leilani's heart and brain are not communicating correctly, and both her

25  cardiologist and new neurosurgeon at Ceders Sini say it is Wallerian degeneration (brain nerve

26

27

28

damage) causing this miscommunication, and it could cause her to go into cardiac arrest. I explained

this to the charge nurse and the neurosurgical resident who came to reset her shunt. She was

hypothermic with a temperature of 88 and a heart rate of 40, and they refused her care, which was

unethical and unlawful because she was admitted at the time and in recovery. The Anesthesiologist

doctor who stayed with us much of the time to observe Leilani in her fragile state said she would

testify that Leilani was denied care and in need of it and could have gone into cardiac arrest. UCLA is

also the last hospital to perform brain surgery and is responsible for the shunt they implanted but

refused care. Leilani saw a new neurosurgeon in June who told us all of her brain surgeries helped to

cause the damage, and she will likely die from complications from it, but it could be in a year of 20;

every day will be a guess, and the rest of her organs will be impacted like her heart during her last

two sedations. According to her cardiologist, Leilani's heart is stronger than a horse's heart, but her

brain is not communicating all the time due to nerve damage and abnormal sectioning.


HHS has also denied Leilani access to ADA and Lanterman Act Rights or protection from the

constant discrimination and withholding of rights by the North Los Angeles County Regional Center.

Dr. Bloch is one of the Los Angeles County officials responsible for all the disability services in all of

Los Angeles County, including the Regional Centers, SELPA, and CCS, and has used his power there

to intimidate, harass, and oppress us. The North Los Angeles County Regional Center is also the

entity responsible for Chris Leilani's father's life debilitating brain injuries, so there is no regard for

either of them, or abusing them has become natural.


I have requested assistance from the HHS to preserve Leilan's rights dozens of times this year

alone, never mind the countless times since 2019. All I am requesting is that my child be able to

access her disability services in a facility other than the one that caused her father's disabilities and is run by Dr. Bloch, who is the cause of her disabilities because the providers there are abusive and discriminate out of retaliation. They bullied me relentlessly; the last assault was in the first week of June when Chris requested assistance from the HHS as a disabled citizen who also must care for Leilani, whom the same offenders caused physical and mental impairment, and was denied his request. Details are attached to the exhibits.

**Chris's Complaint to the DPSS**

The complaint I filed for Chris was the denial of allowing Leilani to receive Regional Services, which controls all the Disability services out of Dr. Bloch's district. They refused for the fourth time in four years. This is also part of HHS and has been reported without a response. Chris's letter to the HHS office is attached. He explains the crime that happened to him in his own words and why he wants his child to be able to access Disability Services outside of Los Angeles County Regional Center, where they took his temporal lobe without permission and never told him to make his disabled to be a lifetime client of the Regional Center in 2008. We did not discover what happened to him until 2013, and we have been denied help from the DA, AG, FBI, Department of Health Care Services, HHS, DOJ, medical board, and every other entity that is supposed to help. Chris is a documented immigrant, which is why he was chosen for this abuse as far as he is concerned, and now he has to watch his daughter suffer. When I call the FBI for him, they are just abusive, and he cannot get assistance from the Federal Government.

**Chris is also being denied access to assistance by the FBI, DOJ, and HHS.**

Chris is very frustrated because the FBI, DOJ, and HHS ignore his requests and have never responded to him. I file on Chris's behalf, but he is an adult who was made disabled by this crime and is being denied due process, same as me. Chris is a member of the disabled community, and he will not investigate or take his report because of prejudice, which violates his Americans with Disabilities Rights as well as Constitutional and human. He is a member of a vulnerable population who has reported abuse and has not responded because of prejudice and corruption.

He has rights, and when I call the FBI, HHS, DOJ, or OIG for him to report the crimes that happened to him and his child, I am mocked and abused, and no one even calls him. He feels that because he and his child are disabled. He is not a natural citizen. The FBI and DOJ do not consider them equal citizens because they refuse to take his report or investigate when there is enough proof to show the validity of the claim, and the accused even admitted to their crimes in State court where Attorney General Bonta's DAs were present.

The documentation and evidence prove everything, but the prejudice towards us and the abusive way the FBI naturally responds to citizens is preventing him from getting justice and keeping his child and the rest of us in danger. It is not like they investigated, found no proof, and then decided to label us repeat tippers or yell at us for continuing to call when new injuries occur. The FBI never heard the entire story or collected any of the doctors', witnesses', or offices' names. They listened for the first two minutes of a crying mother and decided I was delusional and needed someone to blame for my problems, and that was that.

**Department of Public and Social Services Disability OCR**

Ms. Johnson from the DPSS Disability Advocate Complaints division explained that this was beyond their ability to help. She told me she had read our complaints, reviewed the attached documents multiple times with other analysts, and determined that it was a crime requiring criminal

intervention.  I was told to contact the FBI, which was the appropriate agency for this matter, because Dr. Bloch is an official and because of the nature of the allegations.

I then explained that I tried to report it to the FBI and all the other appropriate agencies, but they refused to even speak to me at this point. She said to keep trying because they are the correct agency.  However, since that is not possible because they will not speak to me, I must seek a resolution in this court.

**Details of Previous Claim**

My name is Kimberly Clisbee, and my family and I have been enslaved into the California medical system since 2010. Below is the background information for three of the seven state civil cases I filed and dismissed. I filed multiple cases because the State was refusing to allow all of the actions to be in one case even though this was one big RICO crime across multiple agencies who are all using the disabled population to commit Federal insurance fraud but, worse, create disabled people to gain funding from because they have the use of the Social Security Act Section 1115 Waiver that allows for medical research funding without proving where the science came from.

**What the doctors did with the waiver**

Leilani was Dr. Bloch's study sample; he discussed where she went to school, what programs she could be in, what doctors saw her, etc., for 2010-2018. Everyone we communicated with was involved and knew about the study and Leilana's victimization. They pretended my child had brain cancer for a decade that kept coming back so they could conduct surgeries on her designed to break her body enough to be in Dr. Bloch's study but also dozens of CHLA (USC) doctors so they could get funding for research they used victims to acquire and are not even accurate statistically.

Dr. Krieger did several cancer studies using Leilani, but she never had cancer. He caused hydrocephalus and did not put a shunt to drain it (protocol) because he conducted a decade-long study on the effects of hydrocephalus when a shunt is not used for a shunt alternative study. You can see in his study report on USC PUBHUB and the exhibits that the outcome was not good.

The federal government granted the State of California this waiver in 2009. It will expire in 2026 after a **Congressional vote** and approval from the Department of Health and Human Services to specifically allow Dr. Bloch to utilize the waiver for his CCS Redesign model. Documents are in the exhibit section at the end of this document.

The waiver also allows for all other types of research, that is, research for the "betterment of society" geared to building the California Medical industry but also profiting the school districts, counties, prisons, legal system, and investors. Programs like the Regional Center and CCS are tremendous; they have locations in every impoverished community and an entire client base. However, that is an exponential imbalance with the size of the typical population of disabled people, which makes up 8-10 percent of society with only 2 percent of adolescents.  However, that is not the case in California.

Dr. Bloch has been working for the county and CHLA since 1980. With no exceptional history, he is the highest-paid pediatrician in the nation, and with the decades of research he had done to create these programs, not one page of science can be found from him, which is very uncommon for a doctor. There are CCS documents and his study outline, but no outcomes. I am sure he has done numerous studies. He did not deny his actions in court but only stated that I could not sue him for what he did while working for the county doing a national study sanctioned by the Federal

Government. The rest of the defendants had the same statements; because of the degree of evidence, Leilani, the new doctor, did not concur and called out brain damage due to multiple counts of aggressive and inappropriate surgeries as her condition.

Dr. Bloch is also selling this study on a private mill site, which is a federal offense as it is government property. When I notified the DA's office who is aiding the defendants, the page was taken down, which leads me to believe Detectives Grundland, who had her officers come to my home and intimidate me for Dr. Krieger and works in the DA's office, warned him, because I never told anyone else. I took screenshots of the page in the exhibits.

Dr. Bloch is the director of CCS. CCS pays 30% on top of State Medi-Cal for what Medical alone would pay for, but now it doesn't, so the new programs can exist. This is known as triple dipping in the finance world. The hospital, CCS, and Regional Center all cash in on one patent and divide what just the hospital used to do. They bill for the services but deny the impoverished, who are there likely by force and to profit from and do right by the rest. There are more impoverished brown disabled children than any other, which again goes against nature.

Although Regional Centers have lots of clients, most are undocumented citizens who are not even physically disabled. However, that is where the State and Federal governments send all the Developmental Disability funds thanks to the Lanterman Act, another statute that violates disabled people's constitutional rights. The Regional Centers director, Mark Gahley, was questioned on the disproportion of Latino deaths in hospitals during COVID-19; that letter is also attached.

- 20 -

An extra 30% across-the-board profit is also an incentive to commit the crimes they committed against my child because everyone is profiting, from the hospitals to the doctors to the vendors, and the growth and profit potential are tremendous. The target population is undocumented and documented citizens; I was a casualty because of Leilani's father, who was the county's victim before her, which is explained in detail in the body of this document. This was an intelligent crime with a lot of actors and high-profile people, and without the confession of Dr. Fallah from UCLA, I may never have figured the rest out. Still, I have, and I am requesting, monetary compensation, punitive justice, and a full investigation. We are not the only victims; we are the only ones who are aware.

None of the injuries my child and family suffered would have happened if that provision had not been given to Dr. Edward. Former Attorney General of California Xavier Beccera is the Secretary of the Federal HHS and has refused to help us multiple times but was also instrumental in getting this waiver enforced. Dozens of other states have adopted the use of this waiver, and I would bet they are the same states that had immigrants bussed in last year.

I wish this were not true, but it is, and the federal government has complete control to stop it by removing the state's rights to conduct human studies without providing research and proof of population source that they afforded them.

We have been oppressed, discriminated against, degraded, and threatened with law enforcement and other forms of retaliation. Leilani was sexually battered as a means of intimidation. We are forced to stay in this system so the county, Regional Centers, and medical industry can keep cashing in on Chris and Leilani. If I could gain employment and move, they would lose their income, so they make it so I can't be denying Leilani school, terrorizing me until I am psychologically

paralyzed, restricting access to resources, and constantly canceling Leilani's health insurance and threatening our income.

I initially filed this as one civil rights case but was told by Judge Terry Green at the Stanley Mosk courthouse to file multiple cases to keep everything separate. However, I didn't realize he was setting me up for a vexatious litigator violation down the road. He retired when I filed a complaint against him for prudery and violating disqualification laws, as explained in the body of this document.

By filing all the agencies separately instead, I gave the defendants the opportunity to file a vexatious litigation violation against me and forced me to withdraw before this case could go to trial: seeing my case was, according to all, prima facie, and none of the defendants denied their actions, just my ability to file a complaint for nonsensical reasons, this case was heading to trial because the judges knew there was merit but did not want to help me because the investors put them there not to. So, they waited until I made a layperson mistake because I am not an attorney, and I did.

I do not come from an environment where I know anything about the system, courts, or how they work. I was being attacked with a SLAPP violation, my daughter was being denied care in all the major hospitals, and LAPD detective Sonny Cruz called my house and threatened me on behalf of Dr. Krieger. I just put a complaint together and filed it. It was not on pleading paper, and I did not follow the rules of filing because I did not know how, but a civil rights judge who passed it on due to a challenge by the defense saw the crimes and allowed it to be filed as is because of the merit.

I will not let them kill my baby; it is not her fault the police and government are failing her by letting these individuals continue to injure the marginalized population for profit. The federal

government gave them the authority to do this to her, and in doing so, they are vicariously responsible for all that is explained below.

One of my many areas of expertise is conflict theory and how it applies to prison, society, and the overall stability of the nation. What is happening here reflects the words of Karl Marx in his communist manifesto, which discusses how both Socialism and Capitalism can turn into communism in the wrong hands. California is in the wrong hands, and that is precisely what is happening. It is not natural for people to ignore a child being medically battered like this.

### Facts and Background of Crimes Against Us

1. In 2009, I decided to move to California to open a martial arts academy with a colleague who was already established. I was already attending college, but I put it on hold until I got settled in California. On my trip to see the location, I met Chris, Leilani's father. We were immediately attracted to one another and developed a long-distance relationship; the first time Chris came to visit me, I became pregnant, but I would not know until I moved.

2. The day before I was to move, Chris told me something I did not know: he was disabled, had a seizure disorder, and was unemployed. I was going to California anyway, and if things didn't work out, I could always get to my place, so I did not worry.

3. Three weeks later, I discovered I was pregnant, and I made an appointment with Dr. Samantha Hann at St. Joseph Hospital.

4. Dr. Hann was friendly but very opinionated about my income and my relationship with Chris; I informed her that I had just moved here and that I could not start working until I had my child.

5. From the beginning to the end of my pregnancy, I was told everything was all right, that the baby was healthy, and that everything was going smoothly, but that was not the case.

6. Leilani had a 7CM tumor growing in her brain. We know now it was a SEGA, not as big of a deal as one would think, and the surgery for it is relatively routine. Tuber Sclerosis was the actual condition Leilani had, and one surgery would have taken care of the problem as it has in 100 percent of cases like Leilani's, according to UCLA and Stanford. But CHLA and Dr. Bloch had other plans for Leilani, so the truth was hidden from me until after Leilani was born.

7. Chris Leilani's father was the county's victim before Leilani, which is why she was chosen. He was disabled because of a surgery he had in 2009, which is why he was embarrassed to tell me.

8. In 2006, Chris was working as a licensed pharmaceutical technician and dental hygienist in his early 20s. He and his brothers moved here from the Philippines in the late '90s and were made citizens the following year. Chris also has Tuber Sclerosis, which I was later diagnosed by CHOC in 2011. They likely targeted this population because of the brain tumor component.

9. Prior to contacting the Tuber Sclerosis Alliance about the abuse my child suffered and filing reports, all the hospitals had TSC clinics, directors, and organizations. As soon as I

started to complain, all the TSC clinics disappeared from the Los Angeles Hospitals.
There is no explanation for this aside from the fact that they used that population and
didn't want the clinics around for evidence once this made it to the authorities, which has
been impossible as the authorities act more like Gestapo than public servants.

10. Chris was also misdiagnosed with Sturge-Webber disorder, a condition he has no
    similarities with.

11. Chris was removed from his mother's health insurance due to his age but was employed,
    and insurance for someone with a preexisting condition was expensive, so his employer
    told him to go to the Regional Center because they were supposed to help people with
    seizure disorders. They signed Chris up for Medical and told him he was only allowed to
    go to Huntington Memorial for care because they were the only ones who took this
    insurance. We know that is incorrect now, but at the time, he believed them. During this
    time, Chris also had to stop working because his seizures were so bad, and he was not
    being appropriately treated for them. The Regional Center had him sign up for Social
    Security. He informed them he planned to go back to work, and they suggested he might
    not be able to.

12. Dr Sotherland said they were going to do exploratory surgery to see where his seizures
    were coming from. Chris's seizures changed after that surgery, but so did he; he lost his
    memory and the ability to do specific tasks. In 2013, I forced the Regional Center to allow
    Chris to go to UCLA. The only reason the Regional Center had control over Chris's
    insurance was that Dr. Bloch and the others in the county were working on this project.
    We were told they removed his temporal lobe without his knowledge to consent, which is

- 25 -

why they chode Leilani to injure him. Dr.'s, Regional Center Social workers, Chris's family, and others can confirm all of this.

13. In 2020, Rob Bonta, former Oakland Mayor, wrote a letter to Dr. Mark Gahley, director of the Regional Centers, asking why there was an extreme disproportion of Latino deaths during the COVID-19 pandemic. The letter is included in the evidence and shows that more people are questioning the ethics of the medical industry's actions and intentions.

14. Although Dr. Hann kept telling me everything was okay, she had to know Leilani had a 7cm brain tumor because she had ordered ultrasounds every week for the last two months. She said the ultrasounds were to monitor my placenta previa, but it would be impossible not to see a golf ball-sized tumor in the skull the size of a grapefruit.

15. I told Dr. Hann in the beginning that if there were a problem with my pregnancy, I would go home to Boston immediately as I had just moved here and have my entire family there for support. I believe Dr. Hann withheld the truth to prevent me from returning to the East Coast because the fraud was already planned. She also told me that for six months, I couldn't fly to my baby shower back east because my pregnancy was high-risk. But again, I believe this was to keep me from going to Boston and needing to see a doctor and then discovering Leilani's condition and me not returning.

16. I am an unusually strong person, but I never had a problem during my pregnancy. I never had morning sickness or any other type; I felt the same as I always did and was climbing on cabinets at nine months to clean and even drove myself to the hospital when I went into labor, which was 60 miles away, in LA traffic on a Friday at 5 pm in the dead of summer. I was anything but fragile.

17. We were also denied a copy of our 3-D ultrasound and told by the ultrasound technician at St. Joseph that he was looking at fluid around the brain, but then said it was okay and nothing to worry about. If he was looking at the brain, it is impossible that he missed the golf ball-sized tumor inside. I was told he was supposed to be looking at the position of my placenta, but now I realize there was no need for that every week.

18. Three weeks before giving birth, we were told the county wanted us to have our baby in Palmdale because we had just moved to the family's second home there, and it was the law that you could only have your baby in the city where you live. This is not true, and we still owned property in Burbank, but it did not matter. We were told by Dr. Hann that because we were on Medi-Cal, allowing Leilani to be born in a hospital where the "upper class" have their children would not be appropriate and that we had to go to a county hospital. However, she would still be the delivery doctor, which again was odd. After refusing to give birth in Palmdale, we were allowed to go to Glendale Memorial.

19. When we got into the delivery room, an unidentified male county doctor was there to observe Leilani's birth, which seemed odd. He and Dr. Hann were talking about my scars

- 27 -

from my plastic surgery malpractice, which is embarrassing, but in retrospect, I feel like they were breaking me down in their minds to digest what they were about to do.

20. Leilani was born that evening, and everything was fine; she had a typical birth with an 8-9 APGAR, and nothing else was said. When they brought Leilani to me, I could tell something was not right, so I asked Dr. Parks, the attending physician, to order some tests for her. She said that Leiani was fine and there was nothing to assess. I told her about the twitching and not being able to nurse, but they said everything was fine.

21. Because Leilani could not latch on, the nurse told us to cup-feed her, which was incorrect and caused Leilani to inhale the formula. She was put into the NICU for observation overnight to make sure her lungs cleared when she had her first recorded seizure.

22. It was 3 AM. Dr. Parks came to my room and began to ask me all types of questions about drugs because they couldn't find any in my system, and the seizures Leilani was having were odd. I explained that I stopped drinking coffee, dying my hair, and made every sacrifice for her that I wouldn't dare ingest drugs, even when I wasn't pregnant. She said she just had to ask and that there seemed to be a large shadow on Leilani's MRI.

23. Glendale Memorial is a stage 3 hospital, so it is limited in its radiology abilities, which is why they probably allowed us to go there. I hopped out of my bed and, without waiting for the wheelchair, ran down the hall and hopped into the elevator to see my baby. Dr. Parks asked us if we preferred to go to UCLA or CHLA because Leilani needed to go to one or the other. We were going to choose UCLA but were then informed the county was not allowing us an option and that we had to go to CHLA.

24. She then said an official from the Department of Public Healthcare Services contacted Glendale Memorial on Saturday morning, 8/28/2026, after one uneventful seizure and MRI that only showed a mass and was not even reported to them. She said the county told her we did not have a choice in hospitals and that Leilani could only go to CHLA. When asked about UCLA, she was told no. Dr. Parks said it was odd, but we didn't think anything of it because all hospitals are filled with good people. I now know most are criminals, but I did not think that back then; I came from the white privilege middle class, and the realities of the system and government were still unknown to me.

25. Leilani was taken away on Saturday, but I would not be released until Monday; I was under county order to stay at Glendale Memorial until Monday, 8/30/2010, more than 24 hours after Leilani and was not permitted to sign myself out of the hospital. There was no reason to keep me admitted. When I asked why, no one would answer me; the county just said so. Many people are witnesses to this and will testify, including Dr. Parks, both grandmothers, three uncles, aunts, and several family friends.

26. When I finally got the CHLA, I was told Leilani most likely had cancer and that I needed to do another MRI and biopsy to be sure. After the biopsy, we were told Leilani had a 7CM grad Cancerous brain tumor called congenital Gemistocytic astrocytoma.

27. Congenital, meaning it was growing in the womb the entire time, so the ultrasound technician and Dr. Hann must have lied to us. Also, the cancer they told us she had has a

- 29 -

mortality rate of almost 100% by the age of two, with the majority not making it to a month old. Leilani was rosy-checked, not sick at all, nothing that resembled cancer, and they maintained this lie for a decade. She was never given chemotherapy or radiation; they knew it was not cancer; they were trying to fool me, which they did until Dr. Fallah told me the truth in 2019.

28. Glenda, the social worker appointed to us, told me that Leilani needed to establish insurance before any treatment was given and that she could not receive care under my insurance even though she had just been born. Typically, an infant can be covered under their mother's insurance until they are one year old but the county said she had to be on CCS. She said that because of Leilani's condition, she was required to have her own medical and be on CCS.

29. At the time, CCS was only secondary insurance for children ages three years and up already diagnosed with Cerebral palsy; it was not something the general infant population used, especially when they had yet to be diagnosed with a disability or disorder.

30. Cancer does not cause physical and intellectual disabilities that would make Leilani CCS eligible. It is typically a one-and-done disease; it is not something that requires life-long treatment and therapy. In cases like that, the individual typically succumbs to the disease, but an infant cannot survive this type of cancer into adulthood, especially without cancer treatment.

31. but they planned on creating the disabilities that would qualify her. This was the same as Chris signing up for Social Security prior to the surgery that took him out of the workforce. They were signing her up for disability services before she was disabled, proving their intention.

32. However, we did not go to the Department of Social Services of the Social Security office; Dr. Bloch would be the one to submit it because, again, she did not have the disabilities needed to justify the services. He has executive authority in the Department of Health Care Services. He controls what is accepted and what is denied, which is how the doctors are getting away with this.

33. . Glenda walked us downstairs to the basement of Children's Hospital Los Angeles, where no one else was, took us to a window where they needed minimum information, and signed us up for Medi-Cal, CCS, and Social Security. She didn't even qualify for an SS number yet, so we would not have been able to sign up for SS on our own and had nothing to justify it. They also asked us to sign up for a cancer study, which we did, and the data was used, but she never had cancer. All the medical studies from USC and CHLA must be scrutinized because not only did they use unknowing victims, but they also made up diagnoses.  Dr. Krieger's reputation is what it is because of those studies, and his wife is Hollywood producer Kristie Krieger.

34. Initially, Dr. Krieger was not the doctor assigned to us; Dr. McCombe was. When all the paperwork was filled out, we were asked to go to a meeting regarding Leilan's surgery.

Typically, surgery is scheduled with the doctor, and it is not a big deal, so all of this should have been a warning sign, but I was programmed to trust doctors.

35. Glenda escorted us to a room filled with doctors; there were at least a dozen people in the room, which is not normal if you have ever had surgery. However, these were the people involved in the study, and I did not know that a crime was about to occur. I was told that with a hemispherectomy and shunt, Leilani would be fine, but the question Dr. McComb had was whether we deserved this surgery and gave Leilani a chance at life.

36. Dr. McComb is a cruel man named as a researcher on Dr. Kriger's studies. I believe he was breaking me down because he knew Leilani was going to be injured and to hate us was easier for him.

37. The base of the conversation was Leilani's condition but more about my ability to care for her, the population I come from, the type of person they perceive me as, our income, and the fact that Chris is a Regional Center Client. I was told his condition put me in the system, and that is who I likely am, or we would not be a couple, and we are the type of people that will always be in the system. I was told I lacked intelligence and was incapable, which, if you look at my resume and portfolio, the opposite is true.

38. I was in shock and confused; I found myself begging this doctor who was browbeating me for mercy and to save my child. He said that Leilani was a waste of surgery because "People like us would never be able to give Leilani what she needs, and she would be better off going home to die."

39. I explained, "She is savable. She was not even sick or in need of equipment; she just needed one surgery. Dr. McCombe said that with a hemispherectomy and shunt, she would be okay, but there is much work involved, and people like you who are in the system always will be and can't provide for her so that it would be a waste of medicine."

40. After insulting me for a while longer and realizing I was not taking no for an answer, he said he was refusing to do surgery but recommended his college, Dr. Kriger, to do it. He picked up the phone in the room, made a call, and said I would be hearing from Dr. Mark Krieger, who conducted the biopsy and knew what "needed to be done."

41. I then met with Dr. Kriger from neurosurgery, Dr. Platt from neurology, and Dr. Anat Erderich-Epstein from oncology. Dr. Epstein explained the cancer to us and the surgery. She said that Leilani was a celebrity in the oncology world because she was the fourth child in medical history to be born with this type of cancer, and all the others recovered and lived long lives. After doing the research, we know this is not true; yes, it is that rare, but none live past 2. She also gave me a printout of what to expect. This document is in the exhibits. As you can see, it says 28 rounds of chemotherapy and radiation. Which Leilani never received because she did not have cancer, and the chemo would have killed her.

42. On the day of the scheduled hemispherectomy, Chris, myself, and family friend Marianna Kim were sitting in the waiting room when we were called into a conference room where we met with Dr. Kriger. He told me the surgery had begun, but he needed to make changes and wanted to inform us first.

43. He said that Dr. Bloch called down into the operating room and told him the county was refusing to pay for this surgery because we are in the county system and the only care that is provided is life-sustaining. Meaning that if the child does not die, it does not have to help them recover either. I began to cry. He told me everything would turn out the same and that by the time Leilani was five, she would be typical. He said I either take the modified surgery or Leilani would have to be sent home to die. I, of course, agreed because, again, I assumed he was doing the best for her, and she would die otherwise, so I had no choice. I asked if we could get a second opinion, and he said the county would not let us go to another hospital. It was this or nothing.

44. Dr. Krieger told me La County and Dr. Bloch said he could only do a frontal lobectomy and could not install a shunt to drain, which is the procedure. An infant who undergoes this type of brain surgery, especially when it is her second brain surgery and she is only 13 days old, typically needs a shunt until they can circulate their CF without it. I asked if she had more seizures. He said we would do another surgery; I explained to him that removing the entire section was essential to ensure cognitive ability. He said it was not his job to play God; if that happens, so be it; he is only allowed to conduct life-sustaining surgery to this propulsion, not take an interest in quality of life.

45. Dr. Kriger was conducting a study on shunt alternatives, which are attached to the exhibits and accessible on the USC PUHUB. This was the first step in creating hydrocephalus and allowing it to become arrested to assess the damage.

- 34 -

46. Dr. Kriger also used Leilani in several cancer studies, but she never had cancer; he created a fake diagnosis. You can tell Leilani is a part of these studies because of the data. It is traditional to manipulate the data to make it anonymous. However, Dr. Krieger claimed one of his test subjects has a 6.5CM tumor, which is unlikely.

47. To see an infant with a tumor larger than 3CM is rare, never mind two in one year. I was told by all the doctors that Leilani had the largest brain tumor they had ever seen in an infant, and likely will be due to its rare, so the 6.5 sample is Leilani.

48. Dr Krieger said if I did not like that, I could take her home, but she was not going to be allowed in any other hospital and would die. I had no choice. However, he assured me she would have the same outcome: the surgery would not change anything, and I could trust him to give my child the best care possible, and I did.

49. After surgery, Leilani's pituitary gland went into shock (a sign of hydrocephalus), and Leilani developed adrenal disorder and diabetes incipits (another earmark), which is a salt diabetes and can cause you to empty your cerebral fluid if not controlled by medication.

50. DDAVP is a daily insulin for salt diabetes that also causes blindness. I was worried about this, but Dr. Platt said if she loses her vision, it is okay because she is likely to be intellectually disabled anyway, and vision would be less necessary. I, of course, disagreed, and because they taught me the process of identifying the problem and how the testing works, I could tell a few days after taking Leilani home that she no longer had it. The Adrenal problem cleared for one, and her input and output seemed fine.

51. I asked Dr. Fisher, the endocrinologist, if we could test her, and she told me, "In 40 years, she has never seen a patient with DI cured, and Leilani was not going to be that miracle." I decided to ask Dr. Mona Shah, the pediatrician we were allowed to see in Valencia, to help me conduct an experiment and wean Leilani off the DDAVP if she did not have DI. She agreed; I measured diapers and took Leilani every day to get her sodium measured; if anything, it was not too high because Leilani did not need the DDAVP.

52. We did this for a month. I slowly decreased the DDAVP after Dr. Shah reviewed the labs, and before you knew it, Leilani was cured. I made an appointment with Dr. Fisher and asked her to conduct tests; she said maybe, but then went into the "in 40 years, blah, blah." Then I told her what Dr. Shah and I did, and she said, "It is a miracle," and never saw Leilani again.

53. Because Leilani was not given the full hemispherectomy and shunt, less than a month later her seizures started again. This time, we were told we had to be out of the hospital the day after brain surgery, and she would not receive a post-surgical drain because Dr. Bloch refused to let us stay more than a day since we had been in the hospital for 41 days the month before.

54. This was again diagnosed as cancer surgery, but no treatment was given before or after.

55. When we got to the PICU, the nurse was ready to inject Leilani with sugar insulin. I stopped her and asked why she was giving her that, and she said, "Because she has diabetes." I said, no, she has diabetes insipidus, salt diabetes, not sugar diabetes; you will

- 36 -

kill her with that. She said, what do you call it again? I have never heard of salt diabetes, which is why I automatically grabbed this.

56. I did not leave Leilani's side after that. Her surgery was completed in the evening, and we were told we had to be out of the hospital first thing in the morning. They removed her temporal lobe, which was a major surgery, but they treated it as an outpatient. My baby's head began to swell as soon as they brought her up to the room; she was screaming in agony, and the nurses refused to help.

57. They said she could not have pain medication because she had just come from surgery and couldn't feel pain yet but was screaming in agony. The charge nurse said Dr. Krieger told them she could not have any pain meds, maybe Tylenol if the nurse thought she needed it, and even if she was sick, she had to leave the hospital in the morning and forced me to sign an agreement, or we would get forced out right then and there.

58. Dr. Krieger never came to see her, nor any resident post-surgery, which we now know after a dozen surgeries is not typical. Leilani had a catheter and was developing hydrocephalus because they did not drain her; she threw up and had diarrhea all over me. The nurses refused to clean her up and told me I had to and would not give me scrubs or a Jonny or anything to clean up with.

59. I had to walk through the hospital and to the Ronald McDonald house with vomit and fesses all over me to humiliate, I believe. I was forced to sign a release form and left at 8 am the next day without seeing a neurosurgeon or resident. Leilani's head was swollen,

and she was screaming, but no one cared; they forced us to leave. I had never felt so alienated and scared.

60. At that point, the seizures happened 100 times a day from the moment Leilani came out of surgery. According to Dr. Fallah, it was because of the hydrocephalus. She was so sick, you could see something change in her eyes, and I have a PT from back then who is still with us that will attest to the same thing. She said she saw Leilani slowly fade away and was heartbroken by it. She is happy to testify. She also worked for CCS for a month but quit because of the accusations, neglect, discrimination, and abuse she witnessed. She is a business owner and services most AV school therapies.  Her name is Leticia, and she is well respected in her field. She knows how hard we work with Leilani and has been with us most of Leilani's life.

61. Dr. Platt then put Leilani on ACTH to stop the "infant spasms," but it almost killed her, as explained in detail below. I began to question the medication and began to wean her off. The seizures did not worsen, so I told Dr. Platt I would take Leilani back to Boston for care, and she said I could not do that; Leilani was California's problem, and she lived here now, so they would fix her. She also said we would be denied care when we returned, so I took the head to this warning and stayed.

62. Dr. Platt said Dr. Krieger was not qualified to conduct the hemispherectomy and did not because he was not confident, but he would do it now if I wished. I said no. I was scared and did not want Leilani to be his first, especially after all that had happened, and she said, okay, I will set you up with another doctor at CHOC, where my colleague Dr. Zupanc was the TSC clinic director. The surgeon's name is Dr. Devon Binder.

63. Dr. Devon Binder is an adult neurosurgeon from Orange County whom Dr. Ramos-Platt and CHLA hired to do Leilani's hemispherectomy at Children's Hospital Orange County. I thought it was interesting that he could not do the surgery at CHLA, but my baby was dying, and I was desperate to save her life, so I did not ask.

64. This surgery was the 5th and should have required a shunt and drain. Dr. Krieger told me to make sure they did not give her a shunt that it would get infected, dislodge, and may end up killing Leilani, which is why he never fought CCS to implant one. So, I was okay with no shunt; I still trusted he gave me honest advice and had no idea what he was talking about anyway.

65. There was very little information online about VP shunts in 2010-11, and most of the risk information mimicked Dr. Krieger's, so I trusted him and did not realize he was controlling me with my lack of understanding to go along with him. However, the more I learned about the brain, shunts, brain surgery, and so forth, the more I realized that was exactly what she needed.

66. Dr. Binder's surgery was "aggressive," according to Dr. Fallah. He removed healthy brain tissue and crushed Leilani's optical lobe, causing Wallerian Degeneration, which is needed to walk, talk, and coordinate. According to Dr. Fallah, this part of the brain is never removed, even if the result is death because it causes too much damage and unknown future damage. Leilani would never have been on Dr. Binder's operating table if it were not for Dr. Platt, who set up the procedure, and if the first surgery or second was done correctly, making the CHLA Dr. responsible (in part) for the causality of this injury.

- 39 -

67. Leilani was denied a bedside drain during this surgery, like last time, to ensure she would be released ASAP, which was the plan. However, this time, there was too much pressure due to the aggressiveness of the surgery and the fact that Leilani had so many in one year.

68. My baby's head swelled like a balloon (see exhibits), causing her third cranial ventricle to collapse and the right side of her face to droop, requiring two eye surgeries and taking away her ability to eat.

69. Now they had her where they wanted her, under the care of all departments, with no chance of recovering. No matter how hard I tried to save my baby's brain and future, I could not. I was constantly reminded of my demographic and treated like a degenerate by the doctors in this hospital, just like all the others.

70. However, this time, she almost died twice, the only two times I left her side. The first time I went to the Ronald McDonald house to shower and come back, my baby was drowning in her vomit. It was cold, so I knew no one was monitoring her. The second time I left was a month in; the nurses told me to go out and relax. Reluctantly, I went to a movie. Instead of returning to the Ronald McDonald House as I had said the nurse staff would, I stopped to check on Lani. Her cranial drain was open, and all of her Cerebral Fluid was draining out onto the bed. I never left his side again.

71. After one visit, we were told we could not see Dr. Binder anymore and had to return to CHLA. CCS means you, as does CHLA, kids on Medical have no freedom to choose healthcare facilities and are lucky to get any care. Knowing this, I just followed orders. However, before I left CHOC after Leilani's surgery, I asked the genealogist, Dr. Zadeh, to have Leilani's bloodwork sent to Boston and check her for TSC. Dr. Zedeh was our ally; I have her contact info if needed. She and her mother would come in when no one else was around and test Chris and Leilani for TSC, tuber sclerosis complex with lights, and other gadgets. They kept telling the TSC doctor that Leilani needed to be tested, but Dr. Parks refused and said they could not test for TSC in CHOC because they did not have the capability; Dr. Platt also said the same thing about CHLA, which is a lie, they have a TSC clinic in both hospitals and have been treating TSC for decades. It is a simple blood test; they wanted the cancer charade of cancer to continue.

72. Dr. Sadeh told me that if I come and see her after Leilani is released, she will have the bloodwork sent to Boston so that I can have the results but not to tell anyone until after the results are back and I have the diagnosis in my hand. She knew what was going on and helped us; she will testify to what she knows and thinks after receiving Leilani's complete medical history. Even though CHLA and CHOC are leaders in TSC research in all of California, they told us they could not test her blood and did not make a diagnosis in TSC clinics. I know this is all a lie now, being a pro of the TSC clinic after 8-years of receiving care there and knowing they have been diagnosing it for decades.

73. The TSC diagnosis would have explained the tumor and rejected the cancer theory, proving Leilani only needed the one SEGA surgery, typically a hemispherectomy, but also that she does not have a condition that justifies her condition because it does cause physical disabilities. Leilani was born with a normal APGAR.  However, the lack of cancer treatment makes me question whether they knew it was TSC and not cancer from the beginning and just wanted to profit as much as possible before she died, which I was told over and over she would without reason, and almost did in 2019, but was saved by Dr. Fallah explained later in this document.

74. The test results for TSC came back positive. When I brought this to CHLA, they said the results were subjective and rejected the diagnosis. However, TSC is also mentioned in Leilani's early records at CHLA. I found it while reading all 1100 pages. The TSC clinic is there, so there is no way they did not know. When I told Dr. Platt, she said it could be a false positive. She is barely affected by it.

75. Dr. Zedah also offered to have Chris tested. They were convinced he also had TSC when he was misdiagnosed with Sterger Weber disorder. His doctor denied this claim but told us we could have his blood taken there, and the carrier would get it. They killed the sample twice. I had to sit there with the currier while they drew his blood to make sure it made it to Boston alive.  When the test came back positive, Chris's doctor retired, and Chris was now free to go to UCLA, where we discovered his previous doctor took his temporal lobe without him knowing during an exploratory procedure.

76. After Chris's results came back, Dr. Platt told us it was both cancer and a SEGA. Leilani
was now a super phenom because she would be the only patient with this condition, and
still, no studies or papers.

77. Dr. Rosser, who would be Leilani's TSC doctor at CHLA in 2016, refused her care as an
infant, and Leilani was sent to UCLA to see Dr. Joyce Wu in 2015 of four. We saw her for
a couple of visits, but she was ordered back to CHLA in 2016.

78. During this time, not much was happening medically, but we were suffering a lot of
discrimination in school and CCS therapies. The degradation that came with this fraud
was horrific. When county employees are told to "keep you in line," they do just that. But
inline for me meant to be deprived of resources and to shut up about it because I was poor
white trash and no one cared, so unless I wanted to go to prison, I needed to play ball.
That was the loud and clear message, and Dr. Bloch was at the forefront of all of it; for
more details, see the amended complaints in those cases.

79. In 2015-2016, I began to question why my daughter was not getting any better physically.
There was a 98% prognosis of her only having a slight limp; everything else should have
been fine. When I pushed about therapy, Dr. Bloch sent me a threatening note that I still
have, stating I should be arrested and that it was my fault my child was not thriving. See
the evidence provided for the original complaint in this document.

80. According to Jeanny, Dr. Bloch's assistant, Dr. Kriger sat down with Dr. Bloch and told
him to let me have therapy at CHLA. This would be the first time Leilani went to see a
real orthopedic. She was five. Before that, we had an orthopedic come to the Buena Vista

school CCSMTU. There were no x-rays or real care; he just authorized wheelchairs and wrote prescriptions for DMEs.

81.   Dr. Kay was Leilani's CHLA orthopedic who first told us Leilani was not walking because her hip was out 30%. He said he would not conduct surgery unless the other leg were out 50%, which made no sense, but what does? It is obviously her brain, so if he did the surgery, I would know that, so he refused.

82.   Dr. Kay told us Leilani has hemiplegia from her surgery.

83.   **Sidebar:** Jeanny Umana, Dr. Bloch's assistant, used to have Leilani categorized in CCS as having Cerebral Palsy for billing purposes. I saw it on a CCS document and asked her about it. She told me that because there was no other way to bill for her services because CCS is only for kids with CP, there was no other way to bill the State for her services. I told her, "Leilani does not have CP. She has hemiplegia from brain surgery. It is recoverable and completely different. She said they were in the same family, so it is okay, but is it?

84.   Infants who have hemiplegia from brain surgery can recover from it by 98%. You never recover from Cerebral palsy; it is caused by a lack of oxygen at birth and makes the body think it is one unit, not separate parts, which is why people who suffer from CP are so stiff. It is not the same at all.

85.   I was told my daughter was labeled as CP for insurance purposes, so doing corrective surgery would be wasteful since kids diagnosed with CP typically do not walk, which I

knew was not true; lots of people with cerebral palsy can walk. However, also, she was never diagnosed with Cerebral palsy. It was the first time I heard of it. He then used the term "CP-like" disabilities but CP for billing.

86. Leilani began to develop odd sicknesses in late 2017. We were told she developed precocious puberty, caused by the pituitary gland being injured during the first surgery, where the shunt was denied, and hydrocephalus set in. However, that was incorrect, and they put her on growth hormones that cost 16K a month for several years. Now she is 14, the size of a ten-year-old, and will likely not grow much more.

87. In 2018, Leilani's temperature dropped down to 94. It was a hot summer, and she was not sick. Not that outside temperatures impact internal temperatures. I knew it was serious and asked Dr. Rosser, the TSC neurologist at CHLA, who could not diagnose Leilani but was now in charge of her care. I wondered if we could do Leilani's annual MRI to see if everything was all right. It was already overdue, so I assumed it would not be a problem. Dr. Rosser refused and said she checked with Dr. Kreiger, and he was okay with waiting up to 3 years for another MRI. I said she was sick; one year was always how it had been done. Dr. Rosen replied, "It is up to me, and I say no."

88. I then requested to transfer care to UCLA and get a second opinion from Dr. Joyce Wu. We saw her briefly in 2015, and she was nice back then, so I in-boxed her for help. Dr. Bloch at CCS and Dr. Rosser have already told me that I could only get a second opinion at CHLA because of my medical insurance. I said straight medical could be taken anywhere, but they said not if they said no. When I tried to get help from the Ombudsman,

I was told I needed to move to San Francisco if I wanted healthcare without CCS. It is on a recording line.

89. I then made an appointment with Dr. Krieger to ask why he did not see the need for an MRI. I asked him point blank whether she had cancer, and he said yes when there was no medical proof. I wondered if she had hydrocephalus now or ever, and he said no, which, according to all the MRLs since birth, says she did. He said she was fine; I was overreacting. However, I did not believe him this time; something was different in his attitude toward us; he knew I would find out. I wrote a nasty email to Dr. Rosser, ensuring she would never want to see me again, and was granted my referral. However, getting away from CCS was not as easy.

90. Upon request to see Dr. Wu, I was informed that CCS would not allow the move, even though I was told that we could only see doctors Dr. Bloch approved of, and if we tried to get a second opinion at UCLA, Leilani would lose all her insurance, not just CCS. This was a huge red flag because I knew he did not have the authority to do that. I then reached out to Dr. Rossen, who told me CCS and Dr. Bloch told her she did not have to give me a referral if she thought she was doing her due diligence and that I had no choice but to see her. When I tried to make appointments at UCLA alone, Dr. Bloch would have them canceled. I finally called Dr. Young for CCS and told her what was happening, and she withdrew from Leilani's CCS. However, Dr. Bloch was also in charge of Medi-Cal and abused his power to deny Leilani care to force her back onto CCS.

91. At Leilani's November 2018 appointment with Dr. Wu, she was a completely different person than the first time. I asked to fill out Leilani's Medi-Cal exemption, and she

refused to take it and yelled at me, saying, "Give it to my assistant; what do you want me to do with it?"

92. I asked Dr. Wu to review the previous MRI screens to understand if Leilani was having a problem that could be seen through the imagery. We knew she had issues with her temperature that could cause cardiac arrest and were concerned. Dr. Wu said she did not bother loading them because there was no point. I would not know what I was looking at as I was not smart enough. She said this in front of Dr. James Lee and another witness.

93. I then asked for a referral to child psychology to have Leilani's well-being assessed after everything she has been through. Dr. Wu said kids with Leilani's insurance are not allowed psychological services and would not refer them. This is sad; who needs a psychologist more than a disabled child? No one. But it's true; Medi-Cal will not pay for it.

94. I then asked for an appointment with neurosurgery so they could explain the MRLs to me. She said no and that I would decide on Leilani's care. If you do not like that, go to another hospital.

95. Knowing something was wrong, I called the neurosurgery department and asked for an appointment but was shot down because I needed a referral. I then begged Dr. Lee in pediatrics to help me, and he did. Even though Dr. Lee also told us to go back to CCS if we wanted to stop the abuse and never stood up for us, he referred her to the neurosurgery department without telling Dr. Wu, and in doing so, he saved Leilani's life, so there is a good man in there; he is also stuck in a corrupt system. Doctors can't be fired from UCLA per their contract, so most nurses and doctors disregard corruption as it will only lead to

- 47 -

them being harassed by their peers. However, Dr. James Lee saved Leilani's life with that referral, so no matter what he said to me, I am forever grateful for what he did and forgive him for intimidating me into rejoining CCS.

96. When we saw Dr. Fallah for the first time, he told us Leilani was dying because her third cranial ventricle was too inflamed due to arrested hydrocephalus and pressing against Leilani's basal ganglia and hypothalamus, causing her temperature to drop and all of the other neurological problems she was having. He also told me that the "scar tissue" (according to Dr. Krieger) on her left hemisphere was a tumor that needed to be removed ASAP because it was growing and may quickly become the size of a softball if left too long. He told us about this fancy ultrasound laser they would use, and Leilani would live a long life.

97. He then told us about the arrested hydrocephalus and that it was apparent to anyone who looked at Leilani's MRLs since her first surgery. He said that without a shunt, an infant's brain could not recover from the amount and type of surgery Leilani underwent. The ventricles could not drain the excess fluid, causing it to stay in the skull, slowly eating away at the brain and causing her disabilities with no other apparent cause, like eating, walking, and talking. He said that her advanced cognitive abilities also indicate injury vs. condition.

98. Dr. Fallah seemed sincere and said he was sorry this happened but would do the best for Leilani to move forward. He said some of her functions should be returned, but it was not likely. He told me he could also tell by Leilani's older images, medical records, and general health. He said the precocious puberty, "or what they were calling precocious

puberty," was a sign the hydrocephalus was causing new damage in its arrested state and should have been caught when she was diagnosed at CHLA in 2016.

99. He also said dozens of incidents throughout Leilani's medical life show apparent signs of arrested hydrocephalus. He said he wanted me to know the truth so I could heal and move forward and stop expecting her to get better. He said she was never going to be any different than she is right now. He was not pre-framed yet, so he did not know what he had just done, as proven by his actions after the shunt surgery.

100.   Dr Fallah also confirmed my fear that Leilani never had cancer. He said no matter how fragile, if they removed a 7 cm cancerous tumor from an infant's brain, they would have done a round of chemo and radiation. It is standard procedure. Dr. Kreiger told me she was too fragile, but Dr. Fallah said no; they would have to ensure it would grow back. They knew it was not cancer.

101.   Dr. Wu did not know Dr. Fallah performed Leilani's brain surgery on 7/26/2019, which saved her life until a week after the surgery when I told her. He said she would have died within a few months, evident by the MRI scans and lab work.

102.   After Dr. Fallah conducted Leilani's shunt surgery, Dr. Mathew Sun took over Leilani's care in the ICU and ordered her discharge. The day Leilani was to be released, he entered Leilani's room, looked at Leilani's chart, and asked me to go out into the hallway with him. He told me I could take Leilani home and "remove her surgical staples with a staple puller because he refused to do it." When I said that it was medically illegal, you

couldn't do that or even say this to me. He informed me that nothing was" medically unlawful." He made this statement around the corner from the nurse's station. He took me into the hall to avoid Chris's hearing but forgot about the nine nurses sitting in ear distance around the corner.

103.    The nurses all came running into her room as soon as he left, telling me not to do that! I said I had no intentions. They said it was protocol for the nurses to remove the staples; they could not understand why he said that to me and told me they were filing a report.

104.    At Leilani's post-op appointment with Dr. Fallah, the tone was very different. I explained what happened with Dr. Sun; he said it was in retaliation to the Yelp review I posted about Dr. Krieger. I told him it was anonymous. How did he know it was me? He said, by the content and they follow my algorithms to see when I post something about them. He said it was evident, and now, thanks to his confession to me, there is tension between UCLA and CHLA.

105.    He then told me about the fraud and that if he had known about Leilani, he would not have done the surgery because it only caused problems for the hospital relationship. He said that the entire medical industry would band against me to save the numerous people involved in this project and that UCLA would deny Leilani's service moving forward.  He said it was sad but that nothing could turn back time, and he was not going to be the one to take a fellow doctor down for a "state-insured child that no one cares if she lives or dies because she will never contribute to the world because of her injuries. He said she had already served her purpose, and no one would believe someone like me. He said that to be

treated like this, I must have come from the "system" and would be there for other reasons even if Leilani was not born, so I don't count as a human in the real world. He also said there was a big meeting after Leilani's surgery and decided to withdraw care and not get involved further.

106.    These are not the words of ethical people. They should have taken her in and helped her, not added to the abuse knowingly and willingly!

107.    After this happened, we reported everything to the medical board. They came back and told us they were not going to investigate, that one doctor reviewed all of the allegations and sides with the doctor's right to conduct medicine as they see fit. When I told them I would appeal, the claims manager told me she would deny it without allowing a second investigation.

108.    When we left CHLA, we also sought out orthopedic care at UCLA and were assigned Dr. Racheal Thompson. We were told that because Leilani did not have CCS, she could not see an orthopedic on the UCLA campus, so they sent us to the USC campus, which I thought was odd, but I see why they did that now.

109.    Dr. Thompson said Leilani was there to be diagnosed with Cerebral Palsy, and as you can see by the document in evidence, she did try and make that diagnosis stick with a doctored APGAR from CCS that is in evidence. The documents were given to a fair hearing judge when Dr. Thompson justified why she cut three inches of length off

Leilani's left leg and fused it to her hip leaving her unable to walk or return to her baseline.

110. All the doctors moving forward refused that language, and as you can see, the CP diagnosis has been whipped from her UCLA chart. However, countless documents in evidence show a diagnosis or history of "CP" or cerebral palsy in the evidence.

111. Dr. Racheal Thompson agreed with Dr. Kay that Leilani's hip was out 30%. However, if you look at the x-rays before her surgery, the hip was not out of place. The reason she was not walking was the brain damage and the orthopedics were trying help Dr. Bloch and Krieger cover up their purposeful malpractice and battery.

112. I thought she needed to have her left leg extended a little because that seemed to be the discrepancy in why she was not walking. But she said no, the hip was out of socket but not to worry there was a treatment where she would inject medication into Leilani's longer leg stunting the growth and they would catch up in length by the time she was 18 allowing her to walk again. I explained that would not be necessary if she did not conduct the surgery as she did. Dr. Thompson explained how our health insurance plays into the type of surgery you get.

113. However, if you look at the X-rays, you see the length discrepancy. The hips look okay in the before x-ray and noticeably deformed in the after x-rays in evidence. But the leg discrepancy is still present in both, much worse in the after.

114.    Also, the treatment Dr. Thompson was talking about does not exist. I asked multiple

orthopedics. Unless she was planning on experimenting on Leilani, she was just blowing

smoke to try and confuse me.

115.    It should be noted Dr. Kay has an office at USC; he sent us there to meet a muscular

neurologist for a Botox referral once. According to Dr. Thompson, CCS has an office on

the USC campus as well.

116.    Leilani never returned to baseline; she could stand for three minutes before the surgery

against a table and now has spaghetti legs and a crooked body. We spent years helping her

to get on her feet with therapy, equestrian therapy, swim therapy. Leilani had dozens of

teachers and therapists who will testify to her ability to walk a bit and stand, and we also

have lots of video. Now, she can barely sit up straight because her body is uneven and

twisted. She can walk alone in the pool, which brings her so much joy! Leilani's access

and ability to enjoy life fuller is reduced, and she will have a lifetime of pain and surgery

because of this fraud. I will be

**Sexual battery**

117.    Leilani had her first hip surgery with Dr. Racheal Thompson in February 2019. When

Leilani came back from surgery, I noticed my daughter's incision leaking outside the

surgical wrapping, so I asked to have it reinforced so she didn't get an infection. Dr.

Gayley enters the room with a nurse; the nurse comes in with bandages in her hand but is

instructed by Dr. Gayley not to use them because "Medi-Cal does not pay for post-surgical

bandages, and since she doesn't have CCS, she can't have an actual bandage to cover the

surgery site" (a nurse was there, she filed a report) then placed a giant piece of purple

rubber industrial foam down the length of her incision, which was about a little under a foot long.

118.    When my daughter's home nurse, Jill, from ASAP Home Health Care, removed it, the skin and hair came with it. The nurse took pictures and filed a report with the agency. Although the nurses at Santa Monica Hospital filed a complaint, no disciplinary action was taken. But that is not the worst thing he did to my child; he told a nurse (according to her) to sexually battered Leilani. I assume it hurt me because it felt like prison-style intimidation by the calm demeanor of the nurses and their constant threat to have security come and hold me back while they seemed almost amused. I grew up around real gangsters (not my family). It was part of the reason I got into criminal justice. Plus, I am a philosopher in Criminal Justice and Behavioral Science. I know the behaviors I am seeing. I know how people act and move when they are being intimidated; I have seen it dozens of times; it was the same mannerism.

119.    After the incident with the bandage, Leilani was more irritable than usual. I could see her belly was swollen, and she was in pain. After surgery, you did not feel pain for some time, so I knew something was wrong. She was trying to move her bowels; a mother knows when her baby has a constipated belly, and you could see the agony when she crunched. She just had hip surgery and was too weak and numb to push. I requested an enema to help relieve her pain. She was hysterical right after surgery, and the nurses acted like she was a burden. It was so sad.

120.    When the nurse (Carol Alvos, according to UCLA investigator Eric Gamm, see documents in evidence) returned, she said her doctor refused to give her laxatives and insisted they do a bladder scan because children with Cerebral Palsy tend to get urinary tract infections. I informed her Leilani did not have CP and never had a urinary tract infection. What's more, she has a condition that affects her kidneys, and catheters are not ideal unless needed.

121.    I always thought they meant Scott Gayley, who did not renew his California license for pediatric orthopedic surgery and is working with adults in Florida, but I don't know who ordered it; the nurse only said her doctor. I am starting to believe it was Dr. Thompson, but only nurse Carol Alvos can confirm that.

122.    The nurse scanned Leilani's kidneys and found 13 ml of fluid in her bladder, not even enough to constitute a need to urinate. The human bladder holds between 400 and 600 ml of liquid. 13 is empty.

123.    The nurse (Carol Avalos, according to the UCLA investigation report from investigator Evan Gamm) had then entered the room with a catheter tube and said Leilani's Dr. insisted she had a catheter to force urine out of her.

124.    I said, "She only has 13 ml," the nurse said, "I know, but we can't refuse the doctor's order'. I said I would not allow it, especially since Leilani has an underlying kidney disorder due to TSC. They told me they would use force if I did not allow them.

125.    When I told them they could not put the catheter inside of Leilani, the nurse told me, "I have no legal right to stop a doctor from conducting a test he or she deems necessary." Which is not valid.

126.    They did not follow the procedure either. You are supposed to insert the catheter into the bladder with a balloon at the end to take up space and let the bladder drain slowly. I am certified in catheter training and have been since 2016, so I know the procedure.

127.    They took this little tube and poked her bladder by going in and out of her vagina with it repeatedly for a few minutes to force her to pee, which, of course, she didn't because her bladder was empty. It felt like an eternity; I get sick just thinking about it. One of the reasons I got into the Criminal Justice industry was growing up in 1980s east coast around gangsters. You can never learn what I know from experience and learned from growing up inside, not even working as a law enforcement agent. Which is why people like me are valuable to the system, we come from both sides and have more insight and better instincts. I have seen many forms of intimidation and what they did to Leilani was just that.

128.    Leilani was so freaked out and in pain because she still had to move her bowels that she flailed in agony, ripping at tubes all night. I had to hold her down all night, one hand on her right arm and one on her right leg. She was in so much pain. I asked for help restraining or relaxing her because I feared she would hurt herself. I was told by her nurse, "What is the matter? You can't handle your child." But she was in pain and scared; she kept trying to rip out her tubes and tear up her incision.

129.    It was the longest night of my life. I had to pin her down for four hours while she screamed, and the nurses ignored us. Chris Leilani's father could not stay overnight with us because he had to work and is devastated, unable to forgive himself for leaving us. It probably still would have happened, but he is so broken that he could not protect her from a sexual assault. We didn't let her out of sight after that, which we never did. Leilani has never had a babysitter and won't so long as I am alive. When the shift finally changed, the charge nurse found us. I was crying, my arms numb from holding my poor baby down all night. She gave Leilani her enema and stopped her pain; she was so lovely; her name is on the report she filed. She cried. She was so distraught by what happened and had someone from family services come and talk to us. The proof of the catheter incident is included in this notice.

130.    I reported this to Dr. Thompson, and she just dismissed it, which is why I feel it was her order. Any other doctor would be mortified if this happened to their patient while in the hospital after the surgery they did. The social worker and charge nurse at Sant Monica Hospital were in tears, but Dr. Thompson had a stone face the entire time, watching me cry. She had a nonchalant attitude and said, "I wish there were something I could do. Then, I went right into the next thing.

131.    After that, I spent a year trying to get Leilani's DMEs from Dt. Thompson so she could start her post-surgical therapy, and she kept telling me it was the insurance that was the problem and that I had to go on CCS to access the DMEs that she was prescribing.

132.    However, the vendors and Medi-Cal said it was Dr. Thompson refusing to provide the information needed to approve it, and at the fair hearing, she claimed she did not approve

of the DMEs and passed along the fake APGAR to the judge who denied Leilani her needed equipment. Then, she wrote another prescription for it and did the same thing.

133.    In 2020, Leilani needed to have the pin in her hip removed; we filed complaints with the medical board about Dr. Thompson and knew she was being investigated and would not hurt Leilani in the removal surgery with eyes on her, so we scheduled an appointment with her. When we got to the preop appointment, Dr. Thompson came into the room with three nurses and Los Angeles County Medical Director Babara Ferrer to confront me about my medical board reports.

134.    Even though Ms. Ferrer heard our entire story, she never asked us any questions or showed any emotion. I don't think she even spoke to us and was not introduced by her name, just "someone from administration." But she has a distinct and memorable appearance; Chirs will testify to it as well. She was only there to bear witness because Dr. Thompson knew I wanted her to take the pin out of Leilanis' hip and would do whatever she wanted to get that accomplished. As many are aware, Ms. Ferrer's education is in social services, and she treats everyone like they are on welfare and in need of a social worker. California has adopted a Care Management System that requires everyone on State insurance to have a social worker, depriving them of medical services your doctor prescribes and reducing your freedoms. To require people to have a government supervisor to oppress you when there is no need is Communism, it removes freedoms and is not constitutional.

135.    Disabled people have no choice but to be on Medi-Cal in California, but that does not mean they need a case manager, on the contrary, they need less people between them and their doctors, But California is built around profiteering from immigrant and the impoverished. There is nothing else even notable about California. There is no community cohesion, and all the liberalism is all for show, it is a soulless State.

136.    The pin in Leilani's hip was starting to tear through her skin and muscle because it was longer than it was supposed to be. It was gross, and it hurt her, so I said whatever she wanted. I knew we were never going back once the pin was out, so I said what she wanted to hear. Although she could not hurt Leilani, it was piggyback surgery with dentistry, so Dr. Chang did her dirty work.

137.    After the pin removal, the dentist went in and clean Leilani's teeth and remove a problem tooth. He opened the gum but left the tooth. A week after surgery, Leilani's face blew up (see pictures), and she developed a fever. It was the height of COVID, so to keep her going back and forth was dangerous, but she managed to avoid COVID, as did her father and me. Leilani had to have a second surgery that does not show up in her medical records, nor does the abscess visit to pediatrics.

138.    In 2020, Dr. Marcus Leilani's GI told me her feeding tube needed to be resisted because she was growing out of the one, she had. Dr. Marcus set us up with Dr. Chin at UCLA, with whom we had a telehealth appointment in April 2020.  He said if we had the surgery with him, Dr. Fallah would be at the surgery and ensure Leilani left with a colostomy bag.

139.    When I told Dr. Marcus, she filed a report and recommended I go to Stanford, where Leilani was getting neurological care because of the defendants. She said there was no reason for Dr. Fallah to be at the G-tube surgery; he did not even want to see Leilani in his clinic. Also, there is a reason why she would be in a situation where she would need a colostomy bag, and it was an unusual warning.

140.    Dr. Bronzini, the GI surgeon who did the surgery at Stanford last April, agreed that this was an unusual comment and rare outcome. Dr. Bronzini conducted Leilani's surgery and inserted a mickey-button a size too small that could not be removed for a month, causing her stoma (feeding site that goes directly into the stomach from the outside of the abdomen) to become deformed, infected, and an altogether mess.  Leilani needs to have another surgery to remove the scar tissue and recite (close the surface hole of the stoma and make a new one).

141.    From 2019 until 2024, Leilani was denied care in most major hospitals. In May 2024, she was denied neurological care when she needed it post-op and again a week later following a request. We were told it was the Regents, whose president is Governor Newsom, who were the ones restricting her.

**Background**

**Case ID: 24AVCV00016**

142.)    After being told by Dr. Arrie Fallah at UCLA my daughter was being tortured and medically altered because of Dr. Krieger, I emailed him to beg him to make it stop and, in doing so, threatened him with law enforcement, nothing more. I had never contacted him

before; he was my child's doctor for a decade, and we never had any altercations. It was always professional. I then deleted Dr. Krieger's email from my contacts so I would not email him again. I began contacting all the people who were supposed to help, including the LAPD.

143.)    A few days later, several plainclothes officers came to my home; I assumed they were there to take my report and help us. With all that has happened to us, as a member of the criminal justice system, the police should have been right on the case, especially where there is a minor victim involved. But that was not the case.

144.)    There were two officers from the LAPD TREAT unit, a county officer who did not identify himself, and Charles Musgrove, a colleague of Dr. Bloch's from the Department of Public Social Services. They told me they were there because Heidi Kjar was filing a restraining order on behalf of her client because of my email.

145.)    They said, "Although there was no actual threat, your words were "interpreted" as threatening, and therefore, they were taking legal action against me. I have an email from Charles Musgrove in Exhibit A, making that exact statement.

146.)    I asked to see the email and was told Dr. Krieger erased it, but there were phrases kept from it used to obtain the restraining order. I asked, don't you need the evidence? They said with their experience with people like me, they could easily see I would be a problem for Dr. Kriger, and there was no need for evidence when they could prove to the judge I was psychologically impaired and would forever blame him for my child's disability based on their expertise and opinion.

147.)     They convinced me I was the one at fault and would suffer a more significant penalty

from the judge if I did not admit to what I did, so I wrote a letter to the judge that Charles

Musgrove coached me on. Proof of this is in the exhibits.

148.)     I told the officers everything that happened, that I was protecting my child and trying

to prevent her from being killed by Dr. Krieger and his colleagues at UCLA and didn't even

threaten him, and that they should be taking my report. They told me they were here for Dr.

Krieger's complaint and did not want to confuse my guilt with anything he may have done

as he was the victim as far as they were concerned. This visit was about my crime. I said I

didn't commit a crime; they said it depends on how they see, and to them, I was mentally

unstable and capable of anything. They also accused me of being a danger to Dr. Kriger's

family and asked me how I knew Dr. Krieger had a son.  They then accused me of stalking

him; otherwise, how would I know he had a son?  I explained that he was Leilani's doctor

for a decade, I know he lives in the OC somewhere, I know he has a son, and I know he likes

to talk about football, or at least did to me. You learn things about people you spend that

much time with. But it didn't matter; they called me a potential stalker without any proof,

and the judge accepted it as fact.

149.)     Detective Grunland, who was not even present for this interrogation, wrote a

declaration to the judge saying that she could recognize someone mentally unstable and a

danger to society. I was extremely dangerous and needed to be punished with the highest

penalty. The court has to deter me from pursuing Dr. Kriger in regard to my daughter ever

again and that my Second Amendment rights be removed for three years for Dr. Krieger's

safety. And that is precisely what Judge Swift did. I threatened him with legal action, but he threatened me with retaliation, so I left him out of this.

150.)     Detective Grundland never met or spoke to me; there are no reports aside from Heidi and no record to refer to or video that shows my mannerisms, so this is just a bunch of words coming from a dirty cop. There is no validity or reliability to her statements, but these words injured my reputation and limited my ability to access jobs in law enforcement. I am one of the highest academics in CJ, but I can't get a job in law enforcement in California because of Heidi Kjar and her corrupt colleagues in the LAPD and Stanley Mosk Courthouse. When you google my name, the restraining order is the first thing you see about me, so I am not getting job offers either, which is heartbreaking because I worked so hard.

151.)     Heidi Kjar and her LAPD and Stanley Mosk Courthouse colleagues did this to discredit me, nothing more. I did not have a criminal record, I am not a county member aside from my child, and I don't have a history of violence. In a decade, I sent Dr. Kriger, my child's doctor, two emails. I never called his office or sent him a letter; nothing.

152.)     Heidi Kjar took phrases from the email, not the entire email, and used them as evidence of me threatening harm. She got fellow alums of USC Judge David Swift (at the time Department 25, now Department 59 )to grant Dr. Krieger, a USC doctor conducting medical malpractice in a USC hospital to profit USC investors, a restraining order but not just a regular restraining order, one that takes away my civil rights and makes me look psychologically impaired, so I would seem less credible when this all came to fruition.

Everyone admits there is no threat to harm anyone in that email, just a desperate mother trying to save her child from harm, but the judge said it was a threat because the doctor took it as one. The officers who came to my house to threaten me for the doctor convinced me I was in the wrong and that I should feel bad about scaring the doctor, a man who mutilated my child and had others torment us to instill fear. They said if I wrote a letter to the judge saying I was sorry, he would go easy on me. I did not realize I was admitting to a crime. I was confused and being led by Heidi's colleagues.

153.)    Aside from the lack of evidence, Ms. Kjar needed to obtain the restraining order; she also used a false description, stating I was 5'10 instead of 5'3 dark, complected with dark eyes, living on the wrong side of town, and a decade older than I was.

154.)    Dr. Krieger has known me for a decade. He knows what I look like and knows I am not 60, nor do I look it, and I am short, not tall; no one would confuse me for 5"10. My eyes are green, and my complexion ivory. My hair changes, so that is not significant, and I did live at the address they gave me two years prior before I sold and moved to the suburbs. But they had my weight of 170 correct, which means they had to have accessed my license information because that is an odd weight to be spot on, and it was on my license, which the LAPD could access.

155.)    I believe Ms. Kjar gave this description for the same reason she had Detective Grundland write that made-up psychological evaluation and had Detective Cruze threaten me to stay away from CHLA or go to jail to stall me from acting against her client.

156.)      Detective Cruz was one of the officers who came to my house to threaten me for Dr. Krieger in April 2020. I spoke to him on the phone a couple of times after that, trying to get him to take my report, but he refused. In May 2022, Detective Cruz called me on behalf of Heidi. He said she contacted him and told him I emailed Dr. Platt for help against Dr. Krieger and that I need to stop contacting her but also refrain from telling my story to CHLA doctors, or Heidi would consider it me trying to get a message to her client which would violate my restraining order and I would be arrested. I told Detective Cruz I had to disclose Leilani's medical condition to new doctors so they would know how to treat her; he said I should go to another hospital then because it would be considered a violation at CHLA. This was another means of intimidation and to silence me.

157.)      When I filed my case, Heidi and the other attorneys worked until they got this case in the courtroom; they wanted to petition the appointed judges and have their judges take over. Terry Green, who retired halfway through this case, was the first. He admitted to being biased toward the doctors in open court; everyone heard him, and he did not mince his words.

158.)      Judge Green said he works with the defendants in other cases, and California was one of the top five hospitals in the United States. He went on to say. I do not believe these individuals did what you are saying because they are good people. I then said, "You are biased and should not be hearing this case." he said yes, I am.

159.)      I then filed a motion to change the venue and preliminary challenge, which Bob Wysocky, who was defending the county but is no longer, submitted a doctored court reporter lodge that had the comments removed, which you could tell because all of the other

dialogue was there and usually flowed, then when you get to those comments the flow is interrupted, and the conversation does not make sense.

160.)     Heidi then filed a judiciary notice and committed prudery by stating that Judge Green never said what he said and that I should be punished for misrepresenting him in my filing. He was unequivocal, and all the witnesses heard the same thing, but Heidi, Bob, and Dr. Bloch's attorneys lied on legal documents they submitted to the court. Judge Green responded by retiring. Judge Nelon acknowledged all of this as accurate but then said, "I am the judge now, so problem solved."

161.)     Heidi did not adhere to my rights as a victim and tormented me with discovery and admittance for a year. I did not need to provide her with anything, but I did because I didn't know what I was doing when I first filed, and she had all the power over me. She supervised the police and the court. I had to do whatever she said, or I would suffer legal repercussions like I always had since this all started in 2020. Plus, Judge Nelon was also denying my victims' rights, so I followed orders. Even though I gave Heidi everything she asked for, she told Judge Nelon she believed I was holding back information, and because of that, I violated discovery. I explained that I was not holding back, but Judge Nelon said that if Heidi said I am, I am. I asked what I was not providing so I could provide it, but no one would tell me.

162.)     Even though I believe Judge Nelon was working with Heidi to injure me and stall, I cannot sue her because her actions have not injured me much yet. She did cost me money and caused me psychological distress, but my child is still alive, and this court could reverse all of that, unlike the damage Heidi caused, which is not reversible.

163.)     Lastly, Heidi used her influence to have the case stalled and almost moved back to the Stanley Mosk courthouse, where she and the doctors could control the outcome with political favor.

**Background**

**Case ID:23AVCV01490**

164.)     In 2013, when I signed my baby up for Head Start, I thought she was going to excel and that she would make friends and make memories that would last a lifetime_ I did not know she would be tormented and discriminated against because of Dr_ Bloch and the label he would place on my child that defined how she would be treated. I had a great school experience, and that is all I wanted for Leilani_ School is critical to disabled children because the world is a cruel place. However, so is school when the teachers are prejudiced against the population they serve.

165.)     Buena Vista Elementary School was not our home school, but Dr. Bloch's assistant ran the CCSMTU, so we had no choice but to go there. Leilani was Dr. Bloch's test sample, so he intervened in all county activities and services. Overseeing 30 million other children, you would not think an official would take such personal interest in every aspect of a child's life unless they were studying them. Dr Bloch was personally attached and was in our lives in some form or another daily. Again, this is like the mayor following you around and dictating your life. It is not expected to have an official telling you everything you can and cannot do and using law enforcement and the government to control you, but that was my life for a decade.

166.)    We tried pre-K and thought my baby would be fine; it was only 3 hours. However,

every day I would pick her up, she would see me and start screaming. When I picked her up,

Leilani would hit my face and start ripping at my hair and biting me like she was terrified.

This was not normal behavior for Leilani but developed the more she went to school. Every

day I picked her up, she would wear different clothes because she urinated through her

pants, and her glasses were always covered with a film of dried tears.

167.)    She was only there for three hours; I could not understand. There were only four

children, two mobiles, and three teachers. However, they did not like me or my child; I

could tell by their mannerisms, but I tried to ignore it and make them like us by being

helpful. I tried so hard to get along with the school, and I really wanted Leilani to do well

and be liked.

168.)    I bought everything on the mommy get list for the class (glue, cornstarch, paint, etc.). I

would bake them cookies and help when they needed me to. I would put her braces on for

them and stay with her until the teacher was ready to start the class, so she was not a

problem.

169.)    I wanted Leilani to have a good school experience. But no matter what I did, we were

labeled; I didn't have a chance. Leilani had an audio processing disorder between the ages of

1-7, and yelling hurray was a trigger for her, and the school knew this. Leilani's home nurse,

Ophelia, noticed that when picking up Leilani from school on two occasions, Mrs. Hom

would go behind Leilani, clap loudly, and yell Hurray! This caused Leilani to react in the

same way an autistic child would if they heard a loud noise. I repeatedly asked Mrs. Hom

not to do that, but she said she was not going to hold back her excitement for another child

because mine got upset. I requested that she not be so loud that it scared her and not do it

right behind her, but she refused, so I had to take Leilani out of school until she was old enough for kindergarten.

170.)     In Mrs. Hom's defense, the special needs teachers are not required to be ABA trained or appropriately educated because the population is not served or respected. They are just a blank check to the school, and the less they give the student, the more the administration keeps for bonuses and such.

171.)     Mrs. Hom had no idea why this was abusive or did and did not care because no one was going to reprimand her for us. When I tried to explain it, she took it as me telling her how to do her job because I am ABA certified, so I just took her out and kept her home until kindergarten.

172.)     Because of all the behaviors that developed from the PTSD Leilani suffered from her first school experience, I hired a team of behavioralists who would go to school with Leilani and act as her aide. Since the school was required to provide an aide, they took over payment and hired the aids as school employees. This group of five women worked with Leilani for over a year, five hours a day, five days a week, getting her ready for school doing PT/OT/AEP all day, every day. I was so excited for

173.)     She is so hopeful. No one can say I didn't try. All I did was try to give her an everyday life, but the county was prejudiced, and she was going to suffer no matter what I did.

174.)     When Leilani turned five years old, I tried school again, but this time, I wanted her to be in the mild to moderate class. She could do schoolwork, and in the moderate to severe class, they did not have a curriculum. I was already teaching Leilani how to read and count and did not want that to stop. Julie Arthur did not want Leilani in her class and was not shy

about it. She said kids like Leilani only belong in severe disability classes that they have no right to generalize because they pull the rest of the kids back.

175.)    I explained that this was a class filled with special needs kids whom she had the right to learn with; there was no reason Leilani had to be in a class with two kids who didn't move or speak; she needed to be with children who could help her grow. Irene Orloff, Buena Vista special needs coordinator, tried to help Julie keep Leilani from transferring from moderate to severe to mild to moderate. Again, general education was not an option. Irene was the one who prevented the disabled population from generalizing. She said to me that Leilani could not go in a general class setting because they don't generalize, the disabled population could not use the gym, and they were not offered the opportunity to buy books from the book bus. Julie, Arthor, said it was a waste of books and that our kids weren't worth it.

176.)    I remember that after a gunman's threat, I recommended putting in special needs doors (push buttons) so that students and faculty with wheelchairs could get out of the building in an emergency. Irene told me no but then pointed out the giant new monitor, which they just got to advertise what the general ed kids were doing and class schedules. She was deplorable. Irene's method of assessing Leilani's intelligence was to conduct tests like stacking cups. Leilani would not do it because she was insulted by all the things they were saying about her, as if she could not hear or understand them.

177.)    When Leilani refused, Julie would say, "See, she can't even do this; she does not belong in this classroom." I was heartbroken; this was a five-year-old in a disabled classroom, and she was degrading her. We later discovered that Leilani could read at her grade level, so she was not complying; it wasn't that she couldn't do it; she was hurt.

178.)     I became distraught and sent Irene a dozen videos of Leilani stacking things and told her that her inability to teach special needs was not Leilani's inability to learn. At this point, she had been working with her Behavioral therapist on schoolwork for a year and could read, count, and understand everything around her. However, none of the teachers at that time were ABA (applied behavioral analysis) certified, and Irene did not become ABA certified until after this incident. I, however, was ABA certified, so I understood alternative methods of teaching anyway and tried to share this knowledge, but I was perceived as the lessor; they would not stoop as low to accept me as an equal because of the label Dr. Bloch placed on me.

179.)     After an outside assessment, it was found that Leilani could read at her grade level and do some math, so Mrs. Aurther could no longer contest Leilani's being in a mild to moderate special needs class. Leilani even started to speak when she was around the other kids in Mrs. Author's classroom. In the beginning, she blurted out, "Leilani, go home now." Her aid, Jenifer Frost, reported that. She was starting to talk and surprise us with new words and sounds daily, but after they took her aid away and whatever happened to her that day, they left her alone in the back of the room (explained below), which must have given her PTSD. She hasn't said a word since.

180.)     Julie Braswell told me when I asked why Leilani's friend Kira from horseback riding could attend regular classes and get services Leilani couldn't. Her response was, "You people don't even pay taxes; you don't deserve the same things other families get." Our relationship with Kira became strained over my jealousy of her being able to access PT, equality, and respect. Her mother was a stay-at-home mother; I worked my whole life; why is she receiving more respect and rights than me? I began to resent them and had to stop being their friend. We

were great friends until she came to Leilani's school, where she was treated typically. Then, they started looking down on me because of the discrimination I was suffering. Other mothers are cruel if you're the one being systematically abused, and they are not.

**Julie Author and Irene Orloff 2015-6**

181.)Leilani was the only kindergarten student omitted from kindergarten graduation. She was not allowed to go to gym class with the other kids and was not allowed in the General population because Dr. Bloch insisted, she could not. Jennifer, Leilani's private aide, was crying when I came to pick Leilani up on the last day of school. I asked what was wrong. She told me Leilani was not allowed to go to kindergarten graduation. I ask They had a graduation? Why didn't anyone tell us? Jennifer said Mrs. Aurther said the special needs children are not allowed to go to the general education graduations. Leilani was the only kindergarten student in her class, so what she meant was that Leilani was not allowed to go.

182.)They took a photo of all the kids under a sign and would not let Leilani join in, so Jennifer had one of the teachers take a picture of her and Leilani under the sign so she would still have some memory. I can't even explain how deeply that still hurts. These are not humans; they are monsters. Jennifer quit that year. It was too much for her to see Leilani hurt like that.

183.)After Mrs. Author was forced to allow Leilani to join her class, she ignored her. The aide told me she would never come to help her or check her work and treated her like she was not even there. Leilani's chair was in the back of the room, separate from the other children. Mrs. Arther was adamant about not being responsible for creating a safe or inclusive space for Leilani. Mrs. Arthur let Leilani lead the pledge of allegiance in the first year, which was nice. However, the retaliation for forcing Julie Arther to have Leilani in her class began to grow. Leilani was

having growth issues, and I asked that they take her AFOs off for a while through the day so her circulation did not suffer. Leilani was developing red marks that would not heal from having them on all day.

184.) The solution was to stop putting her in the stander. Leilani's therapist, Jennifer Frost, reported they stopped putting Leilani in the stander, even though it is marked off on the worksheet. She said Julie said, "I am not going to take her braces off multiple times a day; she can just keep them off." Ken Grant, the AEP, said, "Her AFOs are faulty, so we are not going to put her in the stander," but they charted it, so I would think they did. Ken Grant is not qualified to make this decision. He does not have a degree in orthopedics, PT, or OT, nor did anyone tell me about this decision. However, this was the time when I started questioning the doctors and why Leilani was not recovering. All Dr. Related programs began to become restricting and abusive. Jeany Umana told me when I called her for help with Dr. Bloch, "he can make your life difficult if you don't go with the program; I have seen it; your child will lose all her insurance and disability/community services." We have.

185.) Leilani's aides (names are located in the witness list) would report the abuse happening in the school to the district, so in the second year, the teachers wanted the aides out of the school. The aides started to tell me other things that were happening, how abusive Buena Vista was, and the discrimination and inappropriate acts they witnessed.

186.) As time went on, Leilani was restricted from using school property. Leilani was not allowed to use the headphones for the computer lab, so I got her own. She was not included in class events and left out of the yearbook. I fought so hard to have the disabled population in. Leilani started to regress physically and became very depressed. She was getting PT, AEP, and OT daily at school, so it did not make any sense. Her aids told me that Leilani was not going to physical

therapy; they weren't putting her in the stander every day like they were supposed to, just writing down that she was. When I questioned if they even had a PT, they did not. When I asked why we could not use the PT for CCS, they said they had an agreement to let them be in the school but not to provide services. I complained; I said if you have it on the IEP, you are supposed to provide it.

187.)This was when Julie told me she didn't have to do anything for me, and I could try and contest, but no one would care or listen, so I better not start trouble, or Leilani could lose all our services, and I could be in trouble with the police. She told me the county had given her full authority over me. I explained I was not the one in school; she explained I was county property, and my rights were whatever they said they were.

**2016**

188.) Because the State-appointed behavioralists kept reporting abuses they saw in Buena Vista Elementary by other teachers and facilities, Julie Braswell informed me at the beginning of the school year that they were eliminating Leilani's aid and the district would not provide one. She would have to go to school on her own without support. Now my baby has half a brain, is G-tube fed, non-verbal, is field blind, has behavioral disorders, wears diapers, has PICA, and several other conditions that require a nurse, including seizures, and is hemiplegic. She is a danger to herself and needs 24/7 supervision, yet they want her to function in a classroom alone. Julie told me that "Dr. Bloch" told her Leilani's only actual condition was Tuber Sclerosis complex, which does not come with physical disabilities and does not require patients to need an IEP, Leilani would not require aid assistance, and if I kept her out of school, I was okay to have me arrested. All one needs to do is see my child realize she would die without constant assistance, so this was obvious denervation of rights and discrimination based on need

due to disability. I told my daughter's pediatrician this; she wrote me a letter prescribing home-hospital schooling for safety. Julie said she would not honor the doctor's order and would send the police to my home if Leilani did not go to school. Julie said they would have a class aide, not an LVN, sit with her and make sure she was safe. So, I sent Leilani to school out of fear that I would get arrested.

189.) They had a class aide come out to get Leilani on the first day, and the teacher came out and brought her to me. Leilani was screaming about wearing clothes two sizes too small even though I sent her with a change. I picked her up, and she was screaming, biting me, and shaking. The second day I brought, the aide came out and told me, "So you know, I am not staying with her; they are leaving her in the back of the room alone all day." She quit that day, and I turned right around and brought my child home. Next, the DA Tom Lackey, who is now our district Assemblyman and part of this crime, I believe, sent me a letter letting me know I violated the law (in Exhibit).

190.) The truancy officers came, and I told them what was going on. They left and told me to call the DA. In the meantime, one of the other parents turned me on to Brain Allen, who advocates for the disabled community. At first, Brian seemed legit. He acted like he cared and seemed knowledgeable. He was charged to go to my IEP because the regional center was refusing, but then he came to it. During the IEP, both the school and the Regional Center agreed that Leilani lost her aid and did not require PT services; the document is attached as an exhibit.

Because the Regional Center and CCS are sister companies and Dr. Bloch is the chief executive for CCS and county pediatric medical physician in charge of DDS, he has a significant presence at the Regional Center and controls her services. There is a separate suit for the Reginal Center that will explain this more. Since the Regional center refused to advocate, I used Brian for

everything. Julie got the assistant district attorney to call me into a court hearing in the school library to reprimand me for missing school for doctor appointments. I still have the DA's card and called her last year; she is still there. I explained what happened, and she had a "my bad" attitude about it and. did not care that Julie was harassing a disabled child. Because Leilani was injured when left alone and unable to get an aide, my ability to work is limited.

191.)I just finished my first master's degree in criminal justice and hoped I could get a job while Leilani was in school so we could get to a position where we could move out of this State. Because access to public school is a federal right, I thought a fair hearing would fix this problem. However, the State of California transfers your rights to the country, and people like Julie Braswell own your Constitutional rights without prejudice, so you are at their mercy. As an expert in conflict theory, I believe this is the definition of communism.

192.)Brian Allen, who committed fraud on behalf of the Palmdale School district, had me sign a contract and said he would advocate for Leilani and make sure her IEP was met. He was not an attorney; he worked for attorney Leon Ozeran, who agreed to represent us. I never spoke to Leon directly before the trial, just Brian, but he was at the hearing and refused to defend me when the time came. On the day of the hearing, Leon, his wife, Glori Delorio from Behavioral Learning Center, and Brian escorted me into the Palmdale School District mediation office. He sat in front of a judge and the district attorneys. Immediately, I was informed that none of our demands would be met, and I had to either bring my child back to school without aid or PT or homeschool without IEP services.

193.)Julie informed me the school district would have to pay for the home hospital for my child and Dr. Bloch, and the county told her Leilani's condition of Tuber Sclerosis does not come with

disabilities, so to treat her as if she does not have any, they will back her. I looked at Leon, and he said, "Just sign it; they are not going to give you what you want, and I won't get paid if you don't sign." I looked at Brian and told him that he promised to help. Brian told me that if I didn't sign it, he would sue me for 3k because that is what the School District pays attorneys for these cases, and if I don't sign, they won't pay, so I will have to. Glori, who is a state-licensed Behavioral Therapist, informed me that she worked for Leilani until the school department hired her as an employee, so her loyalty lies with Julie. I told her that as a psychologist, you are supposed to do what is best for the disabled child; she said whoever pays is who she works for. She should have her license revoked! I trusted Glorie, but none of the service providers really cared about the kids, just their jobs.

194.) Like Julie said, "Some kids are Volkswagens, and some kids are Cadillacs." I began to become severely depressed and lost hope in life and the government because I could not even access help from law enforcement, a dynamic I never expected. I used to teach law enforcers martial arts techniques and counsel children and adults suffering all types of strain. I never imagined I would suffer this treatment. But at the very least, California is not discriminating on who they discriminate against; it's all about how much Federal and State funding you have. The more the government provides, the less you get and the more they steal and oppress. It is absolutely an American tragedy, and all members of this RICO action must be brought up on criminal charges for the safety of the Disabled population. This case requires multiple forms of retribution, but punitive justice, above all, is essential. Even though they all kept telling me I should be used to this treatment because of my "demographic," that was because they saw an interracial couple who was already being abused and shaken by it.

195.) They judged us by the surface; there was nothing to assume we came from poverty or grew up in or were part of the "system." I have a resume that crushes the most; Chris's mother came to America as a citizen and worked 80 hours a week for seven years to buy a house on Hollywood Way in Burbank. She then went to the Philippines, brought Chris and his brother here, made them citizens, and bought more property. Chris's brother served four tours as a Navy Seal.

**Antelope Valley Learning Academy 2017**

196.) After that, I spent the next four years trying to get my daughter back into school, but Julie blocked her. Leilani became depressed; school was the only place she could access other children, and she felt like she had a purpose. Since she was not allowed to go to her homeschool, her bond with the neighborhood kids began to fade. She cried every day for the first year; she was so lonely and broken by Mrs. Authur and Palmdale School District discrimination and abuse.

197.) I signed Leilani to Learn for Life (Antelope Valley Learning Academy); it was a homeschool that was not part of the Palmdale school district at the time, but it is now. Brian Allen called me and told me I had to sign Leilani up for homeschooling in the Palmdale School District, or he would not be my advocate anymore. I told him I would not subject her to any more abuse, and he said, "That is the deal I made with them, and you signed a contract with me, so you have no choice: I will sue you." I told him off and did my own thing, and that was the end of Brian Allen. But he has a reputation at the Regional Center as a fraud and probably can tell you more about the Palmdale School district crimes than I can. Carol Armstrong, a defendant in this case and the Regional Center, was our new caseworker when this all happened. When I mentioned his name, Carol told me, "He prays on families and charges them to go to IEP and conduct other legal services the Regional Center provides.

198.) They do, but never for Leilani, so maybe that is why these parents went to him. She said he
pretended to have a disabled child to get us to trust him but never actually did. That is how he
got us. He told us he had a grown-up son with autism who struggled in the school system, and
he advocated because of his son's discrimination. He may have a disabled son; that is what he
told me, but Carol told me that was part of his scam. In the beginning, Learn for Life gave
Leilani all her therapy and school services; they were great in that way.

199.) However, they have not been acquired by the Palmdale School District yet, so that would
change. Leilani needed to be around other kids, and they did not have anything for her. Also,
the homeschool teacher, Gary Cothran, was not qualified to work with her and was more
focused on diaper changing than anything else, which was odd to me and caused me to try to
get back into the Palmdale school district.

200.) Gary told me he was not well versed in the teaching curriculum but was better with life-skill
training and wanted to help with Leilani's potty training. We did not need this service and
thought it was an odd request, so he never did anything but chat me up when he came for her
weekly sessions. Gary told me he usually helped parents teach potty training by having the
child stand with their hands on the table as you stripped them down and changed their diaper.
He said it was both OT and teaching disabled children self-care, two degrees he did not have.
He was also not an LVN, so I could not understand why, in every session, he only wanted to
chat with me and change her diaper. He told me he offered this service to many of his students,
who accepted the help, but we decided to leave the school instead.

201.) I did not see it as appropriate, so I just avoided the subject when it came up. He never had a
lesson plan to teach her but came every week trying to change her diaper. It was so weird. I told
Casey McWhirter this and asked for another teacher. She said there wasn't anyone else, so I

pushed to get her back into the Palmdale School District since that was the only option. The Department of Education does not respond to reports of abuse when it's a disabled child, and the Office of Fair Hearings is anything but.

202.)In 2019, I saw that Julie Braswell had left the special needs department, so I was very excited. I thought it would be safe to go back and that Leilani would finally get to start her life. I never dreamed Donna Campbell and Aaron Yoscovitz would retaliate so much.

## 2019

203.)I reached out to Dr. Campbell, Assistant Superintendent for the special needs department at the Palmdale School District. I told her everything that happened, and she appointed Aaron Yoscovitz to our case. Aaron was aware of our previous abuse: we went to him for help multiple times back in 2016 when Julie Braswell was abusing Leilani, and he refused to help, so I was a little nervous knowing we had to work with him if Leilani was to go to school, but I knew I had to be extra friendly and submissive if we were going to survive. Aaron immediately defended Julie and told us that if we wanted things to go smoothly, we needed to play ball and not complain about things that were out of the statute of limitations to pursue.

204.)At the time, I had no idea what that meant. I had never been to court, and my expertise was in terrorism, emergency management, and law enforcement; I hadn't earned my degree in public policies and law yet. However, I now know he was threatening me with retaliation, a promise he made good of.

205.)I sent Dr. Campbell an email telling her how I felt about Aaron and that I was concerned we would end up in the same situation, so could I have another liaison? She emailed me back and said that she forwarded my email to him, which violated confidentiality and caused tension. I

emailed her, "How could she violate my trust like that?" an email she did not respond to. I tried

to get help from Special Needs Director Dr. Cooper, but he refused to work with us as well and

turned over all my requests for help to Aaron. This was a strong message that this was going to

be a repeat of last time, but I still maintained hope and tried to get along. All of Leilani's

teachers liked me, which made it better. But Irene Orloff, the special needs coordinator at

Buena Vista, was still there, and she picked up right where she had left off. I contacted SI

Maldenado, but there was no response. I was once again terrified. I thought if I were as

submissive as possible, then maybe things would change for Leilani, so I did what Arron asked

and kept my head down and mouth shut for a while, but the PTSD of it all caused me to ask for

help from the principal who "didn't want to lose his job."

206.) With a special need's child, the principal, Department of Education, and school board will not

offer support or protection. Staff won't help, even when it's abuse, or they could get fired. Why?

It is only the district and special needs department that will help because the abuse is usually

depriving the child of their funding. Only disabled children get additional funding, so they are

considered a source of income. Because the State and Federal governments do not have a

department designated to protect and serve this department, I have found that they are not

afforded the same Constitutional rights as abled children. The special needs population only has

a special needs director. SELPA is an organization that receives federal funding, and because it

is separate from the school, it is assumed that it is neutral for the kids. They are not; they help

withhold services for profiteering and do not advocate or do anything they advertise. SELPA is

only the keeper of the funds. They do nothing to help the children. The Palmdale School

District does not offer psychological support or guidance counseling for the disabled

population, so there isn't even a counselor to help them. I asked the Regional Center to advocate

and go to our upcoming IEP to help get us into a different school, but Carol Armstong refused. She said that as long as her IBP says what it should be, that is all that matters.

207.)The treatment of the students while they are in class is not our concern. You can call an attorney. I told her the Lanterman Act entitles her to this service; she said it's up to her, and she sees no need for it. According to law, the assessment was supposed to be done in six months, but the pandemic hit, so I didn't make a big deal that it took much longer. Leilani was being trained on a retinal gaze communications device. The Palmdale School District did not have a device for children like my child to communicate, and she could read, so I wanted to give her the opportunity to learn to talk and communicate with others to help her later in life. She cannot type accurately because of botched b surgery, so touching the iPad is not ideal, but she can spell and use her eyes to point with a retinal gaze device.

208.)The Palmdale School District did not have a device like this, so I found one for her. Leilani did great during the trial, and her health insurance was paying for it, so there shouldn't have been an issue. Leilani was so excited! She was finally given a voice after ten long years and started to learn to use the device.1bis device is _paid for by insurance but requires a school speech pathologist to conduct the assessment. So, Palmdale School District Special Needs Coordinator Irene Orloff: Aaron Yoscovitz, and the school speech pathologist all got together for a Zoom meeting with Belva from Control Bionics to coordinate the assessment. Belva is happy to testify. I asked her to save the Zoom meetings that she had, and she was more than happy to do so 1bis was a moment of healing for me. After all my baby went through, I was so happy she was finally being shown respect as a human and given a few rights. She is constantly told she is not worth anything, including doctors' savings. She can hear, and her mind works as well as anyone else's; the negativity she is shown hurts her and prevents her from sleeping. Even with

the assessments happening, I knew it was only a matter of time before things got worse, so I decided to sell my house. I wanted to move back to New Hampshire, but it was in the middle of COVID-19, so we had to stay in California and purchase a home in Ranch Vista.

209.)In 2015, I was told the West side of Palmdale was a different school district, which is why Leilani could not attend Ocotillo Elementary School. I begged to go to that school, but because the CCS was in Buena Vista 2020, In November of 2020, I put my home up for sale and bought a new one on the Westside. We wanted to be far away from Buena Vista so they could not force us to go there when the Pandemic was over.

210.)Palmdale School District knew we were getting ready to move, so they wanted to expedite the completion of her IBP. They began to conduct her final assessments, and the IBP will be held on December 18th, 2023. Leilani had her assessment for her communications device and performed it twice, proving she could use it; we were so excited for her. We just needed the signed evaluation so we could order the device. But Aaron used this as an opportunity to hurt us. For no good reason aside from retaliation because the school was not paying for the device; it was a personal use type of equipment.

211.)The next day, Belva, the representative I was working with to obtain the device, called and said, "Cheryl, the pathologist, called her and said she could not sign the assessment, or she would be fired." I immediately called Aaron and asked him about the assessment and device; he said: "we didn't authorize that assessment, and if Mrs. Gooden decided to do it on her own, she would be fired." I felt like I was in the Twilight Zone; he was at the Zoom meetings, and we discussed this at length. Cheryl and Mr. Chu, my daughter's elementary teacher, then asked me to join a Zoom meeting with them. They were both confused and didn't know what was happening, but they wanted to protect Cheryl from getting fired and planned to confront Aaron at the IEP that

was to happen the following day. I told Cheryl I would contact Dr. Chante, the school principal, and explained what happened, and he had Cheryl call her union rep. Aaron called me, and I told him he could not take Leilani's device from her and that I was going to confront him about it at the IEP and get the others to voice their opinion on his abuse. I then received an email from Irene Orloff (in exhibits) canceling the IEP.

212.) I was told that since I said I wanted to move to Boston, they are assuming I am and refusing to do her IEP. I then insisted they give me a copy of the assessment. They said there wasn't an assessment. However, they hired an outside psychologist to conduct her psychological assessment and type the entire report, so I emailed her, and she sent me the documents. It is in the exhibits and has "Draft" across it because they never intended to publish it until they knew I had a copy. When I emailed Dr. Campbell for help, she just said, "Good luck with your move." I explained that I was not moving. Leilani was still a student at PSD, and she needed to help her. She never responded, even though she would remain a student there for another month. From there, it just got worse. I contacted the superintendent, who began his investigation, which was corrupt from start to finish. There wasn't a fair hearing. I spoke to the investigator at length, but when I got her report, it was filled with lies, both mine and Cheryl's. However, I don't believe Cherle entirely because she did not go to bat for Leilani at all. She only covered herself, had her union rep negotiate a deal for her, and signed an NDA preventing her from discussing any of this. We remained friends for a year after the incident. I think she only did that out of guilt. When I changed my phone number, I didn't forward it to her.

213.) Cheryl ended up quitting her job because she was asked to say she decided to conduct the assessment without permission {ag multiple Zoom recordings to prove otherwise) and to say I wanted to stick it to the PSD and make them pay for the device and move back to my

hometown of Boston. None of this is true, of course. I purchased a seven-hundred-thousand-dollar home in West Palmdale a month before, and we all knew the insurance company was going to pay for the device as it did in 2022, so this was just unbelievable. Especially where there are Zoom meetings, documentation, and witnesses. But none of that matters when the county is corrupt, and no one is going to help anyway. These statements made no sense, but the school board accepted them as fact and denied my child both her IEP and her communications device.

214.)Cheryl also told me the PSD has their therapist fill out timesheets to bill medical for their salaries, which the school district already pays. The office manager explained when asked, "We use the money for office supplies, school equipment, and executive salaries. Peggy Bledsoe Leilani's former OT reported the same thing.

This is a fraud, but from what I discovered, most schools in this area do that. They charge health insurance for each service provider, which, for some children like mine, is five, and they use the money as they see fit.

**Antelope Valley Learning Academy 2020**

215.)At this point, AVLA is part of the Palmdale school district. So, everything that was happening at Palmdale School District followed us. Leilani was denied AEP because the only provider was Ken Grant, the AEP who injured her at PSD in 2016. Casey said there is no apparent reason to her why she cannot use Ken, so Leilani cannot have AEP. Casey then told me I had to print up all my worksheets for Leilani using my printer, paper, and ink and mail them in because they do not get a voucher for her school supplies (which is not true), so I would have to buy my own. Leilani was only offered virtual therapy and not consistently or entirely. The OCR

investigation found them in violation of FAPE and required them to compensate PT services. Leilani also went through the same problems getting the communications device authorized. Belva will testify to it. Leilani passed the assessment, but Casey did not believe she did and insisted she repeat the assessment. Then Casey insisted we try another device and eventually divulged the concern of approving the assessment and being stuck paying for the device. The same reason Palmdale School District refused her. I explained that Medi-Cal pays for communication devices they need you to assess. She insisted they would not and refused to sign the assessment.

216.) I explained that the Regional Center would pick up the bill if the insurance did not pay and had Casey contact Carol Armstrong. However, they teamed up to prevent Leilani from getting her communication device and stander instead of helping, and according to AV SELPA, they do not get involved with disabled children accessing IEP services and needs; they distribute the funds, so there is nowhere to go for help.

217.)Regional Center was supposed to give Leilani a standard but did not want to. AVLA was convinced they were going to have to use the SELPA money for disability series instead of bonuses, so Carol and Casey worked together to prevent both Leilani was denied her standard by her UCLA doctor and the Reginal Center but had a Stander requirement on her IEP. I was finally able to get the Regional Center to agree to get Leilani a standard and bad contract. I told Casey that since Leilani was homeschooled and the Regional Center was

providing Leilani with a standard to keep, she did not need to provide one. I thought she would be happy, but for some reason unknown to me, she got involved with the stander to deprive Leilani. I have the document from the vendor with Casey's name as the contact and the one

ordering it. This was in the Regional Center's hands, and the school and Regional Center do not work together.

218.) I didn't understand until the standard Leilani was prescribed was suddenly denied and then made inaccessible when I protested. We had to find a "cheaper" one. Because medical, education, and special needs services are based on income, insurance type, and demographic, they have nothing to do with need. I have a dozen DME providers I will call witnesses who will testify that there is discrimination in services by race, disability, and socioeconomic status. Everyone knows Leilani's disabilities are from malpractice, so she is a target. I discovered Carol and Casey were working together to get the stander and make sure it was the property of the school, not Leilani; when I found out, I told the vendor that Casey had nothing to do with Leilani's stander, and it was to come to the house.

219.) The next thing I knew, the vendor called and said he did not provide the type of standard I needed and that I must find another vendor. Carol also refused to let Leilani have the assessment for the communications device to give to Medi-Cal.

220.) She said she did not think it was appropriate for her and did not believe she would use it at home. Carol is not a speech pathologist; four, not including Belva, all agreed it was appropriate and Leilani could navigate it. Second, Carol is not a licensed special needs teacher and does not know what is best; she is a special needs coordinator, the one who controls the IEP services. IEP is a business for the schools, just like the prison system for a county. Unlike GenEd, there is money to be stolen from the disabled population by simply depriving the students. The State does not provide a layer of protection aside from one that is made up of state investor attorneys.

221.) After denying the communications device, I began to fight for Leilani's other IEP services. Leilani is very fragile because of all the medical malpractice and is on a home hospital order.

Casey, like Julie, refused to honor it; it was like Deja vu. She also said that if she could show proof of Leilani's disabilities and need for this service, she would reconsider because Leilani does not have an apparent disability. I went off on her. I didn't even know what I said. I went blank and just started screaming because it was Julie all over again, and I could not handle it anymore. I then called Heather Struve; I was ashamed I had lost my temper with Casey and never wanted to speak to her again because that was not the person I was. It's the person this has turned me into. She acted like she cared and said I will contact Casey, and we can work this out. The next thing I knew, I was served with a cease-and-desist order, and I was not to contact anyone from the school unless it was via US postage. I called Heather to beg for forgiveness for standing up for myself after years of hearing Casey tell me how little my child is worth and how her rights are less than others because of her disability needs.

222.) I could not handle it anymore; Casey is not certified in ABA or special needs, so she cannot understand what a disabled child needs and she is exceptionally prejudiced! She is given ultimate power over people she does not respect even though they are higher than her in the professional world. But all she sees is brown, disabled, and already systematically abused, so it is okay for her to be her hateful self and abuse at will. Nichole Lavender, Leilani's first homeschool teacher at AVLA the second time around, expressed her concern about Leilani's treatment by Casey and will be called to testify.

223.) Nichole did not understand why Leilani was not given the same treatment as other children and why I was so disliked. She was one of the good ones. I was grateful to have one decent person to talk to, even if it was only for a short time. Nichole went on maternity leave, and then Leilani had no teacher; I just submitted the form to Casey. Then we had a real mean teacher towards the end; I don't remember the name, but she was the one who told me I had to print up all

Leilani's schoolwork from my printer, pay for all the supplies, and mail them in. She also would not talk to me on the phone or email because she was ordered not to. It was an impossible situation. At this point, I had severe PTSD and refused to attend the IBP because I could not physically. These people did not care about my child; the IBP was not going to get her physical therapy, occupational therapy, or APE, so what was the point? I taught her anyway. There has never been a teacher who could teach Leilani aside from me and Nancy Collins.

224.) Nancy Collins was supposed to be Leilani's teacher, but she has no respect for this population. Nancy told me kids like Leilani are a waste of services because they come from dysfunctional families and will only end up in the state, so she didn't want to waste her time on us. She assessed Leilani and discovered she could read, do the math, and comprehend at her age level (proof in exhibits), but due to the extreme prejudice she showed. She refused to work with her on a regular basis. However, she did assess her and discover Leilani's ability to learn when the rest just called her hopeless, so I am grateful for that. However, I hear the words she said to me every day. It was the cruelest thing I ever heard another person say, and she has a disabled relative; it is just prejudice towards the people of the AV and interracial couples.

225.) But I still called Heather crying and begging for forgiveness because I needed to be able to get my child's IBP services; a few days later, Heather, whom I had a civilized conversation with, sent me a letter explaining that I was not to call or email and that I could only communicate via mail. Which into torment; there is no difference between mail and email and text; it was to control me and make things difficult. Heather is a member of the Karens of Chatsworth, a group of women that run the Reginal Center, SELPA, school, Department of Developmental Services, Department of Healthcare Services, and all other special needs services provided by the state and federal government for Antelope Valley but have extreme prejudice for the

population. Ruth Jenka, director for the North Los Angeles County Regional Center and defendant in a sister RICO matter, also works closely with Heather, based on the Regional Center interference, and helps withhold services at the AVLA. So, they work together to abuse and bully families systematically that they feel prejudiced toward, based on my experience.

226.)No one would communicate with me in the entire school because of an argument I got in with Casey that was me defending myself from her bullying me. I was freaking out; in the everyday world, the teacher gets fired, but when you're in "the system," you're not equal; it's unreal. I called the principal because Leilani is a student of the AVLA, not the special needs department. Still, she refused to help and said the special education department was separate from the school, and the school did not interfere with those students. I told them that was a FAPE violation, and she said to contact the Department of Education, Jokingly, because she knows they do not help the disabled population. Dr. James Peters was the division director who sued the Department of Education, I immediately withdrew her from special needs, not realizing it would remove her IEP. I could not handle the psychological pressure. I was going to go verbally wild on these people, and I didn't want to do that, and there is no complying with bullying; I was never going to do as they instructed because I am not a prisoner, I am not a criminal, and they are not an authority. They are employed to provide a service they were refusing because of prejudice towards the disabled, the poor, the brown, and because I am from Boston. In a regular government, this woman would be fired, not Leilani losing school.

227.)However, just like that, they put Leilani in General education and started threatening me with truancy if I did not bring Leilani into the 6th-grade classroom, leave her there all day, and have her perform like all the other children because she was not disabled. All of a sudden, the staff started calling me to set up appointments and pretending like they did not know she was

disabled. The school psychologist who is supposed to support and protect the vulnerable population who has known us for seven years called me and pretended it was the first time he had ever spoken to me and asked me to describe my child. I said, "You realize you know us right'? He told me Casey instructed him to treat Leilani like a new student they had never met and set her up for General Education. I felt dizzy and immediately filed an Office of Civil Rights report. I also contacted an attorney, Dr. James Peters. I saw his advertisement on TV and called.

228.)Dr. Peters was the director of the special needs division at the time, but Gavin Newsom gave him 7 million dollars, and he abandoned his post. Dr. Peters was going to file a class action suit, which would have forced him to pay all of his clients, but instead, Gavin Newsom just gave him money, so he chose who to help and left the rest without. My retainer is in Exhibit G. He was also the special needs division director, and now there is none. Dr. Peters and his associate, Mrs. Byren, signed on to represent me; they knew what I was going through and assured me they were doing their due diligence. I told the school I had an attorney and gave them his contact information. He was in contact with them and did see the crimes, but in the end, he did not defend us and abandoned us altogether, leaving us to be retaliated against and inevitably without a school or IEP.

229.)The Office of Civil Rights investigated and found the AVLA guilty of violating Leilani's FAPE and discrimination. Still, it has a narrow scope of service, so it gave me the ability to pursue this in Federal court until February 2024. Heather was forced to offer Leilani compensated IEP services and put her back on an IEP, but I could not work with any of these people anymore; who treats disabled children and their families like that? The trust and ability to work with them were dead, so we signed up for Gorman Learning Center, a sister school of AVLA, and

retaliation continued. In the meantime, Medi-Cal and Belva from Control Bionics joined forces, and Leilani received her peach devices in April 2023.

**Gorman Learning Center 2023**

230.) When I enrolled Leilani at Gorman, I told myself to be soft-spoken, always be happy, and never complain or make waves. I just needed to get Leilani back on her IEP so you would not go to jail because she was still Gen Ed but not go to school because that would be impossible. She had a home hospital order, so that would cover most kids, but we do not have the same rights as everyone else; we are La County-owned. We first met Makenna Barr. She was not a special needs teacher. She was told to pretend she was admittedly in our last conversation. She was supposed to set up Leilani's IEP but had no idea how to do that or any understanding of special needs. So, she included who pretended to be the special needs coordinator, admittedly, in our last conversation.

231.) Because they had no idea what they were doing, I asked for Dr. Alva's contact information so he could assist. Dr. Alva was the special needs director, and typically, that is who took the lead in getting the process going. I was told no; I could not have his information, but they would tell him I wanted to speak to him. This went on for three weeks. When Dr. Alva finally contacted me, he was firm about my communicating with him via email only because of my OCR investigation. He did not want me to cause him any trouble. I explained what Leilani went through; he gushed over his colleagues and then proceeded to use Leilani's IBP as a weapon for six months. No one from the school would help me even though I called dozens of times. Dr. Alva kept 1threatening me with law enforcement and using the bible to explain why he was right, and I was wrong; it was incredible!

232.)He tormented me more than the rest. I asked him to stop contacting me, but he would not and continued to put God in the middle, telling me I needed Jesus to deal with my insubordination issue; he needed a psychiatrist! He refused services like PT, and then he would give them back. Then, we would have words, and he would take them away again. I had to find my own PT, which was Leticia Pena, Leilani's PT since she was three months old. I had to find an OT; they did not have a psychologist, so they had to hire from outside. Even though Leilani was the only physically disabled student, was on home hospital orders, and it was still a COVID-active world, Dr. Alva would not let service providers come to the house for safety" reasons.

233.) I said providers always come to the house; he explained that my house could get them sick. I said, "So I am less clean than the public schools? I said we could work in my backyard; he said you are not safe for my providers. I asked how, and he said that is the policy. I asked, "since when," he said just now. So, Leilani was never able to access OT or PT. By the time Leticia finished making up the time for AVLA, we were leaving Gorman.

234.)I called El Dorado SELPA dozens of times, but they never called me back until the Office of Civil Rights got involved. You can see by the complaint El Dorado SELPA. I have also saved emails. El Dorado SELPA was the SELPA for Antelope Valley Learning Academy, so they knew what Leilani's IBP was and her needs. See the 2017 IBP for reference. The El Dorado SELPA knew about Leilani's IBP and needs and had access to all the documents I provided when filing this case. However, they helped Dr. Alva deny her services and remove her IEP.

235.)Leilani was his only student; Dr. Alva was paid for decades to only service autistic children and did not want to provide a PT, OT, and speech pathologist for one child, especially Leilani. Dr. Alva changed the extended school year from two months to two weeks. When I complained, he said he could change it to whatever he wanted; he did not have to follow the standard. He did

not allow me to participate in the IEP process, reduced Leilani's disabilities to only speech, and forced her into a general education program. In June, a general education teacher called and introduced herself and told me Leilani was required to go to sixth grade and do the work, and if she couldn't, they expected me to, or I would suffer legal recourse. I explained that I have a double master's and a regular master's and am finishing a double Ph.D. program now; I will not do sixth-grade work for my disabled child, who should not be in Gen ED. She said if I did not, I would go to jail. So, I told her that the last time this happened, I became a private school, so technically, you cannot hold me to compulsory law. She hung up.

236.)Throughout this entire ordeal, I called the Gorman School Director Denice Burchett about 30 times, but she refused to respond. The only time she emailed me was to confirm that I was withdrawing Leilani. Both Dr. Alva and Danie were fired. After we were forced out of Gorman, I called Antelope Valley SELPA. They did not help us at Palmdale School District before, but I needed to get Leilani in school so I could work. SELPA is responsible for all children in the district and gets funding for them. However, even when I begged for help getting Leilani back into school safely, they refused to help. The Regional Center and the Department of Education did, as well. It is like she does not matter because whether she goes or not, they still get her funding. This discrimination violates the Americans with Disability Act but is also hateful and disgraceful. This situation ended up with an OCR investigation that found Gorman Learning Academy in violation of FAPE and discrimination. The scope of their abilities only allows them to address specific violations, so like AVLA, I have the right to pursue this in Federal court until July 2024. Dr. Steven Alva, the Special needs director, and Denice Burchett Gorman, the Learning Academy director, were fired, and we were during negotiations. However, it would not have allowed Leilani to go to a different school because they were

restaffed, but only in two areas. What is it to say that this person is going to be different from all the others? They will not be; it is an attitude and prejudice that is too deeply rooted but specific to disabled children.

### Regional Center

### 23AVCV00028

237.)The Regional Center and CCS are sister organizations. They are both USC organizations that began as non-profits and provide disability services promised by the federal government, which is a violation of the Fourteenth Amendment. This is why I will be fighting the Lanterman Act in the Federal Court for the Constitutionality of the Statute. The Lanterman Act is a California State law that forces the disabled population to depend on the Regional Center in their county for their Federal and State Developmental Disability services. So, when you are discriminated against, you cannot access these services. Most states have these services in schools or hospitals, but USC created these Laws and programs to control the disabled populations' funding and, in doing so, has created a prison for many, including my family.

**Fourteen Amendment:** "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

### The North Los Angeles County Regional Center injured Chris first.

238.) The reason Leilani was injured was that her father had injured his fist. Chris had a seizure problem, so he went to the Regional Center for help. They told him that he could only go to

- 95 -

Huntington Memorial and was only allowed to see one doctor. This doctor told him he was going to do a craniotomy in 2009, but in 2013, we discovered they took his temporal lobe.

239.) Leilani was able to get therapy through the Regional Center from ages 1-3; She had PT/OT/SLP/ twice a week. When she turned three, we were told we had to go to CCSMTU, where Leilani never received PT or OT again. She did a five-week intensive therapy, which consisted of one hour for three days a week for five weeks, then nothing for the rest of the year. When I asked the Regional Center for PT/OT, I was told it was an income-based service, and if CCS was giving her therapy, it was enough.

240.) They told me that if I enrolled Leilani in school, they would give her PT and OT, so we did, and they did not, as you can see by the school complaints filed. The regional center is about income over need. The idea is that if you could not afford it on your own based on your income, then they were allowing you to live above your lifestyle. I called DDS multiple times and asked to be able to access these resources without having to get permission from Ruth Jenka; they said no, so we have to forfeit DDS services unless we want abuse and neglect, so we go without them.

**What is Leilani's Regional Center qualifying condition?**

241.) She was made disabled to be a client. Leilani and her father were part of the CCS-Redesign model that got Regional Center and CCS government funds. Like the Tuskegee study, the county of Los Angeles, via Chief Medical Physician Dr. Edward Bloch, CCS, and the Regional Center created a client base. They made babies globally disabled with multiple botched surgeries. With Leilani, they conducted four brain surgeries to cause physical disabilities, pretending Leilani had cancer, then cut her leg three inches short, fused it to her hip to pull out her spine, to cause skeletal deformation to fake cerebral palsy. Dr. Bloch produced counterfeit documents to say Leilani was born with an Apgar of 4 and was

- 96 -

1   incubated. I have the actual records; she had an 8-9 APGAR, a video from an hour after

2   birth, and dozens of pictures. She was never in an incubator or sickly.

3   242.) Dr. Bloch, the chief medical director of North Los Angeles County Regional Center, did

4   this and targeted Leilani when I was pregnant. Why? The NLACRC organized her father's

5   brain surgery in 2009 and told him he was having exploratory surgery. I took him to UCLA

6   in 2013, and they told him the doctors had removed his temporal lobe, which explained his

7

8   cognitive regression. There is a lot to this case, so I suggest you review the court docs in the

9   case below for more details.

10   243.) This is a case about the deprivation of Leilani's State and Federal rights due to the

11   corruption in the North Los Angeles County Regional Center. Not a standard the

12   Department of Developmental Services will provide the one that the regional center was

13   supposed to Valley Medical, so the standard is a moot issue. However, the three years of

14   IPPs to get a standard prove they tormented me, so thanks for adding them.

15

16   **Deprivation of rights**

17   244.) Leilani has never been signed up for independent studies, but the Regional Center said that

18   is why they are not helping her with her IEP. I do not even know where that idea came

19   from. She is homeschooled on doctors' orders because the abuse she sustained at Palmdale

20   School District was traumatic, and the doctors were afraid. The regional center at that time

21   told me they do not get involved in school issues. However, Dr. Bloch chose that school for

22   Leilani; his assistant, Jeanny Umana, worked in the MTU there and could take notes for his

23   study. Dr. Bloch, even though he was a county official, dictated everything in Leilani's life,

24   including where I gave birth, what hospitals and doctors could see her, and what school she

25   went to, and made sure he was involved in all of her decisions from school, social and

26   medical. It is like living in prison.

27

28

245.) The Office of Civil Rights has conducted its fourth investigation into the schools Leilani has suffered abuse at Palmdale School District, Antelope Valley Learning Academy, and, most recently, Gorman. It found violations and is negotiating a compensatory resolution because there are no other schools for Leilani to go to in the district.

246.) The issues with the school are for the same reason the Regional Center has withheld Leiani's rights since 2013. This is more about all the civil rights violations, as it is a standard. According to the Lanterman Act, Leilani has been eligible for respite and daycare since she became a client in 2010 but was denied until 2019; I had to prove I was pursuing my Ph.D. with written documentation. Before that, when I was going for my BA and first master's and was employed, I was not allowed either, or we only used the respite for one year because of COVID-19; I am too afraid. When I asked another mother from the Regional Center if she got Respite, I was told yes, 30 hours a week. When I asked her if she was employed, she said no. Respite for the Lanterman population was a law. I began to research more about the Lanterman Act, and Leilani is not protected by it at all. What is more, if the Lanterman Act were abolished, she would be able to get the services directly from DDS.

**Carol Armstrong**

247.) In 2019, we had Carol Armstrong as Leilani's service provider. I told Carol about Leilani's leg alteration surgery, that a nurse sexually battered her during her leg alteration surgery, that UCLA Dr. Fallah told me everything that happened, and that Leilani's condition was a fraud and Dr. Bloch and CHLA were involved, she refused to report. I begged her that I was broken, but her superiors (so she says) instructed her to ignore my requests. In other words, protect the people who injured Leilani with further injury.

248.)    Carol was the first one to give us a hard time with the standard. She would not get

Leilani a pediatric stander, even though she was only 60 lbs. and 4 ft tall, and our therapist

told us to get a sit-to-stand so Leilani could recover from surgery. They gave her an adult

stander she could not use. We had to have a medical company come out and tell them it was

dangerous. Then, it took three more years and three IPPs to get another adult standard. As I

previously stated, the ombudsman's office is getting the standard, so it is a moot issue.

Leilani was denied her IEP in 2019 and forced out of the Palmdale School district. Carol

refused to advocate. Carol refused to help us get Leilani a communications device for which

they were not even paying. I have a witness, Belva, who is the communications device

vendor. Carol tried to get the standard through the school so the Regional Center did not

have to pay for it, and Leilani could not keep it. When I refused, they refused the Batman

stander Leilani needed.

249.)    In a desperate cry for help, I begged Carol to take a report about the sexual battery,

and then she became annoyed and yelled at me and told me to stop talking about it. She

would never take the report. I was so broken down and beaten that I just went off on her. I

called her name and told her she had no business working in this industry. Then, I called her

supervisor, who never called me back. A week later, I received a cease-and-desist order

begging for help.

250.)    After that, I could never have a normal relationship with anyone there; everyone

treated me like I did something wrong, and I soon developed PTSD from the bullying and

inability to reach disability help or services. Evelyn is the provider now, and she made a

game out of the stander and did not offer help with school until it was too late. There is no

resolution to this problem, and there is nowhere else Leilani can obtain her federal and

state-entitled services and protection, so she must move to Boston.  We seek monetary
compensation as a resolution.

**Carol Armstrong committed perjury in a fair hearing.**

251.)       When asked why she did not report the abuse I described, Ms. Armstrong indicated
that there are no medical records that indicate the issues you described with CCS and
CHLA, nor does the Regional Center have records from the Palmdale School District.

252.)       Why would there be no medical records if the county and CCS executives run the
Regional Center, and Dr. Bloch, the chief pediatric medical physician of LA County and
director of CCS, has access to all the medical and insurance records or everyone in the state
as he is a chief executive for the Department of Developmental Services and one of the
primary executives at that branch? The CCSMTU is his department, and wherever the
CCSMTU is, there is typically a Regional Center close by. CCS is also supplemental
insurance.

253.)       I have 1,589 pages from CHLA that the Regional Center has access to. It is the same
school district where Carol Armstrong was assisting Casey McWhirter. Why did she not get
the records from Casey? She was not planning on helping Leilani in school and did not need
or want them. The regional center had access to the records because I signed a form
allowing them to access them several times. However, Dr. Bloch erased all of Leilani's
County records. I have every IPP and Regional Center report from 2010, every IEP from
2013, dozens of medical board reports, and Office of Civil Rights reports. She is not being
truthful. She also did not ask or want anything.

**Carol's part in Leilani's inability to access FAPE or IEP services in school**

254.) Carol worked closely with Casey McWhirter from the Antelope Valley Learning Academy to prevent Leilani from getting a speech device and a stander and fulfilling her IEP requirements. Casey's abuse and FAPE violations have already been proven in a CDE investigation and OCR investigations. When I asked Carol for help advocating, she refused.

**Refusal to file a complaint**

255.) The NLACRC refused to take my 4731 Complaint in 2019, 2022, 2023. I had to call Orange County, and they filed it for me. The investigation found fault, and the resolution was a memo. I do not even know what that means. I never received a memo. What did the memo say, and how did it help? I notice 4731 is not in your evidence. Why? Gabby, the site director, has refused to take my calls or discuss any of this ever, not once, and it is the reason I am so panicked every time I call there for help. The very definition of insanity is doing the same thing repeatedly and expecting different results. Trying to get disability service, advocacy, respect, or anything else from the NLACRC causes PTSD and distress because you know your child means nothing to these monsters.

**Evelyn Molina**

256.) Evelyn told me there were no records on my child from 2019 down. Every time I would discuss the Title complaint I filed or something from the past, she would say she did not have access to those records, but that is not true; she produced them for the fair hearing. Evelyn tormented me with Leilani's standard (DME) from 2019-2023. The first stander that a physical therapist prescribed was a Riffton Batman, which cost 7K. They refused to provide it and requested I select a different standard through a vendor I had to find. They have a list of vendors, but Evelyn said it was not part of the coordinator's job to coordinate DMEs. The parents have to find their vendors and get three assessments, and the last one is the one they will approve of. It has nothing to do with need. In the end, they would only approve of a 1K stander that was not even

appropriate or the correct size. However, their goal is to keep her as a client, so if she can walk, she will be less profitable to them. This was all Dr. Bloch's way of tormenting us more and depriving Leilani of accessing her Federal and State funds so he and his constituents could profit.

257.) When I started calling Ruth Jenka in 2017, she never responded, not once. I told her my child was sexually assaulted and denied school and advocacy from the Reginal Center. She did not care. When I called to speak to the manager in September to get help with school, she yelled at me and berated me. I was mortified, and we just refused to sign the new IPP. After reaching out to DDS, we were told we could not go to another county and access the Regional Center because the county owned my DDS rights, which is a violation of the Fourteenth Amendment. Ruth Retired after dismissing my case against her, as did Julie Braswell, Dr. Alva, Judge Green, and multiple others.

In closing, if the Federal Government had done its due diligence, my family would not be suffering this constant retaliation, conspiracy against rights, and deprivation of rights under the color of the law. Alas, they refuse. The Federal Bureau of Investigation, Department of Justice, and Department of Health and Human Services have made it clear they will never investigate and are not taking my recent request for help seriously. I am not directly accusing Xavier Beccera of committing these crimes. However, he is aware of them and is shielding his colleagues and the California medical industry from harm or shame. The Former Attorney General told me he would not investigate when he oversaw the DOJ here, and he has kept to that promise.

As you can see, this is the responsibility of the Federal Government, and we are entitled to relief. I am afraid for my health, my future, and my life. I am afraid for my child and her future. She has severe behaviors because of all the abuse, and I am terrified of what will happen to her when I die.

She gets physically aggressive sometimes and does not know how to stop, but she is disabled; all you must do is walk away, but most people will hurt her; I know it. She was not born to be this, and it is not fair that she is not dancing and laughing with her friends, having crushes with boys, and dreaming about her future. She will slowly get sicker and die a painful death because of her injuries, and it kills me to watch; I wish it were me so bad. If there were a way to switch with her, I would in a nanosecond, but I cannot. All I had to do to avoid her injuries was not give birth in California, and that will haunt me forever because I moved here three months pregnant with her. Her condition would be okay if this were natural or an accident, but it is not; it was done to her, and she is suffering discrimination and retaliation as a result. If she is not restored at all and able to leave California, it will tell these predators it's okay to continue to hurt her, and the FBI, DOJ, and HHS will sit back and allow it as they have been.

I do not want to die here; I do not want my child to die here. I cannot watch my child suffer depreciation of school, disability services, basic respect from the community, and standard resources. I cannot be treated like a prisoner or criminal that the county of Los Angeles can do whatever they want to because our government now sees us as "certifiably expendable." I want to be free again and respected; I want to work in a job and be respected by others, not constantly looked down on and abused for being in a population I was forced into. I am not a free person anymore; the joy of life is gone, and my faith in humanity, in my country, and in government is gone. All I wanted to do was open a martial arts academy and be the best mother I could be. I did not want to be a victim of this crime, and neither did Chris and Leilani. However, we are victims of a horrific crime that the Federal Government is responsible for investigating and bringing to justice but refuses to investigate due to prejudice and conflict of interest, and we require assistance from this court to be made as whole as possible and to escape California and the reach or our attackers.

1
2
3
4
5
6

## **PRAYER FOR RELIEF**

7    WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

8    1. Financial damages of seventy-five million dollars will be awarded to the plaintiffs or an amount

9    the judge sees fit for the three plaintiffs, two being severely disabled because of this crime with

10   expensive medical life-long needs.

11

12       I declare under penalty of perjury under the laws of the State of California that the foregoing is true
     and correct and that this declaration was executed on July 22, 2024, in Palmdale, California.
13

14

15       _____                                      _____
16       Christopher Co                                             Kimberly Clisbee

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT F



Email response from Tom Scott and

Proof I filed a Complaint with the Office of Inspector General and HHS who have not responded.

The DPSS letter recommending Chris and Leilani's Regional Center issue be dealt with Kathryn Barger, who is a defendant in the case that led to the Federal government's negligence

The letters Rob Bonta Sent me

The letter Rob Bonta Sent Mark Ghaly

The Department of letter received 7/20/2024 revoking Leilan's rights to ADA and DDS services in retaliation to Chris's complaint also attached

## Complaint # DIS00001625

From: Thomas Scott (thomas.scott@lacity.org)

To: kimberlyclisbee@yahoo.com

Date: Wednesday, June 26, 2024 at 09:40 AM PDT

Good morning Kimberly Clisbee,
Thank you for taking the time to explain to me the matters that you and your family are currently dealing with. As I
mentioned to you during our phone conversation these matters are outside the purview of the Civil, Human Rights and
Equity Department, I will be listing the referrals I mentioned to you during our conversation below. Since these matters
are outside of the purview of the department this will close the complaint that you filed with us. Thank you.

Regards,
Tom Scott, Special Investigator

Subject: Complaint Record # DIS00001625  has been Closed

This email is to confirm that your complaint # DIS00001625 has been closed. Based on our initial review, we have
determined that the alleged discriminatory
practices are not within our purview. LA Civil Rights has the authority to investigate claims of discrimination within the
private sector pertaining to either commerce, education, employment, or housing. Additionally, incident claims must also
meet the following criteria:

- Must have taken place within the City of Los Angeles

- Must be within three (3) years of the incident date

- Must involve one of the protected classes

Our office does not have the authority to investigate complaints against public entities. For certain complaints related to
discrimination in employment and housing, you may visit the State of California Civil Rights Department website for
additional support.

While we are unable to pursue further action(s), we are recommending the following resources who may be able to
assist you:

**California Civil Rights Department: CRD**
Website: calcivilrights.ca.gov
Telephone: 800-884-1684

**United States Civil Rights Commission:**
Website: www.usccr.gov
Telephone: 415-329-2639
Email: publicaffairs@usccr.gov

**Federal Bureau of Investigations:**
Website: fbi.gov
Telephone: 310-477-6565

**United States Attorney General:**
Website: www.usa.gov/DOJ

Telephone: 202-514-2000

If you have any further questions, please reach out to our department at 213-978-1845. Thank you.
Civil + Human Rights and Equity Department
City of Los Angeles
civilandhumanrights.lacity.org

--
Regards,

Thomas Scott, Special Investigator
Civil, Human Rights and Equity Department
201 N. Los Angeles Street, Suite 6,
Los Angeles, California 90012
Office: (213) 407-5144
Office: (213) 978-1845
Email: Thomas.Scott@lacity.org

Follow @lacivilrights on Twitter | Facebook | Instagram

Confirmation Receipt for Whistleblower Retaliation

From: no-reply@oig.hhs.gov

To:     kimberlyclisbee@yahoo.com

Date:  Monday, July 1, 2024 at 07:16 AM PDT

# **Confirmation**

You have successfully submitted your complaint.

Thank you for your submission. Hotline tips are incredibly valuable, and we appreciate your efforts to help us stamp out fraud, waste, and abuse.

We will review your complaint for relevance and completeness. If you have identified yourself, a reviewing official may contact you for further information. It is important to note that you may not be contacted by an investigator but that does not mean your complaint is not being investigated. Due to the high volume of complaints we receive, it is not possible to contact every complainant. The Hotline will not be able to confirm receipt of your complaint or respond to any inquiries about action taken on your complaint.

You may request information about your complaint through the OIG Freedom of Information Act office. Remember to phrase your request in terms of a search for records pertinent to your complaint, not status. You should wait at least six months before filing such a request.

County of Los Angeles

**DEPARTMENT OF PUBLIC SOCIAL SERVICES**

12860 CROSSROADS PARKWAY SOUTH • CITY OF INDUSTRY, CALIFORNIA 91746
Tel (562) 908-8400 • Fax (562) 695-4891



JACKIE CONTRERAS, Ph.D.
Director

Board of Supervisors
HILDA L. SOLIS
First District

HOLLY J. MITCHELL
Second District

LINDSEY P. HORVATH
Third District

JANICE HAHN
Fourth District

KATHRYN BARGER
Fifth District

July 8, 2024

Kimberly Clisbee
3531 Springridge Way,
Palmdale, CA 93551

Dear Kimberly Clisbee:

This letter is to notify you that the Los Angeles County Department of Public Social Services (DPSS),
Civil Rights Section (CRS) has received your complaint regarding alleged discrimination by Dr. Edward
Bloch, Chief Physician of Pediatrics with the Department of Public Health (DPH), Gavin Newsom,
Governor of California, the University of Southern California (USC), Children's Hospital Los Angeles
(CHLA), University of California Los Angeles (UCLA), Kathryn Barger, and several unnamed doctors,
judges, and education providers.  Upon review of your complaint letter, it was determined that your
complaint is outside the jurisdiction of DPSS.

The DPSS Civil Rights Section handles investigations of civil rights complaints filed by our
applicants/recipients against DPSS staff or its contracted agencies.  In your complaint, you stated that
you are being discriminated based on abuse of power by Dr. Edward Bloch, Chief Physician of
Pediatrics with DPH, Gavin Newsom, Governor of California, USC, CHLA, UCLA, Kathryn Barger, and
several unnamed doctors, judges, and education providers.  Unfortunately, your complaint is not under
our jurisdiction and the investigation of your complaint has been discontinued.  You may contact the
agencies below for information regarding your concerns:

**Medical Board of California**
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815
webmaster@mbc.ca.gov
1-800-633-2322

**Department of Development Services**
1215 O Street
Sacramento, CA 95814
833-421-0061

**Supervisor Kathryn Barger**
213-974-5555

Should you have any questions regarding this letter, you may contact Miguel Barrios at:
(562) 908-8356.

Sincerely

Marcia Benitez, Civil Rights Coordinator
Civil Rights Section

MB:RQ:mib

*"To Enrich Lives Through Effective And Caring Service"*

# DEPARTMENT OF PUBLIC SOCIAL SERVICES
## AMERICANS WITH DISABILITIES ACT (ADA)
## COMPLAINT FORM



This form is for a DPSS informal complaint procedure, designed to quickly resolve complaints regarding violations of the Americans with Disabilities Act.

The use of this form is not required to comply with federal regulations and does not initiate a lawsuit or formal complaint procedure.

You may file a complaint if you feel that you have been discriminated against due to your disability or are not satisfied with the service you received related accommodating your disability. Some disabilities may include, but are not limited to problems with walking, sitting, standing, reading, learning, understanding, speaking, hearing, seeing, being around crowds, and memory loss.

**Instructions**
1. Complaint must be in writing and should contain the name, address, and telephone number of complainant along with a brief description of the alleged violation(s).
2. Please include the corrective action being requested to resolve the alleged violation(s).
3. All complaint forms should be signed.
4. You may mail or email your complaint(s) to DPSS ADA Title II Coordinator <u>or</u> Chief Executive Office (CEO), Disability Civil Rights Section at:

<table>
<tr><td>

ADA Title II Coordinator
Department of Public Social Services
12860 Crossroads Parkway South
City of Industry, CA 91746
Telephone: (844) 586-5550
Fax: (562) 692-2240
TTY: (877) 735-2929 (California Relay)
(Office hours only 7:00 a.m. to 4:30 p.m.)

</td><td>

Chief Executive Office
Disability Civil Rights Section
500 West Temple Street, Room 754
Los Angeles, California 90012
Telephone: (213) 202-6944
TTY: (855) 872-0443
Email: <u>Adavis@ceo.lacounty.gov</u>

</td></tr>
</table>

5. You may request an informal meeting with the DPSS ADA Title II Coordinator to answer any questions.
6. DPSS will acknowledge receipt of your complaint in writing within five (5) workdays from the date the complaint was filed.

**Please Note:**
- Using this informal complaint procedure is not a requirement under federal regulations nor does it prevent you from filing a complaint with the appropriate federal enforcement agency.
- Any retaliation, coercion, intimidation, threat, interference, or harassment for filing of a complaint is prohibited and should be reported immediately to the DPSS ADA Title II Coordinator: (844) 586-5550 or to the County's CEO, Disability Civil Rights Section: (213) 202-6944.

*This form is available in alternate format from the Departmental ADA Coordinator upon request.*

ADA-PUB 1 (Rev. 04/17)

*ROB BONTA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

**PUBLIC INQUIRY UNIT**
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
(916) 210-6276
TOLL FREE: (800) 952-5225
TTY: CA Relay Service
(800) 735-2922

August 11, 2022

PIU: 953130

Kimberly A. Clisbee
3531 Springridge Way
Palmdale, CA 93551-5365

Dear Kimberly Clisbee:

Thank you for your emails of May 11, 2022 and August 10, 2022 to the Office of the Attorney General.

In regards to your complaint against Los Angeles County, it is our general policy that local governments are primarily responsible for citizen complaints against their employees or agencies, and that appropriate local resources should be utilized for the resolution of such complaints. We suggest that you first address your complaint to the head of the county agency. If this does not lead to a satisfactory resolution, we suggest that you contact the county counsel's office and your representative on the county Board of Supervisors for assistance.

If you have evidence of criminal misconduct, you may wish to contact the local district attorney in the area where the alleged crime occurred. The district attorney has primary responsibility for the investigation and prosecution of alleged violations of state laws. You may also want to share this information with your county grand jury. In California, grand juries have the authority to investigate allegations of misconduct on the part of local agencies.

In regards to your complaints against Children's Hospital Los Angeles and UCLA Medical Center, the following agency is in a much better position to render assistance to you in this matter. If you wish to pursue the matter further, we suggest you contact:

California Department of Public Health
Licensing and Certification Unit
P. O. Box 997377
Sacramento, CA 95899
Telephone: (916) 440-7360

In addition, the Medical Board of California is the State agency that licenses medical doctors, investigates complaints and disciplines those who violate the law. If your complaint involves a medical doctor we suggest you contact the Medical Board as follows:

Medical Board of California
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815
Within CA call: 800-633-2322
Outside CA call: 916-263-2382
Fax: 916-263-2944

Page 2

http://www.medbd.ca.gov/

If you are seeking financial compensation or need legal assistance in this matter, please understand that we are prohibited by law from representing private individuals or providing legal advice, legal research or legal analysis to private individuals under any circumstances.

In regards to your complaint against the Los Angeles Police Department, it is the Department of Justice general policy that local governments will be primarily responsible for citizen complaints against law enforcement agencies or employees of law enforcement agencies, and that appropriate local resources (sheriff or police department, district attorney, citizens review commission, and grand jury in the area of jurisdiction) be utilized for resolution of such complaints prior to a request for intervention by the Attorney General.

The Attorney General will review citizen complaints against a law enforcement agency or its employees for possible investigation when substantive allegations of unlawful conduct are made and all appropriate local resources for redress have been exhausted. However, we will not review matters that do not involve credible allegations of criminal conduct. Allegations of police misconduct that is not criminal are handled exclusively by the law enforcement agency.

You should first direct your complaint to the local law enforcement agency regardless of whether you are alleging criminal or non-criminal misconduct. Every law enforcement agency in California is required to establish a procedure to investigate citizens' complaints (Penal Code Section 832.5). A written description of the procedure is available from all law enforcement agencies. If you are alleging that a law enforcement officer committed a crime and your complaint is not resolved by your complaint to the agency, you should next contact the county district attorney in the county where the law enforcement agency is located. Most complaints against local law enforcement can be resolved by contacting the aforementioned agencies.

If these agencies do not act on your complaint within a reasonable period of time, you may write to the Attorney General's Office. Your correspondence should include specific information about misconduct that violates state law, the details of your efforts to resolve the complaint with the local authorities, copies of your complaint(s) to the local authorities and copies of their response(s). If you did not receive a written response to your complaint from either the law enforcement agency or the district attorney, you must still provide us with a copy of the correspondence you submitted to those agencies when you submitted your complaint. Requests to the Attorney General that do not contain this information cannot be acted upon.

As noted above, our office only reviews matters that involve credible allegations of criminal conduct. For your guidance, please be advised that the following matters are not considered criminal in nature: complaints about parking citations; complaints about traffic tickets; complaints about the determination of fault for vehicle accidents; complaints about rudeness or profane language; complaints that a problem reported to law enforcement has not been resolved to your satisfaction; complaints that a law enforcement agency is not dedicating enough resources to solve a crime; complaints that a law enforcement officer performed a court ordered eviction; and complaints that a law enforcement agency is refusing to release records, such as arrest reports or camera footage. If your concern pertains to any of these issues, then you should contact the law enforcement agency directly. If you are dissatisfied with their response, then we suggest that you consult with a private attorney regarding any civil remedies that may be available to you.

Page 3

In regards to your complaint against the Palmdale School District, again, it is our general policy that appropriate local resources should be utilized to resolve complaints relating to local government entities or employees. We suggest that you first direct your concerns to the school district superintendent. If that does not lead to a satisfactory resolution, we suggest that you address your concerns to the district school board. If you have concerns about the legality of actions taken by school district personnel, you may also wish to contact the district attorney. The district attorney has primary responsibility for the investigation and prosecution of alleged violations of state laws.

Finally, you may wish to consult with a private attorney regarding any civil remedies that may be available to you. An attorney would directly represent your interests and is the one whose advice would be most helpful to you. You may obtain a referral to a certified lawyer referral service by calling the State Bar at 1-866-442-2529 (toll free in California) or 415-538-2250 (from outside California), or via their website at: http://www.calbar.ca.gov.

We hope this information has been helpful in regards to your requests. Thank you again for writing.


Sincerely,


Casey Hallinan
Public Inquiry Unit

For    ROB BONTA
Attorney General

**ROB BONTA**
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

PUBLIC INQUIRY UNIT
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
(916) 210-6276
TOLL FREE: (800) 952-5225
TTY: CA Relay Service
(800) 735-2922

June 21, 2021

PIU: 953130

Kimberly A. Clisbee
3531 Springridge Way
Palmdale, CA 93551-5365

RE:   **CA Department of Health and Human Services**

Dear Kimberly Clisbee:

Thank you for your correspondence to the Office of the Attorney General regarding a state agency.

The Attorney General's Office is unable to assist or comment on this matter because we are required by law to provide legal representation to state agencies in disputes rising out of their actions. This duty precludes the Attorney General from representing individual citizens in their disagreements with state agencies or providing advice to any individual regarding the disputed activity. While the Attorney General represents state departments in legal matters, he does not seek to impose his own policy judgments or control the administration of the business of his client agencies. For assistance in resolving a problem with a state agency, we suggest that you contact the director of the agency, your representatives in the California Legislature, the Governor's Office, and/or a private attorney.

If you wish to file a claim for monetary damages you believe were caused by a state agency, please contact the Government Claims Program. This agency may be contacted as follows:

Government Claims Program
Office of Risk and Insurance Management
Department of General Services
P.O. Box 989052, MS 414
West Sacramento, CA 95798-9052
Telephone: (800) 955-0045
Internet: https://www.dgs.ca.gov/ORIM/Services/Page-Content/Office-of-Risk-and-Insurance-Management-Services-List-Folder/File-a-Government-Claim

If you wish to report alleged improper governmental activity by a state employee or agency, please contact the Bureau of State Audits. This agency may be contacted as follows:

Investigations Division
California State Auditor's Office
P.O. Box 1019
Sacramento, CA 95812
Telephone: (800) 952-5665
Fax: (916) 322-2603
Internet: http://www.auditor.ca.gov

Page 2

We hope that our effort to help you to identify the correct government offices to address your concern will be beneficial to you.

We also suggest you contact:

**Medical Board of California**
**2005 Evergreen Street, Suite 1200**
**Sacramento, CA 95815**
**Within CA call: 800-633-2322**
**Outside CA call: 916-263-2382**
Fax: 916-263-2944
Internet: http://www.mbc.ca.gov/

Additionally, we recommend that you consult with a private attorney. An attorney would directly represent your interests and is the one whose advice would be most helpful to you. You may obtain a referral to a certified lawyer referral service by calling the State Bar at 1-866-442-2529 (toll free in California) or 415-538-2250 (from outside California), or via their website at: http://www.calbar.ca.gov.

Again, thank you for contacting the Office of the Attorney General.

Sincerely,

Chinelo Bivens
Public Inquiry Unit

For    ROB BONTA
Attorney General

STATE OF CALIFORNIA – HEALTH AND HUMAN SERVICES AGENCY                    DEPARTMENT OF HEALTH CARE SERVICES OFFICE OF CIVIL RIGHTS

**CIVIL RIGHTS COMPLIANCE PROGRAM**
**COMPLAINT OF DISCRIMINATION (TITLE VI AND ADA)**

Complete and return to:

Department of Health Care Services, Office of Civil Rights
PO BOX 997413
Sacramento, CA 95899-7413

**I believe that I have been discriminated against on the basis of:**

| ☒ AGE | ☐ ETHNIC GROUP IDENTIFICATION | ☒ MARITAL STATUS | ☐ RELIGION |
|---|---|---|---|
| ☒ ANCESTRY | ☒ GENDER | ☒ MEDICAL CONDITION | ☐ SEX |
| ☒ COLOR | ☐ GENDER IDENTITY | ☒ NATIONAL ORIGIN | ☐ SEXUAL ORIENTATION |
| ☒ DISABILITY (Mental/Physical) | ☐ GENDER EXPRESSION | ☒ RACE | ☒ OTHER BASIS: |
| | | | Region/socioeconomic ☒ |

| Name & Address of Medi-Cal Administrator/Provider | Name & Title of Person Who Discriminated | Date of Occurrence | Phone Number (Respondent) |
|---|---|---|---|
| Los Angeles Department of Public Health/CCS-MTU | Nurse Case manager Jeanne Umana and Jennifer Pohl | | 800-288-4584 |
| Children's Hospital Los Angeles | Glenda K Social worker CHLA | | 323-361-2485 |
| Los Angeles Department of Public Health/California Child Services | Dr Anne Long/Dr Sunthorn Sumethasorn | | 800-288-4584 |

Describe in your own words what action(s) have happened to lead you to believe you have been discriminated against.

See attachment.

Indicate what resolution you are seeking.

Prison for the perpetrators, monetary compensation for a decade of psychological torment, physical, community, and systematic abuse, for dehumanizing and degrading me and withholding Civil rights.

I understand the above information is true and complete to the best of my knowledge and belief.

| Complainant's Printed Name | Complainant's or Authorized Representative Signature | Date |
|---|---|---|
| Kimberly Clisbee | | 1/20/22 |

DHCS 1044 (Revised 09/2020)                                                                 Page **2** of **2**

June 25, 2020

Secretary Mark Ghaly, MD, MPH
California Health and Human Services Agency
1660 Ninth Street, Room 460
Sacramento, California 95814

Dear Dr. Ghaly,

As Co-Chairs of the Covid-19 Racial Disparities Task Force in Oakland, we are writing to you
with concerns that have been raised regarding the Verily testing platform that the State has been
using for its community test sites.

As you are aware, like many counties across the state and country, we are seeing large disparities
in the effects of Covid-19 within our community. Recent data from the Alameda County
Department of Public Health shows that our Latinx population has a case rate that is 5 times higher
than that of Whites, while our African-American/Black population faces a death rate that is more
than double that of Whites. The Covid-19 Racial Disparities Task Force seeks to address these
racial health disparities in Oakland.

Our Task Force members and Affiliate partners (see list attached) which includes a broad
network of health providers, including community clinics and CBOS, have raised a number of
issues with the current testing platform supported by your agency. Please see below for an outline
of the challenges and recommendations to both address the challenges and improve access for
vulnerable communities. Furthermore, while Verily can honestly say they have not shared data
outside of their stated guidelines, there is no accountability for third party use, sale or other
monetization of data that is being disproportionately collected in low resource communities and
communities of color.

### Challenges
### Accessibility of Platform
Currently, the platform does not have an option to allow less tech-savvy users to make an
appointment over the phone. Even if testing partners were able to hire a call center to manage calls,
the platform requires the user directly input information (and not have information be inputted on
their behalf, like we've seen with other platforms like Microsoft and the National COVID Testing
Platform). This was documented in an article on testing in San Francisco. In addition, the platform
is only available in English and Spanish. The City of Oakland has residents who speak other
languages, including Chinese, Vietnamese, Arabic, Tagalog, Khmer, and Korean. Additionally,
patients only receive calls if they are COVID-19 positive. If a patient receives a negative test, the
only way for the user to access their results is online through the Verily platform.

### Data Security and Community Trust
It is critical in this crisis that we continue to build trust between government and healthcare
providers and vulnerable communities. The platform requires users to have a Google account in

order register for an appointment and receive results. Some users are concerned about surveillance and access to their data. The platform requires a sign off of two lengthy privacy policies in order for users to register for an appointment. Per the privacy policies, personal data can be shared with "Verily's contractors… the entity that is operating the site and its contractors, the state Department of Public Health and potentially other federal, state, and local health authorities, and other entities that assist with the testing program." This exposes vulnerable community members to widespread sharing of personal data that could be used for commercial or other purposes.

**Operational Challenges**
After being assured that Verily could support a pedestrian-only site, the City of Oakland opened the Roots Community Clinic site on May 8th. For four weeks (until June 1st), the Verily website stated that the site was for drive thru appointments, which led to patients arriving to the Roots Community Clinic site expecting drive thru service (which cannot be accommodated). Same day appointments options are ideal but are difficult because of the length of the Verily registration process.

Additionally, for the first 711 Verily registrations from the Allen Temple and Roots Community Clinic sites, the race and ethnicity question has a "Not Reported" response for 76% of the respondents, which seems inconsistent with all other City and Roots surveys. It's also noted that many of those registered on Verily are coming from communities outside of the adjacent zip codes.

<u>Recommendations</u>
**Disaggregate Verily's provision of PPE and tests from the platform** – For sites that do not work well with the platform (i.e. pedestrian only sites), we request that the State continue to provide PPE and tests without requiring the use of the platform.
**Ensure private data is protected** – do not put individuals' personal data at risk and create further mistrust of government among vulnerable communities.
**Ensure testing platforms are flexible and accessible** – This includes supporting multiple languages, multiple ways of intake (i.e. phone or online appointments), multiple types of appointments (onsite/same day or in advance) and a platform that is easily modified.
**Consider use of a free, open-source appointment and data management platform** – The City of Oakland and County of Alameda are partnering on a pilot of the National Testing Data Response platform, which was designed by **Alliance for Innovation**, and is currently being used in Terrant County (TX) and in San Jose.

In addition, we would also like to offer the following recommendations to better serve our most-impacted communities:
1. **Provide more direct support to community health clinics** - community health clinics already have relationships with their local community and should be directly supported (with funding and supplies) to expand their testing efforts. Community health institutions like Roots provide linkage to care and wraparound services that are critical for more vulnerable patients.
2. **Direct Resources Based on Need** - In addition to numbers of tests conducted, the percent positive rate per site should be used to identify where testing is most needed and where resources should be diverted.

Thank you for your support. We look forward to engaging with you further as we continue to identify ways to address the racial disparities in our community.

Sincerely,

Mayor, Libby Schaaf, City of Oakland,

Alameda County Supervisor Wilma Chan

Assemblymember Rob Bonta

Dr. Anthony Iton

Co-Chairs of Oakland's Covid-19 Racial Disparities Task Force

# North Los Angeles County Regional Center

Main Office: 9200 Oakdale Avenue, Suite 100 Chatsworth, CA 91311 • 818-778-1900 • Fax 818-756-6140 • www.nlacrc.org

6/20/2024

CHRIS CO & KIMBERLY CLISBEE
3531 SPRINGRIDGE WAY
PALMDALE, CA 93551

**RE:** LEILANI CO
**UCI:** 8120420

Dear CHRIS CO & KIMBERLY CLISBEE,

This letter is to introduce myself as your new North Los Angeles County Regional Center (NLACRC) Service Coordinator. My name is Rachel Rambus and you can reach me at (661) 951-1299 Monday through Friday or via email at RRambus@nlacrc.org.

Feel free to call me if you have any questions. Should you need to discuss an urgent matter and I am unavailable, please call 661-945-6761 and ask to speak with the Officer of the Day.

I look forward to meeting with you.

Sincerely,

*Rachel Rambus*

Consumer Services Coordinator

Copy: Consumer file

**BDS**

**NANCY BARGMANN**
*DIRECTOR*

State of California—Health and Human Services Agency
**Department of Developmental Services**
1215 O Street, Sacramento, CA 95814
www.dds.ca.gov



**GAVIN NEWSOM**
*GOVERNOR*

June 26, 2024

**Confidential Client Information
See California Welfare and Institutions
Code Section 4514 and 5328**

Christopher Co
3531 Springridge Way
Palmdale, CA  93551

Dear Christopher Co:

On June 20, 2024, the Department of Developmental Services (Department) received
the Welfare and Institutions (W&I) Code section 4731(c) complaint appeal you
submitted regarding North Los Angeles County Regional Center.  The appeal was
submitted on behalf of Leilani Co.

W&I Code section 4731 does not cover disputes about services to be included in an
Individual Program Plan.  However, the Department will review your appeal to see if a
W&I Code section 4731 violation has occurred.  If you have questions about this letter,
please contact me at (916) 654-2426 or by email at appeals@dds.ca.gov.

Sincerely,

*Tom Blythe*

TOM BLYTHE,
Assistant Chief
Office of Community Appeals and Resolutions

cc: Cristina Preuss, North Los Angeles County Regional Center
    Dana Lawrence, North Los Angeles County Regional Center
    Anastacia Byrne-Reed, Department of Developmental Services



# North Los Angeles County Regional Center

Main 818-778-1900 | Fax 818-756-6140 | 9200 Oakdale Avenue, Suite 100, Chatsworth, CA 91311 | www.nlacrc.org

June 17, 2024

Christopher Co
3531 Springridge Way
Palmdale, CA 93551

**Re:    4731 Complaint – Leilani Co – UCI # 8120420**

Dear Mr. Co:

I am writing in response to the 4731 Complaint received by the North Los Angeles County Regional Center (hereafter, "NLACRC") on May 20, 2024 on behalf of your daughter, Leilani Co. The complaint is against NLACRC and involves your request to reactivate Leilani's case by conducting an Individual Program Plan ("IPP") in order to continue to provide her services.

## COMPLAINT

The allegations included in the 4731 Complaint are as follows:

1. NLACRC has not conducted an Individual Program Plan ("IPP") in accordance with Welfare and Institutions Code §4646.5(a)(5), in violation of Leilani's rights.

## JURISDICTION

California Welfare and Institutions Code sets forth a complaint procedure that allows a consumer, or anyone on behalf of a consumer, who believes that a right to which a consumer is entitled has been abused, punitively withheld, or improperly or unreasonably been denied by a regional center, developmental center or service provider, to file a complaint. It is important to note that this process is prohibited by law from resolving disputes concerning the nature, including quality, scope, or amount of services and supports that should be included in an individual program plan or regarding rates and audits.

## INVESTIGATION

This investigation includes information from your 4731 Complaint interviews with, Evelyn Molina (NLACRC Consumer Services Supervisor ("CSS")),  Catherine Cortez ("NLACRC Consumer Services Coordinator ("CSC")), and Gabriela Eshrati (NLACRC Consumer Services Director) and a record review that includes emails and correspondences sent to you.

Mr. Christopher Co
4731 Complaint – Leilani Co
June 17, 2024
Pg. 3

**10/9/23 ID Note**
"CSS received and reviewed the response email from 10/6/2023 (CSS follow-up regarding the NOPA dated 9/7/2023 due to inability to conduct an IPP). Mrs. Clisbee stated this CSS has no business contacting her. Mrs. Clisbee elaborated with allegations about NLACRC and called this CSS a Karen throughout the email."

**10/9/23 ID Note**
"CSS reviewed the case. Case inactivated due to inability to conduct an IPP. NOPA dated 9/7/2023. Parent currently has a Cease and Desist Inappropriate and Threatening Comments letter dated 2/17/2023. Mrs. Clisbee refused to meet with the IPP team to conduct an IPP pending a second stander to be provided for Leilanie. The First stander was provided in 2021. Mrs. Clisbee reported the stander was donated to a therapist. The second stander was provided in 5/2023. Mrs. Clisbee was given the option to meet in person, telephone or virtual. Mrs. Clisbee expressed she did not wanted to meet by telephone or virtual not in person at a local place. Mrs. Clisbee did not contact NLACRC after a 15 day no contact letter was mailed to her. Mrs. Clisbee was provided with a NOPA dated 9/7/2023 due to inability to conduct an IPP meeting. CSS follow-up with Mrs. Clisbee on 10/6/2023 and provided the NOPA. Mrs. Clisbee responded 10/7/2023 stating this CSS has no business contacting her and insulted CSS throughout the email. ..."

**10/16/23 ID Note**
"Telephone contact with mother to discuss reactivation of case, she informed she wanted to speak with my Supervisor and did not want to speak with me. Mother was informed if she wants to reactivate she needs to make the request. Call was transferred to Evelyn McComie."

**5/2/24 ID Note**
"Telephone contact with Xochitl Gonzalez who informed DDS spoke with mother and wants the case reactivated in the SCO. I informed we would agree to reactivate in the SCO if the parent and consumer met with our staff in an agreed location in SC as there is a cease and desist letter for parent to meet with us at our NLACRC location due to prior threats and H&S for staff/office. In addition, it was relayed that we would from inception of reactivating case do an addendum that agreed to in-person meeting with consumer and if services are being identified/requested, NLACRC has the right to assess for the service that could require we review reports from third parties, i.e. IEP, medical records, award notices, service reports, etc. Ms. Gonzalez informed they would discuss with mother and get back to me on next steps."

**APPLICABLE STATUTE/REGULATION**

Welfare and Institutions Code §4646 provides in relevant part:

"(a) It is the intent of the Legislature to ensure that the individual program plan and provision of services and supports by the regional center system is centered on the individual and the family of the individual with developmental disabilities and takes into account the needs and preferences of the individual and the family, where appropriate, as well as promoting community integration, independent, productive, and normal lives, and stable and healthy environments. It is the further intent of the Legislature to ensure

Mr. Christopher Co
4731 Complaint – Leilani Co
June 17, 2024
Pg. 6

**REFERRAL TO DDS**

In the event that you do not agree with NLACRC's response, you may refer this complaint to the Director of the Department of Developmental Services within 15 working days of receipt of this letter at the following address:

Nancy Bargmann, Director
Department of Developmental Services
1215 O Street, MS 8-20 Sacramento, CA 95814
(916) 651-6309
DDSACPS@dds.ca.gov

The director will issue a written administrative decision within 45 days of receiving a complaint.

Sincerely,

*Karin Ahdoot*

Karin Ahdoot
Due Process Officer

Cristina Preuss
Interim Executive Director

c:    Evelyn McOmie, Deputy Director
      Gabriela Eshrati, Consumer Services Director
      Arezo Abedi, Executive Administrative Assistant

To whom this may concern;

Upon receipt of your response to my 4731 complaints, I am confused because it did not make sense or highlight my concerns. However, someone initiated it without communicating with me or my daughter's mother, so it is unlikely to be correct based on experience. I know my provider did her due diligence, and she is efficient and good at her job; the inconsistencies are always the analysis.

You are speaking of Evelyn Molina, Gabriel Eshari, and Evalyn McOmie as if they are people who are allowed to see Leilani's records or have anything to do with her after all those individuals did to her. I love my child; I will not allow monsters who have already discriminated against and abused her to the point where she has lost school, been medically altered, and sexually assaulted. It is disgraceful that they are still employed. However, they are, and we are still in need of services for Leilani that she is entitled to by law, so obviously, Nancy is the lead Karen, and this needs to be dealt with, which has already been filed in Federal Court in Washington.

Note, I did not file anything in court; I am a victim filing a grievance, so to retaliate by changing my services would be unlawful retaliation. I have to clarify that because that is how we are accustomed to being provided support by the DDS, Mark Gahley, or any of the other Nazi regimes.

My daughter's mother is fighting the Constitutionality of the Lanterman Act and having the individuals that injured my child and me, including Kathryn Barger, Dr. Edward Bloch, Gavin Newsom, USC, CHLA, UCLA, Mark Gahley, and 33 others. I am not a plaintiff as I am incapacitated because of the surgery the Regional Center arranged and cannot represent myself in that capacity. I am cognitively away; it's just my ability to express it because of the part of my brain you took. It controls speech and communication.

Also, note I am not composing this letter. I am dictating while Kimberly Clisbee tries as I am unable to communicate in this manner without assistance thanks to the Regional Center arranging surgery for me in 2008, where they removed my temporal lobe without telling me to force me out of the middle-class where I worked as a licensed dental hygienist and licensed pharmaceutical technician. I will, however, sign it to express my validation.

Although I am documented as having never been in the system since coming here, we immediately became citizens and had the means to survive and support ourselves comfortably without government assistance of any kind. But I fit the color palette for the population that was being created to justify the need for the Regional Center and CCS to gain Federal Funding so USC, Dr. Gahley, Dr. Bloch, La County, investors, and the Director

can commit Federal Insurance fraud with the other pink-collar criminals or the "Karens of Chatsworth" as they are known by most.

These are a group of white women, mostly but not all, that run the regional center, SELPA, CCS, Department of Education, Developmental Disabilities, County employees of all kinds, doctors, attorneys, Board of Supervisors (not part of Chatsworth but the crime syndicate that exists there), and DSS from Chatsworth. They work together to oppress and systematically abuse immigrants and other marginalized citizens. They have personal prejudice towards it and choose to label it so the rest of the pack can take a bite in ways that are more horrific than imaginable. They would do well in a cartel or torturing terrorists; they did much worse to my child, and much worse happened to her by others because of these individuals.

The employees of the North Los Angeles County Regional Center bullied my daughter and her mother from day one. Although the first three years went on without a hitch, it was soon that Erika would also participate in the abuse and force Leilani into the hands of Dr. Bloch and CCS. He is responsible for her disabilities and used the Social Security Act section 1115 waiver to obtain funding for her injuries and the monsters at USC who conducted experiments on her for study purposes because she was "certifiably expendable." What the doctors did to her was admitted to in court, but Regional Center failed her by refusing to report it all the years Kim begged them. Leilani would have never been sexually assaulted or had her leg disfigured if all of the women mentioned in the complaint, including the director, had done their due diligence.

The Regional Center providers bully Kim like a bunch of female gang members. I would not let those women babysit dogs. The State affords Disability rights, not the Lancaster Regional Center, and Evelyn Mcomie does not even have the college education to justify why she is in the position she is. She is there to permit the bullying, oppress the population she is prejudiced against, and commit Federal insurance fraud; that is her job.

Nancy Bargmann, the Director, knows all about this situation and added to the abuse last year in retaliation and support of her colleague.

My complaint included all these women, including the director, for failing to do her due diligence when my daughter's mother begged for years for help. She arranged a fair hearing, which in itself is a constitutional violation because it omits real court and allows USC judges to enforce corruption. A Federal Civil case with compensation would have been the appropriate action, not more systematic abuse. Still, the Director is from here and went to Pepperdine, where other participants of this crime went. It is unlikely she is not the obstacle to Leilani's obtaining services and part of the bigger crime.

In a world unlike mine where the Regional Center, USC, and Mark Gahley don't have you as a prisoner and are withholding your rights so his colleagues can commit Federal Insurance Fraud and medically alter brown citizens, these women would be in prison as they should be. But I am the prison of the Regional Center, as you made me disabled by taking my temporal lobe and not telling me I would be a client instead of the high-functioning pharmaceutical technician I was when I came to your facility for help.

Rob Bonta and the mayor of Oakland questioned Mark Gahley in 2020 about the disproportion of Latino deaths and testing during COVID-19. So, he has a pattern of criminality. I will attach the letter, but what good will that do? You are all under him and part of this, so even writing this complaint is nonsensical; it tells the criminal about their crime, but it's part of the process and will go into Kim's Federal court documents as a filed document.

The only reason my child is disabled is that the Regional Center executives and La County doctors imprisoned my child in the system by force because they got away with hurting me. After all, the Regional Center is responsible for damaging my brain in surgery first in 2008.

You state that Evelyn tried several times to schedule an appointment. Why would Kim be making an appointment with a bunch of mean women who bullied her and refused to report sexual abuse of a disabled child? I don't want to breathe the same air as disgusting people like that. They are irresponsible thugs; they cannot oversee a child's services they have already abused for a decade.

It is not society's fault the DDS takes its employee's word over the parents, grandparents, doctors, and other providers who have filed reports of abuse; the Regional Center supports bullying of parents by their staff, racism, and Pedophilia and does not protect its clients or this situation would not be.

Just because you are okay with it does not mean it is okay, and I should subject my child to these women who would be in prison if Nancy Bargmann was not protecting them because she is part of the crime. The only people who look at Evelyn and Gabriel and see decent human beings are not one because they are not.

My daughter's mother and I have been trying to get our child the services she is entitled to by the Lanterman Act and Americans with Disability rights for years now. But the DDS will only allow my child to be with people who abuse her, which makes me fear for my

child, have no trust in the DDS, and feel like my life is over. I will have nothing but oppression for the rest of my life because the Regional Center forced me here and forced my child, and now you are oppressing us and withholding our rights.

Why? Why am I your prisoner, and why does my child not deserve the same rights as others based on you? Why couldn't you help me with my seizures and not imprison me and take my life? I did not commit a crime; I paid my taxes; the hate for immigrants is so vast that you pretend to want them to come to California to injure them for financial gain. It's barbaric.

Why did you take a chunk of my brain and take me out of a good lifestyle? I was 25, had a college education, made an exceptional financial living for someone my age, lived independently, and was the trustee for the other townhouse owners on Hollywood Way when you ripped my brain apart, signed me up for social security, and made me your client. Throwing me into the system, my prison for being brown and needing medical assistance, and calling me degenerate. I think who the degenerate is is confused.

In closing, there is no point in a fair hearing because all those people are corrupt and unethical, and fair hearings are Unconstitutional and violate Maybury vs Madison. The judges (attorneys) have a vested interest in keeping people in the system and not providing access to civil rights.  California is a communist state for the disabled, thanks to all of you.

All I wanted by bringing Kim to California and getting her pregnant was to have a family and live an everyday life. If I knew I was a victim of the North Los Angeles County Regional Center, Ruth Jenka, Dr. Bloch, etc., I would have never brought anyone else in my life. I feel so responsible when it's not my fault for wanting love. I deserved it. But I wouldn't have chosen a professional woman with a life and bright future, nor would I have ever brought a child into the world for you to brutalize. But I did not know what the Regional Center did until 2013, five years later, and I didn't realize we were prisoners and why until recently, thanks to doctors who can't live with the guilt of their crimes.

Why would I expect any of you to help my child when you did this to us so you could create an income from the pain and suffering you caused?

I am sorry if what you did to my family and I upset anyone; please don't retaliate against me. If I need to give you more body parts to sell so my child can access her rights as a natural-born American, please let me know.  Since the Regional Center turned California into WWII Germany for the disabled population, I assume the only way for me, my child, and Kim to get the same Constitutional rights as everyone else is to give you a pound of flesh to trade in for Federal Insurance fraud purposes.

Chdyplin Co

**Chris Co & Kimberly Clisbee**
**3531 Springridge Way**
**Palmdale, CA 93551**

# North Los Angeles County Regional Center

Main 818-778-1900 • Fax 818-756-6140 | 9200 Oakdale Avenue #100, Chatsworth, CA 91311 | www.nlacrc.org

## PROOF OF SERVICE BY MAIL

**RE:    Leilani Co**
**UCI:    8120420**

I am over the age of 18 and not a party to this cause. I am a resident of/or employed in the county where the mailing occurred. My business address is:

**NORTH LOS ANGELES COUNTY REGIONAL CENTER**
**9200 Oakdale Avenue, #100**
**Chatsworth, CA 91311**

NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED

**Chris Co & Kimberly Clisbee**
**3531 Springridge Way**
**Palmdale, CA 93551**

I enclosed a NOTICE OF ACTION/HEARING REQUEST by enclosing a true copy in a sealed envelope addressed to each person whose name and address is given above and deposited in the United States mail with the postage fully prepaid. I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___07/16/2024___ at Chatsworth, California
Date

_Joanna Torres_
TYPE OR PRINT NAME

_(SIGNATURE OF DECLARANT)_

CC: Client File
    Appeal File

NLACRC #370 (Rev. 01/07)

Supporting people with developmental disabilities in the San Fernando, Santa Clarita, and Antelope Valleys since 1974

State of California – Health and Human Services Agency

**Notice of Action (NOA)**

DS 1820 (Rev. 03/2023)

Department of Developmental Services
Office of Community Appeals and Resolutions

\*Required Fields

\*Date: 07/16/2024

\*What regional center is providing this NOA?

North Los Angeles County Regional Center

Unique Client Identifier (UCI), if any

8120420

**Consumer or Applicant:**

| \*First Name: | \*Last Name: | \*Date of Birth: |
|---|---|---|
| Leilani | Co | 08/26/2010 |

| \*Primary Phone number: | Secondary Phone number: | \*Email Address: |
|---|---|---|
| 6614710015 | | KIMBERLYCLISBEE@YAHOO.COM |
| Cell | Type of Phone Number | |

| \*Street Address: | Apartment number: |
|---|---|
| 3531 SPRINGRIDGE WAY | |

| \*City: | \*Zip: |
|---|---|
| PALMDALE | 93551 |

\*Is Consumer or Applicant a Medicaid Home and Community Based Services Waiver Participant (Check one)   ☐ Yes   ☒ No

**Name of Authorized Representative: (If applicable)**

| First Name: | Last Name: | Relationship to Claimant: |
|---|---|---|
| CHRIS/KIMBERLY | Co/Clisbee | Parent of a minor child |

| Primary Phone Number: | Secondary Phone Number: | Email Address: |
|---|---|---|
| 6614710015 | | KIMBERLYCLISBEE@YAHOO.COM |
| Cell | Type of Phone Number | |

**\*The Action(s) the Regional Center Proposes to Take (If more than one action is proposed, check all that apply):**

☐ Eligibility Denial
☐ Eligibility Termination
☒ Service Denial
☐ Service Reduction
☐ Service Termination

**\*Date the Proposed Action(s) will Occur:**

08/17/2024

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

**\*Proposed Action(s):**

Denial of case to be provided with case management services by a different Regional Center and termination of case management services for case to be inactivated effective 8/16/2024, due to you declining to participate in IPP with North Los Angeles County Regional Center (NLACRC).

**\*Reason for the Proposed Action(s):**

On 06/20/24, NLACRC received interoffice letter to reactivate case per request of family. On 6/27/2024 my supervisor Ms. Lopez and I called you to schedule IPP meeting. You,were not in agreement with NLACRC providing case management services to conduct IPP and requested for a different Regional Center to provide case management services. In addition, you were not in agreement to schedule and participate in an Individual Program Plan meeting at this time with NLACRC. NLACRC is unable to grant your request to provide regional center case management services out of our service area by another California Regional Center. The regional center catchment areas were determined through the passing of the Lanterman Act. Both geographic accessibility and population density were considered when selecting locations for the 21 regional centers. The catchment areas boundaries for the regional centers conform to county boundaries or a group of counties, except LA County, which is by health districts and not by county. It is determined at the state level.

**\*Facts and Laws Supporting the Proposed Action(s):**

All decisions regarding regional center supports and services are governed by the Lanterman Developmental Disabilities Services Act. Section 4646.5(a)(8) requires a   schedule of regular periodic review that objectives have been fulfilled within the times specified, and that consumers and families are satisfied with the individual program plan and its implementation.   Section 4646.5(b) further states that   For all active cases, individual program plans shall be reviewed no less often than once every three years. 4640. Title 17, 50501 (18) Service catchment area.   Service catchment area   refers to that geographical area within which a regional center provides services specified in its contract with the Department as required by Welfare and Institutions Code Section 4640. A regional center  s catchment area is   the geographical area within which a regional center provides services specified in its contract with the [State Department of Developmental Services] as required by Welfare and Institutions Code Section 4640. (Cal. Code Regs., tit. 17, § 50501, subd. (18)."the legislature considered transfers only when the consumer has relocated to another regional center's catchment area as it only mentions transfer of cases in relation to.

**Please see the following page for your choices, how to appeal this decision(s), and how to get help**

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

## YOUR CHOICES

If you agree with the proposed decision in your Notice of Action (NOA) then you do not need to do anything.

If you do not agree with the proposed decision in this NOA, you have the right to file an appeal. An appeal is a way to resolve a disagreement with your regional center. Appeal requests are sent to the Department of Developmental Services (DDS).

## HOW TO APPEAL

- You may submit the appeal request form electronically at the DDS website:
  www.dds.ca.gov/general/appeals-complaints-comments/fair-hearings-complaint-process/
- You may send the attached form by email to AppealRequest@dds.ca.gov
- You may send the attached form by mail to 1215 O Street MS 8-20, Sacramento, CA 95814
- You may send the attached form by fax to 916-654-3641

You must file your appeal request on time. There are two deadlines.

- The first deadline is for when you want to keep your current services the same during your appeal:
  - o Your request must be postmarked or received by DDS no later than 30 days from when you got your NOA and before the action takes place.
  - o Keeping your current services during an appeal is called "aid paid pending".
- The second deadline is for all other appeal requests. If your appeal request is filed 31 to 60 days from when you got your NOA, the regional center's decision will happen while your appeal continues. Appeal Requests must be postmarked or received by DDS no later than 60 days after the date you received this NOA.

## WHERE TO GET HELP

You may get help with your appeal request. People who can help you are:

- Your service coordinator or other regional center staff, if you ask them.
- Your clients' rights advocate (CRA) at:
  - o (800) 390-7032 for Northern California, or
  - o (866) 833-6712 for Southern California, or
  - o Find the clients' rights advocate at your regional center here:
    www.disabilityrightsca.org/what-we-do/programs/office-of-clients-rights-advocacy-ocra/ocra-staff-links
- The Ombudsperson Offices at (877) 658-9731 or ombudsperson@dds.ca.gov. If you are in the Self-Determination Program email sdp.ombudsperson@dds.ca.gov instead.
- You also may get help from a Family Resource Center: https://frcnca.org/get-connected/.
- Your regional center may help you find a local parent support group or community-based organization that may help you.

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

- If you live at Porterville Developmental Center, Canyon Springs, or a STAR Home, you also may get help from the State Council on Developmental Disabilities:

  - Canyon Springs, Desert STAR, South STAR (760) 770-0651
  - Porterville and Central STAR (559) 782-2431
  - Headquarters (408) 834-2458
  - scdd.ca.gov/clientsrightsadvocates/.

**The "Appeals Information Packet" is found using the QR code or link below. The packet provides additional information about the appeal process.**



www.dds.ca.gov/general/appeals-complaints-comments/infopacket.pdf

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

# EXHIBIT G

~~Exhibit 5~~

Letter from the Department of Disability Services responding to Chirs's 4731 Complaint

Chris's letter to the Department of Disability Services

The NOA we received from the North Los Angeles County Regional Center, which states that it will permanently revoke Leilani's right to DDS, violates her federal rights.

Note: Ms. Baggley from the State DDS office said this document violates Leilani's rights and is a violation of Federal law as it suggests Los Angeles County can remove an individual's constitutional rights

The last part of this Exhibit identified Ms. Joanna Torres, who wrote this report declaring the County would permanently remove DDS rights.

Upon investigation, Ms. Torres works at the Children's Center of the Antelope Valley. You will also see that Dr. Bloch is affiliated with this organization, which is funded by the Board of Supervisors and has Kathryn Barger's' photo on its website.

This confirms Dr. Bloch is harassing us through our services; otherwise, a member of the NLACRC would have filled that document out, not an individual who has nothing to do with the Regional Center but works with Dr. Bloch at a facility paid for by Kathryn Barger. Furthermore, it suggests the two of them are conspiring against our rights and committing color-of-law crimes as a team like they were in court



# North Los Angeles County Regional Center

Main 818-778-1900 | Fax 818-756-6140 | 9200 Oakdale Avenue, Suite 100, Chatsworth, CA 91311 | www.nlacrc.org

June 17, 2024

Christopher Co
3531 Springridge Way
Palmdale, CA 93551

**Re:    4731 Complaint – Leilani Co – UCI # 8120420**

Dear Mr. Co:

I am writing in response to the 4731 Complaint received by the North Los Angeles County Regional Center (hereafter, "NLACRC") on May 20, 2024 on behalf of your daughter, Leilani Co. The complaint is against NLACRC and involves your request to reactivate Leilani's case by conducting an Individual Program Plan ("IPP") in order to continue to provide her services.

## COMPLAINT

The allegations included in the 4731 Complaint are as follows:

1. NLACRC has not conducted an Individual Program Plan ("IPP") in accordance with Welfare and Institutions Code §4646.5(a)(5), in violation of Leilani's rights.

## JURISDICTION

California Welfare and Institutions Code sets forth a complaint procedure that allows a consumer, or anyone on behalf of a consumer, who believes that a right to which a consumer is entitled has been abused, punitively withheld, or improperly or unreasonably been denied by a regional center, developmental center or service provider, to file a complaint. It is important to note that this process is prohibited by law from resolving disputes concerning the nature, including quality, scope, or amount of services and supports that should be included in an individual program plan or regarding rates and audits.

## INVESTIGATION

This investigation includes information from your 4731 Complaint interviews with, Evelyn Molina (NLACRC Consumer Services Supervisor ("CSS")), Catherine Cortez ("NLACRC Consumer Services Coordinator ("CSC")), and Gabriela Eshrati (NLACRC Consumer Services Director) and a record review that includes emails and correspondences sent to you.

Mr. Christopher Co
4731 Complaint – Leilani Co
June 17, 2024
Pg. 3

**10/9/23 ID Note**
"CSS received and reviewed the response email from 10/6/2023 (CSS follow-up regarding the
NOPA dated 9/7/2023 due to inability to conduct an IPP). Mrs. Clisbee stated this CSS has no
business contacting her. Mrs. Clisbee elaborated with allegations about NLACRC and called this
CSS a Karen throughout the email."

**10/9/23 ID Note**
"CSS reviewed the case. Case inactivated due to inability to conduct an IPP. NOPA dated
9/7/2023. Parent currently has a Cease and Desist Inappropriate and Threatening Comments
letter dated 2/17/2023. Mrs. Clisbee refused to meet with the IPP team to conduct an IPP
pending a second stander to be provided for Leilanie. The First stander was provided in 2021.
Mrs. Clisbee reported the stander was donated to a therapist. The second stander was provided
in 5/2023. Mrs. Clisbee was given the option to meet in person, telephone or virtual. Mrs.
Clisbee expressed she did not wanted to meet by telephone or virtual not in person at a local
place. Mrs. Clisbee did not contact NLACRC after a 15 day no contact letter was mailed to her.
Mrs. Clisbee was provided with a NOPA dated 9/7/2023 due to inability to conduct an IPP
meeting. CSS follow-up with Mrs. Clisbee on 10/6/2023 and provided the NOPA. Mrs. Clisbee
responded 10/7/2023 stating this CSS has no business contacting her and insulted CSS
throughout the email. ..."

**10/16/23 ID Note**
"Telephone contact with mother to discuss reactivation of case, she informed she wanted to
speak with my Supervisor and did not want to speak with me. Mother was informed if she wants
to reactivate she needs to make the request. Call was transferred to Evelyn McComie."

**5/2/24 ID Note**
"Telephone contact with Xochitl Gonzalez who informed DDS spoke with mother and wants the
case reactivated in the SCO. I informed we would agree to reactivate in the SCO if the parent
and consumer met with our staff in an agreed location in SC as there is a cease and desist letter
for parent to meet with us at our NLACRC location due to prior threats and H&S for staff/office.
In addition, it was relayed that we would from inception of reactivating case do an addendum
that agreed to in-person meeting with consumer and if services are being identified/requested,
NLACRC has the right to assess for the service that could require we review reports from third
parties, i.e. IEP, medical records, award notices, service reports, etc. Ms. Gonzalez informed
they would discuss with mother and get back to me on next steps."

**APPLICABLE STATUTE/REGULATION**

Welfare and Institutions Code §4646 provides in relevant part:

> "(a) It is the intent of the Legislature to ensure that the individual program plan and
> provision of services and supports by the regional center system is centered on the
> individual and the family of the individual with developmental disabilities and takes into
> account the needs and preferences of the individual and the family, where appropriate,
> as well as promoting community integration, independent, productive, and normal lives,
> and stable and healthy environments. It is the further intent of the Legislature to ensure

Mr. Christopher Co
4731 Complaint – Leilani Co
June 17, 2024
Pg. 6

## REFERRAL TO DDS

In the event that you do not agree with NLACRC's response, you may refer this complaint to the Director of the Department of Developmental Services within 15 working days of receipt of this letter at the following address:

Nancy Bargmann, Director
Department of Developmental Services
1215 O Street, MS 8-20 Sacramento, CA 95814
(916) 651-6309
DDSACPS@dds.ca.gov

The director will issue a written administrative decision within 45 days of receiving a complaint.

Sincerely,

*Karin Ahdoot*

Karin Ahdoot
Due Process Officer

Cristina Preuss
Interim Executive Director

c:    Evelyn McOmie, Deputy Director
      Gabriela Eshrati, Consumer Services Director
      Arezo Abedi, Executive Administrative Assistant

To whom this may concern;

Upon receipt of your response to my 4731 complaints, I am confused because it did not make sense or highlight my concerns. However, someone initiated it without communicating with me or my daughter's mother, so it is unlikely to be correct based on experience. I know my provider did her due diligence, and she is efficient and good at her job; the inconsistencies are always the analysis.

You are speaking of Evelyn Molina, Gabriel Eshari, and Evalyn McOmie as if they are people who are allowed to see Leilani's records or have anything to do with her after all those individuals did to her. I love my child; I will not allow monsters who have already discriminated against and abused her to the point where she has lost school, been medically altered, and sexually assaulted. It is disgraceful that they are still employed. However, they are, and we are still in need of services for Leilani that she is entitled to by law, so obviously, Nancy is the lead Karen, and this needs to be dealt with, which has already been filed in Federal Court in Washington.

Note, I did not file anything in court; I am a victim filing a grievance, so to retaliate by changing my services would be unlawful retaliation. I have to clarify that because that is how we are accustomed to being provided support by the DDS, Mark Gahley, or any of the other Nazi regimes.

My daughter's mother is fighting the Constitutionality of the Lanterman Act and having the individuals that injured my child and me, including Kathryn Barger, Dr. Edward Bloch, Gavin Newsom, USC, CHLA, UCLA, Mark Gahley, and 33 others. I am not a plaintiff as I am incapacitated because of the surgery the Regional Center arranged and cannot represent myself in that capacity. I am cognitively away; it's just my ability to express it because of the part of my brain you took. It controls speech and communication.

Also, note I am not composing this letter. I am dictating while Kimberly Clisbee tries as I am unable to communicate in this manner without assistance thanks to the Regional Center arranging surgery for me in 2008, where they removed my temporal lobe without telling me to force me out of the middle-class where I worked as a licensed dental hygienist and licensed pharmaceutical technician. I will, however, sign it to express my validation.

Although I am documented as having never been in the system since coming here, we immediately became citizens and had the means to survive and support ourselves comfortably without government assistance of any kind. But I fit the color palette for the population that was being created to justify the need for the Regional Center and CCS to gain Federal Funding so USC, Dr. Gahley, Dr. Bloch, La County, investors, and the Director

can commit Federal Insurance fraud with the other pink-collar criminals or the "Karens of Chatsworth" as they are known by most.

These are a group of white women, mostly but not all, that run the regional center, SELPA, CCS, Department of Education, Developmental Disabilities, County employees of all kinds, doctors, attorneys, Board of Supervisors (not part of Chatsworth but the crime syndicate that exists there), and DSS from Chatsworth. They work together to oppress and systematically abuse immigrants and other marginalized citizens. They have personal prejudice towards it and choose to label it so the rest of the pack can take a bite in ways that are more horrific than imaginable. They would do well in a cartel or torturing terrorists; they did much worse to my child, and much worse happened to her by others because of these individuals.

The employees of the North Los Angeles County Regional Center bullied my daughter and her mother from day one. Although the first three years went on without a hitch, it was soon that Erika would also participate in the abuse and force Leilani into the hands of Dr. Bloch and CCS. He is responsible for her disabilities and used the Social Security Act section 1115 waiver to obtain funding for her injuries and the monsters at USC who conducted experiments on her for study purposes because she was "certifiably expendable." What the doctors did to her was admitted to in court, but Regional Center failed her by refusing to report it all the years Kim begged them. Leilani would have never been sexually assaulted or had her leg disfigured if all of the women mentioned in the complaint, including the director, had done their due diligence.

The Regional Center providers bully Kim like a bunch of female gang members. I would not let those women babysit dogs. The State affords Disability rights, not the Lancaster Regional Center, and Evelyn Mcomie does not even have the college education to justify why she is in the position she is. She is there to permit the bullying, oppress the population she is prejudiced against, and commit Federal insurance fraud; that is her job.

Nancy Bargmann, the Director, knows all about this situation and added to the abuse last year in retaliation and support of her colleague.

My complaint included all these women, including the director, for failing to do her due diligence when my daughter's mother begged for years for help. She arranged a fair hearing, which in itself is a constitutional violation because it omits real court and allows USC judges to enforce corruption. A Federal Civil case with compensation would have been the appropriate action, not more systematic abuse. Still, the Director is from here and went to Pepperdine, where other participants of this crime went. It is unlikely she is not the obstacle to Leilani's obtaining services and part of the bigger crime.

In a world unlike mine where the Regional Center, USC, and Mark Gahley don't have you as a prisoner and are withholding your rights so his colleagues can commit Federal Insurance Fraud and medically alter brown citizens, these women would be in prison as they should be. But I am the prison of the Regional Center, as you made me disabled by taking my temporal lobe and not telling me I would be a client instead of the high-functioning pharmaceutical technician I was when I came to your facility for help.

Rob Bonta and the mayor of Oakland questioned Mark Gahley in 2020 about the disproportion of Latino deaths and testing during COVID-19. So, he has a pattern of criminality. I will attach the letter, but what good will that do? You are all under him and part of this, so even writing this complaint is nonsensical; it tells the criminal about their crime, but it's part of the process and will go into Kim's Federal court documents as a filed document.

The only reason my child is disabled is that the Regional Center executives and La County doctors imprisoned my child in the system by force because they got away with hurting me. After all, the Regional Center is responsible for damaging my brain in surgery first in 2008.

You state that Evelyn tried several times to schedule an appointment. Why would Kim be making an appointment with a bunch of mean women who bullied her and refused to report sexual abuse of a disabled child? I don't want to breathe the same air as disgusting people like that. They are irresponsible thugs; they cannot oversee a child's services they have already abused for a decade.

It is not society's fault the DDS takes its employee's word over the parents, grandparents, doctors, and other providers who have filed reports of abuse; the Regional Center supports bullying of parents by their staff, racism, and Pedophilia and does not protect its clients or this situation would not be.

Just because you are okay with it does not mean it is okay, and I should subject my child to these women who would be in prison if Nancy Bargmann was not protecting them because she is part of the crime. The only people who look at Evelyn and Gabriel and see decent human beings are not one because they are not.

My daughter's mother and I have been trying to get our child the services she is entitled to by the Lanterman Act and Americans with Disability rights for years now. But the DDS will only allow my child to be with people who abuse her, which makes me fear for my

child, have no trust in the DDS, and feel like my life is over. I will have nothing but oppression for the rest of my life because the Regional Center forced me here and forced my child, and now you are oppressing us and withholding our rights.

Why? Why am I your prisoner, and why does my child not deserve the same rights as others based on you? Why couldn't you help me with my seizures and not imprison me and take my life? I did not commit a crime; I paid my taxes; the hate for immigrants is so vast that you pretend to want them to come to California to injure them for financial gain. It's barbaric.

Why did you take a chunk of my brain and take me out of a good lifestyle? I was 25, had a college education, made an exceptional financial living for someone my age, lived independently, and was the trustee for the other townhouse owners on Hollywood Way when you ripped my brain apart, signed me up for social security, and made me your client. Throwing me into the system, my prison for being brown and needing medical assistance, and calling me degenerate. I think who the degenerate is is confused.

In closing, there is no point in a fair hearing because all those people are corrupt and unethical, and fair hearings are Unconstitutional and violate Maybury vs Madison. The judges (attorneys) have a vested interest in keeping people in the system and not providing access to civil rights. California is a communist state for the disabled, thanks to all of you.

All I wanted by bringing Kim to California and getting her pregnant was to have a family and live an everyday life. If I knew I was a victim of the North Los Angeles County Regional Center, Ruth Jenka, Dr. Bloch, etc., I would have never brought anyone else in my life. I feel so responsible when it's not my fault for wanting love. I deserved it. But I wouldn't have chosen a professional woman with a life and bright future, nor would I have ever brought a child into the world for you to brutalize. But I did not know what the Regional Center did until 2013, five years later, and I didn't realize we were prisoners and why until recently, thanks to doctors who can't live with the guilt of their crimes.

Why would I expect any of you to help my child when you did this to us so you could create an income from the pain and suffering you caused?

I am sorry if what you did to my family and I upset anyone; please don't retaliate against me. If I need to give you more body parts to sell so my child can access her rights as a natural-born American, please let me know. Since the Regional Center turned California into WWII Germany for the disabled population, I assume the only way for me, my child, and Kim to get the same Constitutional rights as everyone else is to give you a pound of flesh to trade in for Federal Insurance fraud purposes.

Chdyphn Co

**Chris Co & Kimberly Clisbee**
**3531 Springridge Way**
**Palmdale, CA 93551**



# North Los Angeles County Regional Center

Main 818-778-1900 • Fax 818-756-6140 | 9200 Oakdale Avenue #100, Chatsworth, CA 91311 | www.nlacrc.org

### PROOF OF SERVICE BY MAIL

**RE:    Leilani Co**
**UCI:    8120420**

I am over the age of 18 and not a party to this cause. I am a resident of/or employed in the county where the mailing occurred. My business address is:

**NORTH LOS ANGELES COUNTY REGIONAL CENTER**
**9200 Oakdale Avenue, #100**
**Chatsworth, CA 91311**

NAME AND ADDRESS OF EACH PERSON TO WHOM NOTICE WAS MAILED

**Chris Co & Kimberly Clisbee**
**3531 Springridge Way**
**Palmdale, CA 93551**

I enclosed a NOTICE OF ACTION/HEARING REQUEST by enclosing a true copy in a sealed envelope addressed to each person whose name and address is given above and deposited in the United States mail with the postage fully prepaid. I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___07/16/2024___ at Chatsworth, California
                                Date

_Joanna Torres_                                    (SIGNATURE OF DECLARANT)
TYPE OR PRINT NAME

CC: Client File
      Appeal File

NLACRC #370 (Rev. 01/07)

*Supporting people with developmental disabilities in the San Fernando, Santa Clarita, and Antelope Valleys since 1974*

State of California – Health and Human Services Agency

**Notice of Action (NOA)**

DS 1820 (Rev. 03/2023)

Department of Developmental Services
Office of Community Appeals and Resolutions

\*Required Fields

\*Date: 07/16/2024

\*What regional center is providing this NOA?

North Los Angeles County Regional Center

Unique Client Identifier (UCI), if any

8120420

**Consumer or Applicant:**

| \*First Name: | \*Last Name: | \*Date of Birth: |
|---|---|---|
| Leilani | Co | 08/26/2010 |

| \*Primary Phone number: | Secondary Phone number: | \*Email Address: |
|---|---|---|
| 6614710015 | | KIMBERLYCLISBEE@YAHOO.COM |

| Cell | Type of Phone Number |
|---|---|

| \*Street Address: | Apartment number: |
|---|---|
| 3531 SPRINGRIDGE WAY | |

| \*City: | \*Zip: |
|---|---|
| PALMDALE | 93551 |

\*Is Consumer or Applicant a Medicaid Home and Community Based Services Waiver Participant
(Check one)  ☐ Yes   ☒ No

**Name of Authorized Representative: (If applicable)**

| First Name: | Last Name: | Relationship to Claimant: |
|---|---|---|
| CHRIS/KIMBERLY | Co/Clisbee | Parent of a minor child |

| Primary Phone Number: | Secondary Phone Number: | Email Address: |
|---|---|---|
| 6614710015 | | KIMBERLYCLISBEE@YAHOO.COM |

| Cell | Type of Phone Number |
|---|---|

**\*The Action(s) the Regional Center Proposes to Take (If more than one action is proposed, check all that apply):**

☐ Eligibility Denial
☐ Eligibility Termination
☒ Service Denial
☐ Service Reduction
☐ Service Termination

**\*Date the Proposed Action(s) will Occur:**

08/17/2024

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

Notice of Action (NOA) | DS 1820 (Rev. 03/2023) - Page 1 of 4

**\*Proposed Action(s):**

Denial of case to be provided with case management services by a different Regional Center and termination of case management services for case to be inactivated effective 8/16/2024, due to you declining to participate in IPP with North Los Angeles County Regional Center (NLACRC).

**\*Reason for the Proposed Action(s):**

On 06/20/24, NLACRC received interoffice letter to reactivate case per request of family. On 6/27/2024 my supervisor Ms. Lopez and I called you to schedule IPP meeting. You,were not in agreement with NLACRC providing case management services to conduct IPP and requested for a different Regional Center to provide case management services. In addition, you were not in agreement to schedule and participate in an Individual Program Plan meeting at this time with NLACRC. NLACRC is unable to grant your request to provide regional center case management services out of our service area by another California Regional Center. The regional center catchment areas were determined through the passing of the Lanterman Act. Both geographic accessibility and population density were considered when selecting locations for the 21 regional centers. The catchment areas boundaries for the regional centers conform to county boundaries or a group of counties, except LA County, which is by health districts and not by county. It is determined at the state level.

**\*Facts and Laws Supporting the Proposed Action(s):**

All decisions regarding regional center supports and services are governed by the Lanterman Developmental Disabilities Services Act. Section 4646.5(a)(8) requires a   schedule of regular periodic review that objectives have been fulfilled within the times specified, and that consumers and families are satisfied with the individual program plan and its implementation.   Section 4646.5(b) further states that   For all active cases, individual program plans shall be reviewed no less often than once every three years. 4640. Title 17, 50501 (18) Service catchment area.   Service catchment area   refers to that geographical area within which a regional center provides services specified in its contract with the Department as required by Welfare and Institutions Code Section 4640. A regional center   s catchment area is   the geographical area within which a regional center provides services specified in its contract with the [State Department of Developmental Services] as required by Welfare and Institutions Code Section 4640. (Cal. Code Regs., tit. 17, § 50501, subd. (18)."the legislature considered transfers only when the consumer has relocated to another regional center's catchment area as it only mentions transfer of cases in relation to.

Please see the following page for your choices, how to appeal this decision(s), and how to get help

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

## YOUR CHOICES

If you agree with the proposed decision in your Notice of Action (NOA) then you do not need to do anything.

If you do not agree with the proposed decision in this NOA, you have the right to file an appeal. An appeal is a way to resolve a disagreement with your regional center. Appeal requests are sent to the Department of Developmental Services (DDS).

## HOW TO APPEAL

- You may submit the appeal request form electronically at the DDS website: www.dds.ca.gov/general/appeals-complaints-comments/fair-hearings-complaint-process/
- You may send the attached form by email to AppealRequest@dds.ca.gov
- You may send the attached form by mail to 1215 O Street MS 8-20, Sacramento, CA 95814
- You may send the attached form by fax to 916-654-3641

You must file your appeal request on time. There are two deadlines.

- The first deadline is for when you want to keep your current services the same during your appeal:
  - o Your request must be postmarked or received by DDS no later than 30 days from when you got your NOA and before the action takes place.
  - o Keeping your current services during an appeal is called "aid paid pending".
- The second deadline is for all other appeal requests. If your appeal request is filed 31 to 60 days from when you got your NOA, the regional center's decision will happen while your appeal continues. Appeal Requests must be postmarked or received by DDS no later than 60 days after the date you received this NOA.

## WHERE TO GET HELP

You may get help with your appeal request. People who can help you are:

- Your service coordinator or other regional center staff, if you ask them.
- Your clients' rights advocate (CRA) at:
  - o (800) 390-7032 for Northern California, or
  - o (866) 833-6712 for Southern California, or
  - o Find the clients' rights advocate at your regional center here: www.disabilityrightsca.org/what-we-do/programs/office-of-clients-rights-advocacy-ocra/ocra-staff-links
- The Ombudsperson Offices at (877) 658-9731 or ombudsperson@dds.ca.gov. If you are in the Self-Determination Program email sdp.ombudsperson@dds.ca.gov instead.
- You also may get help from a Family Resource Center: https://frcnca.org/get-connected/.
- Your regional center may help you find a local parent support group or community-based organization that may help you.

---

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

- If you live at Porterville Developmental Center, Canyon Springs, or a STAR Home, you also may get help from the State Council on Developmental Disabilities:

  - Canyon Springs, Desert STAR, South STAR (760) 770-0651
  - Porterville and Central STAR (559) 782-2431
  - Headquarters (408) 834-2458
  - scdd.ca.gov/clientsrightsadvocates/.

**The "Appeals Information Packet" is found using the QR code or link below. The packet provides additional information about the appeal process.**



www.dds.ca.gov/general/appeals-complaints-comments/infopacket.pdf

**Confidential Client Information, California Welfare and Institutions Code Sections 4514 and 5328, Health Insurance Portability and Accountability Act.**

Your privacy is important to us. Manage your privacy choices.





# Joanna Torres, BA

**Public Health Professional**

Claim your profile

## At a glance



**Affiliated with The Children'S Center Of The Antelope Valley**
and The Childrens Center of the Antelope Valley

At a glance        Locations        Background

## More about Joanna Torres, BA

Joanna Torres, BA is a Public Health Professional. They are affiliated with The Children'S Center Of The Antelope Valley and The Childrens Center of the Antelope Valley.

### Education & experience

**Affiliation**
The Children'S Center Of The Antelope Valley

The Childrens Center of the Antelope Valley

### Background

**Gender**
Female

**NPI number**


**brave**

{ }

children's center of the antelope valley dr edward bloch    Q

Q All    ⊠ Images    📰 News    🎞 Videos    ᵇᵈ Goggles    ⇅

Showing results for    **Palmdale, CA, US**  ⁞    Revert to global

# The Children's Center of the Antelope Valley

**The Children's Center of the Antelope Valley**

Located in Lancaster, California, this center provides community services and non-profit programs focused on promoting whole-person health and a healthier community. Dr. Edward Bloch is likely an affiliated professional or a key figure in the center's operations.

**Services and Programs**

- Holistic healing approaches
- Whole-person health initiatives
- Community reentry programs, such as the DOORS (Developing Opportunities and Offering Reentry Solutions) center, in partnership with the Justice, Care, and Opportunities Department (JCOD)

**Mission**

To promote healing of the whole person and a healthier community, as stated on their Facebook page.

Note: The provided information does not include specific details about Dr. Edward Bloch's role or expertise, but it suggests his involvement with the center's mission and programs.

AI-generated answer. Please verify critical facts.

Show less ⌃

Feedback

**Contc**

451

htt

jcar

+16

Lacounty
locator.lacounty.gov › health › Location › 3181218 › childrens-center-of-antelope-v...

CHILDREN'S CENTER OF ANTELOPE VALLEY

Welcome to The Children's Center of the Antelope Valley! (661) 945-5908



**Donate**



Home About Us Services Ways to Give News and Events Contact Privacy

# ANNUAL REPORT

## *Fiscal Responsibility:*

*The Board of Directors is constantly looking ahead to ensure the programs and services being provided to the community align with the mission and vision that will ultimately bring a positive impact in the lives of the families we serve. CCAV has been a continuous recipient of funding from the County of Los Angeles, which has resulted in long-term grants from the county departments of mental health, public health, and child and family services - ultimately establishing multi-year Master Agreements. Our sponsors and donors are both advocates and champions for sharing the same passion for the mission - that every 95 cents of a dollar goes directly to services supporting the health and wellness of our local children.*

**Read about our Fiscal year 2022 - 2023 Audited Financial Report.**



Platinum
Transparency
2024

Candid.



KAthryn DArger

Platinum
Transparency
2024

Candid.

# Program Highlight



WEDO Reentry Program Supports Adults & Families After Incar...

# CONTACT US

# VISIT US

# TELL US

Tel at 1-888-7441
Fax at 700-1453
15111 Penn Avenue
Lancaster, CA 93534

Call our office today for a
personal tour of our facility

Hours of Operation:
Monday – Friday 8:00a - 5:00p

| Name * | Message |
|--------|---------|
| Email * | |
| Subject | |

# THE CHILDREN'S CENTER
# OF THE ANTELOPE VALLEY



Center
e Valley

*Our Mission at The Children's Center of the Antelope Valley is
"To promote healing of the whole person and a healthier community by
providing care and services to empower children, individuals, and families to
overcome life's difficulties."*

# OUR WORK

## STRONG
## BODIES
## STRONG
## MINDS

- **Whole-Person Health**
  - ○
  - ○

## WE DO

- **Wraparound Support, Mentorship & Resources for:**
  - ○
  - ○

## BE KIND
## TO YOUR
## MIND

- **Individual Therapy**

- **Group Counseling**

Exhibit 5

Proof Mark Ghaley was in charge of the programs that injured Chris and Leilani and is a colleague of Dr. Bloch

The website Dr. Bloch was selling the Federally funded CCS program for profit



Community Health and Integrated Programs for the Los Angeles ✕ Q

Q All ⊠ Images ▤ News ▦ Videos ◠◠ Goggles ⇄

# Community health and integrated programs for the los angeles county ccs

Based on the provided information, the following programs and initiatives focus on community health and integration in Los Angeles County:

1. **Health Innovation Community Partnership (HICP):** A partnership created by the Los Angeles County Board of Supervisors to promote health, wellness, and economic well-being in eastside communities. HICP aims to establish a thriving health innovation district around the LAC+USC Medical Center and USC Health Sciences Campus.
   - Location: 1200 North State Street, 90033, Los Angeles
   - Contact: (213) 221-2723
2. **Los Angeles County Department of Public Health - Children's Medical Services - San Gabriel Valley Consortium On Homelessness:** This agency administers state health services for children with special healthcare needs and disabilities. It provides funding for diagnostic and treatment services, including California Children's Services (CCS) program.
3. **Los Angeles Alliance for Community Health and Aging (LAACHA):** Offers evidence-based health programs to promote healthy aging and wellness. Participants can register online or contact local program coordinators for more information.
4. **California Children's Services (CCS):** A statewide program that assists children with serious medical conditions, including chronic illnesses, traumatic injuries, and severe infectious diseases. CCS provides diagnostic and treatment services, medical case management, and rehabilitative therapy.

These programs demonstrate the county's commitment to community health and integration, focusing on:

- Promoting health equity and wellness in underserved communities (HICP)



 About

Board

Programs

Stakeholders

Agents

Solicitations

Grants

Resources

Careers

Southeast Health Center, a public health clinic located in the Bayview Hunters Point community. In addition to having a large primary care pediatrics practice, Dr. Ghaly led the clinic's transition to the patient-centered medical home model of care, expanded specialty care and diagnostics services, and addressed issues such as teen health, youth violence, food security, and environmental health issues.

In 2011, Dr. Ghaly became the Deputy Director for Community Health and Integrated Programs for the Los Angeles County Department of Health Services. In this role, Dr. Ghaly directed clinical operations in the Los Angeles County Juvenile Detention system and led the transition of jail health services from the Los Angeles County Sheriff and the Los Angeles County Department of Mental Health into one integrated system of care. Dr. Ghaly also led a County team to expand health and behavioral health services on the Martin Luther King, Jr., health campus in South Los Angeles, which included the opening of the public-private Martin Luther King, Jr., Community Hospital. Additionally, Dr. Ghaly was the architect of the Los Angeles County Whole Person Care Pilot program, oversaw the launch of the Drug Medi-Cal Organized Delivery System in Los Angeles County, and established the County's Office of Diversion and Reentry which has diverted over 3,000 individuals out of County jail and into community-based treatment and

accomplishments was the creation and continued development of the County's Housing for Health program. Since 2012, Housing for Health has supported over 6,500 chronically ill individuals facing homelessness, many of whom are stuck in acute care facilities, to gain permanent supportive housing through federal subsidies and LA County's Flexible Housing Subsidy Pool

Mark's prior clinical work within Los Angeles County also included seeing patients at the Los Angeles County Juvenile Detention System and the Martin Luther King Jr. Outpatient Center Medical Hub that serves children and youth in the Los Angeles Child Welfare System.

Dr. Ghaly was born and raised in Minneapolis, Minnesota. He earned duel B.A. degrees in biology and biomedical ethics from Brown University, his M.D. degree from Harvard Medical School, and his M.P.H. from the Harvard School of Public Health. Dr. Ghaly completed his residency training in Pediatrics at the University of California, San Francisco. Dr. Ghaly is married to Christina Ghaly and has four young children

Dr. Ghaly is honored to serve Governor Gavin Newsom and looks forward to forging partnerships and relationships across California to make the Governor's vision a reality for the benefit of all Californians.

## The Board

- Dr. Mark Ghaly – Board Chair
- Jarrett Tomás Barrios
- Jerry Fleming
- Kate Kendell
- Mayra Alvarez

## Resources

- Agendas, Materials & Webcasts

Back to Top

Accessibility

Register to Vote



Privacy Policy

Contact

Copyright © 2024 Covered California


**WIKIPEDIA**
The Free Encyclopedia

# California Health and Human Services Agency

The **California Health and Human Services Agency (CHHS)** is the state agency tasked with administration and oversight of "state and federal programs for health care, social services, public assistance and rehabilitation" in the U.S. state of California. The agency is headed by the Secretary of the California Health and Human Services Agency, with headquarters in Sacramento.[1] Many of the laws in the California Health and Safety Codes are enforced by it.

On March 6, 2019, Governor Gavin Newsom nominated Mark Ghaly to be Secretary of CHHS.[2] The California State Senate unanimously confirmed Ghaly on June 17, 2019.[3] Ghaly previously served as the director of health and social impact for Los Angeles County, deputy director of the Los Angeles County Department of Health Services, and medical director of the San Francisco Department of Public Health's Southeast Health Center. Ghaly earned his doctorate of medicine degree from Harvard Medical School and a master of public health degree from the Harvard T.H. Chan School of Public Health.[2]

CHHS was created from a reorganization of other California agencies, including the California Health and Welfare Agency which included the California Department of Health Services.

## California Health and Human Services Agency

**CHHS**
California Health & Human Services Agency

| Agency overview | |
|---|---|
| **Jurisdiction** | California |
| **Headquarters** | 1600 Ninth Street Sacramento, CA 95814 38.57384°N 121.49800°W |
| **Employees** | 33,000 |
| **Annual budget** | US$ 88.2 billion (2011) |
| **Agency executive** | Mark Ghaly, Secretary |
| **Website** | chhs.ca.gov (http s://www.chhs.ca.go v) |

## Organization

The agency is divided into various departments and boards:[4]

- California Department of Aging
- California Department of Child Support Services
- California Department of Community Services and Development
- California Department of Developmental Services
- California Emergency Medical Services Authority
- California Department of Health Care Services
- California Department of Managed Health Care
- California Managed Risk Medical Insurance Board
- California Department of Public Health
- California Department of Rehabilitation
- California Department of Social Services

# CalHHS Secretary Dr. Mark Ghaly Stakeholder Committee to Create Master Plan for Developmental Services

English

Blog, Featured

**What You Need to Know**: Today's appointment of a Stakeholder Committee underscores that California is doubling down on the promise of the Lanterman Developmental Disabilities Services Act by modernizing the developmental services system to better serve the needs of Californians with intellectual and developmental disabilities—moving forward the goal of a person-centered, equity-focused, and data-driven system.

**SACRAMENTO** – California Health and Human Services Agency (CalHHS) Secretary Dr. Mark Ghaly today announced the establishment of a Master Plan for Developmental Services **Stakeholder Committee**. The Committee will be tasked with working with CalHHS and its departments to **develop a Master Plan for Developmental Services to be released by March 2025**. The Master Plan is designed to serve as California's collective roadmap to marshal the public and private resources of the entire developmental services system, as well as other systems and sectors, to deliver meaningful and concrete results.

*"The reality is that the developmental services system cannot, nor should it, operate in isolation given the changing needs of the consumers and families we serve today."* **said CalHHS Secretary Dr. Mark Ghaly**. *"This means we must proactively think about how we connect the dots between systems and sectors, while more intentionally integrating developmental services to our work to serve the whole needs of the individual and their families.*

**WHY CREATE A MASTER PLAN:** Over the last few years, in partnership with the Legislature, the Newsom Administrations has made historic investments to increase rates within the developmental services system. The Master Plan will leverage these investments to strengthen accessibility, quality, and equity for all consumers. In recognition that California's developmental disabilities system is deeply connected to other health and social systems, the Master Plan will seek to create and strengthen bridges that connect the developmental services system to other critical systems across CalHHS, and other systems and services including education, housing, employment, transportation, and safety.

**WHY THIS MATTERS TO CALIFORNIANS:** Since 2019, the number of Californians served by the developmental services system has grown by 31%, with significant growth among children under the age of 22 who have an Autism diagnosis. Today, over 400,000 Californians receive services and supports through California's 21 Regional Centers. Individuals who receive services today are more diverse and live longer. They face affordable housing shortages, lower rates of employment, and the challenges of accessing services from other systems and sectors to address their physical, social, and behavioral health needs. A 21st century developmental services system must increase its ability to provide culturally responsive services and to

strengthen the accountability and standardization of the system so that it is easi ▇ English families to navigate no matter where they live in California.

*"Our work together will build on the promise of the Lanterman Act, our current efforts and investments and new thinking from the diverse communities served by our Regional Centers,"* said **California Department of Developmental Services (DDS) Director Nancy Bargmann.** *"Our goal is to realize a 21st century developmental services system which is more person-centered, and based on quality, outcomes, and cultural competence."*

**ABOUT THE COMMITTEE:** The Stakeholder Committee consists of a diverse group of individuals who bring varying backgrounds and experiences to help build the Master Plan. The members of the Committee have been appointed by the CalHHS Secretary for a one-year term with the intent that they collectively deliver a Master Plan by March of 2025. In addition to the Stakeholder Committee, there will be topical subcommittees formed to bring together additional subject matter experts, community partners, individuals with intellectual and developmental disabilities, and family members. These subcommittees will help shape the components of the Master Plan and provide opportunities for deeper and wider engagement.

**WHAT COMES NEXT:** In the weeks to come, CalHHS along with the DDS, will launch a public engagement campaign to engage individuals with intellectual and developmental disabilities, families, and system partners in the communities and neighborhoods across the state to better understand their hopes and dreams for a 21st century developmental services system. This Master Plan will not be developed in a vacuum in Sacramento, instead, it will look to meet people where they are to collectively learn about their lived experiences and use that to help shape the future of this system—a system that looks to provide culturally responsive services which meet the diverse needs of individuals with intellectual and developmental disabilities and their families. Most importantly, this process will be public and open to all Californians to engage in and participate in, our collective voices will only make this stronger.

**BIGGER PICTURE:** Over the last decade, California has closed all the Developmental Centers with the goal of integrating individuals with intellectual and developmental disabilities in communities and outside of institutional settings. Moreover, California is the only state in the nation that provides developmental services and supports as an entitlement with an intentional focus on home and community-based services. This contrasts with other states where individuals with intellectual and developmental disabilities are on a wait list for services and are capped on what types of services they may receive.

###

← Previous Post                                                                                        Next Post →

# Federal Civil Rights Statutes

## Title 18, U.S.C., Section 249 - Matthew Shepard and James Byrd, Jr., Hate Crimes Prevention Act

This statute makes it unlawful to willfully cause bodily injury—or attempting to do so with fire, firearm, or other dangerous weapon—when 1) the crime was committed because of the actual or perceived race, color, religion, national origin of any person, or 2) the crime was committed because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person and the crime affected interstate or foreign commerce or occurred within federal special maritime and territorial jurisdiction.

The law also provides funding and technical assistance to state, local, and tribal jurisdictions to help them to more effectively investigate, prosecute, and prevent hate crimes.

The law provides for a maximum 10-year prison term, unless death (or attempts to kill) results from the offense, or unless the offense includes kidnapping or attempted kidnapping, or aggravated sexual abuse or attempted aggravated sexual abuse. For offenses not resulting in death, there is a seven-year statute of limitations. For offenses resulting in death, there is no statute of limitations.

## Title 18, U.S.C., Section 241 - Conspiracy Against Rights

This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).

It further makes it unlawful for two or more persons to go in disguise on the highway or on the premises of another with the intent to prevent or hinder his/her free exercise or enjoyment of any rights so secured.

Punishment varies from a fine or imprisonment of up to ten years, or both; and if death results, or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title or imprisoned for any term of years, or for life, or may be sentenced to death.

## Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law

This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the U.S.

This law further prohibits a person acting under color of law, statute, ordinance, regulation or custom to willfully subject or cause to be subjected any person to different punishments, pains, or penalties, than those prescribed for punishment of citizens on account of such person being an alien or by reason of his/her color or race.

Acts under "color of any law" include acts not only done by federal, state, or local officials within the bounds or limits of their lawful authority, but also acts done without and beyond the bounds of their lawful authority; provided that, in order for unlawful acts of any official to be done under "color of any law," the unlawful acts must be done while such official is purporting or pretending to act in the performance of his/her official duties. This definition includes, in addition to law enforcement officials, individuals such as Mayors, Council persons, Judges, Nursing Home Proprietors, Security Guards, etc., persons who are bound by laws, statutes ordinances, or customs.

Punishment varies from a fine or imprisonment of up to one year, or both, and if bodily injury results or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined or imprisoned up to ten years or both, and if death results, or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.

## Title 18, U.S.C., Section 245 - Federally Protected Activities

1) This statute prohibits willful injury, intimidation, or interference, or attempt to do so, by force or threat of force of any person or class of persons because of their activity as:

a. A voter, or person qualifying to vote....;

b. a participant in any benefit, service, privilege, program, facility, or activity provided or administered by the United States;

c. an applicant for federal employment or an employee by the federal government;

d. a juror or prospective juror in federal court; and

e. a participant in any program or activity receiving Federal financial assistance.

2) Prohibits willful injury, intimidation, or interference or attempt to do so, by force or threat of force of any person because of race, color, religion, or national origin and because of his/her activity as:

a. A student or applicant for admission to any public school or public college;

b. a participant in any benefit, service, privilege, program, facility, or activity provided or administered by a state or local government;

c. an applicant for private or state employment, private or state employee; a member or applicant for membership in any labor organization or hiring hall; or an applicant for employment through any employment agency, labor organization or hiring hall;

d. a juror or prospective juror in state court;

e. a traveler or user of any facility of interstate commerce or common carrier; or

f. a patron of any public accommodation, including hotels, motels, restaurants, lunchrooms, bars, gas stations, theaters...or any other establishment which serves the public and which is principally engaged in selling food or beverages for consumption on the premises.

3) Prohibits interference by force or threat of force against any person because he/she is or has been, or in order to intimidate such person or any other person or class of persons from participating or affording others the opportunity or protection to so participate, or lawfully aiding or encouraging other persons to participate in any of the benefits or activities listed in items (1) and (2), above without discrimination as to race, color, religion, or national origin.

Punishment varies from a fine or imprisonment of up to one year, or both, and if bodily injury results or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined or imprisoned up to ten years or both, and if death results or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be subject to imprisonment for any term of years or for life or may be sentenced to death.

## Title 18, U.S.C., Section 247 - Church Arson Prevention Act of 1996

Prohibits (1) intentional defacement, damage, or destruction of any religious real property, because of the religious, racial, or ethnic characteristics of that property, or (2) intentional obstruction by force or threat of force, or attempts to obstruct any person in the enjoyment of that person's free exercise of religious beliefs. If the intent of the crime is motivated for reasons of religious animosity, it must be proven that the religious real property has a sufficient connection with interstate or foreign commerce. However, if the intent of the crime is racially motivated, there is no requirement to satisfy the interstate or foreign commerce clause.

Punishment varies from one year imprisonment and a fine or both, and if bodily injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this section, and the violation is by means of fire or an explosive, a fine under this title or imprisonment of not more than forty years or both; or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined in accordance with this title and imprisonment for up to twenty years, or both, and if death results or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined in accordance with this title and imprisoned for any term of years or for life, or both, or may be sentenced to death.

## Title 18, U.S.C., Section 248 - Freedom of Access to Clinic Entrances (FACE) Act

This statute prohibits (1) the use of force or threat of force or physical obstruction, to intentionally injure, intimidate or interfere with or attempt to injure, intimidate or interfere with any person or any class of persons from obtaining or providing reproductive health services; (2) the use of force or threat of force or physical obstruction to intentionally injure, intimidate, or interfere with or attempt to injure, intimidate, or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious



USPS logo — **UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL®**

■ Expected delivery date specified for
■ Domestic shipments include $100 o
■ USPS Tracking® service included for
■ Limited international insurance.**
■ When used internationally, a custom

*Insurance does not cover certain items. For de
exclusions see the Domestic Mail Manual at htt
** See International Mail Manual at http://pe.usp
limitations of coverage.

**MEDIUM FLAT RAT**
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

**TRACKED ■ INSU**

PS00011000001

FRB2 July 2022
ID: 11.875 x 3.375 x 13.625
OD: 12 x 3.5 x 14.125
ODCUFT: 0.343

US POSTAGE PAID
$19.30
Origin: 93550
10/07/24
0567980550-02
Retail

**PRIORITY MAIL®**

EXPECTED DELIVERY DAY: 10/09/24

3 Lb 8.30 Oz
RDC 03

C032

SHIP
TO:
STE 134
255 E TEMPLE ST
LOS ANGELES CA 90012-3309

USPS TRACKING® #

9505 5152 8422 4281 3157 23

**PRIORITY MAIL**
**MEDIUM FLAT RATE**
**POSTAGE REQUIRED**

FROM:  Kim Clisbee
3531 Springer Rose Way
Primary, CA 93561

001344
000344
TO:  Nathan Clerk
Central District of California
United States District Court
Los Angeles, CA 90012
255 Temple St. Suite TS 134

RECEIVED
CLERK, U.S. DISTRICT COURT
OCT - 8 2024
CENTRAL DISTRICT OF CALIFORNIA
BY                      DEPUTY

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

Priority Mail® postage required

Thank you for using Priority Mail® Service